1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  DARREN J. ROBBINS (168593)
   655 West Broadway, Suite 1900
3  San Diego, CA  92101
   Telephone:  619/231-1058
4  619/231-7423 (fax)
   darrenr@rgrdlaw.com
5       – and –
   SAMUEL H. RUDMAN
6  MARY K. BLASY(211262)
   58 South Service Road, Suite 200
7  Melville, NY  11747
   Telephone:  631/367-7100
8  631/367-1173 (fax)
   srudman@rgrdlaw.com
9  mblasy@rgrdlaw.com

10  Attorneys for Plaintiff

11  [Additional counsel appear on signature page.]

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                  SOUTHERN DIVISION

15  DANIEL TUROCY, Individually and      )  Case No. 8:15-cv-01343
    on Behalf of All Others Similarly    )
16  Situated,                            )  CLASS ACTION
                                         )
17                          Plaintiff,   )  COMPLAINT FOR VIOLATIONS OF
                                         )  THE FEDERAL SECURITIES LAWS
18       vs.                             )
                                         )
19  EL POLLO LOCO HOLDINGS, INC.,        )
    STEPHEN J. SATHER, LAURANCE          )
20  ROBERTS, EDWARD J. VALLE,            )
    TRIMARAN POLLO PARTNERS,             )
21  L.L.C., TRIMARAN CAPITAL             )
    PARTNERS and FREEMAN SPOGLI          )
22  & CO.,                               )
                                         )
23                          Defendants.  )  DEMAND FOR JURY TRIAL
                                         )
24  ─────────────────────────────────────)

25

26

27

28

Plaintiff Daniel Turocy, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by El Pollo Loco Holdings, Inc. ("El Pollo Loco" or the "Company"), as well as media and analyst reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of the common stock of El Pollo Loco between May 15, 2015 and August 13, 2015, inclusive (the "Class Period") seeking remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants include El Pollo Loco, certain of its senior executives and directors, and its controlling shareholders (collectively, "Defendants").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to §27 of the Exchange Act.  A substantial portion of the acts and transactions giving rise to the violations of law complained of occurred in this District.

## THE PARTIES

4.     Plaintiff Daniel Turocy purchased El Pollo Loco common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

- 1 -

5.    Defendant El Pollo Loco, headquartered in Costa Mesa, California, through its subsidiary, El Pollo Loco, Inc., develops, franchises, licenses, and operates quick-service restaurants under the El Pollo Loco name in the United States.

6.    Defendant Stephen J. Sather ("Sather") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of El Pollo Loco, and a member of its Board of Directors.

7.    Defendant Laurance Roberts ("Roberts") is, and was at all relevant times, the Chief Financial Officer ("CFO") of El Pollo Loco.

8.    Defendant Edward J. Valle ("Valle") is, and was at all relevant times, the Chief Marketing Officer of El Pollo Loco.

9.    Defendants Sather, Roberts and Valle are sometimes referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants ran El Pollo Loco as "hands-on" managers overseeing El Pollo Loco's operations and finances and made the material false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of El Pollo Loco's financial and business operations, as they received daily reports and had access to computerized information regarding sales, costs and expenses, product demand, inventory management and customer incentives. They were also intimately involved in deciding which disclosures would be made by El Pollo Loco. Indeed the Individual Defendants made various public statements for El Pollo Loco during the Class Period, and participated in all Class Period investor conferences. The Individual Defendants also signed El Pollo Loco's filings with the SEC during the Class Period.

10.   Defendant Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo") was incorporated in 2005 and is based in Irvine, California. Defendant Trimaran Pollo is owned by defendant Trimaran Capital Partners ("Trimaran Capital"), a private asset management firm headquartered in New York, New York, and defendant Freeman Spogli & Co. ("Freeman Spogli"), a private equity firm based in Los Angeles,

1  California.  Trimaran Pollo, Trimaran Capital and Freeman Spogli are collectively
2  referred to herein as the "Controlling Shareholder Defendants."

### BACKGROUND TO THE CLASS PERIOD

4       11.     El Pollo Loco was founded in 1980.  El Pollo Loco is Spanish for "The
5  Crazy Chicken."  The Company opened its first location on Alvarado Street in Los
6  Angeles, California, in 1980, and has since grown its restaurant system to 415
7  restaurants, comprising 172 company-operated and 243 franchised restaurants as of
8  December 31, 2014.  Its restaurants are located in California, Arizona, Nevada, Texas,
9  and Utah, with the typical restaurant being a free-standing building with drive-thru
10 service.

11      12.     In 2005, the Controlling Shareholder Defendants acquired the Company
12 and took its shares private.

13      13.     In July 2014, the Controlling Shareholder Defendants took the Company
14 public in an underwritten initial public stock offering ("IPO"), selling approximately
15 8.2 million shares of El Pollo Loco common stock at $15 per share and raising more
16 than $123 million in gross proceeds.

17      14.     Pursuant to a stockholders' agreement between El Pollo Loco and the
18 Controlling Shareholder Defendants, following its IPO, El Pollo Loco remained a
19 subsidiary of Trimaran Pollo and, with the Controlling Shareholder Defendants
20 continuing to collectively own more than 70% of El Pollo Loco's equity, Trimaran
21 Capital maintained the power to select the members of its Board.  The Chairman of El
22 Pollo Loco's Board of Directors, Michael G. Maselli, is a managing director of
23 Trimaran Fund Management, L.L.C.  Another El Pollo Loco director, Dean C. Kehler,
24 co-founded Trimaran, and remains one of its managing partners.  A third El Pollo
25 Loco director, Wesley W. Barton, is a vice president of Trimaran.  Following the IPO,
26 "Trimaran and Freeman Spogli [would] indirectly beneficially own shares sufficient
27 for majority votes over all matters requiring stockholder votes, including: . . .
28 decisions affecting [its] capital structure," and "Trimaran and Freeman Spogli [could]

seek to cause [the Company] to take courses of action that . . . might involve risks to [its] other stockholders or adversely affect us or [its] other stockholders . . . ." By the beginning of the Class Period, the Controlling Shareholder Defendants still collectively owned approximately 60% of the Company's outstanding common stock.

15.     During the second half of 2014, El Pollo Loco was impacted by steeply rising labor costs in California.  On July 1, 2014, the State of California raised its minimum wage 12.5%, from $8 to $9 per hour, and the State's minimum wage is scheduled to again increase an additional 11.1%, to $10 per hour, effective January 1, 2016.  El Pollo Loco's Los Angeles area restaurants alone generated, in the aggregate, approximately 80% of its revenues in fiscal years 2013 and 2014.

16.     In an attempt to mitigate the effects of rising labor costs, the Company sought to increase prices by removing its $5 value menu from its menu boards in February of 2015, and during the first and second quarters of 2015, expanded its previously largely chicken-based product offerings to include higher priced shrimp and steak offerings.  However, shrimp and steak also cost considerably more than chicken, increasing the Company's costs during the first half of 2015.  Meanwhile, the removal of the $5 value menu from the Company's menu boards drove away value-conscious customers.  As a result, in early 2015 the Company began experiencing decreased store traffic.

17.     During the Class Period, Defendants concealed the deleterious impact this was having on the Company's comparable store sales growth and issued a series of materially false and misleading statements as detailed herein.  As a result of these false statements, El Pollo Loco stock continued trading at artificially inflated prices during the Class Period, allowing the Controlling Shareholder Defendants, the CEO and others to cash-out by selling tens of millions of dollars of their personally held El Pollo Loco shares at fraud-inflated prices without the unwanted scrutiny that another underwritten public stock offering would have entailed.

## MATERIALLY FALSE AND MISLEADING
## CLASS PERIOD STATEMENTS

18. The Class Period starts on May 15, 2015. El Pollo Loco issued a release announcing its first quarter 2015 financial results for the three-month period ended April 1, 2015 following the close of trading on the evening of May 14, 2015. The Company reported that its total revenue had increased 11.1% to $90.4 million in the first quarter of 2015, compared to $81.4 million reported in the first quarter of 2014, emphasizing that that revenue increase was driven by "[s]ystem-wide comparable restaurant sales [having grown] 5.1%, including a 3.5% increase for company-operated restaurants, and a 6.2% increase for franchised restaurants." The release quoted defendant Sather as stating in pertinent part that the Company's "first quarter results, . . . once again demonstrate[d] strong operating momentum through solid sales and earnings growth," and that El Pollo Loco's "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to resonate with guests, as evidenced by [its] system-wide comparable restaurant sales growth of 5.1%," which he emphasized "extended [the Company's] track record to 15 consecutive quarters of positive comparable restaurant sales growth." As to the Company's "2015 Outlook," the release stated in pertinent part that El Pollo Loco was still on track to report "*[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%*" in the second quarter of 2015.

19. During the conference call that followed the release later in the afternoon on May 14, 2015, Defendants made further positive statements about the Company's purportedly strong ongoing comparable store sales trends and ability to meet its second quarter 2015 guidance, with defendant Sather stating in his opening remarks in pertinent part:

> Our results were driven by a solid combination of comparable sales growth and new unit growth as we continued our acceleration of new unit development in existing and new markets.

- 5 -

For the first quarter, we saw a 5.1% increase in system-wide comparable sales growth that consisted of a 3.5% increase for company-operated restaurants and a 6.2% increase for franchised restaurants. ***The increase in comparable sales growth marked our 15th consecutive quarter of positive same-store sales*** and came on top of a 7.2% growth last year for a strong two-year growth rate of 12.3%. We also added 17 units consisting of 12 new company-owned restaurants and 5 new franchised El Pollo Loco restaurants opened during and subsequent to the first quarter of last year.

***We believe our comp growth is continued evidence of the appeal of our brand driven by our fresh, hand-crafted Mexican-inspired cuisine, compelling value proposition and fast service***. Our menu allows us the flexibility to create new ***and unique menu items to complement our signature fire-grilled chicken and provide our customers with even more choices at a great value***.

During the first quarter we featured Baja Shrimp and Tostadas, both are proven winners with our customers. In line with our longer-term menu strategy, shrimp is being offered across our menu throughout the end of May and continues to perform very well.

In order to further test our multi-protein strategy, we are currently promoting carne asada on top of our shrimp offering. Our Carne Asada is made from fresh USDA beef seasoned with the traditional marinate of citrus, salt and pepper to add flavor, and tenderize the meat. It is then fire-grilled, hand-chopped for our five delicious carne asada entrée items; the Burrito, the Tostada, a Taco, Quesadilla, and a Wet Burrito each offering a fresh take on an El Pollo Loco menu classic.

Similar to shrimp, we currently plan to include carne asada on our menu for multiple modules. While the carne asada promotion and

underlay represents an incremental food cost investment, it represents the first time we showcased three different proteins on our menu at the same time. While we are still in an extended test in assessing the overall impact on the menu and mix, *we are optimistic about what we believe to be a long-term opportunity to expand our menu*, including the potential to include shrimp and/or carne asada as full-time menu items.

20.    During his opening remarks, defendant Roberts too lauded the Company's purportedly ongoing strong comparable store sales growth, blaming the timing of the New Year's holiday for the relatively light increase in store traffic experienced during the quarter, stating in pertinent part as follows:

For the first quarter ended April 1, 2015, total revenue increased 11.1% to $90.4 million from $81.4 million in the first quarter of 2014. *The increase in revenue was largely a result of the increase in company-owned restaurant sales*, which rose 11.2% in the first quarter to $84.7 million. Our company-owned sales growth in the first quarter resulted from the contribution of 12 new company-owned restaurants opened during and subsequent to the first quarter of 2014 *combined with a 3.5% increase in comparable restaurant sales*.

The comparable restaurant sales growth was comprised of a 3.4% increase in average check and a 0.1% increase in traffic. *Note that the comparable restaurant sales growth was negatively impacted by the timing of the New Year's holiday, which reduced same-store transaction and sales by approximately 60 basis points for the quarter*. Franchise revenue increased 9.2% year-over-year to $5.7 million, largely due to an increase in franchised comparable restaurant sales growth of 6.2%.

21.     Reassuring investors that the Company's comparable store sales growth guidance of 3%-5% included any negative repercussions from the price increases in the expanded menu, defendant Roberts stated in pertinent part as follows:

> **We continue to expect full year systemwide comparable restaurant sales growth of 3% to 5%.** That said, we do not expect our comparable restaurant sales increases to be evenly split among the remaining three quarters of 2015.
>
> During the second quarter, we will be lapping a record high average unit volume quarter as a result of two of our most successful promotions, while simultaneously conducting extended tests of alternative proteins. As a result, **we will expect our second quarter comparable sales to be closer to the low end of the range.**

22.     Defendant Sather concluded his opening comments by emphasizing that the Company was "continu[ing]" to achieve "increasing" comparable store sales, stating in pertinent part as follows:

> We're excited about **our continued operating momentum** and the long-term opportunities to bring freshly prepared Crazy You Can Taste entrées to an even wider audience. Our success to-date is due to our focus on the four pillars of our brand[:] high-quality food, compelling value, excellent service, and a warm and inviting atmosphere. **Our steadfast focus on these four pillars positions the brand well for the future supporting our continued growth through increasing comparable restaurant sales,** expanding the restaurant base, and enhancing restaurant's operations.

23.     When asked during the conference call by a stock research analyst to explain the moderate decline in comparable store sales growth experienced during the first quarter of 2015, Defendant Valle again maintained that it was due largely to the timing of the New Year's holiday, adding that it was also partially caused by a

- 8 -

decreased emphasis on the Company's "under 500 calorie" menu offerings, something he said Defendants were reinvigorating and that he claimed would return comparable store sales growth to their lofty 2014 levels, stating in pertinent part as follows:

> [A]s Larry had mentioned, *the New Year's Eve timing – New Year's timing where the gain fell into the prior year and the pain fell into this year*. And as he mentioned, there was [a] 60 basis point hit on comps for that. But also kind of the under 500 line, we focused on our shrimp and moved away a little bit from the Under 500 line, and that was a little bit of a drag as well. We happen to be restaging that line in June, and we're *– we will get back up to the strength that it's had in the quarter of last year. Remember, again, how successful that volume was in Q1 of 2014*.

24.     As a result of the positive spin Defendants put on the first quarter 2015 results, assuring investors that the Company was on track to continue its 15 continuous quarters of increased comparable store sales, though at a moderately lower pace of 3%-5% compared to the 5.1% achieved in the first quarter of 2015, on May 15, 2015, the price of El Pollo Loco stock declined only $4.36 per share from its close of $29.06 on May 14, 2015, to close at a price that remained artificially inflated at $24.70 per share.

25.     Despite the unbridled enthusiasm expressed during the May 14, 2015 conference call, the Controlling Shareholder Defendants and defendants Sather and Valle, along with other El Pollo Loco executives and directors, immediately cashed in, selling more than 6 million of their personally held El Pollo Loco shares for *more than $132.4 million in gross proceeds*, in sales that were unusual both in scope and timing in light of the fact that none of them had sold any shares since November 2014:

| SELLER | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| Deft. Trimaran Pollo | 05/19/15 | 5,402,500 | $21.85 | $118,044,625 |
| Deft. Sather | 05/19/15 | 360,000 | $21.85 | $7,866,000 |

| Deft. Valle | 05/19/15 | 175,000 | $21.85 | $3,823,750 |
|---|---|---|---|---|
| Kay Bogeajis, Chief Operating Officer | 05/19/15 | 25,000 | $21.85 | $546,250 |
| Douglas Ammerman, Director | 05/19/15 | 45,822 | $21.80 | $998,920 |
| Samuel Borgese, Director | 05/19/15<br>05/29/15<br>06/02/15 | 11,645<br>17,200<br>25,249<br>54,094 | $21.85<br>$20.92<br>$21.00 | $254,443<br>$359,824<br>$530,229<br>$1,144,496 |
| *Totals* | | *6,062,416* | | *$132,424,041* |

26.     On July 6, 2015, the Company disclosed that it had reintroduced its $5 value menu, which had been previously removed from its menu boards in an attempt to increase average ticket orders, while continuing to conceal the dramatic declines in store traffic that had necessitated the return of the $5 value menu.  The Company's release stated in pertinent part as follows:

"At El Pollo Loco, we've gone to obsessive lengths to offer the quality and taste our guests crave at a great value with our new Pollo Bowls," said Ed Valle, Chief Marketing Officer of El Pollo Loco. "Our Original Pollo Bowl is a fan favorite and we are excited to unveil four new Pollo Bowls that combine our signature fire-grilled chicken with authentic ingredients like our perfectly marinated baja shrimp all in one bowl for only $5."

27.     The true facts, which were known to or recklessly disregarded by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     traffic at El Pollo Loco stores had declined substantially beginning in the first quarter 2015 due to the removal of the value items from the menu boards;

(b)    as a result, comparable store sales during the second quarter of 2015 were 50% lower than the 3%-5% growth Defendants, including Sather and Roberts, had led the market to expect; and

(c)    that, as a result of (a)-(b), Defendants lacked a reasonable basis for their Class Period statements about El Pollo Loco's business, operations and earnings.

28.    After the close of trading on August 13, 2015, the Company issued a release announcing its second quarter 2015 results for the three-month period ended July 1, 2015. El Pollo Loco disclosed that contrary to Defendants' prior claims of being on track to achieve 3%-5% comparable store sales increases on May 14, 2015, *halfway through the quarter*, in reality, second quarter 2015 "[s]ystem-wide comparable restaurant sales [had only grown] *1.3%, including a 0.5% decrease for company-operated restaurants*, and a 2.6% increase for franchised restaurants."

29.    In his opening remarks during the conference call held with investors that afternoon, defendant Sather confirmed that El Pollo Loco had only achieved "a 1.3% increase in system-wide comparable restaurant sales growth that consisted of a 50 basis point decrease for company-operated restaurants and a 2.6% increase for franchised restaurants," conceding that "second quarter results were impacted by the combination of higher priced offerings and a reduction of [the] value portion of [its] menu." Defendant Sather went on to elaborate, stating in pertinent part, as follows:

> Specifically, we ran sequential promotions featuring premium entrées with shrimp and carne asada, at the same time, we were eliminating our $5 Combo menu panel. We believe this confluence of actions drove reduced visits from some of our more value-oriented customers. We remain confident that adding new proteins to our menu is an ongoing opportunity for us; and in fact we've add shrimp to the menu permanently.
>
> In the third quarter, we re-launched the $5 Combo menu, which will remain in our restaurants full time to reinforce our value offering.

30.     During his opening remarks, defendant Roberts further disclosed that the "comparable restaurant sales decline of 0.5% . . . was comprised of a 3.9% decrease in traffic; partially offset by an increase in average check size of 3.4%."

31.     During the Q&A session, defendants Sather and Roberts engaged in the following discussion with a research analyst, conceding that the decrease in comparable store sales was a trend being experienced throughout the second quarter of 2015 – which was halfway over by May 14, 2015 – and that it was driven in large part by the Company's removal of its $5 value offerings from the Company's menu boards in February 2015:

> **[Q - David E. Tarantino:]**  First question is about the comp trends that you saw in Q2, and perhaps if there's a comment on what you're seeing in Q3, but Steve, maybe could you elaborate on the factors you think are weighing on the trend line? And then, I know you mentioned removing the $5 panel and now bringing it back; is that one of the factors that's giving you confidence that you could see better trends going forward? . . .

> **[Sather:]**  Sure . . . – let me give you an overview, and then I'll have Ed talk specifically on some of the things we've done in Q3.

> First of all, I think, it kind of referred to, we kind of lost the value focus on the first half of 2015. As you know, we employ a balance of a high/low pricing strategy. And what I think happened is, can we temporarily overweighed this to the higher priced items. To be more specific, we increased the price on our $5 Combo meal, we actually removed that panel from the menu board, and – because that was – because that was in February because of the higher pricing, also we increased the prices on our value menu, and specifically on another entrée line, which was important, the 500, 500, and we believe that really impacted our value customer.

When you then take on top of that, that we layered in the premium proteins, we first did shrimp, then carne asada. While we were happy with their performance, we think that they really further drove that perception of higher prices with the non-focus of value, and I'll let Ed comment on what we've done in the start of third quarter to really counter that. . . .

[Valle:] Yeah, I mean, I think that's exactly right. We launched the $5 Combo, David or re-launched them to make; first of all to put that panel back up on the menu board, and make it more prominent. We're seeing strong results from that. That $5 Combo panel will remain for the balance of 2015.

We also re-launched the Under 500 line, which we spoke about briefly in the last call that we are giving customers more value in terms of not just variety, but also in terms of price range as well. It's not back to its original level, but it's showing very solid growth as we're looking at it. So we feel pretty good about moving to trying to stabilize the business, and sort of reengaged our value customer.

[Sather:] David, yet another question?

[Q - David E. Tarantino:] Yeah. The follow-up to that was, I guess, it sounds like you alluded to it. But are you – you're starting to see the business respond to the changes you're making, and I guess in your history, have you dealt with this issue before in terms of losing that value customer, and then winning them back, I guess some historical context there would be helpful?

[Sather:] This is Steve. I think in period seven, first period of Q3, we actually have the $5 Pollo Bowls to launch there, and then the next period the $5 Combos and the Chicken & Shrimp. *And we saw the*

***stabilization certainly of bringing that a very popular $5 Pollo Bowl item and now the $5 Combos on that, so we're seeing that stabilization.***

***Quite frankly, we had never taken something like that off the menu board before.*** They've been on, we've had a very, there's always been a value portion, either in $5 Loco menu or a number of what we call our snack items, and we've taken some price on those.

32.   In response to the above revelations, El Pollo Loco's stock price declined by 20% from its closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015, 33% below the price where Defendants had just sold $132 million of their own El Pollo Loco shares and ***42%*** below El Pollo Loco's Class Period high of $25.37 per share on May 15, 2015, erasing more than ***$382 million*** in market capitalization.

## ADDITIONAL SCIENTER ALLEGATIONS

33.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding El Pollo Loco, their control over, and/or receipt of modification of El Pollo Loco's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning El Pollo Loco, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

34.    At all relevant times, the market for El Pollo Loco's common stock was an efficient market for the following reasons, among others:

(a)    El Pollo Loco's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company had more than 38 million shares outstanding as of August 6, 2015.  During the Class Period, on average, more than 960,000 shares of El Pollo Loco stock were traded on a daily basis, demonstrating a very active and broad market for El Pollo Loco stock and permitting a very strong presumption of an efficient market;

(c)    As a regulated issuer, El Pollo Loco filed periodic public reports with the SEC;

(d)    El Pollo Loco regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    El Pollo Loco was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(f)    Numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in El Pollo Loco stock at all times during the Class Period; and

(g)    Unexpected material news about El Pollo Loco was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

35.     As a result of the foregoing, the market for El Pollo Loco common stock promptly digested current information regarding El Pollo Loco from publicly available sources and reflected such information in El Pollo Loco's stock price. Under these circumstances, all purchasers of El Pollo Loco common stock during the Class Period suffered similar injury through their purchase of El Pollo Loco common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

36.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted material information concerning El Pollo Loco's business fundamentals and engaged in a scheme to deceive the market.  Defendants knowingly misstated then-present sales and earnings trends in order to improve the market's perception of El Pollo Loco's worth to allow Defendants to sell stock at fraud inflated prices.

37.     By artificially inflating and manipulating El Pollo Loco's stock price, Defendants deceived plaintiff and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, El Pollo Loco's stock price fell precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of El Pollo Loco stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

38.     This is a class action on behalf of those who purchased or otherwise acquired El Pollo Loco common stock during the Class Period, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants.  Class members are so numerous that joinder of them is impracticable.

39.     Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material

facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of El Pollo Loco common stock; and (e) the extent of and appropriate measure of damages.

40.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Defendants El Pollo Loco and the Individual Defendants

41.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

42.     Throughout the Class Period, Defendants El Pollo Loco and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of El Pollo Loco common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

43.     During the Class Period, Defendants El Pollo Loco and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period, did: (a) artificially inflate and maintain the market price of El Pollo Loco common stock; (b) deceive the investing public, including plaintiff and other Class members, as alleged herein; (c) cause plaintiff and other members of the Class to purchase El Pollo Loco common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, El Pollo Loco and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and

1  Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary
2  participants in the wrongful and illegal conduct charged herein or as controlling
3  persons as alleged below.

4      44.    In addition to the duties of full disclosure imposed on El Pollo Loco and
5  the Individual Defendants as a result of their affirmative false and misleading
6  statements to the investing public, these Defendants had a duty to promptly
7  disseminate truthful information with respect to El Pollo Loco's operations and
8  performance that would be material to investors in compliance with the integrated
9  disclosure provisions of the SEC, including with respect to the Company's revenue
10  and earnings trends, so that the market price of the Company's securities would be
11  based on truthful, complete and accurate information.  SEC Regulations S-X (17
12  C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

13      45.    El Pollo Loco and the Individual Defendants had actual knowledge of the
14  misrepresentations and omissions of material facts set forth herein or acted with
15  reckless disregard for the truth in that they failed to ascertain and disclose such facts,
16  even though such facts were either known or readily available to them.

17      46.    As a result of the dissemination of the materially false and misleading
18  information and failure to disclose material facts as set forth above, the market price
19  of El Pollo Loco common stock was artificially inflated during the Class Period.  In
20  ignorance of the fact that the market price of El Pollo Loco common stock was
21  artificially inflated, and relying directly or indirectly on the false and misleading
22  statements made knowingly or with deliberate recklessness by El Pollo Loco and the
23  Individual Defendants, or upon the integrity of the market in which the shares traded,
24  plaintiff and other members of the Class purchased El Pollo Loco common stock
25  during the Class Period at artificially high prices and, when the truth was revealed,
26  were damaged thereby.

27      47.    Had plaintiff and the other members of the Class and the marketplace
28  known of the true facts, which were knowingly or recklessly concealed by El Pollo

Loco and the Individual Defendants, plaintiff and the other members of the Class would not have purchased or otherwise acquired their El Pollo Loco shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

48.     By virtue of the foregoing, El Pollo Loco and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Controlling Shareholder Defendants

49.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

50.     The Individual Defendants and the Controlling Shareholder Defendants had control over El Pollo Loco and made the material false and misleading statements and omissions on behalf of El Pollo Loco within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their controlling shareholder status (as detailed herein at ¶14), executive positions, board membership status, stock ownership and/or contractual relationships with El Pollo Loco as alleged above, the Individual Defendants and the Controlling Shareholder Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading.  These Defendants were provided with or had access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

51.     In particular, the Individual Defendants and Controlling Shareholder Defendants had direct involvement in and responsibility over the operations of the

1  Company and, therefore, are presumed to have had the power to control or influence

2  the particular transactions giving rise to the securities violations as alleged herein.

3        52.    By reason of such wrongful conduct, the Individual Defendants and

4  Controlling Shareholder Defendants are liable pursuant to §20(a) of the Exchange Act.

5  As a direct and proximate result of the Individual Defendants' and the Controlling

6  Shareholder Defendants' wrongful conduct, plaintiff and the other members of the

7  Class suffered damages in connection with their purchases of the Company's common

8  stock during the Class Period.

9  **PRAYER FOR RELIEF**

10      WHEREFORE, plaintiff, on behalf of the Class, prays for judgment as follows:

11      A.    Determining that this action is a proper class action, designating plaintiff

12  as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the

13  Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

14      B.    Awarding compensatory damages in favor of plaintiff and the other Class

15  members against all Defendants, jointly and severally, for all damages sustained as a

16  result of Defendants' wrongdoing, in an amount to be proven at trial, including

17  interest thereon;

18      C.    Awarding plaintiff and the Class their reasonable costs and expenses

19  incurred in this action, including counsel fees and expert fees; and

20      D.    Awarding such other and further relief as the Court may deem just and

21  proper.

22  **JURY DEMAND**

23      Plaintiff demands a trial by jury.

24  DATED: August 24, 2015         ROBBINS GELLER RUDMAN
                                    & DOWD LLP

25                                 DARREN J. ROBBINS

26

27                                   *s/ Darren J. Robbins*
                                DARREN J. ROBBINS

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt El Pollo Loco.docx

El Pollo Loco Holdings, Inc.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Daniel Turocy ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transactions during the Class Period in the securities that are the subject of this action:

See Schedule A

5.   Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:



6.   Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _18ᵗʰ_ day of _August_ , 2015.

_____
DANIEL TUROCY

## DANIEL TUROCY
## SCHEDULE A

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share | Total Cost |
|---|---|---|---|---|
| 5/15/15 | Buy | 136 | 24.6699 | $3,362.11 |
| 5/19/15 | Buy | 113 | 23.22 | $2,630.86 |
| 5/29/15 | Buy | 726 | 20.69 | $15,027.94 |
| 7/9/15 | Buy | 55 | 19.37 | $1,072.35 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

El Pollo Loco Holdings, Inc.

1