ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS (225196)
LAURIE L. LARGENT (153493)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
llargent@rgrdlaw.com

THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN (219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA  90071
Telephone:  213/785-2610
213/226-4684 (fax)
lrosen@rosenlegal.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DANIEL TUROCY, et al., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> EL POLLO LOCO HOLDINGS, INC., et al., <br><br> Defendants. | Case No. 8:15-cv-01343-DOC-KES (**Consolidated**) <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

1113505_1

1    Lead Plaintiffs Robert W. Kegley, Sr., Peter Kim, Dr. Richard J. Levy, Sammy

2    Tanner and Ron Huston (collectively "Plaintiffs"), individually and on behalf of all

3    others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint

4    against defendants, allege the following based upon personal knowledge as to those

5    allegations concerning Plaintiffs and, as to all other matters, upon investigation of

6    counsel, which included, without limitation: (1) review and analysis of Securities and

7    Exchange Commission ("SEC") filings made by El Pollo Loco Holdings, Inc. ("El

8    Pollo Loco" or the "Company"); (2) review and analysis of press releases and other

9    publications disseminated by defendants; (3) review of news articles, analyst reports

10   and conference call transcripts; and (4) review and analysis of other publicly available

11   information concerning defendants and El Pollo Loco.  The investigation of the facts

12   pertaining to this case is continuing.  Plaintiffs believe that additional evidentiary

13   support will exist for the allegations set forth herein after a reasonable opportunity for

14   discovery.

15                              **NATURE OF THE ACTION**

16   1.    This is a securities class action on behalf of all purchasers of the

17   securities of El Pollo Loco between May 15, 2015 and August 13, 2015, inclusive (the

18   "Class Period"), seeking remedies pursuant to §§10(b), 20(a) and 20A of the

19   Securities Exchange Act of 1934 (the "Exchange Act") against defendants El Pollo

20   Loco, Stephen J. Sather ("Sather") the Company's Chief Executive Officer ("CEO"),

21   Laurance Roberts ("Roberts") the Company's Chief Financial Officer ("CFO"),

22   Edward J. Valle ("Valle") the Company's Chief Marketing Officer ("CMO"), and the

23   Company's controlling shareholders, as described below (collectively, "Defendants").

24   2.    This case concerns Defendants' failure to disclose material adverse

25   information that was negatively impacting El Pollo Loco's sales growth before and

26   during the Class Period.  Prior to the Class Period, Defendants repeatedly showcased

27   El Pollo Loco's impressive record of quarter-after-quarter sales growth in company-

28   wide "comparable store sales," a key metric closely watched by market analysts and

                                        - 1 -

investors.  Comparable store sales is a measure of sales growth at a given location, and to the market is one of the most important drivers of a restaurant's revenues.  As of December 31, 2014, the Company reported 14 straight quarters of positive company-wide comparable store sales growth, attributing this success to El Pollo Loco's unique positioning as a "quick service restaurant *plus*" ("QSR Plus" or "QSR+") and the Company's compelling value proposition.

3.     During a conference call with investors on May 14, 2015, the day before the start of the Class Period, Defendants reported a continuation of the Company's positive sales growth trend for the first quarter of fiscal year 2015 ("1Q 2015"), reporting better than expected revenue and earnings for the quarter, driven by a 5.1% increase in comparable store sales.  During the call, Defendants also confirmed guidance for company-wide comparable store sales growth for 2Q 2015 in the 3%-5% range.[1]

4.     Unbeknownst to investors, however, at the same time Defendants were touting the Company's consecutive quarter-after-quarter positive sales growth and assuring the market that 2Q 2015 comparable store sales growth would be in the range of 3% to 5%, customer traffic to El Pollo Loco restaurants, a driving component of comparable store sales growth, had been substantially declining since 1Q 2015, thereby seriously plaguing the Company's sales in the first half of 2015 and diminishing the Company's ability to meet its sales growth guidance for 2Q 2015.  In 1Q 2015 Defendants decided to abandon the Company's highly popular value-priced menu, which was a core component of its QSR Plus operating strategy and one of the key factors that drove customer traffic to the Company's restaurants.  Before and during the Class Period, Defendants closely tracked and monitored comparable store sales on a real-time basis, and knew, but concealed from investors, that traffic at El

---

[1]     For financial reporting, El Polo Loco uses a 52- or 53-week fiscal year ending on the last Wednesday of each calendar year.  For fiscal 2015, the first quarter ended April 1, 2015 and the second quarter ended July 1, 2015.

Pollo Loco restaurants was substantially declining and, as a result, comparable store sales were not growing at 3%, much less the 3% to 5% growth Defendants promised investors.  Because Defendants concealed these facts, El Pollo Loco common stock traded at artificially inflated prices following Defendants' May 14, 2015 statements and throughout the Class Period.

5.     Within days of Defendants' May 14, 2015 statements and omissions, which artificially inflated the price of El Pollo Loco stock, defendants Sather and Valle, the Controlling Shareholder Defendants (as defined below) and five other top El Pollo Loco executives suspiciously unloaded close to six million shares of El Pollo Loco common stock, as described in the following chart:

| Defendant | Date Sold | Shares Sold | Proceeds |
|---|---|---|---|
| Controlling Shareholder Defendants | 05/19/15 | 5,402,500 | $118,044,625 |
| Sather | 05/19/15 | 360,000 | $7,866,000 |
| Valle | 05/19/15 | 175,000 | $3,823,750 |
| Additional Insiders[2] | 05/19/15 – 06/02/15 | 124,916 | $2,689,666 |
| TOTALS | | 6,062,416 | $132,424,041 |

6.     These trades were made while Defendants knew that customer traffic was rapidly deteriorating and negatively impacting the Company's ability to meet its 2Q 2015 comparable store sales growth guidance.  All told, Defendants and insiders reaped *over $132 million in proceeds* from their sales, nearly all of which occurred immediately following Defendants' May 14, 2015 call with investors.  The timing of Defendants' and the insiders' stock sales demonstrate that they knew customer traffic

---

[2]     As more fully described in ¶54, the following Company insiders also dumped El Pollo Loco stock during the Class Period: Kay Bogeajis, Chief Operating Officer; Douglas Ammerman, director; and Samuel Borgese, director.

was shrinking and that the Company's 3% to 5% comparable sales growth guidance was not achievable.

7. On August 13, 2015, after the market closed and after Defendants had the opportunity to sell close to six million shares of El Pollo Loco stock, the truth about the Company's declining sales growth was revealed. On that day, Defendants stunned investors by announcing that comparable store sales growth for 2Q 2015 was ***50% lower*** than the 3%-5% growth Defendants had led the market to expect. In reaction to Defendants' announcement, the price of El Pollo Loco stock plummeted 20%, from a closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015, the lowest closing price since the Company's initial public offering ("IPO") on July 14, 2014.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under §§10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act, as El Pollo Loco's principle executive offices are located at 3535 Harbor Blvd., Suite 100, Costa Mesa, California 92626, and a substantial portion of the acts and transactions giving rise to the violations of law complained of occurred in this District.

## THE PARTIES

**Plaintiffs**

10. Lead Plaintiff Robert W. Kegley, Sr. purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

11. Lead Plaintiff Peter Kim purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed

Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

12.     Lead Plaintiff Dr. Richard J. Levy purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

13.     Lead Plaintiff Sammy Tanner purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

14.     Lead Plaintiff Ron Huston purchased El Pollo Loco securities at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 18-2) and suffered damages as a result of Defendants' alleged misconduct.

**Company and Individual Defendants**

15.     Defendant El Pollo Loco, through its subsidiary, El Pollo Loco, Inc., develops, franchises, licenses and operates quick-service restaurants under the El Pollo Loco name in the United States.

16.     Defendant Sather is, and was at all relevant times, the President and CEO of El Pollo Loco, and a member of its Board of Directors.  Prior to becoming CEO in 2010, Sather served as the Company's Senior Vice President of Operations from 2006 to 2010.  While working in El Pollo Loco operations department, Sather created the Company's Operation Dashboard through which Company executives and management track and monitor the Company's sales metrics, including comparable store sales, on a real-time basis.  Based on his tenure with the Company, and prior experience, Sather has extensive experience in the restaurant industry, including the casual dining and quick-service sectors.  As President and CEO, defendant Sather spoke on El Pollo Loco's behalf in releases, conference calls and SEC filings and

- 5 -

1  signed El Pollo Loco's filings with the SEC before and during the Class Period.

2  During the Class Period, defendant Sather sold 360,000 shares of El Pollo Loco

3  common stock at $21.85 per share, reaping proceeds of over $7.8 million.

4       17.   Defendant Roberts is, and was at all relevant times, the CFO of El Pollo

5  Loco.  Roberts has extensive experience in the restaurant industry and as an executive

6  of a publicly held company, including serving as General Manager and CFO of KFC

7  Restaurant Operating Company prior to his employment at El Pollo Loco.  As CFO,

8  defendant Roberts spoke on El Pollo Loco's behalf during conference calls with

9  investors and signed El Pollo Loco's filings with the SEC before and during the Class

10 Period.

11      18.   Defendant Valle is, and was at all relevant times, the CMO of El Pollo

12 Loco.  As CMO, defendant Valle spoke on El Pollo Loco's behalf during conference

13 calls.  During the Class Period, defendant Valle sold  175,000 shares of El Pollo Loco

14 common stock at $21.85 per share, reaping proceeds of over $3.8 million.

15      19.   Defendants Sather, Roberts and Valle are sometimes referred to herein as

16 the "Individual Defendants."  During the Class Period, the Individual Defendants ran

17 El Pollo Loco as "hands-on" managers, overseeing El Pollo Loco's operations and

18 finances and made the material false and misleading statements and omissions

19 described herein.  The Individual Defendants were intimately knowledgeable about all

20 aspects of El Pollo Loco's financial and business operations, as they received daily

21 reports, attended weekly executive meetings and had access to computerized

22 information, including electronic information through the Company's Operation

23 Dashboard, that included real-time information regarding sales, comparable store

24 sales, customer traffic, costs and expenses, product demand, inventory management

25 and customer incentives.  As confirmed by the Company's SEC filings, the Operation

26 Dashboard was a well-developed operations infrastructure that allowed for real-time

27 control over the Company's operations and sales.  The Operation Dashboard allowed

28 Defendants to measure the Company's performance by utilizing a state-of-the-art

- 6 -

1   technology that aggregated real-time restaurant-level information for nearly every

2   aspect of El Pollo Loco's business.  Through the Operation Dashboard, before and

3   during the Class Period, Defendants constantly monitored and measured current

4   performance against benchmarks derived from a broad selection of fast casual and

5   QSR brands, including key operational data regarding sales performance, speed-of-

6   service metrics and food and labor cost controls.

7   **Controlling Shareholder Defendants**

8       20.     Defendant Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo") was

9   incorporated in 2005 and is based in Irvine, California.  Defendant Trimaran Pollo is

10  owned by defendant Trimaran Capital Partners ("Trimaran Capital"), a private asset

11  management firm headquartered in New York, New York, and defendant Freeman

12  Spogli & Co. ("Freeman Spogli"), a private equity firm based in Los Angeles,

13  California.  Trimaran Pollo, Trimaran Capital and Freeman Spogli are collectively

14  referred to herein as the "Controlling Shareholder Defendants."

15      21.     In July 2014, after several years of staging a Company turnaround, the

16  Controlling Shareholder Defendants, who were the owners of El Pollo Loco since

17  2005, took the Company public in an underwritten initial public stock offering

18  ("IPO"), selling approximately 8.2 million shares of El Pollo Loco common stock at

19  $15 per share and raising more than $123 million in gross proceeds.

20      22.     Pursuant to a stockholders' agreement between El Pollo Loco and the

21  Controlling Shareholder Defendants, following its IPO, El Pollo Loco remained a

22  subsidiary of Trimaran Pollo and, with the Controlling Shareholder Defendants

23  continuing to collectively own more than 70% of El Pollo Loco's equity, Trimaran

24  Capital maintained the power to select El Pollo Loco's board members.   The

25  Chairman of El Pollo Loco's Board of Directors, Michael G. Maselli, is a managing

26  director of Trimaran Fund Management, L.L.C.  Another El Pollo Loco director, Dean

27  C. Kehler, co-founded Trimaran Capital, and remains one of its managing partners.  A

28  third El Pollo Loco director, Wesley W. Barton, is a Vice President of Trimaran

Capital.  One of Freeman Spogli's General Partners, John M. Roth, is also an El Pollo Loco director.  Thus, Freeman Spogli and Trimaran Capital representatives account for four of El Pollo Loco's seven directors.  Further, following the IPO, "Trimaran and Freeman Spogli [would] indirectly beneficially own shares sufficient for majority votes over all matters requiring stockholder votes, including: . . . decisions affecting [its] capital structure," and "Trimaran and Freeman Spogli [could] seek to cause [the Company] to take courses of action that . . . might involve risks to [its] other stockholders or adversely affect us or [its] other stockholders . . . ."

23.     Pursuant to the stockholders agreement between El Pollo Loco and the Controlling Defendant Shareholders, in November 2014, the Company commenced a secondary offering through which the Controlling Shareholder Defendants sold 5.6 million shares of their El Pollo Loco common stock.  Following the November 2014 secondary offering and until May 19, 2015, the Controlling Shareholder Defendants still, collectively, maintained 60% of the Company's shares, sufficient for majority votes over all matters requiring stockholder votes, including election of directors.

24.     By reason of their controlling ownership in El Pollo Loco before and during the Class Period as describe above, the Controlling Shareholder Defendants were "control persons" of El Pollo Loco within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), and had the power and influence to control El Pollo Loco and exercised that control to cause the Company to engage in the violations and improper practices complained of herein.

## STATEMENT OF THE CASE

**Company Background**

25.     El Pollo Loco opened its first location on Alvarado Street in Los Angeles, California, in 1980, and the Company has since grown its restaurant system to 415 restaurants, comprising 172 company-operated and 243 franchised restaurants as of December 31, 2014.  Its restaurants are located in California, Arizona, Nevada, Texas and Utah, with the typical restaurant being a free-standing building with drive-thru

1  service.   During the Class Period over 80% of El Pollo Loco's restaurants were

2  located in California.

3       26.    The restaurant industry is divided into two segments; full service and

4  limited service.   El Pollo Loco operates in the limited service restaurant ("LSR")

5  segment, which is comprised of the "quick-service restaurant" ("QSR") and "fast

6  casual" sub-segments.   The restaurant industry defines QSRs as traditional "fast food"

7  restaurants and "fast casual" as a limited or self-service format with higher prices that

8  offer food prepared to order in a more upscale environment.

9  **The Company's Sales Growth Success Was**
**Attributable to Its Positioning as a "QSR Plus"**

10

11       27.    Before and during the Class Period, El Pollo Loco differentiated itself

12  from its QSR and fast casual competitors by branding itself as a "quick service

13  restaurant *plus*," which allowed it to capture sales from both QSRs and fast casual

14  restaurants.   As a QSR Plus chain, El Pollo Loco offered its customers the lower

15  prices and convenience of fast food restaurants, such as Kentucky Fried Chicken or

16  Taco Bell, while also offering fresher, higher quality food and service comparable to

17  more expensive fast casual dining chains, such as Chipotle or Rubios.   As defendant

18  Sather explained in a pre-Class Period January 12, 2015 conference call with

19  investors:

20          Now let's talk for a second about our positioning.   We call it

21          QSR+.   And I really call this the best of both worlds.   We capture the

22          high-quality food of the players you see here on the right: the Chipotle,

23          the Zoes, Rubios.   Very high quality of the fast casual.   Yet we do that at

24          the speed, convenience and value of the players you see here on the left:

25          McDonalds, Chick-fil-A or Taco Bell.   And we want to be right in that

26          positioning because we think that's the perfect sweet spot.

27       28.    Just before the start of the Class Period, in the Company's March 12,

28  2015 earnings press release for 4Q 2014 and FY 2014, defendant Sather attributed the

- 9 -

1 Company's repeated sales growth success to El Pollo Loco's "'"QSR-plus"'
2 positioning" and the "'compelling value proposition'" the Company offered its
3 customers, *e.g.*, fresh, high quality food at lower prices.  Later on the same day, during
4 the earnings conference call with investors, defendant Sather again gave credit for the
5 Company's impressive history of consecutive-quarter comparable store sales growth
6 to the compelling value menu that El Pollo Loco offered through its QSR Plus
7 positioning, explaining:

8       We believe we are uniquely positioned in the restaurant industry
9 in what we refer to as QSR-plus.  We define QSR-plus as offering the
10 high-quality food and dining experience you would expect at a fast
11 casual restaurant, combined with the speed, convenience and value you'd
12 find at a traditional quick service restaurant, essentially getting the best
13 of both worlds.

14       ***Our comp[arable sales] growth is evidence that our compelling***
15 ***value proposition*** alongside our fresh handcrafted Mexican-inspired
16 cuisine continues to appeal to our guests.

17     29.    In its SEC Form 10-K filing for FY 2014, El Pollo Loco also reported
18 that its unique QSR Plus positioning was an integral part of the foundation for the
19 Company's continued sales growth, including growth in customer traffic.  In the FY
20 2014 Form 10-K, filed March 17, 2015, the Company stated:

21       Based on an external research report and a customer satisfaction survey,
22 we believe that our positioning appeals to a broad customer base . . .
23 giving consumers the best of both fast casual and QSR segments.  Our
24 differentiated QSR+ positioning sources traffic from both dining
25 segments ***and as a result continues to fuel our organic transaction***
26 ***growth***.

27     30.    Not surprisingly, both analysts and investors praised El Pollo Loco's
28 QSR Plus positioning and touted the Company's sales growth record.  As a result, the

Company enjoyed a meteoric rise in its share price from its IPO offering price of $15 per share in July 2014 to over $29 per share just before the start of the Class Period.

**Value Pricing Was an Important Component of the QSR Plus Strategy**

31.     Given its niche as a QSR Plus chain, menu pricing was a crucial component of El Pollo Loco's QSR Plus positioning.  As defendant Sather explained in a January 12, 2015 conference call with investors, "we've got a per-person spend of about $5.83.  That's just slightly above what you'd pay in QSR and well below what you see in most fast casuals.  ***So we feel that pricing is very important in QSR positioning***."

32.     During the same call, defendant Valle also emphasized pricing as a key component of the QSR Plus strategy, stating:

> So we position EPL as real food at reasonable prices.  And reasonable prices mean 15% to 18% off the Chipotle, Paneras, the fast casual guys of the world.  And about 8% – 8% to 10% above QSR.  That's what we call QSR+.  That allows us to source volume from QSR because we have better food, and it allows us to source volume from fast casual because we have everyday, price-accessible price points.  Right?  So it works our wonderfully for us.

33.     During a June 23, 2015 conference call with investors, defendant Sather reiterated that El Pollo Loco's menu pricing was an important component of its QSR Plus strategy, which was what allowed the Company to successfully grow its comparable store sales quarter after quarter:

> Let's talk about – I mentioned positioning, lets' talk about that. And we call it QSR+, it is really the best of both worlds.  It takes – if you look on the fast casual side, high-quality food, the dining experience, the atmosphere – we have that with our product and yet we bring that to you

- 11 -

at the speed, convenience and value that you see of the players here on the left, Chick-fil-A, McDonalds or Taco Bell.

So it is very unique positioning. ***And then with our pricing, puts us right in the middle.  We think that is important***.

**In 1Q 2015 Defendants Abandon the Company's QSR Plus Value Pricing Strategy**

34.     Because of its positioning as a QSR Plus chain, before and during the Class Period, El Pollo Loco was under pressure to maintain the lower pricing of a QSR chain with a menu that appealed to the more refined tastes of fast casual diners. Indeed, given this pressure to maintain lower pricing, and thus its QSR Plus positioning, before the Class Period, market analysts and investors questioned the Company's ability to increase prices in order to offset future cost pressures, including looming minimum wage increases the Company was facing in California and Los Angeles, where 80% of the Company's restaurants were concentrated.

35.     Specifically, by the beginning of the Class Period, El Pollo Loco was heavily exposed to rising labor costs, the Company's second largest cost following only food costs.  In California alone, the Company was dealing with a 25% increase in minimum wage over a short 1.5 year period.  Specifically, on July 1, 2014, the State of California raised its minimum wage 12.5%, from $8 to $9 per hour.  Additionally, by the start of the Class Period, California was set to again increase its minimum wage an additional 11.1% to $10 per hour, effective January 1, 2016.  Not only did these increases affect El Pollo Loco's minimum wage workers, they also impacted the Company's above-minimum wage workers as the Company paid supervisors a certain "spread" over minimum wage.  To make matters worse, in Los Angeles, where El Pollo Loco's restaurants generated approximately 80% of its revenues in fiscal years 2013 and 2014, minimum wage was set to increase to $15 by 2020.

36.     In an attempt to mitigate the effects of the rising labor costs, in 1Q 2015 Defendants decided to eliminate El Pollo Loco's value-priced menu, which was a core

- 12 -

component of its QSR Plus positioning strategy and one of the key drivers of customer traffic to El Pollo Loco restaurants.  Specifically, in February 2015 the Company removed its highly popular $5 combo meal menu from the Company's menu boards because of increased pricing, and increased prices on other value-priced menu items. As Defendants ultimately admitted, these price increases drove away value-conscious customers, which severely impacted customer traffic and, in turn, made it impossible for the Company to meet its comparable store sales growth guidance for 2Q 2015.

37.     For example, during an August 13, 2015 earnings conference call, Defendants admitted they lost the value focus of their QSR positioning in 1Q and 2Q 2015 due to their decision remove the Company's $5 combo meal menu.  Because of the disastrous consequences of eliminating the value-priced menu, including the $5 combo meal menu, Defendants re-launched the $5 menu in 3Q 2015, and when they did, they saw an immediate increase in customer traffic.  After the Class Period, defendant Sather admitted that the Company had abandoned its QSR Plus strategy in 1Q 2015, telling investors that re-launching the $5 combo meal menu allowed the Company to "return to [its] winning QSR+ strategy."

38.     In addition to the elimination of El Pollo Loco's value-priced menu, by the beginning of the Class Period the Company was also changing its menu to offer higher priced non-chicken menu items, such as shrimp and beef entrees.  During the May 14, 2015 conference call, Defendants told investors that these items were "proven winners with our customers" and were performing "very well," while at the same time concealing that customer traffic to El Pollo Loco restaurants was severely declining due to the elimination of the Company's value-priced menu, which was the driving force behind its QSR Plus strategy and responsible for the Company's previous success in comparable store sales growth.

- 13 -

**Before and During the Class Period Defendants
Tracked and Monitored Comparable Store Sales**

39.    As evidenced by their public statements and the business and marketing decisions the Company made before and during the Class Period, Defendants, as the Company's top executives, were internally tracking, monitoring and reviewing sales metrics for El Pollo Loco restaurants.  As the Company admitted in its SEC filings, El Pollo Loco's comparable store sales metric was a key performance indicator for the Company and closely monitored by top management, including Defendants.

40.    Before and during the Class Period, Defendants tracked and monitored El Pollo Loco comparable store sales through the Company's Operation Dashboard, which aggregated restaurant-level information on a real-time basis, providing immediate feedback to Defendants on nearly every aspect of the Company's business. As a real-time system, the Operation Dashboard processed information from all of El Pollo Loco's restaurants within milliseconds of the actual sales transactions so that information was immediately available to Defendants.  The Operation Dashboard was constantly monitored by Defendants and available to them through their desktop computers and tablet devices.

41.    Using the Operation Dashboard before and during the Class Period, Defendants closely tracked, monitored and measured the Company's sales performance for both Company-operated and franchise restaurants, including current performance against forecasts, comparable store sales, customer traffic and average check size and current performance against its competitors.

42.    Based on the information Defendants obtained from the Operation Dashboard, they knew the deleterious impact their decision to eliminate El Pollo Loco's value-priced menu was having on the Company's comparable store sales growth, but concealed that information from investors during the Class Period. Instead, Defendants issued a series of materially false and misleading statements and omissions concerning the Company's 2Q 2015 comparable store sales, as detailed

herein.   As a result of these false statements, El Pollo Loco securities traded at artificially inflated prices during the Class Period.   The Controlling Shareholder Defendants, the CEO and others took advantage and sold tens of millions of dollars of their personally held El Pollo Loco shares at fraud-inflated prices.

**MATERIALLY FALSE AND MISLEADING
CLASS PERIOD STATEMENTS**

**May 14, 2015 False and Misleading
Statements and Omissions**

43.   The Class Period starts on May 15, 2015.  On May 14, 2015, following the close of trading, El Pollo Loco issued a release announcing its 1Q 2015 financial results for the three-month period ended April 1, 2015.  The Company reported that its total 1Q 2015 revenue had increased 11.1% to $90.4 million, emphasizing that the revenue increase was driven by "[s]ystem-wide comparable restaurant sales [having grown] 5.1%, including a 3.5% increase for company-operated restaurants, and a 6.2% increase for franchised restaurants."  The release quoted defendant Sather as stating in pertinent part that the Company's "first quarter results . . . once again demonstrate[d] strong operating momentum through solid sales and earnings growth."  According to Sather, El Pollo Loco's "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to resonate with guests, as evidenced by [its] system-wide comparable restaurant sales growth of 5.1%."   Sather also emphasized that the sales growth "extended [the Company's] track record to 15 consecutive quarters of positive comparable restaurant sales growth."  The release stated in pertinent part that El Pollo Loco was still on track to report "[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%" for fiscal year 2015.

44.   During the conference call that followed the release later in the afternoon on May 14, 2015, Defendants made further positive statements about the Company's purportedly strong ongoing comparable store sales trends and ability to meet its 2015 guidance, while concealing that customer traffic was severely declining and that the

- 15 -

2Q 2015 guidance for comparable store sales growth was unachievable.  Sather stated in his opening remarks in pertinent part:

> For the first quarter, we saw a 5.1% increase in system-wide comparable sales growth that consisted of a 3.5% increase for Company-operated restaurants and a 6.2% increase for franchise restaurants.  The increase in comparable sales growth marked our 15th consecutive quarter of positive same-store sales and came on top of a 7.2% growth last year, for a strong two-year growth rate of 12.3%. . . .
>
> We believe our comp growth is continued evidence of the appeal of our brand, driven by our fresh, hand-crafted Mexican-inspired cuisine, compelling value proposition, and fast service.  Our menu allows us the flexibility to create new and unique menu items to complement our signature fire-grilled chicken and provide our customers with even more choices at a great value.

45.    During his opening remarks, defendant Roberts also lauded the Company's purportedly ongoing strong comparable store sales growth, particularly with regard to company-owned stores sales growth, but continued to conceal that customer traffic was substantially shrinking.  During the call Roberts stated:

> For the first quarter ended April 1, 2015, total revenue increased 11.1% to $90.4 million, from $81.4 million in the first quarter of 2014.  The increase in revenue was largely a result of the increase in Company-owned restaurant sales, which rose 11.2% in the first quarter, to $84.7 million.  Our Company-owned sales growth in the first quarter resulted from the contribution of 12 new Company-owned restaurants opened during and subsequent to the first quarter of 2014, combined with a 3.5% increase in comparable restaurant sales.

46.    Although the Company's 5.1% comparable store sales growth in 1Q 2015 was a slightly lighter increase than analysts were expecting for the quarter, during the

- 16 -

1  call Defendants quelled any concern that the decline represented a trend in decreasing
2  customer traffic for the Company or for 2Q 2015.  Instead, Defendants blamed the
3  timing of New Year's Eve, a one-time event for the quarter, for lighter than expected
4  sales growth in 1Q 2015.  During the call defendant Roberts stated:

5        The comparable restaurant sales growth [for Company-owned
6        restaurants] was comprised of a 3.4% increase in average check and a
7        0.1% increase in traffic.

8              Note that the comparable restaurant sales growth was negatively
9        impacted by the timing of the New Year's holiday, which reduced same-
10       store transaction and sales by approximately 60 basis points for the
11       quarter.  Franchise revenue increased 9.2% year-over-year, to $5.7
12       million, largely due to an increase in franchise comparable restaurant
13       sales growth of 6.2%.

14       47.      During the call Roberts also reiterated sales growth guidance for the full
15  year 2015 and gave guidance specifically for 2Q 2015, but continued to conceal the
16  declines in customer traffic.  Reassuring investors that the Company's comparable
17  store sales growth guidance for 2Q 2015 took into account the prior year same quarter
18  record-high average unit volume and any negative impact from introducing higher-
19  priced non-chicken menu items (alternative proteins) in 1Q 2015 and the first month
20  of 2Q 2015, Roberts stated:

21       [W]e continue to expect full-year system-wide comparable restaurant
22       sales growth of 3% to 5%.  That said, we do not expect our comparable
23       restaurant sales increases to be evenly split among the remaining three
24       quarters of 2015.  During the second quarter, we will be lapping a record
25       high average unit volume quarter as a result of two of our most
26       successful promotions, while simultaneously conducting extended tests
27       of alternative proteins.  As a result, we will expect our second quarter
28       comparable sales to be closer to the low end of the range.

- 17 -

48.     Analysts' estimates for El Pollo Loco's 2Q 2015 comparable store sales growth demonstrate that the market and investors believed Defendants' statements that 2Q 2015 comparable store sales growth guidance would be in the lower ranger of 3%-5%.  Because Defendants were concealing the truth about the severe customer traffic declines they were seeing, following Defendants' May 14, 2015 statements confirming 2Q 2015 guidance, market analysts' estimates for 2Q 2015 comparable store sales ranged from 3%-3.3%.

49.     Defendant Sather concluded his opening comments by emphasizing that the Company was "continu[ing]" to achieve "increasing" comparable store sales, stating in pertinent part as follows:

> We're excited about our continued operating momentum and the long-term opportunities to bring freshly prepared Crazy You Can Taste entrées to an even wider audience.  Our success to-date is due to our focus on the four pillars of our brand: high quality food, compelling value, excellent service, and a warm and inviting atmosphere.  Our steadfast focus on these four pillars positions the brand well for the future, supporting our continued growth through increasing comparable restaurant sales, expanding the restaurant base, and enhancing restaurants' operations.

50.     During the conference call, Defendants were asked by a stock research analyst to again explain the slightly lighter increase in comparable store sales growth during 1Q 2015.  So as not to cause concern, in response, defendant Valle again maintained that it was due largely to the timing of the New Year's holiday, adding that it was also partially caused by a decreased emphasis on the Company's "under 500 calorie" menu offerings, something he said Defendants were reinvigorating and that he claimed would return comparable store sales growth to the Company's lofty 2014 levels, stating in pertinent part as follows:

1    [A]s Larry had mentioned, [because of] the New Year's Eve timing . . .

2    the gain fell into the prior year and the pain fell into this year.  He

3    mentioned, there was a 60 basis point hit on comps for that.

4         But also kind of the Under 500 line, we focused on our shrimp and

5    moved away a little bit from the Under 500 line and that was a little bit

6    of a drag, as well.  We happen to be restaging that line in June, and we

7    believe we'll get back up to the strength that it had in the quarter of last

8    year.

9         Remember, again, how successful that line was in 1Q of 2014.

10   51.    Also, during the May 14, 2015 conference call analysts asked whether

11   customer traffic was being impacted by price-resistance to the higher priced

12   alternative proteins (shrimp and carne asada) the Company had added to the menu.

13   Defendant Valle denied that lower comparable store sales were due to lack of

14   customer interest in higher priced offerings and continued to conceal the dramatic

15   declines in customer traffic Defendants were seeing at the time.  During the call,

16   defendant Valle stated:

17        [Analyst:]  Could I follow up on that and understand, is there a

18   dynamic you're seeing that there's some price resistance in the higher

19   price points?  Remind us where the price points of the shrimp and the

20   carne are versus the core chicken products.  And is that the issue, or is it

21   more that people were just confused about the messages you were

22   getting, a couple of different LTOs at once, and maybe that wasn't

23   generating as much incrementality?

24        [Defendant Valle:]  It's more of the second one, John.  We would

25   normally, as we would phase these in, we would sequence them over

26   time.  We would seed the shrimp.  We would grow the shrimp.  And then

27   either 9 months to 12 months later, we would then bring the steak in after

28   that.

1113505_1

1    So I think it was a little bit more of they both kind of converged

2    together.  As a result, the visibility of value on our menu is not as strong

3    as it used to be, at least for that five-week period of time.  Our value

4    scores, though, are still high.

5                              *       *       *

6    It's really like the marketing communication thing.  There's

7    success with the steak.  There's success with the shrimp.  And how are

8    we going to express that and balance that within our menu, as we move

9    into the back end of this year and into 2016.

10   52.    As a result of the misleading statements Defendants made concerning the

11   1Q 2015 results, and reassurances that the Company was on track to continue its 15

12   continuous quarters of increased comparable store sales, though at a moderately lower

13   pace of 3%-5% compared to the 5.1% achieved in 1Q 2015, on May 15, 2015, the

14   price of El Pollo Loco stock declined only $4.36 per share from its close of $29.06 per

15   share on May 14, 2015, to close at a price that remained artificially inflated at $24.70

16   per share.

17   53.    Defendants' May 14, 2015 statements were materially false and

18   misleading when made.  The true facts, which were then known to Defendants but

19   concealed from investors, were that:

20   (a)    Beginning in 1Q 2015, El Pollo Loco restaurants were

21   experiencing a severe decline in customer traffic, a key driver of comparable store

22   sales growth.

23   (b)    Defendants' decision in 1Q 2015 to abandon a key component of

24   the Company's QSR Plus strategy and eliminate its value-priced menu offerings,

25   including a highly popular $5 combo meal menu, resulted in a drastic drop in

26   customer traffic to El Pollo Loco restaurants and made the Company's 2Q 2015

27   comparable store sales growth guidance unachievable, which Defendants concealed

28   from investors.  At the end of the Class Period, during the August 13, 2015 conference

1113505_1

1  call with investors, defendant Sather admitted that the Company had abandoned its
2  QSR Plus strategy in 1Q 2015 and that the Company had re-launched the $5 combo
3  meal menu in 3Q 2015, which would allow El Pollo Loco to "return to [its] winning
4  QSR+ strategy."  During the same call, Sather also admitted that when the value menu
5  was re-launched customer traffic immediately increased.

6       (c)    Before and during the Class Period, Defendants knew that
7  customer traffic to El Pollo Loco restaurants was severely decreasing and that it would
8  negatively impact 2Q 2015 comparable store sales because they constantly tracked,
9  monitored and reviewed comparable store sales through the Operation Dashboard,
10  which provided aggregated real-time restaurant-level information concerning
11  comparable store sales, customer traffic, average check size, comparisons to the
12  Company's forecasts, and current performance against its competitors.

13       (d)    As a result of (a)-(c) above, Defendants had no reasonable basis to
14  expect, and, in fact did not expect, that comparable store sales growth for 2Q 2015
15  would be in the 3%-5% range.  On August 13, 2015, the Company was forced to
16  reduce its FY 2015 comparable store sales growth guidance from the prior range of
17  3%-5% to just 3%, because of the Company's 50% miss on its 2Q 2015 comparable
18  store sales growth and the severe decline in customer traffic that began in 1Q 2015
19  due to the loss of the Company's price-conscious customers and abandonment of El
20  Pollo Loco's QSR Plus pricing strategy.

21      54.    On May 19, 2015, just five days after making their false and misleading
22  statements and omissions on May 14, 2015, defendants Sather and Valle, the
23  Controlling Shareholder Defendants and other El Pollo Loco top executives and
24  directors suspiciously sold their personally held El Pollo Loco common stock for
25  gross proceeds of over $ 132.4 million.  These insider sales were suspicious in amount
26  and timing in light of the fact that none of them had sold any shares since November
27  2014 and the sales were not made pursuant to any 10(b)-5 trading plan.  The timing of
28  Defendants' sales demonstrates that they knew customer traffic was shrinking and that

the Company's 2Q 2015 comparable store sales guidance of 3%-5% was not achievable.  The following chart describes the insider sales:

| Seller | Date Sold | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Deft. Trimaran Pollo | 05/19/15 | 5,402,500 | $21.85 | $118,044,625 |
| Deft. Sather | 05/19/15 | 360,000 | $21.85 | $7,866,000 |
| Deft. Valle | 05/19/15 | 175,000 | $21.85 | $3,823,750 |
| Kay Bogeajis, Chief Operating Officer | 05/19/15 | 25,000 | $21.85 | $546,250 |
| Douglas Ammerman, Director | 05/19/15 | 45,822 | $21.80 | $998,920 |
| Samuel Borgese, Director | 05/19/15<br>05/29/15<br>06/02/15 | 11,645<br>17,200<br>25,249<br>54,094 | $21.85<br>$20.92<br>$21.00 | $254,443<br>$359,824<br>$530,229<br>$1,144,496 |
| TOTALS | | 6,062,416 | | $132,424,041 |

55.    The entirety of Sather's and Valle's sales on May 19, 2015 were the result of exercising options.  Because of these options, defendants Sather and Valle obtained this stock at prices ranging from $2.62 to $5.84 per share, a fraction of what other shareholders paid.  After defendants Sather's and Valle's stock sales on May 19, 2015, they retained no common stock of El Pollo Loco.

**June 10 and July 6, 2015 False and Misleading Statements and Omissions**

56.    On June 10, 2015, El Pollo Loco presented at William Blair's Annual Growth Stock Conference.  During the conference defendant Sather reiterated the Company's QSR Plus strategy, but concealed the severe decline in customer traffic the Company restaurants were experiencing in 2Q 2015 due to the abandonment of the QSR Plus pricing strategy.  During the conference defendant Sather stated:

- 22 -

1         Now we not only provide great service and great atmosphere, but

2   we do it at a very compelling value. The majority of our items are priced

3   between $5.00 and $7.00. Our average per person spend is $6.04 as you

4   can see by the graph here. That's just a little bit above the QSRs that

5   you see to the left there, but well below the fast casual such as a Panera

6   or a Chipotle or a Zoes.

7         So we want to always maintain that value. We don't want to get

8   up too high pricing towards the fast casual, and we always want to

9   maintain that speed with the convenience of the drive-through, etc. So I

10   think this is very important.

11         If you look at our systemwide comps, we talked about the last 15

12   quarters of being positive same-store sales. Very strong. I think you can

13   see that what we've been doing over the last years is clearly resonating

14   with the consumer.

15      57.   Despite knowing the customer traffic was severely declining, and

16 therefore negatively impacting comparable store sales growth and diminishing the

17 Company's ability to meet its 2Q 2015 comparable sales growth guidance, Defendants

18 still concealed the truth from investors during the June 10, 2015 William Blair

19 conference by blaming softening May 2015 sales on the temporary overlapping of

20 higher priced non-chicken menu offerings. Immediately following the conference,

21 William Blair published a research report stating that Company management

22 "continues to believe[] the concurrent marketing support for the two new, higher-

23 priced proteins obscured El Pollo Loco's value message" in May 2015, which

24 concealed from investors the truth about the shrinking of customer traffic and the

25 Company's ability to meet its comparable store sales guidance. Based on this

26 concealment of information, William Blair maintained its estimate for the Company's

27 comparable store sales growth at 3%.

28

- 23 -

58.     On July 6, 2015, the Company disclosed that it had reintroduced its $5 value menu, but continued to conceal the dramatic declines in store traffic that had necessitated the return of the $5 value menu.  The Company's release stated in pertinent part as follows:

> "At El Pollo Loco, we've gone to obsessive lengths to offer the quality and taste our guests crave at a great value with our new Pollo Bowls," said Ed Valle, Chief Marketing Officer of El Pollo Loco. "Our Original Pollo Bowl is a fan favorite and we are excited to unveil four new Pollo Bowls that combine our signature fire-grilled chicken with authentic ingredients like our perfectly marinated baja shrimp all in one bowl for only $5."

59.     Defendants' June 10 and July 6, 2015 statements were materially false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants but concealed from investors, were that:

(a)     Beginning in 1Q 2015, El Pollo Loco restaurants were experiencing a severe decline in customer traffic, a key driver of comparable store sales growth.

(b)     Defendants' decision in 1Q 2015 to abandon a key component of the Company's QSR Plus strategy and eliminate its value-priced menu offerings, including a highly popular $5 combo meal menu, resulted in a drastic drop in customer traffic to El Pollo Loco restaurants and made the Company's 2Q 2015 comparable store sales growth guidance unachievable, which Defendants concealed from investors.  At the end of the Class Period, during the August 13, 2015 conference call with investors, defendant Sather admitted that the Company had abandoned its QSR Plus strategy in 1Q 2015 and that the Company had re-launched the $5 combo meal menu in 3Q 2015, which would allow El Pollo Loco to "return to [its] winning QSR+ strategy."  During the same call, Sather also admitted that when the value menu was re-launched customer traffic immediately increased.

- 24 -

1      (c)     Before and during the Class Period, Defendants knew that

2  customer traffic to El Pollo Loco restaurants was severely decreasing and that it would

3  negatively impact 2Q 2015 comparable store sales because they constantly tracked,

4  monitored and reviewed comparable store sales through the Operation Dashboard,

5  which provided real-time information concerning comparable store sales, customer

6  traffic, average check size, comparisons to the Company's forecasts and current

7  performance against its competitors.

8      (d)     As a result of (a)-(c) above, Defendants had no reasonable basis to

9  expect, and, in fact did not expect, that comparable store sales growth for 2Q 2015

10  would be in the 3%-5% range.  On August 13, 2015, the Company was forced to

11  reduce its FY 2015 comparable store sales growth guidance from the prior range of

12  3%-5% to just 3%, because of the Company's 50% miss on its 2Q 2015 comparable

13  store sales growth and the severe decline in customer traffic that began in 1Q 2015

14  due to the loss of the Company's price-conscious customers and abandonment of El

15  Pollo Loco's QSR Plus pricing strategy.

16                    **THE TRUTH IS REVEALED**

17      60.     After the close of trading on August 13, 2015, the Company issued a

18  press release announcing its 2Q 2015 results for the three-month period ended July 1,

19  2015.  El Pollo Loco disclosed that contrary to Defendants' prior claims of being on

20  track to achieve 3%-5% comparable store sales increases on May 14, 2015, ***halfway***

21  ***through the quarter***, in reality, 2Q 2015 "[s]ystem-wide comparable restaurant sales

22  [had only grown] ***1.3%, including a 0.5% decrease for company-operated***

23  ***restaurants***, and a 2.6% increase for franchised restaurants."  Also on August 13,

24  2015, the Company cut its FY 2015 guidance for comparable store sales from 3%-5%

25  to just 3% because of the Company's significant miss on 2Q 2015 comparable store

26  sales growth and the severe decline in customer traffic that began in 1Q 2015 due to

27  the loss of the Company's price-conscious customers and abandonment of its QSR

28  Plus pricing strategy.

61.     In his opening remarks during the conference call held with investors that afternoon, defendant Sather confirmed that El Pollo Loco had only achieved "a 1.3% increase in system-wide comparable restaurant sales growth that consisted of a 50-basis-point decrease for Company-operated restaurants and a 2.6% increase for franchised restaurants," conceding that "second-quarter results were impacted by the combination of higher-priced offerings and a reduction of [the] value portion of [its] menu."  Defendant Sather went on to elaborate, stating in pertinent part, as follows:

> Specifically we ran sequential promotions featuring premium entrées with shrimp and carne asada at the same time we were eliminating our $5 Combo menu panel.  We believe this confluence of actions drove reduced visits from some of our more value-oriented customers. . . .
>
> In the third quarter, we re-launched the $5 Combo menu which will remain in our restaurants full time to reinforce our value offering. ***This allows us to return to our winning QSR+ strategy of introducing exciting, new, premium Mexican entrees . . . to a base of underlying value frequency drivers like our $5 combos***.

62.     During his opening remarks, defendant Roberts further disclosed that the "comparable restaurant sales decline of 0.5% . . . was comprised of a 3.9% decrease in traffic partially offset by an increase in average check size of 3.4%."

63.     During the Q&A session, defendants Sather and Roberts engaged in the following discussion with a research analyst, conceding that the decrease in comparable store sales was a trend being experienced throughout 2Q 2015 – which was halfway over by May 14, 2015 – and that it was driven in large part by Defendants' decision to eliminate the Company's value-priced menu, including its highly popular $5 combo menu, from the Company's menu boards in February 2015:

> [Q - David E. Tarantino:]  First question is about the comp trends that you saw in Q2, and perhaps if there is a comment on what you're seeing in Q3.  Steve, could you elaborate on the factors you think are

- 26 -

1    weighing on the trend line?  And then, I know you mentioned removing
2    the $5 panel, and now bringing it back.  Is that one of the factors that's
3    giving you confidence that you could see better trends going
4    forward? . . .

5         [Sather:]  Sure . . . .  Let me give you an overview, and then I'll
6    have Ed talk specifically on some of the things we've done in Q3.  First
7    of all, I think – kind of referred to it.  We lost the value focus on the first
8    half of 2015.  As you know, we employ a balance of a high/low pricing
9    strategy, and what I think happened is we temporarily overweighted this
10   to the higher-priced items.  To be more specific, we increased the price
11   on our $5 Combo meal.  We actually removed that panel from the . . .
12   menu board, and because that was in February – because of the higher
13   pricing.

14        Also, we increased the prices on our value menu, and specifically,
15   on another entrée line, which was important, the 5 under 500.  We
16   believe that really impacted our value customer.  When you then take on
17   top of that that we layered in the premium proteins, we first did shrimp
18   and then carne asada.  While we were happy with their performance, we
19   think that they really further drove that perception of higher prices with
20   the non-focus of value.  And, I'll [let Ed] comment on what we've done
21   in the start of third quarter to really counter that. . . .

22        [Valle:]  I think that's exactly right. We launched the $5 combos,
23   David, or re-launched them.  To make – first of all, to put that panel back
24   up on the menu board and make it more prominent, and we're seeing
25   strong results from that.  That $5 combo panel will remain for the
26   balance of 2015.  We also re-launched the under 500 line, which we
27   spoke about briefly in the last call, that we are giving customers more
28   value in terms of not just variety, but also in terms of price range as well.

- 27 -

1    It's not back to its original level, but it's showing very solid growth as

2    we're looking at it.  So we feel pretty good about moving to trying to

3    stabilize the business and reengage our value customer.

4                          *       *       *

5          [Sather:]  David, you had another question?

6          [Tarantino:]  Yes, the follow-up to that was – it sounds like you

7    alluded to it.  But, you're starting to see the business respond to the

8    changes you're making, and in your history, have you dealt with this

9    issue before in terms of losing that value customer and then winning

10   them back?  Some historical context there would be helpful.

11         [Sather:]  Yes, this is Steve.

12         I think in period seven, first period of Q3, we actually have the $5

13   pollo bowls to launch there, and then the next period the $5 combos and

14   the chicken and shrimp, ***and we saw the stabilization certainly of***

15   ***bringing that a very popular $5 pollo bowl item and now the $5 combos***

16   ***on that.  So, we're seeing that stabilization***.

17         ***Quite frankly, we had never taken something like that off the***

18   ***menu board before***.  They've been on – we've had a very – there has

19   always been a value portion.  Either in $5 loco menu or a number of

20   what we call our snack items, and we've taken some price on those.

21   64.    Analysts were surprised by El Pollo Loco's revelations:

22         (a)    In an August 13, 2015 report, a William Blair analyst stated that

23   "[h]aving missed its forecast that was issued in mid-May, El Pollo Loco is clearly in

24   the penalty box with investors . . . .  [I]t will likely take a few quarters for investors'

25   trust to be regained . . . .  [W]e recognize that the company may remain in a 'show-

26   me' state pending the achievement of sustainably improved comp trends."

27         (b)    In an August 13, 2015 report, a Jefferies analyst stated that

28   "[a]lthough we thought [same store sales] would improve as 2Q went on, the focus on

- 28 -

premium items did not resonate with consumers to the extent to offset what appears to be a drop-off in value-oriented traffic. . . .  We have been looking for a return to 4% [same store sales growth] in the 2H at company-owned units, but it does not appear as if the company will get there . . . ."

(c)      In an August 13, 2015 report, a Morgan Stanley analyst stated that the "severe dropoff in traffic due to higher price points in 2Q calls into question [El Pollo Loco's] ability to take pricing to offset future cost pressures, including looming minimum wage hikes in CA and LA in '16 and beyond, as well as raise the average check."

65.      In response to the above revelations, El Pollo Loco's stock price declined by 20%, from its closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015, 33% below the price at which Defendants had just sold $132 million of their own El Pollo Loco shares and **42% below** El Pollo Loco's Class Period high of $25.37 per share on May 15, 2015, erasing more than **$410 million** in market capitalization.

66.      During a November 12, 2015 conference call with investors wherein Defendants reported 3Q 2015 earnings, analysts continued to question Defendants about the 50% miss on 2Q 2015 comparable store sales growth.  During the call, defendant Sather admitted that Defendants knew in early 2015 that the abandonment of the Company's QSR Plus strategy and price changes made to its menu in 1Q 2015 were driving away the Company's price-conscious customers, thereby negatively impacting customer traffic, stating: "Our research confirmed what we thought in the spring, that consumers still love our food, but we can improve on our service and our value, which [we] are now taking actioned steps to address those issues."

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

67.      At all relevant times, the market for El Pollo Loco securities was an efficient market for the following reasons, among others:

1113505_1

1    (a) El Pollo Loco's stock met the requirements for listing, and was

2 listed and actively traded on the NASDAQ, a highly efficient and automated market;

3    (b) The Company had more than 38 million shares outstanding as of

4 August 6, 2015.  During the Class Period, on average, more than 960,000 shares of El

5 Pollo Loco stock were traded on a daily basis, demonstrating a very active and broad

6 market for El Pollo Loco stock and permitting a very strong presumption of an

7 efficient market;

8    (c) As a regulated issuer, El Pollo Loco filed periodic public reports

9 with the SEC;

10    (d) El Pollo Loco regularly communicated with public investors via

11 established market communication mechanisms, including regular dissemination of

12 press releases on the national circuits of major newswire services, the Internet and

13 other wide-ranging public disclosures, such as communications with the financial

14 press and other similar reporting services;

15    (e) El Pollo Loco was followed by many securities analysts who wrote

16 reports that were distributed to the sales force and certain customers of their respective

17 firms during the Class Period, and each of these reports was publicly available and

18 entered the public marketplace;

19    (f) There were several active market-makers in El Pollo Loco stock at

20 all times during the Class Period; and

21    (g) Unexpected material news about El Pollo Loco was rapidly

22 reflected in and incorporated into the Company's stock price during the Class Period.

23   68. As a result of the foregoing, the market for El Pollo Loco securities

24 promptly digested current information regarding El Pollo Loco from publicly

25 available sources and reflected such information in El Pollo Loco's share prices.

26 Under these circumstances, all purchasers of El Pollo Loco securities during the Class

27 Period suffered similar injury through their purchase of El Pollo Loco securities at

28 artificially inflated prices, and a presumption of reliance applies.

- 30 -

## APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE

69.     Plaintiffs are also entitled to the presumption of reliance under *Affiliated Ute Citizens v. U.S*., 406 U.S. 128 (1972), because Defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of material facts concerning the deterioration of customer traffic to El Pollo Loco restaurants that severely diminished the Company's ability to meet it comparable store sales growth guidance for 2Q 2015, which information Plaintiffs and the members of the Class would have wanted to have known and which would have caused investors to not have purchased shares of El Pollo Loco at the prices they traded at during the Class Period.

## LOSS CAUSATION

70.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted material information concerning El Pollo Loco's business fundamentals and engaged in a scheme to deceive the market.  Defendants knowingly misstated then-present sales and earnings trends in order to improve the market's perception of El Pollo Loco's worth to allow Defendants to sell stock at fraud inflated prices.

71.     By artificially inflating and manipulating El Pollo Loco's share prices, Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, El Pollo Loco's share prices fell precipitously as the prior artificial inflation came out of the price.  As a result of their purchases of El Pollo Loco securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

72.     This is a class action on behalf of all purchasers of El Pollo Loco securities during the Class Period, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and

1113505_1

1 the families of the Defendants.  Class members are so numerous that joinder of them

2 is impracticable.

3    73.   Common questions of law and fact predominate and include whether

4 Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material

5 facts; (c) knew or recklessly disregarded that their statements were false; (d)

6 artificially inflated the prices of El Pollo Loco securities; and (e) the extent of and

7 appropriate measure of damages.

8    74.   Plaintiff's claims are typical of those of the Class.  Prosecution of

9 individual actions would create a risk of inconsistent adjudications.  Plaintiffs will

10 adequately protect the interests of the Class.  A class action is superior to other

11 available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against El Pollo Loco and the Individual Defendants**

15    75.   Plaintiffs repeat and reallege the above paragraphs as though fully set

16 forth herein.

17    76.   Throughout the Class Period, El Pollo Loco and the Individual

18 Defendants, in pursuit of their scheme and continuous course of conduct to inflate the

19 market prices of El Pollo Loco securities, had the ultimate authority for making, and

20 knowingly or recklessly made, materially false or misleading statements or failed to

21 disclose material facts necessary to make the statements made, in light of the

22 circumstances under which they were made, not misleading.

23    77.   During the Class Period, El Pollo Loco and the Individual Defendants

24 carried out a plan, scheme and course of conduct using the instrumentalities of

25 interstate commerce and the mails, which was intended to and, throughout the Class

26 Period, did: (a) artificially inflate and maintain the market prices of El Pollo Loco

27 securities; (b) deceive the investing public, including Plaintiffs and other Class

28 members, as alleged herein; (c) cause Plaintiffs and other members of the Class to

- 32 -

1113505_1

purchase El Pollo Loco securities at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, El Pollo Loco and the Individual Defendants took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

78.     In addition to the duties of full disclosure imposed on El Pollo Loco and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, El Pollo Loco and the Individual Defendants had a duty to promptly disseminate truthful information with respect to El Pollo Loco's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

79.     El Pollo Loco and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

80.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market prices of El Pollo Loco securities were artificially inflated during the Class Period.  In ignorance of the fact that the market prices of El Pollo Loco securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by El Pollo Loco and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiffs and other members of the Class purchased El Pollo Loco securities during the Class

1  Period at artificially high prices and, when the truth was revealed, were damaged
2  thereby.

3      81.    Had Plaintiffs and the other members of the Class and the marketplace
4  known of the true facts, which were knowingly or recklessly concealed by El Pollo
5  Loco and the Individual Defendants, Plaintiffs and the other members of the Class
6  would not have purchased or otherwise acquired their El Pollo Loco shares during the
7  Class Period, or if they had acquired such shares during the Class Period, they would
8  not have done so at the artificially inflated prices they paid.

9      82.    By virtue of the foregoing, El Pollo Loco and the Individual Defendants
10 have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

11 **COUNT II**

12 **For Violation of §20(a) of the Exchange Act Against the**
13 **Individual Defendants and the Controlling Shareholder Defendants**

14     83.    Plaintiffs repeat and reallege above paragraphs as though fully set forth
15 herein.

16     84.    The Individual Defendants and Controlling Shareholder Defendants acted
17 as controlling persons of El Pollo Loco within the meaning of §20(a) of the Exchange
18 Act as alleged herein.  By virtue of their controlling shareholder status (as detailed
19 herein at ¶¶20-24), executive positions, board membership status, stock ownership
20 and/or contractual relationships with El Pollo Loco as alleged above, the Individual
21 Defendants and Controlling Shareholder Defendants had the power to influence and
22 control and did, directly or indirectly, influence and control the decision making of the
23 Company, including the content and dissemination of the various statements which
24 Plaintiffs contend were false and misleading.  The Individual Defendants and
25 Controlling Shareholder Defendants were provided with or had access to the
26 Company's internal reports, press releases, public filings and other statements alleged
27 by Plaintiffs to be misleading prior to or shortly after these statements were issued,
28

1113505_1

1 and had the ability to prevent the issuance of the statements or cause them to be

2 corrected.

3       85.    In particular, the Individual Defendants and Controlling Shareholder

4 Defendants had direct involvement in and responsibility over the operations of the

5 Company and, therefore, are presumed to have had the power to control or influence

6 the particular transactions giving rise to the securities violations as alleged herein.

7       86.    By reason of such wrongful conduct, the Individual Defendants and

8 Controlling Shareholder Defendants are liable pursuant to §20(a) of the Exchange Act.

9 As a direct and proximate result of the Individual Defendants' and Controlling

10 Shareholder Defendants' wrongful conduct, Plaintiffs and the other members of the

11 Class suffered damages in connection with their purchases of the Company's

12 securities during the Class Period.

13 **COUNT III**

14 **For Violation of §20A of the Exchange Act Against Defendants Sather**
15 **and Valle and the Controlling Shareholder Defendants**

16       87.    Plaintiffs repeat and reallege each and every allegation contained above

17 as if fully set forth herein.  Count III is brought pursuant to §20A of the Exchange Act

18 against defendants Sather, Valle and the Controlling Shareholder Defendants, on

19 behalf of Plaintiffs who were damaged by defendants Sather, Valle and the

20 Controlling Shareholder Defendants' insider trading.

21       88.    As detailed herein, defendants Sather, Valle and the Controlling

22 Shareholder Defendants were in possession of material, non-public information

23 concerning El Pollo Loco.  Sather, Valle and the Controlling Shareholder Defendants

24 took advantage of their possession of material, non-public information regarding El

25 Pollo Loco to obtain millions of dollars in insider trading profits during the Class

26 Period.

27

28

1113505_1

89.     Defendants Sather, Valle and the Controlling Shareholder Defendants' sales of El Pollo Loco common stock were made contemporaneously with Plaintiffs' purchases of El Pollo Loco common stock during the Class Period.

90.     For example, on May 19, 2015, Sather, Valle and the Controlling Shareholder Defendants sold the following shares of El Pollo Loco common stock for total proceeds of excess of $129 million:

| Defendant | Date of Sale | Amount | Price |
|-----------|-------------|--------|-------|
| Trimaran Pollo | 5/19/2015 | 5,402,500 | $21.85 |
| Sather | 5/19/2015 | 360,000 | $21.85 |
| Valle | 5/19/2015 | 175,000 | $21.85 |

91.     During the period from May 19, 2015 through June 2, 2015, the following Plaintiffs purchased the following shares of El Pollo Loco common stock:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|-----------------|--------|-------|
| Peter Kim | 5/19/2015 | 1,000 | $22.90 |
| Ron Huston | 5/19/2015 | 2,000 | $23.21 |
| Ron Huston | 5/29/2015 | 3,000 | $20.88 |
| Robert W. Kegley, Sr. | 6/02/2015 | 20,000 | $21.99 |

92.     Plaintiffs who purchased shares of El Pollo Loco common stock contemporaneously with sales by Sather, Valle and the Controlling Shareholder Defendants' suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of the Class, pray for judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: January 29, 2016                 Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS
LAURIE L. LARGENT


/s/ LAURIE L. LARGENT
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN
355 South Grand Avenue, Suite 2450
Los Angeles, CA  90071
Telephone:  213/785-2610
213/226-4684 (fax)

1113505_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE ROSEN LAW FIRM, P.A.
PHILIP KIM
275 Madison Avenue, 34th Floor
New York, NY  10016
Telephone:  212/686-1060
212/202-3827 (fax)

Co-Lead Counsel for Plaintiffs

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

GOLDBERG LAW PC
MICHAEL GOLDBERG
13650 Marina Pointe Dr., Suite 1404
Marina Del Rey, CA  90292
Telephone:  800/977-7401
800/536-0065 (fax)

Attorneys for Plaintiffs

1113505_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 29, 2016.

<u>  s/ Laurie L. Largent                      </u>
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:       llargent@rgrdlaw.com

# Mailing Information for a Case 8:15-cv-01343-DOC-KES Daniel Turocy v. El Pollo Loco Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Seth A Aronson**
  saronson@omm.com,LitigationCalendar@omm.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Amber L Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Zachary Marc Faigen**
  zack.faigen@skadden.com,Zack.Faigen@probonolaw.com

- **Winston Ping Hsiao**
  winston.hsiao@skadden.com

- **Alec Johnson**
  aljohnson@omm.com,skemp@omm.com

- **Jay B Kasner**
  jay.kasner@skadden.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Jason D Russell**
  jrussell@skadden.com,Winston.Hsiao@skadden.com,nandi.berglund@skadden.com,jason.russell@skadden.com

- **Evan Jason Smith**
  esmith@brodsky-smith.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)