**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                    Date:  July 25, 2016

Title: DANIEL TUROCY, ET AL V. EL POLLO LOCAL HOLDINGS, INC., ET AL

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

Deborah Goltz                                    Not Present
Courtroom Clerk                                  Court Reporter

ATTORNEYS PRESENT FOR                  ATTORNEYS PRESENT FOR
      PLAINTIFF:                                  DEFENDANT:
   None Present                                  None Present

PROCEEDINGS (IN CHAMBERS):        **ORDER GRANTING DEFENDANTS'**
                                  **MOTION TO DISMISS [50]**

     Before the Court is Defendants El Pollo Loco Holdings, Inc., Trimaran Capital
Partners, Trimaran Pollo Partners, L.L.C., Freeman Spogli & Co., Stephen J. Sather,
Laurance Roberts, and Edward J. Valle's (collectively "Defendants") Motion to Dismiss
the Consolidated Class Action Complaint ("Motion") (Dkt. 50). The Court finds this
matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.
Having reviewed the moving papers and considered the parties' arguments, the Court
hereby GRANTS Defendants' Motion.

## I.     Background

     This lawsuit is a putative securities fraud class action brought by Plaintiffs Robert
W. Kegley, Peter Kim, Dr. Richard J. Levy, Sammy Tanner and Ron Huston (collectively
"Plaintiffs") under Section 10(b), 20(a) and 20A of the Securities Exchange Act of 1934
(the "Exchange Act") and the rules and regulations promulgated thereunder by the
Securities & Exchange Commission ("SEC"), including 17 C.F.R. § 240.10b-5.
Consolidated Class Action Complaint ("CAC") (Dkt. 47) ¶¶ 1, 10–14. The putative class
consists of purchasers of common stock of El Pollo Loco Holdings, Inc. ("El Pollo Loco"
or the "Company") between May 15, 2015 and August 13, 2015 ("Class Period"). *Id.* ¶ 1.
Defendants are El Pollo Loco, certain of its directors and officers, and the Company's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                      Date: July 25, 2016
                                                                                     Page 2

controlling shareholders. *Id.* Plaintiffs allege Defendants failed "to disclose material adverse information that was negatively impacting El Pollo Loco's sales growth before and during the Class Period." *Id.* ¶ 2.

### A.      Facts

### 1.      El Pollo Loco's Menu Changes

El Pollo Loco is a "quick service restaurant plus" ("QSR Plus") fast casual restaurant chain which offers "its customers the lower prices and convenience of fast food restaurants, such as Kentucky Fried Chicken or Taco Bell, while also offering fresher, higher quality food and service comparable to more expensive fast casual dining chains, such as Chipotle and Rubios." *Id.* ¶ 27. As of December 31, 2014, the Company's restaurant system had 415 restaurants, comprised of 172 company-operated and 243 franchised restaurants, over 80% of which were located in California. *Id.* ¶ 25. Given its niche as a QSR Plus chain, Plaintiffs allege "menu pricing was a crucial component of El Pollo Loco's QSR Plus positioning." *Id.* ¶ 31.

By the beginning of the Class Period, El Pollo Loco was "heavily exposed to rising labor costs." *Id.* ¶ 35. In California, the Company was dealing with a 25% increase in minimum wage over a 1.5 year period. *Id.* In order to offset future labor costs, in February, 2015, El Pollo Loco decided to increase its prices by removing the $5 combo meal from the Company's menu boards, which was "a core component of its QSR Plus positioning strategy and one of the key drivers of customer traffic to El Pollo Loco restaurants." *Id.* ¶ 36. The Company also increased prices on other value-priced menu items and changed its menu to offer higher priced non-chicken items, such as shrimp and beef entrees. *Id.* ¶¶ 36, 38.

According to Plaintiffs, the Company's decision to eliminate the $5 combo meal was "disastrous." *Id.* ¶ 37. Customer traffic to El Pollo Loco restaurants drastically dropped which negatively impacted the Company's comparable store sales growth.[1] *Id.* ¶¶ 36–38. However, rather than reveal to investors the truth about the Company's shrinking customer traffic, Plaintiffs allege Defendants "issued a series of materially false and misleading statements and omissions concerning the Company's 2Q 2015 comparable store sales" so that El Pollo Loco securities traded at artificially inflated

---

[1] "Comparable stores sales" is a "measure of sales growth at a given location" and "is one of the most important drivers of a restaurant's revenues." *Id.* ¶ 2.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                         Date: July 25, 2016
                                                                                            Page 3

prices. *Id.* ¶ 42. This allowed Defendants to sell "tens of millions of dollars of their personally held El Pollo Loco shares at fraud-inflated prices." *Id.*

### 2.      Defendants' Roles

Defendants Stephen J. Sather ("Sather"), Laurance Roberts ("Roberts"), and Edward J. Valle ("Valle") (collectively the "Individual Defendants") "ran El Pollo Loco as 'hands-on' managers, overseeing El Pollo Loco's operations and finances." *Id.* ¶ 19.

Defendants Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo"), Trimaran Capital Partners ("Trimaran Capital"), and Freeman Spogli & Co. ("Freeman Spogli") (collectively the "Controlling Shareholder Defendants") have a "controlling ownership" of El Pollo Loco with "the power and influence to control El Pollo Loco" and "to cause the Company to engage in the violations and improper practices." *Id.* ¶ 24.

#### a.      Individual Defendants

Defendant Sather is the President and Chief Executive Officer ("CEO") of El Pollo Loco, and a member of its Board of Directors. *Id.* ¶ 16. He has extensive experience in the restaurant industry, including the casual dining and quick-service sectors. *Id.* While working at El Pollo Loco, CEO Sather created the Operation Dashboard, a real-time system which allows executives and management to track and monitor sales metrics, including comparable store sales. *Id.* During the relevant time period, CEO Sather spoke on El Pollo Loco's behalf in releases, conference calls and signed SEC filings before and during the Class Period. *Id.* On May 19, 2015, CEO Sather sold 360,000 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $7.8 million. *Id.* ¶¶ 16, 54.

Defendant Roberts is the Chief Financial Officer ("CFO") of El Pollo Loco. *Id.* ¶ 17. He has extensive experience in the restaurant industry and as an executive of a publicly held company. *Id.* During the relevant time period, CFO Roberts spoke on El Pollo Loco's behalf during conference calls with investors and signed SEC filings before and during the Class Period. *Id.*

Defendant Valle is the Chief Marketing Officer ("CMO") of El Pollo Loco. *Id.* ¶ 18. During the relevant time period, CMO Valle spoke on El Pollo Loco's behalf during conference calls. *Id.* On May 19, 2015, CMO Valle sold 175,000 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $3.8 million. *Id.* ¶¶ 18, 54.

#### b.      Shareholder Defendants

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                          Date: July 25, 2016
                                                                                                                  Page 4

Defendant Trimaran Pollo is owned by Trimaran Capital, a private asset management firm. *Id.* ¶ 20. Defendant Freeman Spogli is a private equity firm. *Id.*

The Controlling Shareholder Defendants have been the owners of El Pollo Loco since 2005. *Id.* ¶ 21. In July 2014, they took the company public in an underwritten initial public stock offering ("IPO"), selling approximately 8.2 million shares at $15 per share. *Id.* Following the IPO, the Controlling Shareholder Defendants continued to collectively own more than 70% of El Pollo Loco's equity, and Trimaran Capital maintained the power to select El Pollo Loco's board members. *Id.* ¶ 22. Freeman Spogli and Trimaran Capital representatives account for four of El Pollo Loco's seven directors. *Id.*

In November 2014, the Company commenced a second offering through which the Controlling Shareholder Defendants sold 5.6 million shares of their El Pollo Loco common stock. *Id.* ¶ 23. Following the secondary offering and until May 19, 2015, the Controlling Shareholder Defendants "maintained 60% of the Company's shares, sufficient for majority votes over all matters requiring stockholders votes, including election of directors." *Id.*

On May 19, 2015, Trimaran Pollo sold 5,402,500 shares of El Pollo Loco common stock, receiving proceeds of over $118 million. *Id.* ¶ 54.

### 3.      False and Misleading Statements

The CAC sets forth two categories of allegedly false statements: (1) statements of optimism that the Company was still on track to report positive comparable store sales; and (2) allegedly false statements made by CEO Sather, CFO Roberts, and CMO Valle blaming the lighter than expected comparable store sales growth on the New Year's Eve holiday and unrelated menu changes, rather than the elimination of the $5 combo meal and subsequent decline in customer traffic.

### a.      Alleged False and Misleading Statements Regarding On-Going Positive Comparable Store Sales

On May 14, 2015, the day before the start of the Class Period, the Company reported a 5.1% increase in comparable store sales, including a 3.5% increase for company-operated restaurants, and a 6.2% increase for franchised restaurants, for the first quarter of fiscal year 2015 ("1Q 2015"). *Id.* ¶ 43.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                   Date: July 25, 2016
                                                                    Page 5

The following statements were made in the Company's May 14, 2015 press release:

- CEO Stater stated: "first quarter results . . . once again demonstrate[d] strong operating momentum through solid sales and earnings growth."

- CEO Stater stated: "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to resonate with guests, as evidenced by [its] system-wide comparable restaurant sales growth of 5.1%."

- El Pollo Loco was on track to report "[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%" for fiscal year 2015.

*Id.* ¶ 43.

Plaintiffs allege that before and during the Class Period, Defendants "tracked and monitored El Pollo Loco comparable store sales through the Company's Operational Dashboard, which aggregated restaurant-level information on a real-time basis, providing immediate feedback to Defendants on nearly every aspect of the Company's business." *Id.* ¶ 40. Defendants therefore knew by May 14, 2015 that customer traffic was severely declining at El Pollo Loco restaurants due to the elimination of the $5 combo meal, but concealed that information from investors. *Id.* ¶¶ 42, 53. Thus, Defendants' positive statements about the Company's "strong ongoing comparable store sales trends and ability to meet its 2015 guidance" were false and misleading because Defendants knew such results were "unachievable." *Id.* ¶ 44.

### b.     Alleged False and Misleading Statements Regarding The Lighter Than Expected Comparable Stores Sales

Following the May 14, 2015 press release, CEO Stater, CFO Roberts and CMO Valle held a conference call with analysts. *Id.* ¶ 44. Plaintiffs allege Defendants continued to conceal that customer traffic at the restaurants was decreasing as a result of the decision to remove the $5 combo meal, and instead blamed the "lighter than expected sales growth" on the New Year's holiday and other unrelated menu changes, such as the introduction of higher-priced non-chicken menu items and the removal of the under 500 calorie menu, as follows:

- CFO Roberts stated: "Note that the comparable restaurant sales growth was negatively impacted by the timing of the New Year's holiday, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                  Date: July 25, 2016
                                                                         Page 6

       reduced same-store transaction and sales by approximately 60 basis points
       for the quarter."

- CFO Roberts stated: "[W]e continue to expect full-year system-wide comparable restaurant sales growth of 3% to 5%. That said, we do not expect our comparable restaurant sales increases to be evenly split among the remaining three quarters of 2015. During the second quarter, we will be lapping a record high average unit volume quarter as a result of two of our most successful promotions, while simultaneously conducting extending tests of alternative proteins. As a result, we will expect our second quarter comparable sales to be closer to the low end of the range."

- CMO Valle stated: "[A]s Larry had mentioned, [because of] the New Year's timing . . . the gain fell into the prior year and the pain fell into this year.  He mentioned, there was a 60 basis point hit on comps for that. But also kind of the Under 500 line, we focused on our shrimp and moved away a little bit from the Under 500 line and that was a little bit of a drag, as well. We happen to be restaging that line in June, and we believe we'll get back up to the strength that it had in the quarter of last year."

- CMO Valle stated: "We would normally, as we would phase these in, we would sequence them over time. We would seed the shrimp. We would grow the shrimp. And then either 9 months to 12 months later, we would then bring the steak in after that. So I think it was a little bit more of they both kind of converged together. As a result, the visibility of value on our menu is not as strong as it used to be, at least for that five-week period of time. Our value scores, are still high. . . . It's really like the marketing communication thing. There's success with the steak. There's success with the shrimp. And how are we going to express that and balance that within our menu, as we move into the back end of the year and into 2016."

*Id.* ¶¶ 46–47, 50–51.

     On June 10, 2015, El Pollo Loco presented at William Blair's Annual Growth Stock Conference.  *Id.* ¶ 56. During the conference, CEO Sather stated:

- "So we want to always maintain that value. We don't want to get up too high pricing towards the fast casual, and we always want to maintain that speed with the convenience of the drive-through, etc. So I think this is very

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                Date: July 25, 2016
                                                                          Page 7

important. If you look at our systemwide comps, we talked about the last 15 quarters of being positive same-store sales. Very strong. I think you can see that what we've been doing over the last years is clearly resonating with the consumer."

*Id.* ¶ 56.

Plaintiffs allege Defendants' statements were materially false and misleading because Defendants still concealed the truth from investors by "blaming softening May 2015 sales on the temporary overlapping of higher priced non-chicken menu offerings." *Id.* ¶ 57.

On July 6, 2015, the Company disclosed it had reintroduced its $5 combo meal, but continued to conceal the "dramatic declines in store traffic that had necessitated the return of the $5 value menu," as follows:

- CMO Valle stated: "Our Original Pollo Bowl is a fan favorite and we are excited to unveil four new Pollo Bowls that combine our signature fire-grilled chicken with authentic ingredients like our perfectly marinated baja shrimp all in one bowl for only $5."

*Id.* ¶ 58.

### 4.      Insider Trading

On May 15, 2015, following the Company's press release and conference call with analysts, the price of El Pollo Loco stock declined by $4.36 per share from $29.06 per share on May 14, 2015 to $24.70 per share. *Id.* ¶ 52. Five days later, on May 19, 2015, CEO Sather, CMO Valle, and the Controlling Shareholder Defendants (as well as other El Pollo Loco top executives and directors) sold their personally held El Pollo Loco common stock at $21.85 per share, receiving gross proceeds of over $132.4 million. *Id.* ¶ 54.

Plaintiffs allege the insider sales were suspicious in timing and amount because "none of them sold any shares since November 2014 and the sales were not made pursuant to any 10(b)-5 trading plan." *Id.* Plaintiffs further allege the timing of the sales demonstrates that CEO Sather, CMO Valle, and the Controlling Shareholder Defendants "knew customer traffic was shrinking and that the Company's 2Q 2015 comparable store sales guidance of 3%-5% was not achievable." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016
                                                                     Page 8

### 5.        August 13, 2015 Statements

On August 13, 2015, the last day of the Class Period, the Company reported "[s]ystem-wide comparable restaurant sales [had only grown] 1.3%, including a 0.5% decrease for company-operated restaurants, and a 2.6% increase for franchised restaurants" for the second quarter of fiscal year 2015 ("2Q 2015"). *Id.* ¶ 60. The Company did not meet its system-wide comparable restaurant sales growth projection made in 1Q 2015 of approximately 3.0% to 5.0%. *Id.* The Company therefore cut its system-wide comparable restaurant sales growth assumption for the remainder of the 2015 fiscal year downward from 3% to 5% to just 3%. *Id.*

That same day, CEO Stater, CFO Roberts, and CMO Valle held a conference call with analysts which, according to Plaintiffs, revealed the truth about the Company's false and misleading statements and omissions, as follows:

- CEO Sather stated: "second-quarter results were impacted by the combination of higher-priced offerings and a reduction of [the] value portion of [its] menu."

- CEO Sather stated: "In the third quarter, we re-launched the $5 Combo menu which will remain in our restaurants full time to reinforce our value offering. This allows us to return to our winning QSR+ strategy of introducing exciting, new, premium Mexican entrees . . . to a base of underlying value frequency drivers like our $5 combos."

- CFO Roberts stated: "comparable restaurants sales decline of 0.5% . . . was comprised of a 3.9% decrease in traffic partially offset by an increase in average check size of 3.4%."

- CEO Sather stated: "Also, we increased the prices on our value menu, and specifically, on another entrée line, which was important, the 5 under 500. We believe that really impacted our value customer. When you then take on top of that that we layered in the premium proteins, we first did shrimp and then carne asada. While we were happy with their performance, we think that they really further drove that perception of higher prices with the non-focus of value."

- CMO Valle stated: "We launched the $5 combos, David, or re-launched them. To make -- first of all, to put that panel back up on the menu board

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016
                                                                     Page 9

and make it more prominent, and we're seeing strong results from that. That $5 combo panel will remain for the balance of 2015. We also re-launched the 500 line, which we spoke about briefly in the last call, that we are giving customers more value in terms of not just variety, but also in terms of price range as well."

- CEO Sather stated: "I think in period seven, first period of Q3, we actually have the $5 pollo bowls to launch there, and then the next period the $5 combos and the chicken and shrimp, and we saw the stabilization certainly of bringing that a very popular $5 pollo bowl item and now the $5 combos on that. So, we're seeing that stabilization. Quite frankly, we had never taken something like that off the menu before."

*Id.* ¶¶ 60–63.

Plaintiffs allege the Company's statements make clear Defendants knew, yet concealed from investors, that they "had no reasonable basis to expect, and, in fact did not expect, that comparable stores sales growth for 2Q 2015 would be in the 3%-5% range" because of the "severe decline in customer traffic that began in 1Q 2015 due to the loss of the Company's price-conscious customers and abandonment of El Pollo Loco's QSR Plus pricing strategy." *Id.* ¶ 59(d).

On August 14, 2015, El Pollo Loco's stock declined from its closing price of $18.36 per share on August 13, 2015 to $14.56 per share. *Id.* ¶ 65.

## B.    Procedural History

On January 29, 2016, Plaintiffs filed the operative CAC alleging violations of: (1) Section 10(b) of the Exchange Act and Rule 10b-5 against El Pollo Loco and the Individual Defendants; (2) Section 20(a) of the Exchange Act against the Individual Defendants and the Controlling Shareholder Defendants; and (3) Section 20A of the Exchange Act against CEO Sather, CMO Valle and the Controlling Shareholder Defendants. *Id.* ¶¶ 75–92.

Defendants brought the instant Motion on March 28, 2016 (Dkt. 50). Plaintiffs opposed on May 27, 2016 (Dkt. 52), and Defendants replied on June 27, 2016 (Dkt. 55).

## II.    Legal Standard

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016
                                                                     Page 10

        Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed
when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the
complainant to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v.
Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible in order
to survive a motion to dismiss). The pleadings must raise the right to relief beyond the
speculative level; a plaintiff must provide "more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S.
at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, this
court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual
inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire &
Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The court is not required to accept
as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

        An allegation of "fraud or mistake must state with particularity the circumstances
constituting fraud." Fed. R. Civ. P. 9(b). The "circumstances" required by Rule 9(b) are
the "who, what, when, where, and how" of the fraudulent activity. *Vess v. Ciba-Geigy
Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Neubronner v. Milken*, 6 F.3d 666, 672
(9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other
details of the alleged fraudulent activity."). In addition, the allegation "must set forth
what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106
(quoting *In re Glenfed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). This
heightened pleading standard ensures "allegations of fraud are specific enough to give
defendants notice of the particular misconduct which is alleged to constitute the fraud
charged so that they can defend against the charge and not just deny that they have done
anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

        Under the heightened pleading standards of the Private Securities Litigation
Reform Act ("PLSRA"), a securities fraud complaint must identify each alleged
misrepresentation, specify the reasons it is misleading, and state with particularity facts
giving rise to a strong inference that the defendant who made the misrepresentation acted
with fraudulent intent. *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 321
(2007).

        In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents
of the complaint and material properly submitted with the complaint. *Van Buskirk v.
Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v.
Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the
incorporation by reference doctrine, the court may also consider documents "whose
contents are alleged in a complaint and whose authenticity no party questions, but which

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016

Page 11

are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir. 2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Additionally, the court may take judicial notice of certain items without converting the motion to dismiss into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). For instance, the court may take judicial notice of facts "not subject to reasonable dispute" because they are either: "(1) [] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that the court may take judicial notice of "undisputed matters of public record," including "documents on file in federal or state courts," as well as "documents not attached to a complaint . . . if no party questions their authenticity and the complaint relies on those documents").

Dismissal with leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2)  This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made).

## III.     Request For Judicial Notice

As an initial matter, Plaintiffs and Defendants have asked the Court to take judicial notice of several SEC filings, analyst reports, transcripts of various earnings conference calls, and other publicly available financial documents (Dkts. 51, 54, 56). In deciding a motion to dismiss, courts can consider securities offerings and corporate disclosure documents that are publicly available. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. [Plaintiff] does not contest the propriety of the noticing of these documents on appeal, which in any event was proper.") (citation omitted). Therefore, the Court GRANTS the parties' requests.

## IV.     Discussion

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                        Date: July 25, 2016
                                                                                         Page 12

Defendants move to dismiss Plaintiffs' entire CAC on the grounds Plaintiffs fail to plead a false or misleading statement or an inference of scienter under Section 10(b) and Rule 10b-5 that satisfies the heightened pleading standards of the PSLRA. *See generally* Mot. The Court addresses each of Defendants' arguments in turn.

## A.    Section 10(b) and Rule 10b-5 Claims

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts showing (1) a material misrepresentation (or omission), (2) scienter, (3) a connection with the purchase or sale of security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Ins. v. Broudo*, 544 U.S. 336, 341 (2005). As noted above, Defendants' Motion only contests falsity and scienter.

### 1.    Whether the CAC Adequately Pleads a Material False or Misleading Statement

Defendants argue the material false or misleading statements identified by Plaintiffs are not actionable because (1) they are protected under the PSLRA's safe harbor provision as "forward-looking" statements; (2) they are non-actionable puffery; and (3) the allegedly omitted facts rendering the statements false were actually disclosed. Mot. at 12-22. The Court agrees.

#### a.    PSLRA Safe Harbor Provision

The PSLRA provides a "barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). A "forward-looking" statement includes "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i)(1)(A). Such a statement falls within the PSLRA's safe harbor provision if: (1) it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" or (2) "the plaintiff fails to prove that the forward-looking statement" was made with "actual knowledge by that person that the statement was false or misleading." *Id.* § 78u-5(c)(1).

Defendants argue the Company's statements regarding its "sales growth guidance for 2Q FY 2015" were "classic growth and revenue projections" accompanied by meaningful cautionary statements, and therefore "forward-looking on their face." Mot. at

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                   Date: July 25, 2016
                                                                    Page 13

12-13. Both the May 14, 2015 press release and the conference call with analysts contained the following disclaimers: (1) "[a]ll statements other than statements of historical fact . . . are forward-looking statements;" (2) "forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that we expected;" (3) "[w]hile we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and it is impossible for us to anticipate all factors that could affect our actual results;" and (4) "[a]ll forward-looking statements are expressly qualified in their entirety by these cautionary statements." *Id.* at 13. The Company also referred investors to the articulated "Risk Factors" in the Company's SEC filings, such as the final prospectus, dated July 24, 2014. *Id.* at 13-14. The prospectus contained risk factors related to "change[s] [to] our pricing and other marketing strategies" and "new menu items." *Id.*

Plaintiffs acknowledge the Company's 2015 comparable store sales projections are forward looking, but argue the "purported cautionary language" was not meaningful because the disclosures "did not mention that El Pollo Loco had already sharply raised prices, nor that the price increases caused a decrease in customer traffic and reduced comparable store sales growth." Opp'n at 19-20.

"[T]he PSLRA does not require a listing of *all* factors that might make the results different from those forecasted. Instead, the warning must only mention *important* factors of similar significance to those actually realized." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (citation omitted). Although the cautionary language contained in both the press release and conference call appears to be boilerplate, the Company referred investors to its SEC filings, which specifically discussed "pricing" and "new menu items" as factors that could impact the Company's future operating results and financial condition. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (cautionary language stating "risks and uncertainties described in detail in the company's [SEC] filings" was adequate under the PSLRA). The Court therefore finds the cautionary language taken as a whole is meaningful under the PSLRA. Accordingly, the May 14, 2015 comparable store sales projections contained in the press release and conference call with analysts are forward-looking statements exempt under the safe harbor provision.[2]

---

[2] Plaintiffs also argue the Company's forward-looking statements are not protected by the safe harbor provision because "Defendants had actual knowledge that their 2Q 2015 same-store sales projection was baseless." Opp'n at 19. Because the Court finds the cautionary language accompanying the May 14, 2015 statements was sufficient, Plaintiffs' "state of mind" argument is irrelevant. *In re Cutera*, 610 F.3d at 1112 ("[I]f a forward-looking statement is . . . accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter.")

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                            Date: July 25, 2016
                                                                                                                Page 14

### b.      Puffery

Statements that are "mere puffery" cannot constitute actionable misrepresentations of material fact. *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir.1990). The determination of whether an alleged misrepresentation is a statement of fact or instead "mere puffery" presents a question of law that may be resolved on a Rule 12(b)(6) motion. *Newcal Indus., Inc. v. Ilkon Office Solution,* 513 F.3d 1038, 1053 (9th Cir. 2008).

The difference between statements of fact and mere puffery lies in the generality or specificity of a claim. *Newcal Indus.,* 513 F.3d at 1053. "The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions." *Cook,* 911 F.2d at 246. Thus, statements that are vaguely optimistic, general, or subjective are often not actionable. *Id.* By contrast, statements that are specific, detailed, or definite are actionable. *Id.* However, even statements that "might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb,* 883 F.2d 805, 808 (9th Cir. 1989).

Defendants argue other portions of the May 14, 2015 statements are mere puffery and therefore non-actionable. Mot. at 16. Defendants point to the following statements: (1) items are "performing very well," CAC ¶ 38; (2) "[w]e're excited about our continued operating momentum," *id.* ¶ 49; (3) the menu offers "great value," *id.* ¶ 44; (4) the "appeal of our brand, driven by our . . . compelling value proposition," *id.*; (5) "we believe our comp growth is continued evidence of the appeal of our brand," *id.*; (6) "[o]ur steadfast focus on these four pillars positions the brand well for the future," *id.* ¶ 49; (7) "compelling value" *id.* ¶ 56; (8) "we want to always maintain that value," *id.* ; (9) "what we've been doing for the last years is clearly resonating with the consumer," *id.*; (10) "obsessive lengths to offer the quality and taste our guests crave at a great value," *id.* ¶ 58; and (11) food is a "fan favorite," *id.* Mot. at 16–17, 21. Plaintiffs do not address Defendants' argument, but instead contend the Company's statements blaming the poor 1Q and 2Q results on "a one-time event (New Year's Eve), and two easily-reversed corporate decisions (underemphasizing the Under 500 menu and marketing confusion from simultaneously promoting two premium items)" are specific, factual statements and "plainly not puffery." Opp'n at 21.

The Court finds the statements made by the Company such as "great value," "we're excited," "compelling value proposition," and "fan favorite" are the type of vague assertions of corporate optimism that are not actionable under federal securities law. *See*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016
                                                                     Page 15

*In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007)
(concluding statements such as "This is going to be a very big second half for us;"
"[C]onsumer demand for our learning products is more vibrant than ever;" "[W]e
continue to make strong growth in supply chain," and "We are also strengthening our
operations group, supply-chain management system and warehousing and logistics
functions" are not actionable under § 10(b)). The 11 statements identified by Defendants
"represent the 'feel good' speak that characterizes 'non-actionable puffing.'" *Intuitive
Surgical, Inc.*, 759 F.3d at 1060 (citation omitted). For example, courts have found
statements of optimism such as "good," "well-regarded" or "other feel good monikers"
are not actionable because "professional investors, and most amateur investors as well,
know how to devalue the optimism of corporate executives." *Id.* (citation omitted).

As to the statements identified by Plaintiffs, the Court agrees such statements are
outside the scope of mere puffery; however, as discussed below, Plaintiffs have failed to
allege facts supporting a showing that the statements were false when made.

### c.     Omitted Facts

"To be actionable under the securities laws, an omission must be misleading; in
other words it must affirmatively create an impression of a state of affairs that differs in a
material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280
F.3d 997, 1006 (9th Cir. 2002) (citation omitted). This is because "[n]o matter how
detailed and accurate disclosure statements are, there are likely to be additional details
that could have been disclosed but were not." *Id.*

Defendants contend Plaintiffs have failed to plead an "actionable omission"
because the Company's "downward trend in store traffic" was disclosed "in every single
quarterly press release or earnings call." Mot. at 17-18. Plaintiffs do not dispute that
Defendants accurately disclosed numbers concerning store traffic, but contend
Defendants' statements explaining the poor results in 1Q and 2Q were misleading. Opp'n
12-13. Plaintiffs argue the Individual Defendants concealed from investors the "true
cause of the poor comparable store sales performance: that El Pollo Loco's sharply
increasing its prices, including by removing the $5 combo menu, had driven away its
customers." *Id.* at 15. The Court is not persuaded.

The problem with Plaintiffs' argument is Plaintiffs have failed to show
Defendants' failure to mention the $5 combo meal was at odds with the state of affairs
Defendants presented to investors.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                              Date: July 25, 2016
                                                              Page 16

First, as noted above, the Company disclosed that restaurant traffic only grew 0.1% in both the May 14, 2015 press release and conference call with analysts.

Second, the Company made clear it was evaluating the impact of its higher priced menu items, and it expected its comparable restaurant sales growth to drop. For example, CEO Stater stated, "we are still in an extended test and assessing the overall impact on the menu and mix" (Declaration of Jason D. Russell ("Russell Decl.") (Dkt. 51-1) Ex. 2; CFO Roberts stated, "we will expect our second quarter comparable sales to be closer to the low end of the range," *id.*; and CMO Valle stated, "the"[v]isibility of value on our menu is not as strong as it used to be." *id.*

Third, for the Company's statements to be misleading, Defendants must have "actually known specific information" about the impact on the removal of the $5 combo meal from its menu. *See In re Netflix, Inc. Securities Litigation*, 923 F. Supp. 2d 1214, 1223 (N.D. Cal. 2013). Plaintiffs contend CEO Sather, CFO Roberts, and CMO Valle "constantly monitored and measured El Pollo Loco's performance through the Operation Dashboard," which provided real-time data on current performance against forecasts, comparable store sales, customer traffic, and average check size. Opp'n at 23.[3] Even assuming such information is true, Plaintiffs fail to allege facts showing how each Individual Defendant knew any statistical data was specifically linked to the removal of the $5 combo meal, as opposed to the New Year's Eve holiday, or the other menu changes, such as the removal of the Under 500 menu and the promotion of shrimp and steak. *See Intuitive Surgical, Inc.* at 1062 ("The complaint lacks allegations of specific admissions by the individual defendants regarding their involvement with [the company's] operations or with the software-generated reports."); *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) ("The complaint does not plead facts that show that company insiders knew what the complaint says 'would' occur in what was then the future."); *see also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000) ("Absent specific allegations of the *source* of this information or some contemporaneous statement by defendants reflecting familiarity with this information, plaintiffs have failed to meet the falsity pleading burden.") (emphasis in original).  In sum, without more, the Court is not convinced Defendants omitted any information or warnings to investors that would be misleading.

---

[3]  Moreover, the fact that during the August 13, 2015 call with analysts Defendants attributed the removal of the $5 combo menu to the decline in comparable store sales does not necessarily demonstrate that any of Defendants' statements were false when made. *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1070 (C.D. Cal. 2012) ("[A]lleging that certain predictions proved incorrect is not the same as alleging with particularity facts that show the initial prediction was a falsehood.") (citation and internal quotation marks omitted).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016
                                                                                                Page 17

Accordingly, the Court GRANTS Defendants' Motion and DISMISSES the Section 10(b) and Rule 10b-5 claims against El Pollo Loco and the Individual Defendants WITHOUT PREJUDICE.

### 2.      Whether the CAC Adequately Pleads Scienter

Although Plaintiffs' failure to plead a false or misleading statement is fatal to their securities claims, given that leave to amend will be granted, the Court now turns to whether the CAC adequately pleads scienter.

The Private Securities Litigation Reform Act (PSLRA) requires that the complaint "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This scienter requirement means plaintiffs must plead the defendants engaged in "knowing" or "intentional" misconduct. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). Under Ninth Circuit precedent, "reckless" conduct may satisfy the scienter requirement when it is "deliberate" and the facts describing the recklessness are set forth in great detail. *Id.*; *see also In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999) (holding the recklessness must reflect "some degree of intentional or conscious misconduct" in order to satisfy the scienter requirement), *abrogated on other grounds by* 542 F.3d 776, 784 (9th Cir. 2008).

In determining whether there is a "strong inference" of scienter, the court must weigh competing inferences. *Tellabs*, 551 U.S. at 323–24 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."). The inference of scienter must be more than "merely reasonable . . . it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "Omissions and ambiguities count against inferring scienter," but the court must "not scrutinize each allegation in isolation." *Id.* at 326. Instead, the court must view the complaint "holistically." *Id.*; *see also South Ferry*, 542 F.3d at 784 ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter."). Thus, a complaint for securities fraud survives a motion to dismiss when, after considering the totality of the circumstances, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *South Ferry*, 542 F.3d at 784.

Here, Plaintiffs contend CEO Sather, CMO Valle, and the Controlling Shareholder Defendants' sale of their El Pollo Loco common stock supports scienter. Opp'n at 26.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                    Date: July 25, 2016
                                                     Page 18

"[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information.*'" *Ronconi*, 253 F.3d at 435 (emphasis in original). In determining whether sales are suspicious or unusual, courts consider three factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* The CAC fails to meet this requirement.

The CAC does not allege facts "regarding the sales as a percentage of each individual's total holdings." *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1068 (C.D. Cal. 2004) ("[T]he proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious.") (citation omitted). Plaintiffs also do not address "the context surrounding the sales." *Id*; *see also Intuitive Surgical, Inc.* at 1064 (dismissing allegations of insider trading when "the complaint contains no allegations regarding the defendants' prior trading history, which are necessary to determine whether the sales during the Class Period were 'out of line with' historical practices"). For example, Plaintiffs do not explain why CFO Roberts did not sell any shares. *Ronconi*, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made."). Plaintiffs also fail provide any information as to whether there were any restrictions on an insider's ability to trade. *Id.* (finding trade restrictions are important in determining whether the trading pattern is suspicious) (citation omitted).

Accordingly, the Court finds Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter and therefore GRANTS Defendants' Motion and DISMISSES the Section 10(b) and Rule 10b-5 claims against El Pollo Loco and the Individual Defendants on this basis as well.

### B.      Section 20(a) and Section 20A Claims

Plaintiffs allege a Section 20(a) claim against the Individual Defendants and Controlling Shareholder Defendants, and a Section 20A claim against CEO Sather, CMO Valle, and the Controlling Shareholder Defendants.

"[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n. 15 (9th Cir. 2002); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("Section 20(a) claims may be

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: July 25, 2016
                                                                                            Page 19

dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b).").

      Because Plaintiffs fail to sufficiently allege a violation of Section 10(b) and Rule 10b-5, the Court GRANTS Defendants' Motion and DISMISSES Plaintiffs' claims for alleged violations of Section 20(a) and 20A WITHOUT PREJUDICE.

## V.      Disposition

      For the foregoing reasons, the Court hereby GRANTS Defendants' Motion to Dismiss WITHOUT PREJUDICE.

      Plaintiffs may file an amended complaint **on or before August 22, 2016.**

      The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                                    Initials of Deputy Clerk: djg
CIVIL-GEN