ROBBINS GELLER RUDMAN
   & DOWD LLP
RYAN A. LLORENS (225196)
LAURIE L. LARGENT (153493)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
llargent@rgrdlaw.com

THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN (219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA  90071
Telephone:  213/785-2610
213/226-4684 (fax)
lrosen@rosenlegal.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| DANIEL TUROCY, et al., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> EL POLLO LOCO HOLDINGS, INC., et al., <br><br> Defendants. | Case No. 8:15-cv-01343-DOC-KES (**Consolidated**) <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

1178532_1

Lead Plaintiffs Robert W. Kegley, Sr., Peter Kim, Dr. Richard J. Levy, Sammy Tanner and Ron Huston (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against defendants, allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon investigation of counsel, which included, without limitation: (1) review and analysis of Securities and Exchange Commission ("SEC") filings made by El Pollo Loco Holdings, Inc. ("El Pollo Loco" or the "Company"); (2) review and analysis of press releases and other publications disseminated by defendants; (3) review of news articles, analyst reports and conference call transcripts; (4) review and analysis of other publicly available information concerning defendants and El Pollo Loco; and (5) discussions with former employees of El Pollo Loco and El Pollo Loco franchises.  The investigation of the facts pertaining to this case is continuing.  Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the securities of El Pollo Loco between May 15, 2015 and August 13, 2015, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants El Pollo Loco, Stephen J. Sather ("Sather") the Company's Chief Executive Officer ("CEO"), Laurance Roberts ("Roberts") the Company's Chief Financial Officer ("CFO"), Edward J. Valle ("Valle") the Company's Chief Marketing Officer ("CMO"), and the Company's controlling shareholders, as described below (collectively, "Defendants").

2.      El Pollo Loco, a fast food chain primarily based in California with a focus on Los Angeles, faces a serious challenge: California and Los Angeles's quickly rising minimum wages pose a threat to its profitability.  Indeed, before the Class Period, market analysts expressed concern about El Pollo Loco's ability to raise its

1178532_1

prices to meet rising labor costs while maintaining its successful market position as a quick service restaurant plus ("QSR+"), a position that was responsible for El Pollo Loco's tremendous historic sales growth.

3.     In February 2015, just before the start of the Class Period, El Pollo Loco began experimenting with solutions to its minimum wage problems by substantially raising its menu prices.  Specifically, El Pollo Loco significantly altered its QSR+ strategy by removing its highly popular $5 combo meal menu.  This move was unprecedented as El Pollo Loco had always had inexpensive meals on its menu.

4.     Unbeknownst to investors, the result was a disaster.  El Pollo Loco's customer traffic immediately fell as a result, as did its comparable store sales growth – one of the indicators the Company touts to investors as a key measure of its performance.  The failed experiment showed that El Pollo Loco would not be able to raise its prices without driving away customers.

5.     On May 14, 2015, El Pollo Loco reported its 1Q 2015 earnings results.[1] El Pollo Loco's experiment with higher prices had damaged its performance.  Its customer traffic suffered and comparable store sales growth was below expectations. On the conference call Defendants held to discuss the results, analysts repeatedly asked Defendants what had caused the poor comparable store sales growth. Defendants falsely assured analysts that superficial factors, namely the timing of New Year's Eve – purely a calendar issue – and an unrelated menu change were the cause of the customer traffic decrease and lower than expected comparable store sales increase.

6.     Given the market's concerns about El Pollo Loco's ability to raise prices in the face of looming labor cost increases, had Defendants disclosed that it was

---

[1]     For financial reporting, El Polo Loco uses a 52- or 53-week fiscal year ending on the last Wednesday of each calendar year.  For fiscal 2015, the first quarter ended April 1, 2015 and the second quarter ended July 1, 2015.

1  actually El Pollo Loco's attempt to raise prices that drove away its customers, analysts

2  would have accurately determined that its financial outlook was dire.

3       7.    During the May 14, 2015 conference call, concerned about the

4  disappointing 1Q comparable sales trends, analysts specifically asked Defendants

5  about the trend they were so far seeing for 2Q 2015 – the second quarter was half-way

6  over at the time. Because the poor performance in truth was caused by the Company

7  raising prices and thereby driving away customers, poor performance had persisted

8  into 2Q 2015.  Defendants, however, concealed this truth and again blamed an easily-

9  addressable issue – confusion in El Pollo Loco's marketing efforts – for soft customer

10  traffic in early 2Q.  Indeed, defendant Valle specifically denied to an analyst that

11  higher pricing had any impact on 1Q or the 2Q to date.

12       8.    In fact, Defendants claimed that because the poor 1Q and beginning of

13  2Q results were simply due to El Pollo Loco's poor marketing and other one-time or

14  easily-addressed factors, comparable store sales would still grow by at least 3% in 2Q

15  2015 – though by the time Defendants made their statements, it was impossible for El

16  Pollo Loco to achieve the target.  Based on Defendants' misleading statements, market

17  analysts estimated 2Q 2015 comparable store sales in the 3% to 3.3% range.

18       9.    A mere five days after their false statements, and while knowing that

19  higher menu prices were causing a substantial continuing decline in customer traffic

20  that would continue through 2Q 2015, Defendants and Company insiders sold over

21  $130 million of their personally-held stock in a coordinated frenzy.

22
23

| Defendant | Date Sold | Shares Sold | Proceeds |
| --- | --- | --- | --- |
| Controlling Shareholder Defendants | 05/19/15 | 5,402,500 | $118,044,625 |
| Sather | 05/19/15 | 360,000 | $7,866,000 |
| Valle | 05/19/15 | 175,000 | $3,823,750 |

24
25
26
27
28

- 3 -

| Defendant | Date Sold | Shares Sold | Proceeds |
|---|---|---|---|
| Additional Insiders[2] | 05/19/15 – 06/02/15 | 124,916 | $2,689,666 |
| TOTALS | | 6,062,416 | $132,424,041 |

10.   No Defendant has sold any stock since.

11.   The truth about Defendants' misleading statements and omissions was revealed three months later on August 13, 2015, when the Company announced 2Q 2015 results.  Comparable store sales growth was only half of what was expected and traffic in Company-operated stores had fallen by almost 4%.  In the earnings call held to discuss the results, Defendants admitted that poor comparable store sales results in the first half of 2015 had not been caused by marketing confusion or the timing of New Year's – but by higher prices.  While denying it throughout the Class Period, Defendants finally admitted that changing course away from its QSR+ Strategy is what caused its lackluster results.

12.   In reaction to Defendants' announcement, the price of El Pollo Loco stock plummeted 20%, from a closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015, the lowest closing price since the Company's initial public offering ("IPO") on July 14, 2014.

13.   Immediately after El Polo Loco's August 13, 2015 conference call, an analyst issued a report claiming that El Pollo Loco's failed attempt to raise prices cast doubt on El Pollo Loco's ability to survive minimum wage increases.

---

[2]   As more fully described in ¶70, the following Company insiders also dumped El Pollo Loco stock during the Class Period: Kay Bogeajis ("Bogeajis"), Chief Operating Officer ("COO"), Douglas Ammerman, director, and Samuel Borgese, director.

**JURISDICTION AND VENUE**

14.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act, as El Pollo Loco's principle executive offices are located at 3535 Harbor Blvd., Suite 100, Costa Mesa, California 92626, and a substantial portion of the acts and transactions giving rise to the violations of law complained of occurred in this District.

**THE PARTIES**

**Plaintiffs**

16.     Lead Plaintiff Robert W. Kegley, Sr. purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

17.     Lead Plaintiff Peter Kim purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

18.     Lead Plaintiff Dr. Richard J. Levy purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

19.     Lead Plaintiff Sammy Tanner purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

20.     Lead Plaintiff Ron Huston purchased El Pollo Loco securities at artificially inflated prices during the Class Period as described in the previously filed

- 5 -

1  Certification incorporated herein by reference (Dkt. No. 18-2) and suffered damages

2  as a result of Defendants' alleged misconduct.

3  **Company and Individual Defendants**

4      21.    Defendant El Pollo Loco, through its subsidiary, El Pollo Loco, Inc.,

5  develops, franchises, licenses and operates quick-service restaurants under the El

6  Pollo Loco name in the United States.

7      22.    Defendant Sather is, and was at all relevant times, the President and CEO

8  of El Pollo Loco, and a member of its Board of Directors.  Prior to becoming CEO in

9  2010, Sather served as the Company's Senior Vice President of Operations from 2006

10 to 2010.  While working in El Pollo Loco operations department, Sather created the

11 Company's Operation Dashboard through which Company executives and

12 management closely track and monitor the Company's sales metrics, including

13 comparable store sales, on a real-time basis.  Through his tenure with the Company,

14 and prior experience, Sather has extensive experience in the restaurant industry,

15 including the casual dining and quick-service sectors.  As President and CEO,

16 defendant Sather spoke on El Pollo Loco's behalf in releases, conference calls and

17 SEC filings and signed El Pollo Loco's filings with the SEC before and during the

18 Class Period.  During the Class Period, defendant Sather sold 360,000 shares of El

19 Pollo Loco common stock at $21.85 per share, reaping proceeds of over $7.8 million.

20     23.    Defendant Roberts is, and was at all relevant times, the CFO of El Pollo

21 Loco.  Roberts has extensive experience in the restaurant industry and as an executive

22 of a publicly held company, including serving as General Manager and CFO of KFC

23 Restaurant Operating Company prior to his employment at El Pollo Loco.  As CFO,

24 defendant Roberts spoke on El Pollo Loco's behalf during conference calls with

25 investors and signed El Pollo Loco's filings with the SEC before and during the Class

26 Period.

27     24.    Defendant Valle is, and was at all relevant times, the CMO of El Pollo

28 Loco.  As CMO, defendant Valle spoke on El Pollo Loco's behalf during conference

calls.  During the Class Period, defendant Valle sold 175,000 shares of El Pollo Loco common stock at $21.85 per share, reaping proceeds of over $3.8 million.

25.     Defendants Sather, Roberts and Valle are sometimes referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants ran El Pollo Loco as "hands-on" managers, overseeing El Pollo Loco's operations and finances and made the material false and misleading statements and omissions described herein.  The Individual Defendants were intimately knowledgeable about all aspects of El Pollo Loco's financial and business operations, as they received daily reports, attended weekly executive meetings and had access to computerized information, including electronic information through the Company's Operation Dashboard, that included real-time information regarding sales, comparable store sales, customer traffic, costs and expenses, product demand, inventory management and customer incentives.  As confirmed by the Company's SEC filings, the Operation Dashboard was a well-developed operations infrastructure that allowed for real-time control over the Company's operations and sales.  The Operation Dashboard allowed Defendants to measure the Company's performance by utilizing a state-of-the-art technology that aggregated real-time restaurant-level information for nearly every aspect of El Pollo Loco's business.  Through the Operation Dashboard, before and during the Class Period, Defendants constantly monitored and measured current performance against benchmarks derived from a broad selection of fast casual and QSR brands, including key operational data regarding sales performance, speed-of-service metrics and food and labor cost controls.

**Controlling Shareholder Defendants**

26.     Defendant Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo") was incorporated in 2005 and is based in Irvine, California.  Defendant Trimaran Pollo is owned by defendant Trimaran Capital Partners ("Trimaran Capital"), a private asset management firm headquartered in New York, New York, and defendant Freeman Spogli & Co. ("Freeman Spogli"), a private equity firm based in Los Angeles,

- 7 -

California.  Trimaran Pollo, Trimaran Capital and Freeman Spogli are collectively referred to herein as the "Controlling Shareholder Defendants."

27.     In July 2014, after several years of staging a Company turnaround, the Controlling Shareholder Defendants, who were the owners of El Pollo Loco since 2005, took the Company public in an underwritten initial public stock offering ("IPO"), selling approximately 8.2 million shares of El Pollo Loco common stock at $15 per share and raising more than $123 million in gross proceeds.

28.     Pursuant to a stockholders' agreement between El Pollo Loco and the Controlling Shareholder Defendants, following its IPO, El Pollo Loco remained a subsidiary of Trimaran Pollo and, with the Controlling Shareholder Defendants continuing to collectively own more than 70% of El Pollo Loco's equity, Trimaran Capital maintained the power to select El Pollo Loco's board members.   The Chairman of El Pollo Loco's Board of Directors, Michael G. Maselli, is a managing director of Trimaran Fund Management, L.L.C.  Another El Pollo Loco director, Dean C. Kehler, co-founded Trimaran Capital, and remains one of its managing partners.  A third El Pollo Loco director, Wesley W. Barton, is a Vice President of Trimaran Capital.  One of Freeman Spogli's General Partners, John M. Roth, is also an El Pollo Loco director.  Thus, Freeman Spogli and Trimaran Capital representatives account for four of El Pollo Loco's seven directors.  Further, following the IPO, "Trimaran and Freeman Spogli [would] indirectly beneficially own shares sufficient for majority votes over all matters requiring stockholder votes, including: . . . decisions affecting [its] capital structure," and "Trimaran and Freeman Spogli [could] seek to cause [the Company] to take courses of action that . . . might involve risks to [its] other stockholders or adversely affect us or [its] other stockholders . . . ."

29.     Pursuant to the stockholders agreement between El Pollo Loco and the Controlling Defendant Shareholders, in November 2014, the Company commenced a secondary offering through which the Controlling Shareholder Defendants sold 5.6 million shares of their El Pollo Loco common stock.  Following the November 2014

- 8 -

secondary offering and until May 19, 2015, the Controlling Shareholder Defendants still, collectively, maintained 60% of the Company's shares, sufficient for majority votes over all matters requiring stockholder votes, including election of directors.

30.     By reason of their controlling ownership in El Pollo Loco before and during the Class Period as describe above, the Controlling Shareholder Defendants were "control persons" of El Pollo Loco within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), and had the power and influence to control El Pollo Loco and exercised that control to cause the Company to engage in the violations and improper practices complained of herein.

## STATEMENT OF THE CASE

**Former Employee Sources**

31.     In addition to information available from public sources, the allegations pled herein are supported by the first-hand accounts of former employees of El Pollo Loco and El Pollo Loco franchises ("FE").   The former employee sources are as follows:

32.     FE 1 was an Assistant Manager, at a Los Angeles-area El Pollo Loco store from May 2014 to July 2015, and reported directly to the store's General Manager.  According to FE 1, a Company Area Leader would regularly visit the store where FE 1 worked.  According to FE 1, the Area Leader constantly monitored the store's operations, including sales and labor costs.  FE 1 observed the Area Leader monitoring this information on her mobile phone.  According to FE 1, the Area Leader had enough information to know if the store was busy without even being at the store.  For example, according to FE 1, if the store experienced unexpected low customer traffic, within hours, the corporate Area Leader would call and tell the store employees to send employees home to save on labor costs.  FE 1 stated that the Area Leader was always aware of and concerned about labor costs and was monitoring the metric multiple times a day.

33.    According to FE 1, customers were upset about removal of $5 combo menu items and expressed those concerns through the Company's customer feedback system, which included a 1-800 number and an online system for complaints and comments.  FE 1 confirmed that customer complaints and comments could be directly viewed and listened to through El Pollo Loco's Operation Dashboard.  FE 1 also stated that foot traffic noticeably declined when the popular menu items were removed.

34.    FE 2 was a Team Leader at a Los Angeles-area El Pollo Loco from July 2013 to July 2015, and reported directly to the store's General Manager. According to FE 2, the removal of the $5 combo menu caused an immediate fall in store sales. Customers told FE 2 they were upset that the $5 combo menu had been removed. FE 2 reported the $5 combo meal "was people's favorite – that's why people come back." As part of FE 2's employment, FE 2 was responsible for entering all store inventory information into the Operation Dashboard and did so every other day.  FE 2 confirmed that the Operation Dashboard also included, among other things, inventory and sales information and customer feedback.  According to FE 2, the store managers were often in the store office monitoring the store's data on the computer and checking El Pollo Loco emails.

35.    FE 3 was the Senior Director of Operations at El Pollo Loco from August 2013 through mid-April 2015.  FE 3 worked at El Pollo Loco's headquarters and reported directly to El Pollo Loco's COO, Bogeajis.  During FE 3's employment at El Pollo Loco, FE 3 attended meetings with Sather, including weekly executive meetings with Sather, Roberts and other senior executives at the Company.  The weekly meetings took place on Monday mornings and usually lasted two hours. The meetings frequently included discussions of the Company's weekly sales performance, including comparable store sales. According to FE 3, Sather was "glued" to the Operation Dashboard and FE 3 observed Sather reviewing the Operational Dashboard

on his iPad when FE 3 went to Sather's office for meetings.  According to FE 3, Sather created the Operation Dashboard.

**Company Background**

36.     El Pollo Loco opened its first location on Alvarado Street in Los Angeles, California, in 1980, and the Company has since grown its restaurant system to 415 restaurants, comprising 172 company-operated and 243 franchised restaurants as of December 31, 2014.  Its restaurants are located in California, Arizona, Nevada, Texas and Utah, with the typical restaurant being a free-standing building with drive-thru service.  During the Class Period over 80% of El Pollo Loco's restaurants were located in California.

37.     The restaurant industry is divided into two segments; full service and limited service.  El Pollo Loco operates in the limited service restaurant segment, which is comprised of the "quick-service restaurant" ("QSR") and "fast casual" sub-segments.  The restaurant industry defines QSRs as traditional "fast food" restaurants and "fast casual" as a limited or self-service format with higher prices that offer food prepared to order in a more upscale environment.

**The Company's Sales Growth Success Was Attributable to Its Positioning as a "QSR+"**

38.     Before and during the Class Period, El Pollo Loco differentiated itself from its QSR and fast casual competitors by branding itself as a "quick service restaurant *plus*," which allowed it to capture sales from both QSRs and fast casual restaurants.  As a QSR+ chain, El Pollo Loco offered its customers the lower prices and convenience of fast food restaurants, such as Kentucky Fried Chicken or Taco Bell, while also offering fresher, higher quality food and service comparable to more expensive fast casual dining chains, such as Chipotle or Rubios.  As defendant Sather explained in a pre-Class Period January 12, 2015 conference call with investors:

> Now let's talk for a second about our positioning.  We call it QSR+.  And I really call this the best of both worlds.  We capture the

1   high-quality food of the players you see here on the right: the Chipotle,

2   the Zoes, Rubios.  Very high quality of the fast casual.  Yet we do that at

3   the speed, convenience and value of the players you see here on the left:

4   McDonalds, Chick-fil-A or Taco Bell.  And we want to be right in that

5   positioning because we think that's the perfect sweet spot.

6       39.   Just before the start of the Class Period, in the Company's March 12,

7   2015 earnings press release for 4Q 2014 and FY 2014, defendant Sather attributed the

8   Company's repeated sales growth success to El Pollo Loco's '"QSR-plus'

9   positioning"' and the "compelling value proposition" the Company offered its

10  customers, *e.g.*, fresh, high quality food at lower prices.  Later on the same day, during

11  the earnings conference call with investors, defendant Sather again credited the

12  Company's impressive history of consecutive-quarter comparable store sales growth

13  to the compelling value menu that El Pollo Loco offered through its QSR+

14  positioning, explaining:

15           We believe we are uniquely positioned in the restaurant industry

16          in what we refer to as QSR-plus.  We define QSR-plus as offering the

17          high-quality food and dining experience you would expect at a fast

18          casual restaurant, combined with the speed, convenience and value you'd

19          find at a traditional quick service restaurant, essentially getting the best

20          of both worlds.

21           ***Our comp[arable sales] growth is evidence that our compelling***

22          ***value proposition*** alongside our fresh handcrafted Mexican-inspired

23          cuisine continues to appeal to our guests.

24       40.   In its SEC Form 10-K filing for FY 2014, El Pollo Loco also reported

25  that its unique QSR+ positioning was an integral part of the foundation for the

26  Company's continued sales growth, including growth in customer traffic.  In the FY

27  2014 Form 10-K, filed March 17, 2015, the Company stated:

28

1178532_1

Based on an external research report and a customer satisfaction survey, we believe that our positioning appeals to a broad customer base . . . giving consumers the best of both fast casual and QSR segments. Our differentiated QSR+ positioning sources traffic from both dining segments *and as a result continues to fuel our organic transaction growth*.

41.   Not surprisingly, both analysts and investors praised El Pollo Loco's QSR+ positioning and touted the Company's sales growth record. As a result, the Company enjoyed a meteoric rise in its share price from its IPO offering price of $15 per share in July 2014 to over $29 per share just before the start of the Class Period.

**Value Pricing Was an Important Component of the QSR+ Strategy**

42.   Given its niche as a QSR+ chain, menu pricing was a crucial component of El Pollo Loco's QSR+ positioning. As defendant Sather explained in a January 12, 2015 conference call with investors, "we've got a per-person spend of about $5.83. That's just slightly above what you'd pay in QSR and well below what you see in most fast casuals. *So we feel that pricing is very important in QSR positioning*."

43.   During the same call, defendant Valle also emphasized pricing as a key component of the QSR+ strategy, stating:

So we position EPL as real food at reasonable prices. And reasonable prices mean 15% to 18% off the Chipotle, Paneras, the fast casual guys of the world. And about 8%-8% to 10% above QSR. That's what we call QSR+. That allows us to source volume from QSR because we have better food, and it allows us to source volume from fast casual because we have everyday, price-accessible price points. Right? So it works ou[t] wonderfully for us.

44.   During a June 23, 2015 conference call with investors, defendant Sather reiterated that El Pollo Loco's menu pricing was an important component of its QSR+

- 13 -

strategy, which was what allowed the Company to successfully grow its comparable store sales quarter after quarter:

> Let's talk about – I mentioned positioning, let's talk about that. And we call it QSR+, it is really the best of both worlds.  It takes – if you look on the fast casual side, high-quality food, the dining experience, the atmosphere – we have that with our product and yet we bring that to you at the speed, convenience and value that you see of the players here on the left, Chick-fil-A, McDonalds or Taco Bell.

> So it is very unique positioning.  ***And then with our pricing, puts us right in the middle.  We think that is important***.

**In 1Q 2015 Defendants Abandon the Company's QSR+ Value Pricing Strategy**

45.     Because of its positioning as a QSR+ chain, before and during the Class Period, El Pollo Loco was under pressure to maintain the lower pricing of a QSR chain with a menu that appealed to the more refined tastes of fast casual diners. Indeed, given this pressure to maintain lower pricing, and thus its QSR+ positioning, before the Class Period, market analysts and investors questioned the Company's ability to increase prices in order to offset future cost pressures, including looming minimum wage increases the Company was facing in California and Los Angeles, where 80% of the Company's restaurants were concentrated.

46.     Specifically, by the beginning of the Class Period, El Pollo Loco was heavily exposed to rising labor costs, the Company's second largest cost following only food costs.  In California alone, the Company was dealing with a 25% increase in minimum wage over a short 1.5 year period.  Specifically, on July 1, 2014, the State of California raised its minimum wage 12.5%, from $8 to $9 per hour.  Additionally, by the start of the Class Period, California was set to again increase its minimum wage an additional 11.1% to $10 per hour, effective January 1, 2016.  Not only did these increases affect El Pollo Loco's minimum wage workers, they also impacted the

- 14 -

1  Company's above-minimum wage workers as the Company paid supervisors a certain

2  "spread" over minimum wage.  To make matters worse, in Los Angeles, where El

3  Pollo Loco's restaurants generated approximately 80% of its revenues in fiscal years

4  2013 and 2014, minimum wage was set to increase to $15 by 2020.

5    47. El Pollo Loco was acutely conscious of labor costs. El Pollo Loco used

6  the Operation Dashboard's real-time information to make individual staffing

7  decisions.  FE 1 reported that if stores experienced unexpected low traffic, within

8  hours, a Company Area Leader would call and tell the store employees to send

9  employees home to save on labor costs.  Accordingly to FE 1, Company Area Leaders

10  constantly monitored store operations, including labor costs.

11    48. In an attempt to mitigate the effects of the rising labor costs, in 1Q 2015

12  Defendants decided to eliminate El Pollo Loco's value-priced menu, which was a core

13  component of its QSR+ positioning strategy and one of the key drivers of customer

14  traffic to El Pollo Loco restaurants.  Specifically, in February 2015 the Company

15  removed its highly popular $5 combo meal menu from the Company's menu boards

16  because of increased pricing, and increased prices on other value-priced menu items.

17    49. As Defendants ultimately admitted, these price increases drove away

18  value-conscious customers, which severely impacted customer traffic and, in turn,

19  made it impossible for the Company to meet its comparable store sales growth

20  guidance for 2Q 2015.

21    50. For example, during an August 13, 2015 earnings conference call,

22  Defendants admitted they lost the value focus of their QSR positioning in 1Q and 2Q

23  2015 due to their decision to remove the Company's $5 combo meal menu, causing El

24  Pollo Loco's comparable store sales growth to fall to 1.5%, or about 50% below

25  target.  Because of the disastrous consequences of eliminating the value-priced menu,

26  including the $5 combo meal menu, El Pollo Loco re-launched the $5 menu in 3Q

27  2015, and when it did, they saw an immediate increase in customer traffic.  After the

28  Class Period, defendant Sather admitted that the Company had abandoned its QSR+

strategy in 1Q 2015, telling investors that re-launching the $5 combo meal menu allowed the Company to "return to [its] winning QSR+ strategy."

51. The fact that the elimination of the $5 combo menu was driving away customers was immediately apparent.

52. According to FE 1 and FE 2, El Pollo Loco customers were upset about removal of the $5 combo menu and removal of the menu caused an immediate fall in sales. FE 2 stated that customers expressed their concerns and complaints about removal of the $5 value menu through the Company's customer feedback system that included a 1-800 number and an online system for complaints and feedback. Both FE 1 and FE 2 confirm that information posted by customers on the feedback system could be immediately and directly accessed through the Operation Dashboard.

53. Defendants later admitted that they knew by Spring 2015 that removing the $5 combo menu was causing decreasing comparable store sales growth. During a November 12, 2015 conference call with investors wherein Defendants reported 3Q 2015 earnings, analysts continued to question Defendants about the 50% miss on 2Q 2015 comparable store sales growth. During the call, defendant Sather admitted that Defendants knew in early 2015 that the abandonment of the Company's QSR+ strategy and price changes to its menu in 1Q 2015 drove away the Company's price-conscious customers and negatively impacted customer traffic. Sather stated: "Our research **confirmed what we thought in the spring, that consumers still love our food, but we can improve on . . . our value**, which [we] are now taking actioned steps to address those issues."

54. In addition to the elimination of El Pollo Loco's value-priced menu, by the beginning of the Class Period the Company was also changing its menu to offer higher priced non-chicken menu items, such as shrimp and beef entrees. During the May 14, 2015 conference call, Defendants told investors that these items were "proven winners with our customers" and were performing "very well." At the same time, Defendants concealed that elimination of the Company's value-priced menu was

causing a decline in customer traffic at El Pollo Loco restaurants.  The value-priced menu was the driving force behind the QSR+ strategy and responsible for the Company's previous success in comparable store sales growth.

**Before and During the Class Period Defendants Tracked and Monitored Comparable Store Sales**

55.     As evidenced by their public statements and the business and marketing decisions the Company made before and during the Class Period, Defendants, as the Company's top executives, were internally tracking, monitoring and reviewing sales metrics for El Pollo Loco restaurants.  As the Company admitted in its SEC filings, El Pollo Loco's comparable store sales metric was a key performance indicator for the Company and closely monitored by top management, including Defendants.

56.     Before and during the Class Period, Defendants tracked and monitored El Pollo Loco comparable store sales through the Company's Operation Dashboard, which aggregated restaurant-level information on a real-time basis, providing immediate feedback to Defendants on nearly every aspect of the Company's business. As a real-time system, the Operation Dashboard processed information from all of El Pollo Loco's restaurants within milliseconds of the actual sales transactions so that information was immediately available to Defendants.  The Operation Dashboard was constantly monitored by Defendants and available to them through their desktop computers and tablet devices.

57.     According to FE 3, Sather created the Company's Operation Dashboard. When FE 3 went to Sather's office for meetings, Sather was "glued" to the Operation Dashboard.  FE3 observed Sather reviewing the Operational Dashboard on Sather's iPad.

58.     Using the Operation Dashboard before and during the Class Period, Defendants closely tracked, monitored and measured the Company's sales performance for both Company-operated and franchise restaurants, including current

- 17 -

1  performance against forecasts, comparable store sales, customer traffic and average
2  check size and current performance against its competitors.

3      59.    Based on the information Defendants obtained from the Operation
4  Dashboard, they knew the deleterious impact their decision to eliminate El Pollo
5  Loco's value-priced menu was having on the Company's comparable store sales
6  growth, but concealed that information from investors during the Class Period.
7  Instead, Defendants issued a series of materially false and misleading statements and
8  omissions concerning the Company's 2Q 2015 sales and customer traffic, as detailed
9  herein.   As a result of these false statements, El Pollo Loco securities traded at
10 artificially inflated prices during the Class Period.   The Controlling Shareholder
11 Defendants, the CEO and others took advantage and sold tens of millions of dollars of
12 their personally held El Pollo Loco shares at fraud-inflated prices.

**MATERIALLY FALSE AND MISLEADING
CLASS PERIOD STATEMENTS**

13
14 **May 14, 2015 False and Misleading
15 Statements and Omissions**

16     60.    On May 14, 2015, following the close of trading, El Pollo Loco issued a
17 release announcing its 1Q 2015 financial results for the three-month period ended
18 April 1, 2015.

19     61.    The Company reported that its total 1Q 2015 revenue had increased
20 11.1% to $90.4 million, emphasizing that the revenue increase was driven by
21 "[s]ystem-wide comparable restaurant sales [having grown] 5.1%, including a 3.5%
22 increase for company-operated restaurants, and a 6.2% increase for franchised
23 restaurants."  The release quoted defendant Sather as stating in pertinent part that the
24 Company's "first quarter results . . . once again demonstrate[d] strong operating
25 momentum through solid sales and earnings growth."  According to Sather, El Pollo
26 Loco's "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to
27 resonate with guests, as evidenced by [its] system-wide comparable restaurant sales
28 growth of 5.1%."   Sather also emphasized that the sales growth "extended [the

- 18 -

Company's] track record to 15 consecutive quarters of positive comparable restaurant sales growth." The release stated in pertinent part that El Pollo Loco was still on track to report "[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%" for fiscal year 2015.

62.    During the conference call that followed the release later in the afternoon on May 14, 2015, Defendants made further positive statements about the Company's purportedly strong ongoing comparable store sales trends and ability to meet its 2015 guidance, while concealing that customer traffic was severely declining and that the 2Q 2015 guidance for comparable store sales growth was unachievable. Sather stated in his opening remarks in pertinent part:

> For the first quarter, we saw a 5.1% increase in system-wide comparable sales growth that consisted of a 3.5% increase for Company-operated restaurants and a 6.2% increase for franchise restaurants. The increase in comparable sales growth marked our 15th consecutive quarter of positive same-store sales and came on top of a 7.2% growth last year, for a strong two-year growth rate of 12.3%. . . .

> We believe our comp growth is continued evidence of the appeal of our brand, driven by our fresh, hand-crafted Mexican-inspired cuisine, compelling value proposition, and fast service. Our menu allows us the flexibility to create new and unique menu items to complement our signature fire-grilled chicken and provide our customers with even more choices at a great value.

63.    In fact, El Pollo Loco's 1Q 2015 comparable store sales growth fell slightly below analyst expectations. El Pollo Loco experienced this relatively poor growth because of the impact of Defendants' decision to remove the $5 combo menu, undertaken halfway through 1Q 2015.

- 19 -

1178532_1

64.     In an attempt to quell analyst concerns, Defendants blamed two one-time events for the lighter than expected comparable store sales growth.  During the call defendant Roberts stated:

> The comparable restaurant sales growth [for Company-owned restaurants] was comprised of a 3.4% increase in average check and a 0.1% increase in traffic.
>
> Note that the comparable restaurant sales growth was negatively impacted by the timing of the New Year's holiday, which reduced same-store transaction and sales by approximately 60 basis points for the quarter.  Franchise revenue increased 9.2% year-over-year, to $5.7 million, largely due to an increase in franchise comparable restaurant sales growth of 6.2%.

65.     During the conference call, Defendants were asked by a stock research analyst to again explain the slightly lighter increase in comparable store sales growth during 1Q 2015.  So as not to cause concern, in response, defendant Valle again maintained that it was due largely to the timing of the New Year's holiday, adding that it was also partially caused by a decreased emphasis on the Company's "under 500 calorie" menu offerings, something he said Defendants were reinvigorating and that he claimed would return comparable store sales growth to the Company's lofty 2014 levels, stating in pertinent part as follows:

> [Analyst:] Hello. Good afternoon. My question is on the comp [*i.e.*, comparable store sales] trend that you saw in Q1 and that you're pointing to in Q2.  And while I realize it's still within the boundaries of your plan for the year, it is slower than what we've been used to seeing from you, and was just wondering if you could comment on why you think the trend line slowed versus what you saw in the prior quarters into Q1 and now in Q2?

[Defendant Valle:] [A]s Larry had mentioned, [because of] the New Year's Eve timing . . . the gain fell into the prior year and the pain fell into this year.  He mentioned, there was a 60 basis point hit on comps for that.

But also kind of the Under 500 line, we focused on our shrimp and moved away a little bit from the Under 500 line and that was a little bit of a drag, as well.  We happen to be restaging that line in June, and we believe we'll get back up to the strength that it had in the quarter of last year.

Remember, again, how successful that line was in 1Q of 2014.

66.    Also, during the May 14, 2015 conference call analysts asked whether customer traffic was being affected by price resistance to the higher priced alternative proteins (shrimp and carne asada) the Company had added to the menu.  Defendant Valle denied that lower comparable store sales were due to lack of customer interest in higher priced offerings and continued to conceal the dramatic declines in customer traffic Defendants were seeing at the time, stating in pertinent part:

[Analyst:]  Could I follow up on that and understand, is there a dynamic you're seeing that there's some price resistance in the higher price points?  Remind us where the price points of the shrimp and the carne are versus the core chicken products.  And is that the issue, or is it more that people were just confused about the messages you were getting, a couple of different LTOs at once, and maybe that wasn't generating as much incrementally?

[Defendant Valle:]  It's more of the second one, John.  We would normally, as we would phase these in, we would sequence them over time.  We would seed the shrimp.  We would grow the shrimp.  And then either 9 months to 12 months later, we would then bring the steak in after that.

- 21 -

1    So I think it was a little bit more of they both kind of converged

2    together.  As a result, the visibility of value on our menu is not as strong

3    as it used to be, at least for that five-week period of time.  Our value

4    scores, though, are still high.

5                              *        *        *

6    It's really like the marketing communication thing.  There's

7    success with the steak.  There's success with the shrimp.  And how are

8    we going to express that and balance that within our menu, as we move

9    into the back end of this year and into 2016.

10   67.    As analysts returned again and again to Defendants' explanation for poor

11   1Q 2015 and first half 2Q 2015 results, Defendants continued to claim that marketing

12   confusion, and not price increases, were to blame:

13   [Analyst:] Okay.  Trying to think through that, because this is kind

14   of a first in 15 years of following restaurants hearing about two proteins

15   together impacting sales.  And I mean, I don't want to beat a dead horse,

16   but the presentation, I mean, is there – if you move forward and you're

17   moving to a multi-protein platform permanently over time, is there some

18   way to present this to emphasize the value without kind of alarming the

19   customer base?

20   [Defendant Valle:] Yes, I definitely think there is.  Again, a lot of

21   this is, when we put it out there, we see acceptance via mix.  This is

22   going to be a marketing communication story, not a product story.  And

23   it's going to be a sequencing story.

24   68.    Defendants' statements concerning the causes of poor 1Q 2015 and

25   beginning of 2Q 2015 results were misleading because, in truth, El Pollo Loco's poor

26   1Q 2015 and beginning of 2Q 2015 results were caused by the fact that removing the

27   $5 combo menu had driven away its customers, as further set out at ¶¶45-59 above

28   and ¶¶77-80 below.  The customers would not return, and El Pollo Loco would not

- 22 -

1  recover its comparable store sales growth, until El Pollo Loco brought back the $5

2  combo menu. But the low-cost $5 combo menu imperiled El Pollo Loco's profitability

3  in a world of increasing minimum wages.

4      69.    On May 19, 2015, just five days after making their false and misleading

5  statements and omissions, Sather and Valle, the Controlling Shareholder Defendants

6  and other El Pollo Loco top executives and directors suspiciously sold their personally

7  held El Pollo Loco common stock for gross proceeds of over $ 132.4 million.  These

8  insider sales were suspicious in amount and timing in light of the fact that none of

9  them had sold any shares since November 2014 and the sales were not made pursuant

10  to any 10(b)-5 trading plan.  The following chart describes the insider sales:

| Seller | Shares Sold | Price | Remaining shares and immediately exercisable options | Percentage of shares and immediately exercisable options sold | Proceeds |
|---|---|---|---|---|---|
| Deft. Trimaran Pollo | 5,402,500 | $21.85 | 16,746,544 | 24% | $118,044,625 |
| Deft. Sather | 360,000 | $21.85 | 1,085,499 | 25% | $7,866,000 |
| Deft. Valle | 175,000 | $21.85 | 207,159 | 46% | $3,823,750 |
| Kay Bogeajis, Chief Operating Officer | 25,000 | $21.85 | 36,930 | 40% | $546,250 |
| Douglas Ammerman, Director | 45,822 | $21.80 | 8,272 | 85% | $998,920 |
| Samuel Borgese, Director | 11,645 17,200 25,249 54,094 | $21.85 $20.92 $21.00 | 34,547 | 61% | $254,443 $359,824 $530,229 $1,144,496 |
| TOTALS | 6,062,416 | | | | $132,424,041 |

27      70.    The entirety of Sather's and Valle's sales on May 19, 2015 were the

28  result of exercising options.  Because of these options, Sather and Valle obtained this

1   stock at prices ranging from $2.62 to $5.84 per share, a fraction of what other

2   shareholders paid.

3        71.    Defendants' and other El Pollo Loco directors' stock sales were unusual

4   in timing. Defendants had not sold any stock since certain El Pollo Loco insiders

5   elected to participate in an underwritten offering taking place in November 2014 –

6   their first and only stock sales.  At that time, Sather sold 17% of his shares (against

7   25% during the Class Period), Ammerman sold 18% of his shares (against 85% during

8   the Class Period), Borgese sold 21% of his shares (against 61% during the Class

9   Period), and Bogeajis sold 40% of her shares, the same as during the Class Period.

10  Valle did not sell any shares, while Roberts only sold 20% of his.

11       72.    Defendants have not sold any shares since their Class Period stock sales.

12  **June 10 False and Misleading Statements and Omissions**

13       73.    On June 10, 2015, El Pollo Loco presented at William Blair's Annual

14  Growth Stock Conference.  During the conference Sather reiterated the Company's

15  QSR+ strategy, but concealed the severe decline in customer traffic the Company

16  restaurants were experiencing in 2Q 2015 due to the abandonment of the QSR+

17  pricing strategy.  During the conference defendant Sather stated:

18              Now we not only provide great service and great atmosphere, but

19          we do it at a very compelling value.  The majority of our items are priced

20          between $5.00 and $7.00.  Our average per person spend is $6.04 as you

21          can see by the graph here.  That's just a little bit above the QSRs that

22          you see to the left there, but well below the fast casual such as a Panera

23          or a Chipotle or a Zoes.

24              So we want to always maintain that value.  We don't want to get

25          up too high pricing towards the fast casual, and we always want to

26          maintain that speed with the convenience of the drive-through, etc.  So I

27          think this is very important.

28

                                    - 24 -

1       If you look at our system-wide comps, we talked about the last 15

2   quarters of being positive same-store sales.  Very strong.  I think you can

3   see that what we've been doing over the last years is clearly resonating

4   with the consumer.

5       74.   Despite knowing the customer traffic was severely declining, and

6   therefore negatively impacting comparable store sales growth and diminishing the

7   Company's ability to meet its 2Q 2015 comparable sales growth guidance, Defendants

8   still concealed the truth from investors during the June 10, 2015 William Blair

9   conference by blaming softening May 2015 sales on the temporary overlapping of

10  higher priced non-chicken menu offerings.  Immediately following the conference,

11  William Blair published a research report stating that Company management

12  "continues to believe[] the concurrent marketing support for the two new, higher-

13  priced proteins obscured El Pollo Loco's value message" in May 2015, which

14  concealed from investors the truth about the shrinking of customer traffic and the

15  Company's ability to meet its comparable store sales guidance due to removal of the

16  $5 value menu.  Based on this concealment of information, William Blair maintained

17  its estimate for the Company's comparable store sales growth at 3%.

18      75.   Defendants' June statements were materially false and misleading when

19  made because, in truth, El Pollo Loco's poor 1Q 2015 and beginning of 2Q 2015

20  results were caused by the fact that removing the $5 combo menu had driven away its

21  customers, as further set out at ¶¶45-59 above and ¶¶77-80 below.

22      **THE TRUTH IS REVEALED**

23      76.   After the close of trading on August 13, 2015, the Company issued a

24  press release announcing its 2Q 2015 results for the three-month period ended July 1,

25  2015.  El Pollo Loco disclosed that contrary to Defendants' prior claims of being on

26  track to achieve 3%-5% comparable store sales increases on May 14, 2015, *halfway*

27  *through the quarter*, in reality, 2Q 2015 "[s]ystem-wide comparable restaurant sales

28  [had only grown] *1.3%, including a 0.5% decrease for company-operated*

- 25 -

1  *restaurants*, and a 2.6% increase for franchised restaurants."  Also on August 13,
2  2015, the Company cut its FY 2015 guidance for comparable store sales from 3%-5%
3  to just 3% because of the Company's significant miss on 2Q 2015 comparable store
4  sales growth and the severe decline in customer traffic that began in 1Q 2015 due to
5  the loss of the Company's price-conscious customers and abandonment of its QSR+
6  pricing strategy.

7        77.  In his opening remarks during the conference call held with investors that
8  afternoon, defendant Sather confirmed that El Pollo Loco had only achieved "a 1.3%
9  increase in system-wide comparable restaurant sales growth that consisted of a 50
10  basis-point decrease for Company-operated restaurants and a 2.6% increase for
11  franchised restaurants," conceding that "second-quarter results were impacted by the
12  combination of higher-priced offerings and a reduction of [the] value portion of [its]
13  menu."  Defendant Sather went on to elaborate, stating in pertinent part, as follows:

14          Specifically we ran sequential promotions featuring premium entrées
15          with shrimp and carne asada at the same time we were eliminating our
16          $5 Combo menu panel.  We believe this confluence of actions drove
17          reduced visits from some of our more value-oriented customers. . . .

18          In the third quarter, we re-launched the $5 Combo menu which
19          will remain in our restaurants full time to reinforce our value offering.
20          ***This allows us to return to our winning QSR+ strategy of introducing***
21          ***exciting, new, premium Mexican entrees . . . to a base of underlying***
22          ***value frequency drivers like our $5 combos***.

23        78.  During his opening remarks, defendant Roberts further disclosed that the
24  "comparable restaurant sales decline of 0.5% . . . was comprised of a 3.9% decrease in
25  traffic partially offset by an increase in average check size of 3.4%."

26        79.  During the Q&A session, defendants Sather and Roberts engaged in the
27  following discussion with a research analyst, conceding that the decrease in
28  comparable store sales was a trend being experienced throughout 2Q 2015 – which

- 26 -

1    was halfway over by May 14, 2015 – and that it was driven in large part by

2    Defendants' decision to eliminate the Company's value-priced menu, including its

3    highly popular $5 combo menu, from the Company's menu boards in February 2015:

4           [Q - David E. Tarantino:]  First question is about the comp trends

5           that you saw in Q2, and perhaps if there is a comment on what you're

6           seeing in Q3.  Steve, could you elaborate on the factors you think are

7           weighing on the trend line?  And then, I know you mentioned removing

8           the $5 panel, and now bringing it back.  Is that one of the factors that's

9           giving you confidence that you could see better trends going

10          forward?  . . .

11          [Sather:]  Sure . . . .  Let me give you an overview, and then I'll

12          have Ed talk specifically on some of the things we've done in Q3.  First

13          of all, I think – kind of referred to it.  We lost the value focus on the first

14          half of 2015.  As you know, we employ a balance of a high/low pricing

15          strategy, and what I think happened is we temporarily overweighed this

16          to the higher-priced items.  To be more specific, we increased the price

17          on our $5 Combo meal.  We actually removed that panel from the . . .

18          menu board, and because that was in February – because of the higher

19          pricing.

20          Also, we increased the prices on our value menu, and specifically,

21          on another entrée line, which was important, the 5 under 500.  We

22          believe that really impacted our value customer.  When you then take on

23          top of that that we layered in the premium proteins, we first did shrimp

24          and then carne asada.  While we were happy with their performance, we

25          think that they really further drove that perception of higher prices with

26          the non-focus of value.  And, I'll [let Ed] comment on what we've done

27          in the start of third quarter to really counter that. . . .

28

1      [Valle:]  I think that's exactly right. We launched the $5 combos,

2      David, or re-launched them.  To make – first of all, to put that panel back

3      up on the menu board and make it more prominent, and we're seeing

4      strong results from that.  That $5 combo panel will remain for the

5      balance of 2015.  We also re-launched the under 500 line, which we

6      spoke about briefly in the last call, that we are giving customers more

7      value in terms of not just variety, but also in terms of price range as well.

8      It's not back to its original level, but it's showing very solid growth as

9      we're looking at it.  So we feel pretty good about moving to trying to

10     stabilize the business and reengage our value customer.

11                               *        *        *

12     [Sather:]  David, you had another question?

13     [Tarantino:]  Yes, the follow-up to that was – it sounds like you

14     alluded to it.  But, you're starting to see the business respond to the

15     changes you're making, and in your history, have you dealt with this

16     issue before in terms of losing that value customer and then winning

17     them back?  Some historical context there would be helpful.

18     [Sather:]  Yes, this is Steve.

19     I think in period seven, first period of Q3, we actually have the $5

20     pollo bowls to launch there, and then the next period the $5 combos and

21     the chicken and shrimp, ***and we saw the stabilization certainly of***

22     ***bringing that a very popular $5 pollo bowl item and now the $5 combos***

23     ***on that.  So, we're seeing that stabilization***.

24             ***Quite frankly, we had never taken something like that off the***

25     ***menu board before***.  They've been on – we've had a very – there has

26     always been a value portion.  Either in $5 loco menu or a number of

27     what we call our snack items, and we've taken some price on those.

28     80.     Analysts were surprised by El Pollo Loco's revelations:

- 28 -

(a)      In an August 13, 2015 report, a William Blair analyst stated that "[h]aving missed its forecast that was issued in mid-May, El Pollo Loco is clearly in the penalty box with investors . . . .  [I]t will likely take a few quarters for investors' trust to be regained . . . .  [W]e recognize that the company may remain in a 'show-me' state pending the achievement of sustainably improved comp trends."

(b)      In an August 13, 2015 report, a Jefferies analyst stated that "[a]lthough we thought [same store sales] would improve as 2Q went on, the focus on premium items did not resonate with consumers to the extent to offset what appears to be a drop-off in value-oriented traffic. . . .  We have been looking for a return to 4% [same store sales growth] in the 2H at company-owned units, but it does not appear as if the company will get there . . . ."

(c)      In an August 13, 2015 report, a Morgan Stanley analyst stated that the "severe dropoff in traffic due to higher price points in 2Q calls into question [El Pollo Loco's] ability to take pricing to offset future cost pressures, including looming minimum wage hikes in CA and LA in '16 and beyond, as well as raise the average check."

81.      In response to the above revelations, El Pollo Loco's stock price declined by 20%, from its closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015, 33% below the price at which Defendants had just sold $132 million of their own El Pollo Loco shares and 42% below El Pollo Loco's Class Period high of $25.37 per share on May 15, 2015, erasing more than $410 million in market capitalization.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

82.      At all relevant times, the market for El Pollo Loco securities was an efficient market for the following reasons, among others:

(a)      El Pollo Loco's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- 29 -

1        (b)    The Company had more than 38 million shares outstanding as of

2  August 6, 2015.  During the Class Period, on average, more than 960,000 shares of El

3  Pollo Loco stock were traded on a daily basis, demonstrating a very active and broad

4  market for El Pollo Loco stock and permitting a very strong presumption of an

5  efficient market;

6        (c)    As a regulated issuer, El Pollo Loco filed periodic public reports

7  with the SEC;

8        (d)    El Pollo Loco regularly communicated with public investors via

9  established market communication mechanisms, including regular dissemination of

10  press releases on the national circuits of major newswire services, the Internet and

11  other wide-ranging public disclosures, such as communications with the financial

12  press and other similar reporting services;

13        (e)    El Pollo Loco was followed by many securities analysts who wrote

14  reports that were distributed to the sales force and certain customers of their respective

15  firms during the Class Period, and each of these reports was publicly available and

16  entered the public marketplace;

17        (f)    There were several active market-makers in El Pollo Loco stock at

18  all times during the Class Period; and

19        (g)    Unexpected material news about El Pollo Loco was rapidly

20  reflected in and incorporated into the Company's stock price during the Class Period.

21      83.    As a result of the foregoing, the market for El Pollo Loco securities

22  promptly digested current information regarding El Pollo Loco from publicly

23  available sources and reflected such information in El Pollo Loco's share prices.

24  Under these circumstances, all purchasers of El Pollo Loco securities during the Class

25  Period suffered similar injury through their purchase of El Pollo Loco securities at

26  artificially inflated prices, and a presumption of reliance applies.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE

84.     Plaintiffs are also entitled to the presumption of reliance under *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), because Defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of material facts concerning the deterioration of customer traffic to El Pollo Loco restaurants that severely diminished the Company's ability to meet it comparable store sales growth guidance for 2Q 2015, which information Plaintiffs and the members of the Class would have wanted to have known and which would have caused investors to not have purchased shares of El Pollo Loco at the prices they traded at during the Class Period.

## LOSS CAUSATION

85.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted material information concerning El Pollo Loco's business fundamentals and engaged in a scheme to deceive the market.  Defendants knowingly misstated then-present sales and earnings trends in order to improve the market's perception of El Pollo Loco's worth to allow Defendants to sell stock at fraud inflated prices.

86.     By artificially inflating and manipulating El Pollo Loco's share prices, Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, El Pollo Loco's share prices fell precipitously as the prior artificial inflation came out of the price.  As a result of their purchases of El Pollo Loco securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

87.     This is a class action on behalf of all purchasers of El Pollo Loco securities during the Class Period, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and

1178532_1

1  the families of the Defendants.  Class members are so numerous that joinder of them

2  is impracticable.

3       88.    Common questions of law and fact predominate and include whether

4  Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material

5  facts; (c) knew or recklessly disregarded that their statements were false; (d)

6  artificially inflated the prices of El Pollo Loco securities; and (e) the extent of and

7  appropriate measure of damages.

8       89.    Plaintiff's claims are typical of those of the Class.  Prosecution of

9  individual actions would create a risk of inconsistent adjudications.  Plaintiffs will

10  adequately protect the interests of the Class.  A class action is superior to other

11  available methods for the fair and efficient adjudication of this controversy.

12  **COUNT I**

13  **For Violation of §10(b) of the Exchange Act**
**and Rule 10b-5 Against El Pollo Loco**

14  **and the Individual Defendants**

15       90.    Plaintiffs repeat and reallege the above paragraphs as though fully set

16  forth herein.

17       91.    Throughout the Class Period, El Pollo Loco and the Individual

18  Defendants, in pursuit of their scheme and continuous course of conduct to inflate the

19  market prices of El Pollo Loco securities, had the ultimate authority for making, and

20  knowingly or recklessly made, materially false or misleading statements or failed to

21  disclose material facts necessary to make the statements made, in light of the

22  circumstances under which they were made, not misleading.

23       92.    During the Class Period, El Pollo Loco and the Individual Defendants

24  carried out a plan, scheme and course of conduct using the instrumentalities of

25  interstate commerce and the mails, which was intended to and, throughout the Class

26  Period, did: (a) artificially inflate and maintain the market prices of El Pollo Loco

27  securities; (b) deceive the investing public, including Plaintiffs and other Class

28  members, as alleged herein; (c) cause Plaintiffs and other members of the Class to

purchase El Pollo Loco securities at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, El Pollo Loco and the Individual Defendants took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

93.     In addition to the duties of full disclosure imposed on El Pollo Loco and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, El Pollo Loco and the Individual Defendants had a duty to promptly disseminate truthful information with respect to El Pollo Loco's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

94.     El Pollo Loco and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

95.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market prices of El Pollo Loco securities were artificially inflated during the Class Period.  In ignorance of the fact that the market prices of El Pollo Loco securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by El Pollo Loco and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiffs and other members of the Class purchased El Pollo Loco securities during the Class

- 33 -

1  Period at artificially high prices and, when the truth was revealed, were damaged
2  thereby.

3      96.    Had Plaintiffs and the other members of the Class and the marketplace
4  known of the true facts, which were knowingly or recklessly concealed by El Pollo
5  Loco and the Individual Defendants, Plaintiffs and the other members of the Class
6  would not have purchased or otherwise acquired their El Pollo Loco shares during the
7  Class Period, or if they had acquired such shares during the Class Period, they would
8  not have done so at the artificially inflated prices they paid.

9      97.    By virtue of the foregoing, El Pollo Loco and the Individual Defendants
10  have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

11  **COUNT II**

12  **For Violation of §20(a) of the Exchange Act**
    **Against the Individual Defendants and the**
13  **Controlling Shareholder Defendants**

14      98.    Plaintiffs repeat and reallege above paragraphs as though fully set forth
15  herein.

16      99.    The Individual Defendants and Controlling Shareholder Defendants acted
17  as controlling persons of El Pollo Loco within the meaning of §20(a) of the Exchange
18  Act as alleged herein.  By virtue of their controlling shareholder status (as detailed
19  herein at ¶¶21-30), executive positions, board membership status, stock ownership
20  and/or contractual relationships with El Pollo Loco as alleged above, the Individual
21  Defendants and Controlling Shareholder Defendants had the power to influence and
22  control and did, directly or indirectly, influence and control the decision making of the
23  Company, including the content and dissemination of the various statements which
24  Plaintiffs contend were false and misleading.  The Individual Defendants and
25  Controlling Shareholder Defendants were provided with or had access to the
26  Company's internal reports, press releases, public filings and other statements alleged
27  by Plaintiffs to be misleading prior to or shortly after these statements were issued,
28

- 34 -

1    and had the ability to prevent the issuance of the statements or cause them to be

2    corrected.

3         100.   In particular, the Individual Defendants and Controlling Shareholder

4    Defendants had direct involvement in and responsibility over the operations of the

5    Company and, therefore, are presumed to have had the power to control or influence

6    the particular transactions giving rise to the securities violations as alleged herein.

7         101.   By reason of such wrongful conduct, the Individual Defendants and

8    Controlling Shareholder Defendants are liable pursuant to §20(a) of the Exchange Act.

9    As a direct and proximate result of the Individual Defendants' and Controlling

10   Shareholder Defendants' wrongful conduct, Plaintiffs and the other members of the

11   Class suffered damages in connection with their purchases of the Company's

12   securities during the Class Period.

13                            **COUNT III**

14              **For Violation of §20A of the Exchange Act**
                **Against Defendants Sather and Valle and the**
15              **Controlling Shareholder Defendants**

16        102.   Plaintiffs repeat and reallege each and every allegation contained above

17   as if fully set forth herein.  Count III is brought pursuant to §20A of the Exchange Act

18   against defendants Sather, Valle and the Controlling Shareholder Defendants, on

19   behalf of Plaintiffs who were damaged by defendants Sather, Valle and the

20   Controlling Shareholder Defendants' insider trading.

21        103.   As detailed herein, defendants Sather, Valle and the Controlling

22   Shareholder Defendants were in possession of material, non-public information

23   concerning El Pollo Loco.  Sather, Valle and the Controlling Shareholder Defendants

24   took advantage of their possession of material, non-public information regarding El

25   Pollo Loco to obtain millions of dollars in insider trading profits during the Class

26   Period.

27

28

1178532_1

104. Defendants Sather, Valle and the Controlling Shareholder Defendants' sales of El Pollo Loco common stock were made contemporaneously with Plaintiffs' purchases of El Pollo Loco common stock during the Class Period.

105. For example, on May 19, 2015, Sather, Valle and the Controlling Shareholder Defendants sold the following shares of El Pollo Loco common stock for total proceeds of excess of $129 million:

| Defendant | Date of  Sale | Amount | Price |
|-----------|---------------|--------|-------|
| Trimaran Pollo | 5/19/2015 | 5,402,500 | $21.85 |
| Sather | 5/19/2015 | 360,000 | $21.85 |
| Valle | 5/19/2015 | 175,000 | $21.85 |

106. During the period from May 19, 2015 through June 2, 2015, the following Plaintiffs purchased the following shares of El Pollo Loco common stock:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Peter Kim | 5/19/2015 | 1,000 | $22.90 |
| Ron Huston | 5/19/2015 | 2,000 | $23.21 |
| Ron Huston | 5/29/2015 | 3,000 | $20.88 |
| Robert W. Kegley, Sr. | 6/02/2015 | 20,000 | $21.99 |

107. Plaintiffs who purchased shares of El Pollo Loco common stock contemporaneously with sales by Sather, Valle and the Controlling Shareholder Defendants' suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of the Class, pray for judgment as follows:

1      A.     Determining that this action is a proper class action and certifying

2   Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil

3   Procedure;

4      B.     Awarding compensatory damages in favor of Plaintiffs and the other

5   Class members against all Defendants, jointly and severally, for all damages sustained

6   as a result of Defendants' wrongdoing, in an amount to be proven at trial, including

7   interest thereon;

8      C.     Awarding Plaintiffs and the Class their reasonable costs and expenses

9   incurred in this action, including counsel fees and expert fees; and

10     D.     Awarding such other and further relief as the Court may deem just and

11  proper.

## JURY DEMAND

13     Plaintiffs demand a trial by jury.

14  DATED:  August 22, 2016               ROBBINS GELLER RUDMAN
                                            & DOWD LLP
15                                        RYAN A. LLORENS
                                          LAURIE L. LARGENT
16

17                                              s/ LAURIE L. LARGENT
                                              LAURIE L. LARGENT

18
                                          655 West Broadway, Suite 1900
19                                        San Diego, CA  92101
                                          Telephone:  619/231-1058
20                                        619/231-7423 (fax)

21                                        THE ROSEN LAW FIRM, P.A.
                                          LAURENCE M. ROSEN
22                                        355 South Grand Avenue, Suite 2450
                                          Los Angeles, CA  90071
23                                        Telephone:  213/785-2610
                                          213/226-4684 (fax)

24

25                                        THE ROSEN LAW FIRM, P.A.
                                          PHILIP KIM
26                                        275 Madison Avenue, 34th Floor
                                          New York, NY  10016
27                                        Telephone:  212/686-1060
                                          212/202-3827 (fax)

28

- 37 -

1178532_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Co-Lead Counsel for Plaintiffs

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

GOLDBERG LAW PC
MICHAEL GOLDBERG
13650 Marina Pointe Dr., Suite 1404
Marina Del Rey, CA  90292
Telephone:  800/977-7401
800/536-0065 (fax)

Attorneys for Plaintiffs

- 38 -

CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22, 2016.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:       llargent@rgrdlaw.com

1178532_1

# Mailing Information for a Case 8:15-cv-01343-DOC-KES Daniel Turocy v. El Pollo Loco Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Seth A Aronson**
  saronson@omm.com,LitigationCalendar@omm.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Amber L Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Zachary Marc Faigen**
  zack.faigen@skadden.com,Zack.Faigen@probonolaw.com

- **Winston Ping Hsiao**
  winston.hsiao@skadden.com

- **Alec Johnson**
  aljohnson@omm.com,skemp@omm.com

- **Jay B Kasner**
  jay.kasner@skadden.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Jason D Russell**
  jrussell@skadden.com,Winston.Hsiao@skadden.com,nandi.berglund@skadden.com,jason.russell@skadden.com

- **Evan Jason Smith**
  esmith@brodsky-smith.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`