JASON D. RUSSELL (SBN 169219)
jason.russell@skadden.com
WINSTON P. HSIAO (SBN 273638)
winston.hsiao@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JAY B. KASNER (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

Attorneys for Defendants
El Pollo Loco Holdings, Inc., Trimaran Capital Partners,
Trimaran Pollo Partners, L.L.C., Freeman Spogli & Co.,
Stephen J. Sather, Laurance Roberts, and Edward J. Valle

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| DANIEL TUROCY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EL POLLO LOCO HOLDINGS, INC., STEPHEN J. SATHER, LAURANCE ROBERTS, EDWARD J. VALLE, TRIMARAN POLLO PARTNERS, L.L.C., TRIMARAN CAPITAL PARTNERS, and FREEMAN SPOGLI & CO., <br><br> Defendants. | CASE NO.: No. 8:15-CV-01343-DOC-KES <br><br> (1) NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; and <br><br> LODGED UNDER SEPARATE COVER: <br><br> (2) [PROPOSED] ORDER. <br><br> Date:   January 23, 2017 <br> Time:   8:30 a.m. <br> Judge:  Hon. David O. Carter <br> Ctrm.:  9D |

1 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

2       **PLEASE TAKE NOTICE** that on January 23, 2017 at 8:30 a.m. or at the nearest

3 available date at which counsel may be heard, in Courtroom 9D of the above-referenced

4 court located at 411 W. Fourth Street, Santa Ana, CA 92701, Defendants El Pollo Loco

5 Holdings, Inc. ("EPL" or the "Company"), Trimaran Capital Partners, Trimaran Pollo

6 Partners, L.L.C., Freeman Spogli & Co., Stephen J. Sather, Laurance Roberts and Edward J.

7 Valle (collectively, the "Defendants") will, and hereby do, present for hearing by the Court

8 this Motion to Dismiss the Consolidated Second Amended Complaint for Violation of the

9 Federal Securities Laws (the "Motion").

10       The Motion seeks dismissal for failure to state a claim upon which relief may be

11 granted of the Second Amended Complaint ("SAC") brought by Lead Plaintiffs Ron Huston,

12 Peter Kim, Robert W. Kegley, Sr., Dr. Richard Levey, and Samuel Tanner (collectively,

13 "Plaintiffs").  The Defendants' Motion is filed pursuant to Federal Rules of Civil Procedure

14 9(b), 12(b)(6), and 15 U.S.C. § 78u-4, et seq., and is based on the accompanying

15 memorandum of points and authorities, the March 28, 2016 Request for Judicial Notice

16 granted by the Court on July 25, 2016, all pleadings and papers filed in this action, and such

17 additional papers and arguments as may be presented at or in connection with the hearing.

18 This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which

19 took place on October 11, 2016.

20 DATED:  October 21, 2016

21

22                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

23

24             By:  _____*/s/ Jason D. Russell*_____
                                  Jason D. Russell
25                            Attorneys for Defendants
               El Pollo Loco Holdings, Inc., Trimaran Capital Partners,
26             Trimaran Pollo Partners, L.L.C., Freeman Spogli & Co.,
               Stephen J. Sather, Laurance Roberts, and Edward J. Valle

27

28

                                          i

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 7

      A.    The Parties ................................................................................. 7

      B.    EPL Goes Public In July 2014 ................................................. 7

      C.    EPL Discloses Concerns Related To Recent Menu Changes ............... 9

ARGUMENT ............................................................................................................ 10

   I.    PLAINTIFFS FAILED TO STATE A CLAIM UNDER SECTION 10(b)(5) ............................................................................................. 10

      A.    Plaintiffs Fail To Allege A Material False Or Misleading Statement .................................................................................. 10

           1.    The May 14, 2015 Statements Are Not Actionable ................. 10

           2.    The June 10, 2015 Statements Are Not Actionable ................. 23

      B.    The SAC Still Fails To Create A Strong Inference Of Scienter ......... 25

           1.    Plaintiffs' Stock Sales Allegations Remain Insufficient .......... 25

           2.    Plaintiffs' Other Scienter Allegations Are Equally Insufficient .............................................................................. 32

           3.    Defendants' Disclosures Create a Counter-Inference More Compelling Than Plaintiffs' Theory Of Fraud .............. 34

   II.    PLAINTIFFS DO NOT STATE SECTION 20(a) and 20A CLAIMS ........ 35

CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

In re Accuray, Inc. Securities Litigation,
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................. 20

In re Adolor Corp. Securities Litigation,
   616 F. Supp. 2d 551 (E.D. Pa. 2009) .................................................... 34

In re Alamosa Holdings, Inc.,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ................................................. 25

Applestein v. Medivation, Inc.,
   No. C–10–0998 EMC,
   2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ..................................... 28

Applestein v. Medivation, Inc.,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012),
   aff'd, 561 F. App'x 598 (9th Cir. 2014) .............................................. 18

In re Autodesk, Inc. Securities Litigation,
   132 F. Supp. 2d 833 (N.D. Cal. 2000) ................................................. 33

Bao v. Solarcity Corp.,
   Case No. 14-cv-01435-BLF,
   2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ....................................... 5, 23

Baymiller v. Guarantee Mutual Life Co.,
   No. SA CV99-1566DOC(ANX),
   2000 WL 33774562 (C.D. Cal. Aug. 3, 2000) ................................ *passim*

In re Bridgepoint Education, Inc. Securities Litigation,
   No. 3:12–CV–1737 JM (WMC),
   2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ..................................... 26

Brody v. Transitional Hospitals Corp.,
   280 F.3d 997 (9th Cir. 2002) ......................................................... 10, 11

Browning v. Amyris, Inc.,
   Case No. 13–cv–02209–WHO,
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ..................................... 30

California Public Employees' Retirement System v. Chubb Corp.,
   394 F.3d 126 (3d Cir. 2004) .......................................................... 5, 20

Callan v. Motricity Inc.,
   No. C11–1340 TSZ,
   2013 WL 195194 (W.D. Wash. Jan. 17, 2013),
   aff'd sub nom. Mosco v. Motricity, Inc., 2016 WL 1745044
   (9th Cir. May 3, 2016) ...................................................................... 31

Chavez v. Bank of America Corp.,
    No. C–10–0653 JCS,
    2012 WL 1594272 (N.D. Cal. May 4, 2012) ........................................................ 10

City of Brockton Retirement System v. Shaw Group Inc.,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................ 32

In re Copper Mountain Securities Litigation,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ......................................................... 29, 31

In re Credit Acceptance Corp. Securities Litigation,
    50 F. Supp. 2d 662 (E.D. Mich. 1999) ............................................................... 32

Curry v. Hansen Medical, Inc.,
    No. 5:09–cv–05094–JF (HRL),
    2011 WL 3741238 (N.D. Cal. Aug. 25, 2011),
    appeal filed (9th Cir. 2016) .............................................................................. 21

Curry v. Yelp Inc.,
    Case No. 14-cv-03547-JST,
    2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) .................................................. 20

In re Dot Hill Systems Corp. Securities Litigation,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) .............................................................. 18

In re Downey Securities Litigation,
    No. CV 08–3261–JFW (RZx),
    2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ..................................................... 18

In re Enron Corp. Securities, Derivative & ERISA Litigation,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................... 31

In re FoxHollow Technologies, Inc. Securities Litigation,
    359 F. App'x 802 (9th Cir. 2009) ...................................................................... 24

Fried v. Lehman Bros. Real Estate Associates III, L.P.,
    No. 09 Civ. 9100(BSJ),
    2011 WL 1345097 (S.D.N.Y. Mar. 29, 2011),
    aff'd, 506 F. App'x 5 (2d Cir. 2012) .............................................................. 3, 11

In re GeoPharma, Inc. Securities Litigation,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006) ............................................................... 34

GIA-GMI, LLC v. Michener,
    No. C 06-7949 SBA,
    2007 WL 2070280 (N.D. Cal. July 16, 2007) ................................................... 13

Head v. NetManage, Inc.,
    No. C 97–4385 CRB,
    1998 WL 917794 (N.D. Cal. Dec. 30, 1998) ..................................................... 32

Henningsen v. ADT Corp.,
    161 F. Supp. 3d 1161 (S.D. Fla. 2015),
    aff'd sub nom., IBEW Local 595 Pension & Money Purchase Pension Plans
    v. ADT Corp. – F. App'x – (11th Cir. 2016) ..................................................... 20

In re Hienergy Technologies, Inc.,
    No. SACV04-1226DOC(JTLX),
    2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) ....................................... 27

Hill v. Gozani,
    638 F.3d 40 (1st Cir. 2011) ........................................................ 14

Hodges v. Apple Inc.,
    Case No. 13–cv–01128–WHO,
    2013 WL 6698762 (N.D. Cal. Dec. 19, 2013),
    aff'd, 640 F. App'x 687 (9th Cir. 2016) ........................................ 14

In re ICN Pharmaceuticals, Inc., Securities Litigation,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ...................................... 5, 27

In re Impac Mortgage Holdings, Inc. Securities Litigation,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ..................................... 25, 33

In re IMPAX Laboratories, Inc. Securities Litigation,
    No. C 04–04802 JW,
    2006 WL 6361942 (N.D. Cal. Mar. 1, 2006) ................................ 23

In re Infonet Services Corp. Securities Litigation,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ....................................... 33

Janus Capital Grp., Inc. v. First Derivative Traders,
    564 U.S. 135 (2011) ................................................................ 25

Kane v. Madge Networks N.V.,
    No. C–96–20652–RMW,
    2000 WL 33208116 (N.D. Cal. May 26, 2000),
    aff'd sub nom. Kane v. Zisapel, 32 F. App'x 905 (9th Cir. 2002) .......... 24, 25

Kendall v. Visa U.S.A., Inc.,
    518 F.3d 1042 (9th Cir. 2008) ..................................................... 6

Kovtun v. VIVUS, Inc.,
    No. C 10–4957 PJH,
    2012 WL 4477647 (N.D. Cal. Sept. 27, 2012),
    aff'd sub nom. Ingram v. VIVUS, Inc., 591 F. App'x 592
    (9th Cir. 2015) ...................................................................... 29

Kurtzman v. Compaq Computer Corp.,
    No. Civ.A.H–99–779, Civ.A.H–99–836, Civ.A.H–99–869, Civ.A.H–99–
    889, Civ.A.H–99–936,Civ.A.H–99–937, Civ.A.H–99–952, Civ.A.H–99–
    967, Civ.A.H–99–1011, Civ.A.H–99–1020, Civ.A.H–99–1026, Civ.A.H–
    99–1097,Civ.A.H–99–1101, Civ.A.H–99–1112, Civ.A.H–99–1127,
    Civ.A.H–99–1139, Civ.A.H–99–1161, Civ.A.H–99–1174, Civ.A.H–99–
    1178,Civ.A.H–99–1204, Civ.A.H–99–1250, Civ.A.H–99–1281, Civ.A.H–
    99–1290, Civ.A.H–99–1295, Civ.A.H–99–1298, Civ.A.H–99–
    1356,Civ.A.H–99–1359, Civ.A.H–99–1376, Civ.A.H–99–1381, Civ.A.H–
    99–1415, Civ.A.H–99–1417, Civ.A.H–99–1422, Civ.A.H–99–1429,
    2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) ............................. 29

Leslie Salt Co. v. United States,
    55 F.3d 1388 (9th Cir. 1995) ................................................................... 10

Limantour v. Cray Inc.,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................... 32

Lincoln v. Silverstein,
    No. SACV 09–1072 DOC (Ex),
    2011 WL 318318 (C.D. Cal. Jan. 27, 2011) ............................................ 26

Lipton v. Pathogenesis Corp.,
    284 F.3d 1027 (9th Cir. 2002) ................................................. 16, 30, 33

Mack University LLC v. Halstead,
    No. SA CV 07-0393 DOC (ANx),
    2007 WL 4458615 (C.D. Cal. Nov. 14, 2007) ......................................... 25

Malin v. XL Capital Ltd.,
    499 F. Supp. 2d 117 (D. Conn. 2007),
    aff'd, 312 F. App'x 400 (2d Cir. 2009) .................................................... 30

In re Medicis Pharmaceutical Corp. Securities Litigation,
    689 F. Supp. 2d 1192 (D. Ariz. 2009) ..................................................... 20

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
    540 F.3d 1049 (9th Cir. 2008) ............................................................ 27, 34

Mogensen v. Body Central Corp.,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014) ............................................... 30, 35

New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.,
    537 F.3d 35 (1st Cir. 2008) ......................................................................... 6

In re Netflix, Inc. Securities Litigation,
    No. C04-2978 FMS,
    2005 WL 1562858 (N.D. Cal. June 28, 2005) ..................................... 5, 20

In re Netflix, Inc., Securities Litigation,
    923 F. Supp. 2d 1214 (N.D. Cal. 2013) ................................................... 15

Nursing Home Pension Fund, Local 144 v. Oracle Corp.,
    380 F.3d 1226 (9th Cir. 2004) ................................................................. 16

In re Odyssey Healthcare, Inc. Securities Litigation,
    424 F. Supp. 2d 880 (N.D. Tex. 2005) .................................................... 24

Padnes v. Scios Nova Inc.,
    No. C 95-1693 MHP,
    1996 WL 539711 (N.D. Cal. Sept. 18, 1996) .......................................... 11

In re Party City Securities Litigation,
    147 F. Supp. 2d 282 (D.N.J. 2001) ............................................... 8, 30, 32

In re Pixar Securities Litigation,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ................................................... 29

vi

*Plevy v. Haggerty,*
    38 F. Supp. 2d 816 (C.D. Cal. 1998) ....................................................... 25

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco, Inc.,*
    No. 09 Civ. 6966(JGK),
    2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ......................................... 35

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.,*
    759 F.3d 1051 (9th Cir. 2014) .......................................................... 24, 25

*In re Rackable Systems, Inc. Securities Litigation,*
    No. C 09-0222 CW,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ....................................... 22

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ...................................................... *passim*

*South Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ........................................................... 16, 25

*Schwarz v. Meinberg,*
    Case No. CV 13-00356-BRO (PLAx),
    2016 WL 4744179 (C.D. Cal. Sept. 8, 2016),
    *cert. denied,* 2016 WL 4744179 (C.D. Cal. 2016) ................................ 10

*In re Securities Litigation BMC Software, Inc.,*
    183 F. Supp. 2d 860 (S.D. Tex. 2001) .................................................... 29

*Shurkin v. Golden State Vintners Inc.,*
    471 F. Supp. 2d 998 (N.D. Cal. 2006),
    *aff'd,* 303 F. App'x 431 (9th Cir. 2008) ................................................ 22

*In re Silicon Storage Technology, Inc.,*
    No. C 05-0295 PJH,
    2006 WL 648683 (N.D. Cal. Mar. 10, 2006) .......................................... 22

*In re Splash Technology Holdings, Inc. Securities Litigation,*
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................ 15, 25

*In re Splash Technology Holdings, Inc. Securities Litigation,*
    No. C 99-00109 SBA,
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ....................................... 16

*Stadnick v. Vivint Solar Inc.,*
    14-cv-9283 (KBF), 14-cv-9709 (KBF),
    2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015),
    *appeal filed* (2d Cir. 2016) ................................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ............................................................................... 6

*In re Tibco Software, Inc.,*
    No. C 05-2146 SBA,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ............................ 18, 19, 20

vii

1

In re Tyco International, Ltd., Securities Litigation,
      185 F. Supp. 2d 102 (D.N.H. 2002) ...................................................... 30

2

Wenger v. Lumisys, Inc.,
      2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................... 28

3

4

Wozniak v. Align Technology, Inc.,
      No. C–09–3671 MMC,
      2011 WL 2269418 (N.D. Cal. June 8, 2011) ........................................ 11

5

6

Zucco Partners, LLC v. Digimarc Corp.,
      552 F.3d 981 (9th Cir. 2009) .......................................................*passim*

7

8

**STATUTES**

9

15 U.S.C. § 78u-4........................................................................i, 6, 25, 32, 33

10

**RULES**

11

Federal Rule of Civil Procedure 9(b)..................................................................i

12

Federal Rule of Civil Procedure 12(b)(6) ..........................................................i

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

viii

## PRELIMINARY STATEMENT

On July 25, 2016, the Court dismissed Plaintiffs' claims in their entirety. Plaintiffs were given an opportunity to replead to allege, if they could, facts to overcome the Court's conclusion that they had failed to state a claim against any Defendant. As demonstrated below, Plaintiffs' Second Amended Complaint (the "SAC") fares no better than their initial attempt. The SAC lacks *any* facts to support its theories and does nothing to overcome the Court's concerns and conclusions. Worse still, Plaintiffs offer testimony from three confidential former employees; but that testimony, far from aiding Plaintiffs' case, actually demonstrates the absence of any basis to pursue further claims. Having had ample opportunities to state a claim, Plaintiffs' action should be dismissed with prejudice.

On August 13, 2015, Defendant El Pollo Loco Holdings, Inc. ("EPL" or the "Company") announced that it had missed certain growth assumptions for the second quarter fiscal year 2015 ("2Q FY 2015"). The Company attributed the slowed growth trend to high-priced changes to its menu that the Company had previously discussed with the market on May 14, 2015. EPL's common stock price dropped following this announcement.

Like clockwork, a handful of purported EPL shareholders seeking insurance on their investment began filing lawsuits days later claiming securities fraud under the Private Securities Litigation Reform Act (the "PSLRA"). On January 29, 2016, Plaintiffs filed the Consolidated Class Action Complaint (the "Complaint"). In a classic case of fraud by hindsight, the Complaint alleged that statements made by the Company on May 14, June 10 and July 6, 2015 must have been false simply because of the subsequent missed assumptions on August 13. Specifically, the Complaint alleged that: (i) EPL gave 2Q FY 2015 projections it knew it would not achieve; and (ii) though EPL disclosed that it was experiencing slowed growth trends in early 2015, EPL gave false or misleading reasons for the slowed growth while concealing that removal of the $5 combo meal was the true cause.

Defendants moved to dismiss the Complaint (the "First Motion"). On July 25, the Court granted the First Motion, rejected Plaintiffs' falsity theories, and dismissed the Complaint without prejudice ("Order" ECF No. 58). First, the Court held statements about

1    EPL's financial assumptions were protected under the PLSRA safe-harbor. (Order 12.)

2    Second, the Court rejected the allegations that EPL misrepresented the causes for its

3    issues in early 2015, holding "the allegedly omitted facts rendering the statements were

4    *actually disclosed*." (Order 2.)[1]  Specifically, "the problem with Plaintiffs' argument is

5    Plaintiffs have *failed to show Defendants' failure to mention the $5 combo meal was at odds*

6    *with the state of affairs Defendants presented to investors.*" (Id. at 15.)  Rejecting Plaintiffs'

7    allegations, the Court held that EPL disclosed the facts Plaintiffs alleged were concealed:

8    (i) EPL disclosed "that restaurant traffic only grew 0.1%"; and (ii) EPL disclosed and "made

9    clear it was evaluating the impact of its higher priced menu items, and it expected its

10   comparable restaurant sales growth to drop." (Id. at 16.)

11   In addition to these clear disclosures, the Court further held that the Complaint did not

12   allege any facts indicating the Defendants knew, or were in reckless disregard of, the falsity

13   of their statements.   Specifically, the Court rejected Plaintiffs' vague and conclusory

14   allegations that Defendants must have known the "truth" of their statements because of

15   EPL's internal database, the Operation Dashboard.   The Court held that even if the

16   Dashboard gave Defendants relevant data about the slowed growth trends, Plaintiffs "*fail to*

17   *allege facts showing how each Individual Defendant knew any statistical data was*

18   *specifically linked to the removal of the $5 combo meal*, as opposed to the New Year's Eve

19   holiday, or the other menu changes, such as . . . the promotion of shrimp and steak." (Id.)

20   Finally, the Court also held the Complaint "failed to plead sufficient facts giving rise

21   to a strong inference of scienter," because the Complaint was devoid of allegations necessary

22   for the Court to  contextualize the EPL insiders' Class Period sales to determine whether

23   they support an inference of scienter under Ninth Circuit standards. (Id. at 18.)

24   On August 22, 2016, Plaintiffs filed the SAC.  Rather than attempt to find a new angle

25   for their action, Plaintiffs advance the *exact same theory already rejected by the Court*:  that

26   

27   

28   

---

[1] All emphasis and alterations are added and internal citations and quotations are omitted, unless stated otherwise.  All references to "Ex." refer to the Exhibits attached to the March 28 and June 27, 2016 Declarations of Jason D. Russell in support of the Request for Judicial Notice (ECF Nos.  51, 51-1, 51-2, 56-1), which the Court granted in its Order. (Order 11.)

1  EPL's statements on May 14 and June 10 were misleading because EPL gave false reasons
2  for slowed growth in early 2015 while concealing that the sole reason was removal of the $5
3  combo meal.  Even more telling, the SAC largely relies on the same exact factual allegations
4  already deemed insufficient by the Court, barely alleging any new facts to support Plaintiffs'
5  tired theory, let alone address all the deficiencies identified in the Order.  The Court correctly
6  dismissed the Complaint and the SAC does nothing to change this conclusion.

7         **Plaintiffs Fail to Plead a False or Misleading Statement.**  The SAC fails to allege a
8  false or misleading statement concerning EPL's discussion of its slowed growth in early
9  2015 for the very same reasons that doomed the Complaint.

10         First, despite Plaintiffs' efforts to invent some scheme by EPL to conceal the "true
11  reasons" for its slowed growth in early 2015, the Court explicitly held "the allegedly omitted
12  facts rendering the statements were *actually disclosed*" and the Court was "*not convinced*
13  Defendants omitted any information or warnings to investors that would be misleading."
14  (Order 16.)  The law is clear that "[w]here the allegedly omitted facts are disclosed to the
15  market, there can be no omission for the purposes of a securities fraud claim."  Fried v.
16  Lehman Bros. Real Estate Assocs. III, L.P., 2011 WL 1345097, at *8 (S.D.N.Y. Mar. 29,
17  2011), aff'd, 506 F. App'x 5 (2d Cir. 2012).  The Court's holding that EPL's disclosures
18  defeat Plaintiffs' omission claim constitutes the "law of the case," barring Plaintiffs from re-
19  alleging the same theory of liability.  See Baymiller v. Guarantee Mut. Life Co., 2000 WL
20  33774562, at *2 (C.D. Cal. Aug. 3, 2000) (Carter, J.).  The SAC does not allege a *single fact*
21  to override the Court's conclusion that the purportedly concealed facts were "actually
22  disclosed."  (Order 16.)  The Court should dismiss the SAC with prejudice for this reason
23  alone.  See Baymiller, 2000 WL 33774562, at *2 ("Because Plaintiffs have failed to truly
24  amend their complaint as to these causes of action, the SAC is hereby dismissed with
25  prejudice for the same reasons as the FAC.").

26         Second, even if EPL's disclosures did not preclude Plaintiffs' theory of fraud – and
27  they do – the Court held that Plaintiffs' conclusory Operation Dashboard allegations were
28  insufficient to give any indication that the Defendants knew as of May 14 that removing the

1   $5 combo meal was the true cause of EPL's struggles and that the reasons given were false.

2   But the SAC again relies on vague and conclusory allegations about the Dashboard that were

3   already rejected by the Court and should be rejected again.  (See Order 5, 15-16.)

4        The only new allegations in the entire SAC that attempt to address this deficiency are

5   equally vague and conclusory testimony from three former EPL employees ("FEs"):

6   (i) Former Employee 1 ("FE1"), an Assistant Manager at an undisclosed EPL store from

7   May 2014 to July 2015; (ii) Former Employee 2 ("FE2"), a Team Leader at an undisclosed

8   EPL store from July 2013 to July 2015; and (iii) Former Employee 3 ("FE3"), a Senior

9   Director of Operations at EPL from August 2013 to April 2015.  (SAC ¶¶ 32-35.)   None of

10   these allegations satisfy the Ninth Circuit's stringent two-prong test for sufficient

11   confidential witness testimony at the pleading stage:  "First, the confidential witnesses . . .

12   must be described with sufficient particularity to establish their reliability and personal

13   knowledge.  Second, those statements which are reported by confidential witnesses with

14   sufficient reliability and personal knowledge must themselves be indicative of scienter."

15   Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995 (9th Cir. 2009).

16        The allegations fail to satisfy the first prong of reliability and personal knowledge for

17   various reasons:  (i) the SAC only provides the job titles but fails to allege any specifics

18   regarding the FEs job *responsibilities* "to support the probability that a person in [his]

19   position . . . would possess the information alleged," id.; (ii) the FEs rely on unsubstantiated

20   hearsay statements which are "not enough to satisfy [Ninth Circuit's] reliability standard,"

21   id. at 997; and (iii) FE3 left EPL a *month before* the Class Period even began and therefore

22   lacks firsthand personal knowledge of EPL's actions and/or Defendants' state of mind

23   during that period, id. at 996-97.

24        More importantly, the contents of the confidential witness testimony do nothing to

25   improve the SAC's otherwise inadequate allegations of falsity and scienter.  For instance,

26   while FE1 and FE2 vaguely allege that a few customers complained to them about the

27   removal of the $5 combo meal and that customer complaints could be recorded in the

28   Operation Dashboard, the SAC lacks any allegation that complaints about the combo meal

1  were in fact recorded in the Dashboard – let alone the number of complaints recorded, when

2  they were made (*i.e.*, before or after May 14), or the contents of those complaints. There are

3  no facts to suggest that an unidentified number of customer complaints from one or two of

4  EPL's *over 400 stores nationwide* (Ex. 1) prove EPL's statements were knowingly false.

5  See, e.g., In re Netflix, Inc. Sec. Litig., 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005)

6  (small number of customer complaints, on their own, do not establish falsity of company's

7  statements because "every large company can expect to have some customer complaints");

8  Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 156 (3d Cir. 2004) ("anecdotal

9  examples of profitable customers lost" insufficient to demonstrate falsity).

10  FE3's testimony actually *harms* Plaintiffs' case.  While FE3 allegedly sat in on

11  weekly executive meetings with certain of the Individual Defendants that discussed EPL's

12  "weekly sales performance," (SAC ¶ 35), FE3 *does not allege that the $5 combo meal was*

13  *ever discussed during these meetings*, let alone any discussion that conflicts with EPL's

14  statements during the Class Period as to why it was experiencing slowed growth in early

15  2015.  That Plaintiffs' only alleged corporate insider cannot allege a *single fact* related to the

16  specific statements at issue completely *undermines* Plaintiffs' theory of fraud.  See Bao v.

17  Solarcity Corp., 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016) ("not a single confidential

18  witness alleges that Defendants knew of the accounting error central to this case").

19  Simply, nothing in the SAC, including the testimony from the former employees,

20  gives the Court any indication that:  (i) the removal of the $5 combo meal was the true cause

21  of the slowed growth in early 2015; (ii) EPL's May 14 statements discussing reasons for the

22  slowed growth were false; or (iii) by May 14, EPL knew or recklessly disregarded the fact

23  that the $5 combo meal was the true cause for the slowed growth and that the reasons given

24  on May 14 were false.  Thus, in the end, the SAC is still the very type of "fraud by

25  hindsight" that the PSLRA was designed to "eliminate."  In re ICN Pharm., Inc., Sec. Litig.,

26  299 F. Supp. 2d 1055, 1060 (C.D. Cal. 2004) (Carter, J.).

27  **Plaintiffs Fail to Plead Any Inference of Scienter, Let Alone the Requisite**

28  **"Strong" One.**  Even if Plaintiffs could identify an actionable false or misleading statement

1   as to each Defendant – and they cannot – Plaintiffs do not come close to satisfying the

2   PSLRA's requirement that they "state with particularity facts giving rise to a *strong*

3   *inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2);

4   <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 310 (2007).

5        Just like the Complaint, the SAC almost exclusively attempts to establish scienter by

6   alleging that EPL's Chief Executive Officer Stephen J. Sather and Chief Marketing Officer

7   Edward J. Valle sold shares on a single day during the alleged Class Period from May 15,

8   2015 to August 13, 2015.  (SAC ¶ 69; <u>see also</u> Order 6.)  As an initial matter, the Order

9   rejected the Complaint's stock sale allegations, identifying specific deficiencies that made it

10  impossible for the Court to properly evaluate the insiders' Class Period sales.  (Order 18.)

11  The SAC fails to adequately address these specific deficiencies, which alone warrants

12  dismissal with prejudice.  <u>See</u> <u>Kendall v. Visa U.S.A., Inc.</u>, 518 F.3d 1042, 1051–52 (9th

13  Cir. 2008) (amendment futile where plaintiff was granted leave to amend once and amended

14  complaint contained same defects as the prior complaint).

15        As a result, Plaintiffs essentially rest on the same stock sale allegations from the

16  Complaint.  For the same reasons identified in the First Motion and discussed further below,

17  Plaintiffs cannot show that the stock sales were "dramatically out of line with prior trading

18  practices *at times calculated to maximize the personal benefit from undisclosed insider*

19  *information*."  <u>Ronconi v. Larkin</u>, 253 F.3d 423, 435 (9th Cir. 2001).

20        Plaintiffs' other principal attempt to plead scienter fares no better:  Plaintiffs' vague

21  and conclusory allegations concerning the Operation Dashboard fail to establish scienter for

22  the same reasons they failed to establish a false statement in the first instance. The testimony

23  of the three Former Employees does nothing to change this conclusion.

24        Indeed, the documents properly before the Court all create a far more compelling non-

25  fraudulent inference:  the impact of various menu changes was an evolving situation – as EPL

26  made clear on May 14 – that EPL tried to keep the market apprised of throughout 2015 as it

27  learned more.  <u>See</u> <u>N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.</u>, 537 F.3d

28  35, 45 (1st Cir. 2008) ("A statement cannot be intentionally misleading if the defendant did

not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it."). Accepting Plaintiffs' theory based on hindsight penalizes EPL for trying to be as transparent as possible.

For these reasons, the Court should dismiss the SAC with prejudice.

## FACTUAL BACKGROUND

### A.    The Parties

**EPL.** Defendant EPL, through its subsidiary El Pollo Loco, Inc., develops, franchises, licenses and operates quick-service restaurants under the El Pollo Loco name.  (SAC ¶ 21.) EPL has over 400 company-owned and franchised locations across the country. (Ex. 1.)

**The Individual Defendants.**  Defendant Stephen J. Sather is EPL's President and CEO and a member of its Board of Directors ("CEO Sather").  (Id. ¶ 22.)  Defendant Laurance Roberts is EPL's CFO ("CFO Roberts") and Defendant Edward J. Valle is EPL's Chief Marketing Officer ("CMO Valle").  (Id. ¶¶ 23-24.)   Defendants Sather, Roberts and Valle are collectively referred to in this Motion as the "Individual Defendants."   The Individual Defendants and EPL are collectively referred to as the "10(b) Defendants."

**The Trimaran Defendants.**  Defendant Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo") is owned by Defendants Trimaran Capital Partners ("Trimaran Capital"), a private asset management firm headquartered in New York, New York, and  Freeman Spogli & Co. ("Freeman Spogli"), a private equity firm based in Los Angeles, California.  (Id. ¶ 26.)  The three entities are collectively referred to as the "Trimaran Defendants."

### B.    EPL Goes Public In July 2014

On July 24, 2014, EPL conducted an initial public offering ("IPO") of over 7 million shares of EPL common stock.  (Ex. 7.)  As part of the IPO, the Company's officers – including the Individual Defendants – directors, and Trimaran Pollo, among others, all entered into so-called "lock-up" agreements with the underwriters, pledging: "not to . . . sell, offer, contract or grant any option to sell . . .  pledge, transfer . . . or otherwise dispose of any" EPL equity securities for a period of 180 days from the date of the July 24, 2014 prospectus – i.e., until after January 20, 2015, subject to modification at the sole discretion of

representatives of the underwriters.  (Id. at 102, 107.)

Months later, on November 19, 2014, EPL held a secondary public offering of over 6 million common stock shares from Trimaran Pollo and many EPL officers and directors – including the Individual Defendants.  (Ex. 8 at 91.)   The number of shares sold, sale price, sale proceeds, approximate remaining shares after the November 19, 2014 sale, and percentage of holdings retained after the November 19, 2014 sale for the Individual Defendants and Trimaran Pollo, are listed in the following chart (see SAC ¶ 71; Ex. 8 at 91):

| Shareholder | No. Sold | Price | Proceeds | Remaining Shares[2] | Retention % |
|---|---|---|---|---|---|
| Roberts | 22,500 | $27.00 | $607,500 | 88,294 | 79.7% |
| Sather | 250,088 | $27.00 | $6,887,376 | 1,233,544 | 83.1% |
| Valle | 67,400 | $27.00 | $1,819,800 | 325,959 | 82.9% |
| Trimaran Pollo | 6,408,945 | $27.00 | $173,041,515 | 22,149,044 | 77.6% |

**Total Shares Sold:  6,748,933       Total Retention Percentage:  77.9%**

As part of the offering, the selling shareholders entered into lock-up agreements with the underwriters that modified and superseded the July 2014 lock-up agreements.  (Ex. 8 at 98.)   Under the new lock-up agreements, the selling shareholders, including the Individual Defendants and Trimaran Pollo could not sell shares "for a period of 90 days from the date of" the November 19, 2014 prospectus.  (Id.)   Thus, EPL insiders were legally barred from trading from November 19, 2014 to February 17, 2015.  (See id.)

Defendants Sather, Valle and Trimaran Pollo sold on May 19, days after EPL disclosed its results for 1Q on May 14.  See In re Party City Sec. Litig., 147 F. Supp. 2d 282, 312 (D.N.J. 2001)  ("Trading following public announcements simply evidences compliance with the securities laws" as "insiders are only permitted to trade in a 'window' after a public announcement is made"); (see SAC ¶ 69; Exs. 10-12; Order 3-4):

| Shareholder | No. Sold | Price | Proceeds | Remaining Shares | Retention % |
|---|---|---|---|---|---|
| Roberts | 0 | 0 | 0 | 88,296 | 100% |

---

[2]   Approximate remaining shares is the sum of common stock plus fully vested stock options and include options acquirable within 60 days of November 14, 2014.  (Ex. 8 at 91.)

| | | | | | |
|---|---|---|---|---|---|
| Sather | 360,000 | $21.85 | $7,866,000 | 1,085,499 | 75.1% |
| Valle | 175,000 | $21.85 | $3,823,750 | 207,159 | 54.2% |
| Trimaran Pollo | 5,402,500 | $21.85 | $118,044,625 | 16,746,544 | 75.6% |

**Total Shares Sold:  5,937,500        Total Retention Percentage: 75.3%**

### C.    EPL Discloses Concerns Related To Recent Menu Changes

On May 14, 2015, EPL announced its earnings results for 1Q FY 2015.  (SAC ¶¶ 60-61.)  The Company disclosed that while system-wide comparable restaurant sales grew 5.1% and company-owned comparable restaurant sales grew 3.5%, company-owned comparable store traffic growth slowed precipitously to 0.1%.  (Ex. 2 at 4; Order 4.)  This disclosure was in contrast to the two preceding quarters where the company-owned comparable restaurant traffic growth remained steady at 3.3% and 3.1%.  (Ex. 13 at 3; Ex. 14 at 4.)  Later on in that same earnings call, EPL explicitly discussed on a qualitative level that "higher price point[s]" had "an impact on customers," hurting the "[v]isibility of value on our menu."  (Ex. 2 at 7, 8; Order 6.)   EPL stressed that the impact of the menu changes was still being "reevaluat[ed]" (Ex. 2 at 7), and that 2Q FY 2015 projections would be relatively low as EPL continued "conducting extended tests of alternative proteins."  (Ex. 2 at 5; Order 6.)  Thus, EPL maintained its system-wide comparable restaurant sales growth assumption for FY 2015 of 3% to 5%, but disclosed that this figure for the 2Q FY 2015 alone was projected to be "closer to the low end of the range," and that 2Q FY 2015 company-owned comparable restaurant sales growth would be even ***below*** that range.  (Id. at 5, 7; Order 6.)

On August 13, 2015, EPL announced its earnings result for 2Q FY 2015, disclosing that it missed its assumptions and that system-wide comparable restaurant sales grew 1.3% and company-owned comparable restaurant sales dropped 0.5%.  (SAC ¶ 76.)  Consistent with the cautions expressed on May 14, EPL attributed the miss in part to the "combination of higher-priced offerings and a reduction of [the] value portion of [the] menu."  (SAC ¶ 77; Order 8.)  EPL adjusted its system-wide comparable restaurant sales growth assumption for the remainder of FY 2015 downward to 3%.  (SAC ¶ 76; Order 8.)

9

1

**ARGUMENT**

2

## I.     <u>PLAINTIFFS FAILED TO STATE A CLAIM UNDER SECTION 10(b)(5)</u>

3
4
5
6
7
8
9
10
11
12
13
14

The standards applicable to this Motion are articulated in the Court's Order (Order 9-12), and are incorporated by reference herein.  Because the Court already considered and rejected Plaintiffs' arguments, "[t]he 'law of the case' doctrine generally bars courts from reconsidering an issue that has already been decided by the same court or a higher court in the same case." <u>Baymiller</u>, 2000 WL 33774562, at *2.   The doctrine "applies not just to issues decided explicitly, but includes matters that were decided by necessary implication in the court's prior ruling." <u>Chavez v. Bank of Am. Corp.</u>, 2012 WL 1594272, at *5 (N.D. Cal. May 4, 2012) (citing <u>Leslie Salt Co. v. United States</u>, 55 F.3d 1388, 1393 (9th Cir. 1995). Courts apply the doctrine to orders granting motions to dismiss, and hold that the doctrine warrants dismissal with prejudice of subsequent amended pleadings advancing the same allegations.  <u>See</u> <u>Baymiller</u>, 2000 WL 33774562, at *2; <u>Schwarz v. Meinberg</u>, 2016 WL 4744179, at *3 (C.D. Cal. Sept. 8, 2016), <u>cert. denied</u>, 2016 WL 4744179 (C.D. Cal. 2016).

15

### A.     <u>Plaintiffs Fail To Allege A Material False Or Misleading Statement</u>

16

#### 1.     <u>The May 14, 2015 Statements Are Not Actionable</u>

17
18
19
20
21
22
23
24

While no longer challenging EPL's 2Q FY 2015 financial projections, the SAC repeats the allegations in the Complaint that while EPL disclosed on May 14 that it was experiencing slowing growth rates, it provided inadequate and pre-textual reasons for that slowed growth, and concealed that "it was actually [EPL's] attempt to raise prices that drove away its customers."  (SAC ¶ 6; Order 15.)  Plaintiffs allege the "truth" did not come out until EPL specifically discussed "higher prices" at its August 13, 2015 earnings call.  (SAC ¶ 11.) However, the Court correctly dismissed these allegations, and the SAC does not allege anything new to disrupt the Court's conclusion.

25

##### (a)     **As the Court held, EPL disclosed prices were impacting sales.**

26
27
28

"To be actionable under the securities laws, an omission must . . . affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  <u>Brody v. Transitional Hosps. Corp.</u>, 280 F.3d 997, 1006 (9th Cir. 2002) (citation

10

omitted). This is because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." Id. Thus, "[w]here the allegedly omitted facts are disclosed to the market, there can be no omission for the purposes of a securities fraud claim." Fried, 2011 WL 1345097, at *8; Padnes v. Scios Nova Inc., 1996 WL 539711, at *9 (N.D. Cal. Sept. 18, 1996); Wozniak v. Align Tech., Inc., 2011 WL 2269418, at *11 (N.D. Cal. June 8, 2011) (rejecting omission claim where "disclosures, made both prior to the Class Period and reiterated during it, revealed the very [issues] plaintiff alleges were omitted").

Here, on and before May 14, EPL disclosed that it was experiencing slowed growth due in large part to higher prices.  On the May 14 earnings call at issue, EPL disclosed that restaurant traffic grew *0.1%* in 1Q FY 2015 (Ex. 2 at 4), as compared to the *3.3%* and *3.1%* growth the previous quarters, which were also publicly disclosed.  (See Order 16.)

Moreover, while the SAC baselessly alleges that EPL failed to disclose that "it was actually [EPL's] attempt to raise prices" to counterbalance allegedly increased labor costs (SAC ¶ 6; see also Order 2) that caused the slowed growth trends, the true contents of EPL's statements and disclosures prove otherwise for several reasons.  First, as early as the 4Q FY 2014 earnings call on March 12, 2015, EPL disclosed that it increased menu prices in 2014 and again "at the beginning of February [2015]" to "offset higher food and paper costs" – not labor costs as Plaintiffs baselessly assert.  (Ex. 14 at 4.)  Plaintiffs' assertion that EPL concealed its "higher prices" (SAC ¶ 11) is demonstrably false.

Second, Plaintiffs' unsupported assertion that EPL secretly increased prices to offset rising labor costs in California due to a minimum wage hike is similarly baseless and undermined by the fact that:  (i) minimum wage hikes and their impact on QSR + restaurants was not a secret and would equally impact EPL's competitors; (ii) EPL disclosed during earnings calls that labor expenses hovered around 25% of company restaurant sales for three consecutive quarters from 4Q FY 2014 through 2Q FY 2015 (see Ex. 14 at 4; Ex. 2 at 4; Ex. 4 at 4), and actually *decreased* during the Class Period, dropping from 25.5% in 1Q to 25.2% in 2Q; and (iii) EPL stated on August 13, 2015, that "we did not really see much

1  impact" from the most recent California minimum wage hike which occurred back in July

2  2014 (Ex. 4 at 8).  The SAC does not, indeed could not, challenge any of these facts.

3    Third, as shown in the First Motion and held by the Court, EPL's May 14 earnings call

4  explicitly discussed the negative impact higher-priced items were having on the perceived

5  value of its menu, impacting sales growth.  Plaintiffs casually dismiss the addition of these

6  pricier items as an "an unrelated menu change" that was a "superficial factor[]" to EPL's

7  struggles and was "easily-addressable" (SAC ¶¶ 5-7).  Plaintiffs' baseless editorializing aside,

8  EPL clearly disclosed that customers were negatively responding to the pricing changes.

- CFO Roberts discussed how the "higher price point of carne asada and shrimp together" had an "impact on customers." (Ex. 2 at 7.)

- CMO Valle: "visibility of value on our menu is not as strong as [before]." (Id. at 8.)

- CMO Valle noted that the higher price points was impacting customer traffic stating that because of those prices  "[o]ur menu skews a little bit more to check [size] than to [number of] transactions. *So we're assessing the impact of that*." (Id. at 7.)

- In response to the customer reaction, the Company emphasized a need to work on balancing the message to not lose value-oriented customers, stating a plan for the menu to be more "balance[d] in here for [cheaper] entry level price points, which, I think, got squeezed a little bit when both of the proteins came on." (Id. at 11.)

15  (See also Order 6.)  EPL stated the impact of the pricier items was an ongoing situation still

16  being "assess[ed]" and "reevaluat[ed]."  (See Ex. 2 at 7; Order 16.)  Because of this ongoing

17  situation, EPL lowered its comparable stores sales growth assumptions for 2Q FY 2015 below

18  previous quarters.  (Order 5.)[3]

19    Fourth, any effort to create a chasm between EPL's May 14 and August 13 statements

20  is undermined by the contents of the August 13 investor call.  Rather than abandon its previous

21  explanations, EPL reiterated on August 13:  "As we discussed in our *last* earnings call, our

22  second-quarter results were impacted by the combination of higher-priced offerings and a

23  reduction of our value portion of our menu." (Ex. 4 at 3; Order 8.)  CEO Sather explained that

24

---

25  [3] EPL disclosed its estimate that 2Q FY 2015 system-wide growth would be at the "low end" of a 3% to 5% range even though it was higher in previous quarters:  7.9% in 3Q FY 2014 (Ex. 13 at 2), 7.6% in 4Q FY 2014 (Ex. 14 at 3), 7.0% for the entire 2014 fiscal year (Ex. 20 at 1), and 5.1% in 1Q FY 2015 (Ex. 2 at 3).  EPL also estimated that company-owned restaurant growth would be *below* the 3-5% range, even though that figure was higher in previous quarters:  6.4% in 3Q FY 2014 (Ex. 13 at 3), 6.4% in 4Q FY 2014 (Ex. 14 at 4), 5.8% for the entire 2014 fiscal year (Ex. 20 at 1), and 3.5% in 1Q FY 2015 (Ex. 2 at 3).

1  while EPL normally "employ[s] a balance of a high/low pricing strategy," it temporarily "lost

2  the value focus on the first half of 2015," by "overweigh[ing]" the balance "to the higher

3  priced items" – shrimp and steak. (Ex. 4 at 6.)  The $5 combo meal "impacted our value

4  customer," and adding the premium proteins "really further drove that perception of higher

5  prices with the non-focus of value" which "reduced visits from some of our more value

6  oriented customers."  (Id. at 3, 6; Order 8.)  Thus,  EPL confirmed, and if anything simply

7  built upon, its previous explanations for the slowed growth in early 2015.

8         Finally, Plaintiffs repeat their allegations that August 13 disclosures left analysts such as

9  William Blair and Morgan Stanley "surprised" (SAC ¶ 80) even though an actual reading of

10  those reports shows the opposite:  the apparent reason for EPL's missed assumptions were the

11  same issues those same analysts discussed after the May 14 call.  William Blair wrote on May

12  14 that "second-quarter comp slowdown appears to stem from self-inflicted wounds related to

13  two overlapping high-ticket [Limited Time Offerings ("LTOs")] and a less focused value

14  message." (Ex. 15.)  William Blair followed on August 13: "Trends softened as the quarter

15  progressed, with expected weakness in May (overlapping high-ticket LTOs of both shrimp

16  and carne asada that obscured [EPL's] value message) followed by more weakness in June as

17  the launch of hand-carved salads that did not perform as expected."  (Ex. 23.)  Similarly, on

18  May 14, Morgan Stanley reported that "focus on value may have impacted comps as well,"

19  and that EPL's lowered assumptions for the rest of the quarter "impl[ies] negative traffic."

20  (Ex. 17.)  On August 13, Morgan Stanley repeated the message:  "Similar to last quarter,

21  [EPL] blamed the declining traffic on running two higher price point offerings . . . while

22  removing value messaging."  (Ex. 24.)   The analyst reports do not show that the August 13

23  call revealed a development that EPL previously concealed.  On the contrary, the reports

24  confirm that the missed assumptions resulted from a continuation of the very same concerns

25  and issues EPL disclosed, and the analysts absorbed, on May 14.

26         Thus, Plaintiffs mischaracterize EPL's statements and the analysts' reactions to

27  manufacture a misstatement where there was none.  Plaintiffs "cannot sidestep the heightened

28  pleading requirements for fraud by simply mischaracterizing" statements made by EPL.  GIA-

13

1   GMI, LLC v. Michener, 2007 WL 2070280, at *9 (N.D. Cal. July 16, 2007).  Rather, the true

2   contents of EPL's statements demonstrate that EPL continuously sought to disclose that menu

3   pricing changes were impacting sales, precluding an omission claim based on those disclosed

4   facts.  See Hill v. Gozani, 638 F.3d 40, 60 (1st Cir. 2011) (where defendants disclosed a risk,

5   "[t]o the extent that the plaintiff's complaint is that the precise degree of risk was not stated,

6   that failure is not sufficient to have rendered the statements misleading").

7        Indeed, the Court has already held it was "not persuaded" by the allegation that EPL

8   "concealed from investors the 'true cause of the poor comparable store sales performance:

9   that El Pollo Loco's sharply increasing its prices, including by removing the $5 combo

10  menu, had driven away its customers,'" and dismissed the allegation for the very same

11  reasons discussed above.  (Order 15.)  The Court held:  "[t]he problem with Plaintiffs'

12  argument is Plaintiffs have failed to show Defendants' failure to mention the $5 combo meal

13  was at odds with the state of affairs Defendants presented to investors."  (Id.)  Specifically,

14  the Court noted EPL "disclosed that restaurant traffic only grew 0.1% in both the May 14,

15  2015 press release and conference call with analysts."  (Id. at 16.)  EPL "made clear it was

16  evaluating the impact of its higher priced menu items, and it expected its comparable

17  restaurant sales growth to drop," quoting the very statements made by EPL highlighted

18  above.  (Id. (quoting CEO Sather's statement "we are still in an extended test and assessing

19  the overall impact on the menu and mix," CFO Roberts statement "we will expect our

20  second quarter comparable sales to be closer to the low end of the range," and CMO Valle's

21  statement the "[v]isibility of value on our menu is not as strong as it used to be." (Id.)

22       The Court's holding constitutes the "law of the case" and warrants dismissal with

23  prejudice here – particularly where the SAC simply repeats the exact same theory of liability

24  that the Court already dismissed but does not contain a single allegation that even attempts to

25  address the deficiencies discussed above and held by the Court.  The Court should dismiss

26  the SAC with prejudice for this reason alone.  See Baymiller, 2000 WL 33774562, at *2.[4]

---

27  [4] See also Hodges v. Apple Inc., 2013 WL 6698762, at *1 (N.D. Cal. Dec. 19, 2013), aff'd,
28  640 F. App'x 687 (9th Cir. 2016)  ("[t]he Court previously dismissed [complaint] [b]ecause,
                                                                           *(cont'd)*

**(b)     The SAC still fails to allege facts that EPL knew that removing the $5 combo meal caused the slowed growth.**

In any event, Plaintiffs allege no facts showing that the "true cause" for EPL's struggles was removal of the $5 combo meal, much less that EPL knew this by May 14.

As the Court held, "for the Company's statements to be misleading, Defendants must have '*actually known specific information*' about the impact on the removal of the $5 combo meal from its menu," at the time the statements were made.  (Order 16, quoting In re Netflix, Inc., Sec. Litig., 923 F. Supp. 2d 1214, 1223 (N.D. Cal. 2013) (omission claim fails where "[p]laintiffs have not shown that Defendants possessed information at odds with" public statements "such that . . . additional disclosure was required").  "This requirement helps guard against pleading fraud by hindsight" and "providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements conflict with the current state of facts."  In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1072 (N.D. Cal. 2001).  The Court held the Complaint failed to make this showing, and again, the SAC confirms this conclusion, for several reasons.

**(i)     The SAC's Operation Dashboard allegations largely repeat those already found insufficient by the Court.**

First, Plaintiffs again principally rely on the Operation Dashboard to allege EPL knew by May 14 that removing the $5 combo meal was the singular root of all its issues.  (SAC ¶¶ 55-56; Order 5, 15.)   However, as alleged in the dismissed Complaint, the SAC simply identifies general categories of information allegedly contained in the Dashboard and alleges in conclusory fashion that the Defendants constantly monitored the Dashboard.  (Compare Compl. ¶ 19 (Dashboard  "included real-time information regarding sales, comparable store sales, customer traffic, costs and expenses, product demand, inventory management and customer incentives") with SAC ¶ 25 (alleging verbatim) with Order 5.)

But "merely assert[ing] in conclusory terms that the defendants had access to internal

_____
*(cont'd from previous page)*
fundamentally, [plaintiff] ha[d] not identified any affirmative misrepresentation made by [defendant]," had not identified any fraudulent omission by [defendant] . . . Because those same defects appear in the SAC, the motion to dismiss the SAC is granted with prejudice").

data" and "mak[ing] a general assertion about what [plaintiffs] think the data shows," "does not give rise to a strong inference that defendants acted with deliberate or conscious recklessness." Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1036 (9th Cir. 2002). Rather, a "proper complaint which purports to rely on the existence of internal reports [should] contain at least some specifics from those reports as well as such facts as may indicate their reliability," S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783 n.2 (9th Cir. 2008), such as "hard numbers or other specific information" like confidential witness testimony. Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1231 (9th Cir. 2004).

The SAC, just as with the Complaint, does not: (i) allege when and how often the 10(b) Defendants accessed the Dashboard; (ii) identify any particular contents, numbers or data; (iii) explain how such data rendered EPL's financial results misleading; or (iv) let alone explain how the Dashboard would inform Defendants of the *qualitative causes* for that data. Absent such allegations, "[P]laintiffs have failed to meet the falsity pleading burden." In re Splash Tech. Holdings, Inc. Sec. Litig., 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000).

The Court held as much, dismissing the Operation Dashboard allegations in the Complaint, holding: "Even assuming" the Complaint correctly alleged that the Dashboard "provided real-time data on current performance against forecasts, comparable store sales, customer traffic, and average check size," "Plaintiffs fail to allege facts showing how each Individual Defendant knew any statistical data was specifically linked to the removal of the $5 combo meal, as opposed to the New Year's Eve holiday, or the other menu changes, such as the removal of the Under 500 menu and the promotion of shrimp and steak." (Order 16 (citing In re Splash Tech., 2000 WL 1727377, at *16).) The SAC's vague and conclusory Dashboard allegations suffer from the very same deficiencies present in the Complaint and identified by the Court. The allegations should be dismissed again.

### (ii)   The SAC's confidential witness allegations are insufficient as a matter of law.

The SAC's reliance on three confidential Former Employees does not remedy these deficiencies.   In the Ninth Circuit, "a complaint relying on statements from confidential

1   witnesses must pass two hurdles to satisfy the PSLRA pleading requirements.  First, the
2   confidential witnesses . . . must be described with sufficient particularity to establish their
3   reliability and personal knowledge.   Second, those statements which are reported by
4   confidential witnesses with sufficient reliability and personal knowledge must themselves be
5   indicative of scienter."   Zucco, 552 F.3d at 995.   "The first prong of this two-part
6   confidential witness test analyzes whether a complaint has provided sufficient detail about a
7   confidential witness' position within the defendant company to provide a basis for attributing
8   the facts reported by that witness to the witness' personal knowledge."  Id.  The witnesses
9   must be "described with sufficient particularity to support the probability that a person in the
10  position occupied by the source would possess the information alleged."  Id.

11      Here, a year after the initiation of this action, Plaintiffs can only muster allegations
12  from just three former employees as supposed confidential witnesses.  However, the SAC
13  fails to satisfy either prong of the two-part test for each of the three witnesses.

14                          **(1) Former Employee 1 ("FE1")**

15      The SAC alleges that FE1 was an "Assistant Manager, at a Los Angeles-area [EPL]
16  store from May 2014 to July 2015."  (SAC ¶ 32.)  FE1 testifies that "customers were upset
17  about removal of $5 combo menu items," and that "foot traffic noticeably declined when the
18  popular menu items were removed."  (Id. at ¶ 33.)  FE1 alleges customers "expressed those
19  concerns through [EPL's] customer feedback system, which included a 1-800 number and an
20  online system for complaints and comments," and that complaints could be "viewed and
21  listened to through [the]  Dashboard."  (Id.)  The allegations fail for several reasons.

22      As to the first prong of the two-part test – whether the SAC establishes FE1's
23  reliability and personal knowledge – the SAC fails to allege any facts concerning FE1's job
24  responsibilities, let alone facts sufficient "to support the probability that a person in [his]
25  position . . . would possess the information alleged."  Zucco, 552 F.3d at 995.  Instead, the
26  SAC simply alleges his general job title and that he "reported directly to the store's General
27  Manager" (SAC ¶ 32), without even alleging the General Manager's responsibilities.  Courts
28  reject confidential witness testimony for this reason alone.  See, e.g., 552 F.3d at 995; In re

1   Downey Sec. Litig., 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (complaint "does

2   not adequately describe each confidential witness's job description and responsibilities, but

3   merely states each confidential witness's general job title and, on occasion, the name and

4   title of the confidential witness's supervisor"); In re Dot Hill Sys. Corp. Sec. Litig., 594 F.

5   Supp. 2d 1150, 1163 (S.D. Cal. 2008) (same).

6        Specifically, while FE1 alleges that customer complaints were logged on the

7   Operation Dashboard, the SAC provides zero indication as to how an Assistant Manager of a

8   single EPL store would know the contents of the Operation Dashboard which was allegedly

9   utilized by EPL executives.   See, e.g., Zucco, 552 F.3d at 996 (dismissing confidential

10  witness allegations where "[s]ome of the confidential witnesses were simply not positioned

11  to know the information alleged"); In re Tibco Software, Inc., 2006 WL 1469654, at *22

12  (N.D. Cal. May 25, 2006) (rejecting confidential witness allegations concerning specific

13  acquisition and company's forecasting process where the "job descriptions provided for

14  CW4 and CW6 do not indicate whether those witnesses had any specific knowledge

15  regarding the . . . acquisition or [the company's] forecasting process").

16       The SAC also fails to establish the reliability of FE1's testimony where FE1 relies on

17  the hearsay of customers who allegedly complained about removal of the $5 combo items.

18  See, e.g., Zucco, 552 F.3d at 997 (dismissing allegations where "majority of the confidential

19  witnesses base their knowledge on vague hearsay" which "is not enough to satisfy [Ninth

20  Circuit's] reliability standard"); Applestein v. Medivation, Inc., 861 F. Supp. 2d 1030, 1039

21  (N.D. Cal. 2012), aff'd, 561 F. App'x 598 (9th Cir. 2014) ("[T]he fact that Plaintiffs rely on

22  hearsay statements passed onto CW–2 further underscores the unreliability of the

23  confidential witness statements in this case.   There is very little detail about the information

24  that CW–2 received or how he 'verified' the information that he received.").

25       Even if the SAC established FE1's reliability and personal knowledge with the

26  sufficient particularity required by the Ninth Circuit – and it does not – the contents of FE1's

27  testimony does nothing to show either that:  (i) the removal of the $5 combo meal was the

28  true cause of the slowed growth in early 2015; (ii) EPL's May 14 statements discussing

1   reasons for the slowed growth were false; or (iii) let alone by May 14, that EPL knew or

2   recklessly disregarded the fact that the $5 combo meal was the true cause for the slowed

3   growth and that the reasons given on May 14 were false.

4        First, while vaguely alleging that customers complained about the removal of the $5

5   combo menu items and that such complaints would be logged in the Operation Dashboard,

6   FE1 does not allege that to his knowledge customers did in fact make such complaints in a

7   manner that would be logged in the Dashboard, let alone that these complaints were *in fact*

8   logged in the Dashboard.  Even if he did so, FE1 does not allege how many such complaints

9   were made, when they were made (*i.e.*, before or after May 14), or the contents of those

10  complaints.  Plaintiffs simply do not explain how FE1's vague testimony concerning an

11  unidentified number of undated complaints from *one out of EPL's 400 stores nationwide*

12  somehow demonstrates that by May 14, the $5 combo menu was in fact the true and sole

13  cause of EPL's slowed growth in 2015.  Similarly, while FE1 also alleges that "foot traffic

14  noticeably declined [in his store] when the popular menu items were removed," (SAC ¶ 33),

15  the SAC does not allege that this was the case as to all or a large number of EPL's over 400

16  stores to suggest that the removal was the true and sole cause of EPL's issues.

17       Without such information, the SAC's Operation Dashboard allegations fail for the

18  same reasons that compelled the Court to dismiss the Complaint's Operation Dashboard

19  allegations:  there are zero facts to suggest that based on specific contents in the Dashboard,

20  by May 14, the 10(b) Defendants knew, or were in reckless disregard, of the fact that

21  removal of the $5 combo meal was the sole cause for EPL's slowed growth trends in early

22  2015 and the reasons given on May 14 were false.  See, e.g., Zucco, 552 F.3d at 997

23  (rejecting witness allegations "not detailed enough to pass muster"); In re Tibco, 2006 WL

24  1469654, at *18 ("insufficiency of [confidential witness] allegations is readily apparent"

25  where "Plaintiffs utterly fail to provide information showing who specifically knew the

26  information, how they knew it, what information was known, and when it was known").

27       Indeed, "every large company can expect to have some customer complaints," and

28  thus courts routinely reject allegations of customer complaints as insufficient to establish

falsity or scienter, particularly when the allegations are vague as to the number and scope of the supposed complaints.  In re Netflix, 2005 WL 1562858, at *7; Curry v. Yelp Inc., 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015) ("even if consumer complaints could sufficiently prove a statement false to overcome a motion to dismiss," the alleged complaints "did not do so because they were insufficiently numerous and corroborative"); Stadnick v. Vivint Solar Inc., 2015 WL 8492757, at *14-15 (S.D.N.Y. Dec. 10, 2015) (former employees' allegations of lost customers insufficient to support allegation that company fraudulently failed to disclose installation delays where employees did not allege "what percentage, if any, of those lost customers were due to installation delays" or how this alleged "'trend' materially affected the Company's revenues"), appeal filed (2d Cir. 2016).[5]

Second, FE1 does not allege any facts that suggest that the addition of the higher-priced items or the New Year's holiday had in fact no impact on customer traffic or spending habits.  Thus, FE1's allegations do not even contradict EPL's statements on May 14.  See, e.g., In re Tibco, 2006 WL 1469654, at *19 (rejecting witness allegations that were "not inconsistent with the Company's proffered reasons for belatedly realizing that the Company was going to miss its numbers for the first quarter"); Chubb Corp., 394 F.3d at 157.

Finally, the SAC does not allege that FE1 had any interaction with any EPL insider, let alone allege that FE1 specifically informed insiders of the information he now alleges. Thus, there is no indication that any of the facts alleged by FE1, a low-level employee, can even be imputed to the 10(b) Defendants to establish scienter.  "Thus, it is difficult to surmise how the opinions and observations of [FE1] could support a reasonable inference about what [the 10(b)] Defendants knew or did not know at the time each of the challenged statements [were] made."  In re Accuray, Inc. Sec. Litig., 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010); In re Medicis Pharm. Corp. Sec. Litig., 689 F. Supp. 2d 1192, 1211 (D. Ariz.

---

[5] Henningsen v. ADT Corp., 161 F. Supp. 3d 1161, 1202 (S.D. Fla. 2015) ("allegations concerning customer service" lack "specificity regarding the scope of the problem.  None of the confidential witnesses . . . specify how common the customer service problems were or [how] many customers cancelled due to the problems."), aff'd sub nom. IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp., – F. App'x – (11th Cir. 2016).

1  2009) (dismissing allegations where "[p]laintiffs do not provide any information linking CW

2  2 with the Defendants, or giving him personal knowledge of the Defendants' state of mind").

3  **(2)  Former Employee 2 ("FE2")**

4  The SAC alleges that FE2 was a "Team Leader at a Los Angeles-area [EPL] from

5  July 2013 to July 2015."  (SAC ¶ 34.)  Similar to FE1, FE2 alleges that "[c]ustomers told

6  [him] they were upset that the $5 combo menu had been removed" and that the Operation

7  Dashboard included "inventory, sales information and customer feedback."  (Id.)

8  FE2's allegations fail to satisfy either prong of the Ninth Circuit's two-part test for the

9  same reasons FE1's allegations fail:  (i) the SAC does not sufficiently allege FE2's job duties

10  to establish personal knowledge of the facts he attests to; (ii) FE2 relies on hearsay

11  statements from customers; (iii) FE2 does not allege that any such alleged complaints were

12  logged in the Dashboard, the number of the complaints, the date of the complaints, the

13  contents of the complaints, or any other information to suggest that the complaints he

14  witnessed demonstrates that removal of the combo menu was in fact the true and sole cause

15  of EPL's system-wide issues in early 2015; (iv) FE2 does not allege any facts that actually

16  conflict with EPL's May 14 statements; and (v) the SAC does not allege FE2 interacted with

17  the 10(b) Defendants or that his information was otherwise transmitted to them.

18  **(3)  Former Employee 3 ("FE3")**

19  The SAC alleges that FE3 was "the Senior Director of Operations at [EPL] from

20  August 2013 through mid-April 2015."  (SAC ¶ 35.)  FE3 alleges that he attended weekly

21  meetings with CEO Sather, CFO Roberts and "other senior executives at [EPL]," which

22  "frequently included discussions of [EPL's] weekly sales performance including comparable

23  store sales."  FE3 further alleges that CEO Sather was "glued" to the Operation Dashboard.

24  (Id.)  FE3's testimony does not support Plaintiffs' theory of fraud for several reasons.

25  First, FE3 departed EPL a *month before* May 14, and was not employed at EPL at any

26  time during the Class Period.  "[T]he Ninth Circuit concluded in Zucco that allegations made

27  by witnesses who were not employed throughout the length of the relevant time period were

28  unreliable."  Curry v. Hansen Med., Inc., 2011 WL 3741238, at *5 (N.D. Cal. Aug. 25,

21

1   2011) (citing <u>Zucco</u>, 552 F.3d at 996-97 (witnesses not employed at company during class

2   period do not have firsthand knowledge of the company's actions during that period)),

3   <u>appeal filed</u> (9th Cir. 2016); <u>Shurkin v. Golden State Vintners Inc.</u>, 471 F. Supp. 2d 998,

4   1015 (N.D. Cal. 2006) ("CW3's employment ended before the Class Period and thus, CW3

5   lacks any personal knowledge as to the [defendant's] production activity during" class

6   period), <u>aff'd</u>, 303 F. App'x 431 (9th Cir. 2008); <u>In re Rackable Sys., Inc. Sec. Litig.</u>, 2010

7   WL 3447857, at *9 (N.D. Cal. Aug. 27, 2010) (witnesses not employed during class period

8   "which makes it unlikely that they had personal knowledge of Defendants' relevant state of

9   mind").  The Court should dismiss FE3's allegations as unreliable for this reason alone.

10        <u>Second</u>, while FE3 alleges that CEO Sather was "glued" to the Dashboard (SAC

11   ¶ 35), FE3 does not allege a *single fact* about what the Dashboard contained – let alone that

12   the Dashboard contained specific information that informed CEO Sather that removal of the

13   $5 combo meal was the sole reason for EPL's issues in early 2015.   Without such

14   information, Plaintiffs still "fail to allege facts showing how each Individual Defendant

15   knew any statistical data was specifically linked to the removal of the $5 combo meal, as

16   opposed to the New Year's Eve holiday, or the other menu changes, such as the removal of

17   the Under 500 menu and the promotion of shrimp and steak."  (Order 16); <u>see also</u> <u>In re</u>

18   <u>Silicon Storage Tech., Inc.</u>, 2006 WL 648683, at *11-12 (N.D. Cal. Mar. 10, 2006)

19   (allegation informants provided defendants with "inventory reports" insufficient where

20   plaintiffs "have failed to cite to any specific report, to mention any dates or contents of

21   reports, or to allege their sources of information about any reports," and "[t]he allegations are

22   similarly deficient, for the same reasons, with respect to the defendants' attendance at

23   meetings and their 'hands-on' managerial style").

24        <u>Finally</u>, while FE3 alleges there were weekly meetings to discuss "sales performance

25   including comparable store sales" (SAC ¶ 35), FE3 *does not* allege that the meetings

26   specifically discussed the removal of the $5 combo meal, let alone that the removal was the

27   true and sole cause of EPL's issues.  Nor does FE3 allege that the meetings discussed but

28   rejected other possible reasons for those issues.  Without these essential allegations, FE3's

1   statements merely amount to generalized allegations of the 10(b) Defendants' "hands-on"

2   managerial style.  But "[t]he presence of confidential witnesses to verbalize this general

3   allegation does not render the general allegation any more particularized."  In re IMPAX

4   Labs., Inc. Sec. Litig., 2006 WL 6361942, at *5 (N.D. Cal. Mar. 1, 2006); Bao, 2016 WL

5   54133, at *5 (rejecting confidential witness allegations that individual defendants were

6   "hands-on when it came to sales" and "involved in financial and accounting policy

7   decisions" where "[t]hese statements offer no detail about the decisions the Individual

8   Defendants made or knew about," and thus the "[c]ourt cannot infer [their] knowledge of

9   any specific accounting decision, much less the overhead accounting error" at issue).

10      Indeed, FE3's testimony only undermines Plaintiffs' theory of fraud.  FE3 is the only

11   witness offered by Plaintiffs who purportedly was privy to EPL insiders' discussions on

12   EPL's performance.  Yet FE3 could not allege *any information* suggesting that EPL insiders

13   discussed the removal of the $5 combo meal prior to the statements on May 14, or any other

14   allegation remotely relevant to those statements.  FE3's silence is deafening and destructive

15   to Plaintiffs' claims.  See Bao, 2016 WL 54133, at *6 ("most glaringly, not a single

16   confidential witness alleges that Defendants knew of the [fraud] central to this case").

17   ## 2.   The June 10, 2015 Statements Are Not Actionable

18      The SAC's allegations concerning EPL's June 10 statements also fail as a matter of

19   law.  Repeating the dismissed allegations in the Complaint, the SAC attacks three paragraphs

20   of EPL's June 10 presentation at William Blair's Annual Growth Stock Conference, which

21   discussed EPL's value-pricing strategy.  (SAC ¶ 73; Order 6.)  Plaintiffs again allege that the

22   June 10 statements were somehow misleading because EPL omitted the same supposed

23   "concealed facts" that allegedly render the May 14 statements false:  removal of the combo

24   meal was the true cause of EPL's issues in early 2015.  Thus, Plaintiffs fail to state a claim as

25   to the June 10 statements for the same reasons that the May 14 claims continue to fail.[6]

26   ---
27   [6]   To the extent the SAC still takes issue with vague statements such as:  (i) "great service and great atmosphere"; (ii) "very compelling value"; and (iii) product "is clearly resonating
28   with the consumer" (SAC ¶ 73), the Court already dismissed them as non-actionable puffery (Order 14), and should do the same here.  See Baymiller, 2000 WL 33774562, at *2.

1    Plaintiffs' allegations cannot support an omission claim in any event where EPL's

2  June 10 statements do not even discuss potential causes for EPL's issues in early 2015.  The

3  Ninth Circuit has "expressly declined to require a rule of completeness for securities

4  disclosures."  Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1061

5  (9th Cir. 2014). Rather, an omission must "create an impression of a state of affairs that

6  differs in a material way from the one that actually exists," id., and be "linked to specific true

7  statements that were rendered misleading because adverse information was omitted."  Kane

8  v. Madge Networks N.V., 2000 WL 33208116, at *9 (N.D. Cal. May 26, 2000), aff'd sub

9  nom. Kane v. Zisapel, 32 F. App'x 905 (9th Cir. 2002).

10    Here, Plaintiffs allege no facts linking the alleged omission – that removal of the $5

11  combo meal was the allegedly true cause of EPL's slowed growth – to the actual contents of

12  the June 10 statements, let alone any explanation as to how the alleged omission rendered the

13  affirmative statements false or misleading.  Plaintiffs have not alleged how statements such

14  as:  (i) "our average per person spend is $6.04"; (ii) "we want to always maintain that value";

15  and (iii) "last 15 quarters of being positive same-store sales" (SAC ¶ 73) "would give a

16  reasonable investor the impression that" issues the Company was facing in early FY 2015

17  were "different than [they were] in reality."  Intuitive Surgical, Inc., 759 F.3d at 1061.

18    Plaintiffs cannot state an omission claim when there is little relationship, let alone any

19  "conflict," between the affirmative statements and the alleged omission.  See In re

20  FoxHollow Techs., Inc. Sec. Litig., 359 F. App'x 802, 805 (9th Cir. 2009).  Without any

21  allegedly specific connection or conflict between the affirmative statements and the alleged

22  omission,  Plaintiffs simply ask the Court to "require [the Company] to choose between an

23  affirmative duty to disclose everything if *anything* is said and a vow of silence.  *The*

24  *securities laws do not require such an election*."  In re Odyssey Healthcare, Inc. Sec. Litig.,

25  424 F. Supp. 2d 880, 895 (N.D. Tex. 2005) (first emphasis in original) (rejecting claim

26  company's financial results were misleading based on alleged omission of compliance

27  issues, holding "[t]here simply is too attenuated a relationship between the two subjects, and

28

24

1    the Complaint makes no attempt to bridge this analytical gap").[7]

2    **B.   The SAC Still Fails To Create A Strong Inference Of Scienter**

3         To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong

4    inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2);

5    S. Ferry, 542 F.3d at 782.  "This requires more than conclusory allegations regarding a

6    defendant's mental state, and the Court must take into account all of the plausible inferences,

7    including non-culpable inferences.  When all is said and done, the inference of scienter must

8    be at least as compelling as the alternate inference" to survive a motion to dismiss.  Mack

9    Univ. LLC v. Halstead, 2007 WL 4458615, at *6 (C.D. Cal. Nov. 14, 2007) (Carter, J.).

10        **1.   Plaintiffs' Stock Sales Allegations Remain Insufficient**

11        Just like the Complaint, the SAC again principally attempts to establish scienter by

12   alleging that the Individual Defendants, Trimaran Pollo and certain other non-defendant EPL

13   individuals sold shares during the Class Period.[8]  The Court rejected these sale allegations

14   and the allegations in the SAC continue to fail as a matter of law for the following reasons:

15        **(a)   The SAC does not adequately address the deficiencies with the
16           Complaint's trading allegations identified by the Court.**

17        In this Circuit, stock sales alone, even if substantial, cannot satisfy the PSLRA's

18   stringent pleading requirements. See Intuitive Surgical, Inc., 759 F.3d at 1063-64.  Rather, to

19   provide any basis for adequately pleading scienter, Plaintiffs must allege that the stock sales

20   ---

21   [7]  There is no allegation that the single quoted excerpt from the June 10 presentation can
     be attributed to CFO Roberts or CMO Valle. See In re Impac Mortg. Holdings, Inc. Sec.
     Litig., 554 F. Supp. 2d 1083, 1092 (C.D. Cal. 2008) (dismissing complaint that "failed to
     attribute any false . . . statement whatsoever to six of the eight named [d]efendants.");
22   Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011).
     [8]   Plaintiffs' stock sale allegations as to Defendant Trimaran Pollo are irrelevant to the
23   scienter analysis where Plaintiffs do not bring their section 10(b) claim against Trimaran
     Pollo and do not allege that Trimaran Pollo made any of the alleged false statements. See
24   In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832, 860 (N.D. Tex. 2005) (noting "stock
     sales by non-speaking defendants irrelevant because state of mind of defendants alleged
25   to have made misstatements is considered by the court"); Kane, 2000 WL 33208116, at
     *11 (same).  Plaintiffs' trading allegations as to three non-defendant executives or board
26   members – Kay Bogeajis, Douglas Ammerman, and Samuel Borgese – are similarly
     irrelevant.  See Plevy v. Haggerty, 38 F. Supp. 2d 816, 834 n.12 (C.D. Cal. 1998) (stock
27   sales of unnamed insiders "irrelevant to alleging scienter against the five named
     Defendants"); In re Splash, 160 F. Supp. 2d at 1082 n.22.  Plaintiffs do not allege that
28   Defendants Trimaran Capital and Freeman Spogli sold shares during the Class Period.

1   are "suspicious" or "unusual." Ronconi, 253 F.3d at 435. Trading is deemed "suspicious

2   only when it is dramatically out of line with prior trading practices *at times calculated to*

3   *maximize the personal benefit from undisclosed inside information*." Id. (emphasis in

4   original). In determining whether sales are suspicious or unusual, courts are to consider the

5   following: (i) the amount and percentage of shares sold by insiders; (ii) whether the sales

6   were consistent with the insiders' prior trading history; and (iii) the timing of the sales. Id.

7         In dismissing Plaintiffs' scienter allegations the Court held Plaintiffs failed to give

8   sufficient context to evaluate the EPL insiders' Class Period sales. Specifically, the Court

9   held the Complaint failed to: (i) allege the "sales as a percentage of each individual's total

10  holdings"; (ii) allege the insiders' "prior trading history"; (iii) explain why CFO Roberts did

11  not sell any shares; or (iv) allege "whether there were any restrictions on an insider's ability

12  to trade." (Order 18.) The SAC largely fails to address these deficiencies.

13        While the SAC alleges the percentage of sales for both the November 19, 2014 and

14  May 19, 2015 sales, the SAC does not give any other information concerning the November

15  sales: neither the total amount, the price, nor the gross proceeds of the sales. See In re

16  Bridgepoint Educ., Inc. Sec. Litig., 2013 WL 5206216, at *27 (S.D. Cal. Sept. 13, 2013)

17  (plaintiff "problematically" has "not set forth allegations regarding the amount of stock that

18  Defendants held prior" to the class period or "amount of stock that Defendants received as

19  compensation prior to and during the Class Period," and "[w]ithout this backdrop, the court

20  has little context to analyze allegations regarding Defendants' trading activity"). Nor does

21  the SAC even try to address why CFO Roberts did not sell shares during the Class Period or

22  whether the insiders were subject to any trading restrictions prior to May 19. Plaintiffs'

23  failure to adequately address the specific deficiencies noted by the Court warrants prejudicial

24  dismissal in and of itself. See Baymiller, 2000 WL 33774562, at *2; Lincoln v. Silverstein,

25  2011 WL 318318, at *3 (C.D. Cal. Jan. 27, 2011) (dismissing with prejudice where court

26  previously "put plaintiff on notice of the very same deficiencies discussed in this [o]rder" but

27  amended complaint "failed to fix the deficiency," and thus "further opportunity for

28  amendment would prove futile and would serve only to waste time").

In any event, as shown below, Plaintiffs cannot satisfy any of the three factors the Ninth Circuit uses to evaluate alleged stock sales, and their allegations should be dismissed.

### (b) The size of the alleged Class Period sales is not suspicious under Ninth Circuit precedent.

Plaintiffs' stock sale allegations against certain of the named defendants solely rely on the supposedly large size of the Class Period sales to allege that the sales were unusual and suspicious enough to create a strong inference of scienter.  (SAC ¶ 69.)  The assertion fails where the size of the sales at issue is not suspicious under precedent in the Ninth Circuit.

Courts throughout the Ninth Circuit have stressed a focus on the percentage of shares sold rather than the raw number of shares sold.  See, e.g., In re ICN Pharm., 299 F. Supp. 2d at 1068 ("the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious").  Under either metric, Plaintiffs' allegations fail.  Here, CEO Sather and CMO Valle sold 535,000 total shares on May 19 for over $11 million.  (SAC ¶ 69.)  The law does not support a conclusion that such amounts are suspiciously large to support an inference of scienter.  See Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1067 (9th Cir. 2008) (trading allegations insufficient when individual defendants collectively sold $33 million of stock); In re Hienergy Techs., Inc., 2005 WL 3071250, at *12 (C.D. Cal. Oct. 25, 2005) (Carter, J.) (sale of 580,000 shares by single defendant insufficient).

Plaintiffs' allegations become even weaker when considering the percentage of the Individual Defendants' individual and collective holdings that the May 19 sales constituted.  After CEO Sather and CMO Valle's May 19 sales, they retained 75.1% and 54.2%, respectively, of their total holdings at the time, including vested exercisable options.  They collectively retained *70.7%* of their holdings.  Accounting for CFO Roberts who sold *no* stock during the Class Period, the Individual Defendants collectively retained *72.1%* of their holdings, or sold 28% of their holdings. Ninth Circuit courts "typically require larger sales amounts . . . to allow insider trading to support scienter."  Metzler, 540 F.3d at 1067 (allegations insufficient when individual defendants collectively sold $33 million of stock,

1    but where one sold no stock, another sold 100% of his holdings, and a third sold 37% of his

2    holdings, noting "[w]e typically require larger sales amounts . . . to allow insider trading to

3    support scienter"); Ronconi, 253 F.3d at 435-36 (rejecting inference of scienter where seven

4    of eleven insider defendants had sold 69% or more of their shares and options, and an eighth

5    defendant had sold 98% of her shares"); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1238

6    n.6, 1251 (N.D. Cal. 1998) (sales of 26%, 38%, 25% and 32% held not sufficient).

7         Even if the Court were to consider the sales of Defendant Trimaran Pollo  the

8    Court's conclusion would only be bolstered.  While Trimaran Pollo's 5,402,500 shares

9    sold on May 19 represent the bulk of the 6,062,416 shares sold by all the listed persons in

10   the Complaint (see SAC ¶ 69), Trimaran Pollo actually retained **75.6%** of its holdings

11   after the sale.  Thus, the Individual Defendants and Trimaran Pollo collectively retained

12   **75.3%** of their holdings after the May 19 sales.  "In short, [EPL insiders] maintained more

13   stock than they sold during the class period.  This fact *strongly rebuts* an inference of

14   scienter on the part of these individual defendants."  Applestein v. Medivation, Inc., 2011

15   WL 3651149, at *8–9 (N.D. Cal. Aug. 18, 2011).  The Court should dismiss Plaintiffs' stock

16   sales allegations for this reason alone.

17              **(c)    The SAC fails to show that the Individual Defendants' May 19**
18                      **sales are dramatically out of line with their previous sales.**

19        Nor are the insiders' Class Period sales dramatically out of line with their historical

20   sales.  The Ninth Circuit is clear that "[f]or individual defendants' stock sales to raise an

21   inference of scienter, plaintiffs must provide a meaningful trading history for purposes of

22   comparison to the stock sales within the class period."  Zucco, 552 F.3d at 1005.  Plaintiffs

23   bear the burden of demonstrating that Class Period sales are "*dramatically out of line with*

24   *prior trading practices*."  Ronconi, 253 F.3d at 435.  Plaintiffs cannot make this showing.

25        As an initial matter, the EPL insiders sold only one other time before the Class Period

26   – November 2014.  The insiders do not have a significant trading history to compare the

27   Class Period sales to when EPL had its IPO in July 2014 – less than a year before the May

28   2015 sales at issue – and when the insiders were subject to various lock-up provisions and

closed trading windows from November 2014 to May 2015.  Courts have declined to find class period stock sales suspicious when the defendants' trading history is "too limited to give rise to an inference of intent to defraud."  See, e.g., In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 901-02 (S.D. Tex. 2001) (individual defendant's trading history "too limited to give rise to an inference of intent to defraud" where defendant only began having vested options year before class period).

In any event, Plaintiffs cannot demonstrate that the insiders' Class Period sales are "dramatically out of line" with the sales in November 2014.  The Individual Defendants collectively sold 535,000 shares and retained **72.1%** of their holdings on May 19, compared to selling 339,988 shares and retaining **82.9%** of their holdings in November 2014.  The Individual Defendants' Class Period sales are hardly "dramatically out of line" with their November 2014 sales, and indeed are largely consistent.  See, e.g., Kovtun v. VIVUS, Inc., 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012), aff'd sub nom. Ingram v. VIVUS, Inc., 591 F. App'x 592 (9th Cir. 2015) (sale of 250,000 shares during class period not "dramatically out of line" with 100,000 shares sold prior to class period); In re Copper Mountain Sec. Litig., 311 F. Supp. 2d 857, 874 (N.D. Cal. 2004) (sale of 150,000 and 99,000 shares respectively during class period compared to 195,000 and 82,750 prior to class period, "the court would be hard-pressed to conclude that [defendants'] sales during the class period were dramatically out of line with their previous trading patterns"); In re Pixar Sec. Litig., 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006) (sale of 150,000 shares during class period not "dramatically out of line" with pre-class period sale of 100,000 shares).[9]

The comparison is even more innocuous when considering Trimaran Pollo's trading history.  The Individual Defendants and Trimaran Pollo collectively sold **more shares** in November – **6,748,933** and retaining 77.9% of their holdings – than on May 19 – **5,937,500**

---

[9]   See also Kurtzman v. Compaq Comput. Corp., 2000 WL 34292632, at *34 (S.D. Tex. Dec. 12, 2000) (sale of 86% holdings during class period was "comparable" to sale of 90% holdings two years prior and 50% one year prior, and "[c]ase law recognizes that even the sale of a large percentage of an insider's holdings does not raise an inference of scienter where the sale is consistent with the insider's prior trading practices" ).

1  and retaining 75.3%.  Indeed courts have held "[t]his fact alone strongly cuts against an

2  inference of scienter."  <u>Mogensen v. Body Cent. Corp.</u>, 15 F. Supp. 3d 1191, 1222 (M.D.

3  Fla. 2014); <u>Malin v. XL Capital Ltd.</u>, 499 F. Supp. 2d 117, 151 (D. Conn. 2007) (same),

4  <u>aff'd</u>, 312 F. App'x 400 (2d Cir. 2009).

5           **(d)      <u>The timing of the sales negates an inference of scienter.</u>**

6           Plaintiffs have not provided any explanation whatsoever as to how the "timing of the

7  [May 19] sales creates a strong inference of scienter."  <u>Browning v. Amyris, Inc.</u>, 2014 WL

8  1285175, at *17 (N.D. Cal. Mar. 24, 2014).  Rather,  the timing strongly cuts *against* an

9  inference of scienter for several reasons.

10          <u>First</u>, while Plaintiffs vaguely allege that the timing of insiders' May 19 sales was

11  suspicious (SAC ¶ 69), courts routinely hold the opposite:  that "[t]rading following public

12  announcements simply evidences compliance with the securities laws.  Indeed, insiders are

13  only permitted to trade in a 'window' after a public announcement is made."  <u>In re Party</u>

14  <u>City</u>, 147 F. Supp. 2d at 312;  <u>Lipton</u>, 284 F.3d at 1037 (timing of sales one week after

15  quarterly results disclosure not suspicious because "[o]fficers of publicly traded companies

16  commonly make stock transactions following the public release of quarterly earnings").[10]

17          As shown above, prior to May 19, the EPL insiders were subject to lock-up

18  agreements and pre-public disclosure blackout periods prohibiting them from selling their

19  shares from November 19, 2014 through February 17, 2015, and then until May 19.  Thus,

20  while Plaintiffs nakedly allege that the May 19 sales were suspicious "in light of the fact that

21  none of them had sold any shares since November 2014" (SAC ¶ 69), Plaintiffs fail to tell

22  the Court the simple reason for this fact as requested by the Court in its Order dismissing the

23  Complaint:  *they were barred from doing so due to a combination of lock-up agreements and*

24

25  ────────────────
   [10]    <u>See also</u> <u>In re Tyco Int'l, Ltd., Sec. Litig.</u>, 185 F. Supp. 2d 102, 112 n.6 (D.N.H. 2002)
26  ("[M]ost publicly traded companies have adopted policies which prevent insiders from
   trading except during narrow windows that are open for only brief periods following the
   release of accounting information.  Given this reality, evidence of insider trading following
27  the release of accounting information is of limited value in determining whether the released
   information is misleading in most cases because it is equally likely that the information is
28  accurate and that the timing of the trades is dictated by . . .  [an] insider trading policy.").

                                                    30

1   *pre-public disclosure closed trading windows.*  Courts uniformly find that such facts *negate*

2 an inference of scienter.  <u>Ronconi</u>, 253 F.3d at 436  (finding that defendant was "legally

3 forbidden to trade for a significant period before the alleged insider trading" negated

4 inference of scienter); <u>Callan v. Motricity Inc.</u>, 2013 WL 195194, at *25 (W.D. Wash. Jan.

5 17, 2013) ("Plaintiffs[] have failed to demonstrate that the stock sales were either significant

6 or uncharacteristic, given their timing immediately after the post-IPO lock-up expired."),

7 <u>aff'd sub nom.</u>, <u>Mosco v. Motricity, Inc.</u>, 2016 WL 1745044 (9th Cir. May 3, 2016).

8      <u>Second</u>, putting the trade prohibitions aside, the insiders sold at a time that did not

9 maximize their potential return, further negating an inference they timed the sales to reap the

10 benefits of insider information.  <u>See</u> <u>Ronconi</u>, 253 F.3d at 435 (no inference of scienter is

11 created by timing of an insider's stock sales when the insider "miss[es] the boat" by selling

12 below the stock's peak price); <u>In re Enron Corp. Sec., Derivative & ERISA Litig.</u>, 258 F.

13 Supp. 2d 576, 594 (S.D. Tex. 2003) ("If an insider sells when the stock price is not at a high

14 point or *after,* rather than before, he has delivered negative news about the corporation that

15 causes the stock price to decline, the sale may not be suspicious." (emphasis in original)).

16      Here, insiders' May 19 sales occurred immediately after the tempered projections in

17 the May 14 earnings release and investor call caused the stock to *drop* $4.36 from $29.06 – a

18 pre-earnings release price higher than any Class Period price.  (SAC ¶ 52; Ex. 22.)   The

19 insiders sold their shares days later on May 19 for $21.85 per share (Exs. 10-12) – $7.21 or

20 25% below the $29.06 high.  Under Plaintiffs' theory of fraud, the insiders chose to make

21 allegedly fraudulent statements that led to a stock *drop* before selling their shares

22 immediately after on May 19.  This theory simply does not pass muster.  <u>See</u> <u>In re Copper

23 Mountain</u>, 311 F. Supp. 2d at 875 (that defendants sold their shares at prices "constitut[ing]

24 only 43% to 72% of the stock's peak value," "tend to show that defendants did not calculate

25 their sales to maximize the stock's value" because "[h]ad [defendants'] sales been calculated

26 to reap the benefits of the undisclosed information, it is likely that at least some of the stock

27 sales would have been at a price closer to the stock's maximum value").

28      <u>Third</u>, the lapse in time between the May 19 sales and the alleged corrective

1   disclosure on August 13 further negates an inference of scienter.  "A broad temporal distance

2   between stock sales and a disclosure of bad news defeats any inference of scienter."  In re

3   Party City, 147 F. Supp. 2d at 313 (three-month gap not suspicious).  Courts have concluded

4   that similar, or lesser, amounts of time between sales and alleged disclosures negate

5   inferences of scienter.  See, e.g., Head v. NetManage, Inc., 1998 WL 917794, at *4 (N.D.

6   Cal. Dec. 30, 1998) (two-month gap not suspicious, because "if defendants were engaged in

7   a fraudulent scheme to inflate the price of stock, common sense dictates that they would sell

8   when they learned that their scheme would be discovered"); City of Brockton Ret. Sys. v.

9   Shaw Grp. Inc., 540 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2008) (10-week gap not suspicious).

10                      (e)      **Other factors further negate an inference of scienter.**

11          Other circumstances surrounding the alleged stock sales at issue further negate an

12   inference of scienter based on those sales. That CFO Roberts did not sell any of his shares

13   during the Class Period negates an inference of scienter as to him and those who did sell.

14   The Ninth Circuit has held that an insider's "sales do not support the strong inference" where

15   other "equally knowledgeable insiders act in a way inconsistent with the inference that the

16   favorable characterizations of the company's affairs were known to be false when made."

17   Ronconi, 253 F.3d at 436.   This is particularly true when the defendant who did not sell was

18   a high-ranking executive like a CFO, such as CFO Roberts.  See In re Credit Acceptance

19   Corp. Sec. Litig., 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999).  As stated above, the Court's

20   Order explicitly noted that the Complaint failed to explain why CFO Roberts did not sell any

21   shares during the Class Period, and the SAC has failed to heed the Court's Order.

22          Finally, at the very least, the May 19 sales cannot support an inference of scienter to

23   the allegedly false statements made in June.  See Limantour v. Cray Inc., 432 F. Supp. 2d

24   1129, 1152 (W.D. Wash. 2006) (sales made week before statement "do not aid in the

25   scienter analysis" and are "irrelevant" as to claims concerning that statement).

26          **2.      Plaintiffs' Other Scienter Allegations Are Equally Insufficient**

27          Plaintiffs' other conclusory allegations to create an inference of scienter fare no better.

28   As stated above, Plaintiffs must "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A).   To that end, Plaintiffs must show actual knowledge or deliberate recklessness, which requires Plaintiffs to plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco, 552 F.3d at 991.  Plaintiffs fail to do so here.

### (a) That the Individual Defendants hold senior positions in the Company does not support an inference of scienter.

The law requires Plaintiffs to "distinguish among those they sue and identify with particularity the role each defendant played in the alleged fraud." In re Impac, 554 F. Supp. 2d at 1093; In re Infonet Servs. Corp. Sec. Litig., 310 F. Supp. 2d 1080, 1105 (C.D. Cal. 2003) (no scienter when there is "little effort to distinguish each Defendant's individual knowledge of the facts and circumstances surrounding the alleged misstatements").

Plaintiffs do not distinguish each Individual Defendant's knowledge, or connect them individually to any fraudulent act.  Instead, Plaintiffs claim they all knew or must have known of the alleged fraud because of their positions as "hands-on managers."  (SAC ¶ 25.) But the high rank of Individual Defendants is insufficient to infer a strong inference of scienter; a rule to the contrary would "eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).

### (b) The SAC does not sufficiently allege any of the Individual Defendants had access to undisclosed information.

Plaintiffs rely on their vague allegations concerning the Operation Dashboard, and the equally vague and unreliable testimony from three former employees, to establish scienter. As shown above, supra I.A.1(b), these allegations fail as a matter of law to create any inference of scienter, let alone a strong and compelling one.[11]

---

[11]   See Lipton, 284 F.3d  at 1036 (allegation defendants had access to negative data did not create strong inference of scienter where plaintiffs only "make a general assertion about

*(cont'd)*

### 3. Defendants' Disclosures Create a Counter-Inference More Compelling Than Plaintiffs' Theory Of Fraud

Even if the Court were to entertain Plaintiffs' inadequate scienter allegations, to state a claim, the allegations must create an inference of scienter "at least as compelling as any opposing inference of non-fraudulent intent." Metzler, 540 F.3d at 1066.

Here, however, Plaintiffs' theory of fraud makes little sense.  Plaintiffs posit that by May 14, EPL knew the true cause of the slowed sales growth was mistakenly removing the $5 combo meal but it chose not to reinstate the combo meal until months later in July as part of some fraudulent scheme.  (SAC ¶ 79.)  Plaintiffs would have the Court believe that the 10(b) Defendants – all of whom retained the majority of their holdings – continued for months with a strategy they knew was hurting EPL, and thus their own professional and equity interests, just to delay having to admit to investors that they made a business mistake.  "Plaintiffs' theory does not make sense on the facts alleged, let alone present a cogent or compelling rationale for inferring scienter."  In re Adolor Corp. Sec. Litig., 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009); In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) ("Courts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations.").  The Court should dismiss the action on this basis alone.

Even if the Court were to countenance this illogical theory, Plaintiffs' allegations do not pass muster where Defendants' disclosures during the Class Period create a stronger inference of non-fraudulent intent.  As stated above and *held by the Court*, EPL adequately disclosed on May 14 that:  (i) traffic growth had dropped; (ii) the slowed growth was due in part to higher prices on the menu which had an "impact" on customers and hurt the "visibility of value on our menu"; (iii) the impact of the pricier menu was still being "[re]evaluat[ed]"; and (iv) in light of all of that, EPL estimated relatively low projections for 2Q FY 2015.  (Order 16.)  "In light of extensive disclosures" "it simply cannot be said that an inference that [EPL] acted with scienter is at least as compelling as any opposing

---

*(cont'd from previous page)*
what they think the data shows" but "do not allege with particularity any specific information showing that [this] data informed defendants that" statements were false).

1  inference one could draw from the facts alleged." <u>Plumbers & Pipefitters Local Union No.</u>

2  <u>719 Pension Tr. Fund v. Conseco, Inc.</u>,   2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30,

3  2011).  Rather, "the most compelling inference is that [EPL] actively and diligently sought to

4  apprise the market of information relevant to [EPL's] corporate prospects, and the risks and

5  prospects of [its] business and the challenges it faced."  <u>Id.</u>

6       That EPL gave more explanation on August 13 for its issues – *i.e.*, the impact of

7  removing the $5 combo meal – changes nothing.  Rather, EPL's continued transparency only

8  proves that the impact of menu changes was an ongoing situation that EPL was attempting to

9  keep the market apprised of as EPL learned more.  <u>See</u> <u>Mogensen</u>, 15 F. Supp. 3d at 1223

10  (inference that defendants knew "about their sales slump [in March 2012] before they

11  publicly acknowledged it in May," "is exceedingly feeble, especially in light of the fact that

12  Defendants' March 2012 disclosures acknowledged a[n inventory] problem" and thus "it is

13  more likely that Defendants timely disclosed adverse information as they became aware of

14  it, and genuinely did not realize the scope" until May).  Plaintiffs' illogical theory does not

15  pass muster on its own, let alone next to the non-fraudulent reality.

16  **II.      PLAINTIFFS DO NOT STATE SECTION 20(a) AND 20A CLAIMS**

17       Finally, as the Court held, Plaintiffs' failure to allege an underlying 10(b) claim

18  dooms their section 20(a) claims against all named Defendants and their section 20A claims

19  against Defendants Sather and Valle and the Trimaran Defendants.  (Order 18-19.)  The

20  SAC still fails to allege a section 10(b) claim and therefore its section 20(a) and 20A claims

21  must also be dismissed.  <u>See</u> <u>Baymiller</u>, 2000 WL 33774562, at *2.

22                              <u>**CONCLUSION**</u>

23       For the reasons stated, the Court should dismiss the SAC with prejudice.

24  DATED: October 21, 2016

                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
25                            By:  _____*/s/ Jason D. Russell*_____
                                        Jason D. Russell
26                                    Attorney for Defendants
                              El Pollo Loco Holdings, Inc., Trimaran Capital Partners,
27                            Trimaran Pollo Partners, L.L.C., Freeman Spogli & Co.,
                              Stephen J. Sather, Laurance Roberts, and Edward J. Valle

28