**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                    Date:  March 20, 2017

Title: DANIEL TUROCY ET AL. V. EL POLLO LOCO HOLDINGS, INC. ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

|  Deborah Goltz  |  Not Present  |
|:---:|:---:|
| Courtroom Clerk | Court Reporter |
| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING MOTION TO DISMISS [64]**

Before the Court is Defendants El Pollo Loco Holdings, Inc.; Trimaran Capital Partners; Trimaran Pollo Partners, LLC; Freeman Spogli & Co.; Stephen J. Sather; Laurence Roberts; and Edward J. Valle's (collectively, "Defendants") Motion to Dismiss the Consolidated Second Amended Class Action Complaint ("Motion") (Dkt. 64). The Court finds this matter suitable for resolution without oral argument. Fed. Civ. P. 78; L.R. 7-15. Having reviewed the papers and considered the parties' arguments, the Court GRANTS Defendants' Motion.

**I.      Background**

This is a putative securities fraud class action brought by Plaintiffs Robert W. Kegley, Peter Kim, Dr. Richard J. Levy, Sammy Tanner, and Ron Huston (collectively "Plaintiffs") under Section 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations promulgated thereunder by the Securities & Exchange Commission ("SEC"), including 17 C.F.R. § 240.10b-5. Consolidated Second Amended Complaint ("CSAC") (Dkt. 59) ¶ 1.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

Page 2

The putative class consists of purchasers of the securities of El Pollo Loco Holdings, Inc. ("El Pollo Loco" or the "Company") between May 15, 2015 and August 13, 2015 ("Class Period"). *Id.* Defendants are El Pollo Loco, certain of its directors and officers, and the Company's controlling shareholders. *Id.* Generally, Plaintiffs allege Defendants failed to disclose material facts and made materially false or misleading statements as part of a scheme which caused the market prices of El Pollo Loco securities to be artificially inflated during the Class Period. *Id.* ¶ 91.

**A. Facts**

**1. El Pollo Loco's Menu Changes**

El Pollo Loco is a "quick service restaurant plus" ("QSR Plus") restaurant chain, which means it has both "quick service" and "fast casual" segments. Id. ¶ 37. In other words, El Pollo Loco offers "its customers the lower prices and convenience of fast food restaurants, such as Kentucky Fried Chicken or Taco Bell, while also offering fresher, higher quality food and service comparable to more expensive fast casual dining chains, such as Chipotle and Rubios." *Id.* ¶ 38. As of December 31, 2014, the Company's restaurant system had 415 restaurants, comprised of 172 company-operated and 243 franchised restaurants, over 80% of which were located in California. *Id.* ¶ 36. Given its niche as a QSR Plus chain, Plaintiffs allege "menu pricing was a crucial component of El Pollo Loco's QSR Plus positioning." *Id.* ¶ 42.

By the beginning of the Class Period, El Pollo Loco was "heavily exposed to rising labor costs." *Id.* ¶ 46. In California, the Company was dealing with a 25% increase in minimum wage over a one-and-a-half year period. *Id.* To offset future labor costs, in February, 2015, El Pollo Loco decided to remove the $5 combo meal from the Company's menu boards, even though the combo meal was "a core component of its QSR Plus positioning strategy and one of the key drivers of customer traffic to El Pollo Loco restaurants." *Id.* ¶ 48. The Company also increased prices on other value-priced menu items and changed its menu to offer higher priced non-chicken items, such as shrimp and beef entrees. *Id.* ¶¶ 48, 54.

According to Plaintiffs, the Company's decision to eliminate the $5 combo meal was "disastrous." *Id.* ¶ 50. Customer traffic to El Pollo Loco restaurants drastically dropped which negatively impacted the Company's "comparable store sales growth." *Id.* ¶¶ 49, 50. However, rather than reveal to investors the truth about the Company's waning customer traffic, Plaintiffs allege Defendants "issued a series of materially false and misleading statements and omissions concerning the Company's 2Q 2015 sales and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                      Date: March 20, 2017

customer traffic." *Id.* ¶ 59. These statements and omissions caused El Pollo Loco securities to be traded at artificially inflated prices, allowing Defendants to sell "tens of millions of dollars of their personally held El Pollo Loco shares at fraud-inflated prices." *Id.*

### 2. Defendants' Roles

Defendants Stephen J. Sather ("Sather"), Laurence Roberts ("Roberts"), and Edward J. Valle ("Valle") (collectively the "Individual Defendants") "ran El Pollo Loco as 'hands-on' managers, overseeing El Pollo Loco's operations and finances." *Id.* ¶ 25.

Defendants Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo"), Trimaran Capital Partners ("Trimaran Capital"), and Freeman Spogli & Co. ("Freeman Spogli") (collectively the "Controlling Shareholder Defendants") have a "controlling ownership" of El Pollo Loco with "the power and influence to control El Pollo Loco" and "to cause the Company to engage in . . . violations and improper practices." *Id.* ¶ 30.

#### a. Individual Defendants

Defendant Sather is the President and Chief Executive Officer ("CEO") of El Pollo Loco, and a member of its Board of Directors. *Id.* ¶ 22. He has extensive experience in the restaurant industry, including the casual dining and quick-service sectors. *Id.* While working at El Pollo Loco, CEO Sather created the Operation Dashboard, a real-time system which allows executives and management to track and monitor sales metrics, including comparable store sales. *Id.* Before and during the Class Period, CEO Sather spoke on El Pollo Loco's behalf in releases, conference calls, and signed SEC filings. *Id.*

Defendant Roberts is the Chief Financial Officer ("CFO") of El Pollo Loco. *Id.* ¶ 23. He has extensive experience in the restaurant industry and as an executive of a publicly held company. *Id.* Before and during the Class Period, CFO Roberts spoke on El Pollo Loco's behalf during conference calls with investors and signed SEC filings. *Id.*

Defendant Valle is the Chief Marketing Officer ("CMO") of El Pollo Loco. *Id.* ¶ 24. During the relevant time period, CMO Valle spoke on El Pollo Loco's behalf during conference calls. *Id.*

#### b. Shareholder Defendants

Defendant Trimaran Pollo is owned by Trimaran Capital, a private asset management firm. *Id.* ¶ 26. Defendant Freeman Spogli is a private equity firm. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

Page 4

Following El Pollo Loco's July 2014 initial public stock offering ("IPO"), Trimaran Pollo and Freeman Spogli (collectively, "the Controlling Shareholder Defendants") continued to collectively own more than 70% of El Pollo Loco's equity, and Trimaran Capital maintained the power to select El Pollo Loco's board members. *Id.* ¶ 28. Freeman Spogli and Trimaran Capital representatives account for four of El Pollo Loco's seven directors. *Id.*

In November 2014, the Company commenced a second offering through which the Controlling Shareholder Defendants sold 5.6 million shares of their El Pollo Loco common stock. *Id.* ¶ 29. Following the secondary offering and until May 19, 2015, the Controlling Shareholder Defendants "maintained 60% of the Company's shares, sufficient for majority votes over all matters requiring stockholders votes, including election of directors." *Id.*

## B.  False and Misleading Statements

The CSAC sets forth two general categories of allegedly false statements: (1) statements of optimism that the Company was still on track to report positive comparable store sales; and (2) allegedly false statements made by CEO Sather, CFO Roberts, and CMO Valle blaming the lighter than expected comparable store sales growth on the New Year's Eve holiday and unrelated menu changes, rather than the elimination of the $5 combo meal and the subsequent decline in customer traffic.

### 1.  Alleged False and Misleading Statements Regarding On-Going Positive Comparable Store Sales

On May 14, 2015, the day before the start of the Class Period, the Company reported a 5.1% increase in comparable store sales, including a 3.5% increase for company-operated restaurants, and a 6.2% increase for franchised restaurants, for the first quarter of fiscal year 2015 ("1Q 2015"). *Id.* ¶ 69.

The following statements were made in the Company's May 14, 2015 press release:

- CEO Sather stated: "first quarter results . . . once again demonstrate[d] strong operating momentum through solid sales and earnings growth."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                    Date: March 20, 2017

Page 5

- CEO Sather stated: "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to resonate with guests, as evidenced by [its] system-wide comparable restaurant sales growth of 5.1%."

- The press release also stated that El Pollo Loco was on track to report "[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%" for fiscal year 2015.

*Id.* ¶ 61.

Plaintiffs allege that before and during the Class Period, Defendants "tracked and monitored El Pollo Loco comparable store sales through the Company's Operation Dashboard, which . . . provid[ed] immediate feedback to Defendants on nearly every aspect of the Company's business." *Id.* ¶ 56. Defendants therefore allegedly knew by May 14, 2015 that customer traffic was severely declining at El Pollo Loco restaurants due to the elimination of the value-priced menu, but concealed that information from investors. *Id.* ¶¶ 59, 73. Thus, Plaintiffs allege that Defendants' positive statements about the Company's "strong ongoing comparable store sales trends and ability to meet its 2015 guidance" were false and misleading because Defendants knew such results were "unachievable." *Id.* ¶ 62.

## 2. Alleged False and Misleading Statements Regarding The Lighter Than Expected Comparable Stores Sales

Following the May 14, 2015 press release, CEO Sather, CFO Roberts, and CMO Valle held a conference call with analysts. *Id.* ¶¶ 62, 64, 66. Plaintiffs allege Defendants continued to conceal that customer traffic at the restaurants was decreasing as a result of the decision to remove the $5 combo meal. Instead, Defendants blamed the "lighter than expected sales growth" on the New Year's holiday and other unrelated menu changes, such as the introduction of higher-priced non-chicken menu items and the removal of the under 500 calorie menu. *Id.* ¶ 64–66. Plaintiffs cite three statements as evidence:

- CFO Roberts stated: "Note that the comparable restaurant sales growth was negatively impacted by the timing of the New Year's holiday, which reduced same-store transaction and sales by approximately 60 basis points for the quarter."

- CMO Valle stated: "[A]s Larry had mentioned, [because of] the New Year's timing . . . the gain fell into the prior year and the pain fell into this

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                   Date: March 20, 2017

year.  He mentioned, there was a 60 basis point hit on comps for that. But also kind of the Under 500 line, we focused on our shrimp and moved away a little bit from the Under 500 line and that was a little bit of a drag, as well. We happen to be restaging that line in June, and we believe we'll get back up to the strength that it had in the quarter of last year."

- CMO Valle also stated: "We would normally, as we would phase these in, we would sequence them over time. We would seed the shrimp. We would grow the shrimp. And then either 9 months to 12 months later, we would then bring the steak in after that. So I think it was a little bit more of they both kind of converged together. As a result, the visibility of value on our menu is not as strong as it used to be, at least for that five-week period of time. Our value scores, are still high. . . . It's really like the marketing communication thing. There's success with the steak. There's success with the shrimp. And how are we going to express that and balance that within our menu, as we move into the back end of the year and into 2016."

*Id.*

On June 10, 2015, CFO Sather presented on behalf of El Pollo Loco at William Blair's Annual Growth Stock Conference. *Id.* ¶ 73. During the conference, CEO Sather stated:

So we want to always maintain that value. We don't want to get up too high pricing towards the fast casual, and we always want to maintain that speed with the convenience of the drive-through, etc. So I think this is very important.

If you look at our system-wide comps, we talked about the last 15 quarters of being positive same-store sales. Very strong. I think you can see that what we've been doing over the last years is clearly resonating with the consumer.

*Id.*

Plaintiffs allege Defendants' statements were materially false and misleading because Defendants still concealed the truth from investors by "blaming softening May 2015 sales on the temporary overlapping of higher priced non-chicken menu offerings," *id.* ¶ 74, 75, rather than the removal of the $5 combo meals.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                          Date: March 20, 2017

### C. Alleged Insider Trading

On May 19, 2015, CEO Sather, CMO Valle, and the Controlling Shareholder Defendants (as well as other El Pollo Loco top executives and directors) sold their personally held El Pollo Loco common stock, receiving gross proceeds of over $132.4 million. *Id.* ¶ 69.

Trimaran Pollo sold 5,402,500 shares of El Pollo Loco common stock at $21.85, receiving proceeds of over $118 million. *Id.* ¶ 69. CMO Valle sold 175,000 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $3.8 million. *Id.* ¶¶ 24, 69. CEO Sather sold 360,000 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $7.8 million. *Id.* ¶¶ 22, 69. Other non-defendant top executives and directors sold 124,916 shares at prices ranging from $20.92 to $21.95 per share, receiving proceeds of over $2.6 million. *Id.* ¶ 69. Plaintiffs do not include any allegations relating to sales by CFO Roberts.

Plaintiffs allege these sales were suspicious in timing and amount because "none of [the sellers] sold any shares since November 2014 and the sales were not made pursuant to any 10(b)-5 trading plan." *Id.* ¶ 69.

### D. The "Truth" Revealed in August 13, 2015 Statements

On August 13, 2015, the last day of the Class Period, the Company reported "[s]ystem-wide comparable restaurant sales [had only grown] 1.3%, including a 0.5% decrease for company-operated restaurants, and a 2.6% increase for franchised restaurants" for the second quarter of fiscal year 2015 ("2Q 2015"). *Id.* ¶ 76. The Company did not meet its 1Q 2015 system-wide comparable restaurant sales growth projection of approximately 3%–5%. *Id.* The Company therefore cut its system-wide comparable restaurant sales growth assumption for the remainder of the 2015 fiscal year downward from 3%–5% to just 3%. *Id.*

That same day, CEO Sather, CFO Roberts, and CMO Valle held a conference call with analysts which, according to Plaintiffs, revealed the truth about the Company's false and misleading statements and omissions. For example:

- CEO Sather stated: "second-quarter results were impacted by the combination of higher-priced offerings and a reduction of [the] value portion of [its] menu."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

Page 8

- CEO Sather stated: "In the third quarter, we re-launched the $5 Combo menu which will remain in our restaurants full time to reinforce our value offering. This allows us to return to our winning QSR+ strategy of introducing exciting, new, premium Mexican entrees . . . to a base of underlying value frequency drivers like our $5 combos."

- CFO Roberts stated: "comparable restaurants sales decline of 0.5% . . . was comprised of a 3.9% decrease in traffic partially offset by an increase in average check size of 3.4%."

- CEO Sather stated: "Also, we increased the prices on our value menu, and specifically, on another entrée line, which was important, the 5 under 500. We believe that really impacted our value customer. When you then take on top of that that we layered in the premium proteins, we first did shrimp and then carne asada. While we were happy with their performance, we think that they really further drove that perception of higher prices with the non-focus of value."

- CMO Valle stated: "We launched the $5 combos, David, or re-launched them. To make—first of all, to put that panel back up on the menu board and make it more prominent, and we're seeing strong results from that. That $5 combo panel will remain for the balance of 2015. We also re-launched the 500 line, which we spoke about briefly in the last call, that we are giving customers more value in terms of not just variety, but also in terms of price range as well."

- CEO Sather stated: "I think in period seven, first period of Q3, we actually have the $5 pollo bowls to launch there, and then the next period the $5 combos and the chicken and shrimp, and we saw the stabilization certainly of bringing that a very popular $5 pollo bowl item and now the $5 combos on that. So, we're seeing that stabilization. Quite frankly, we had never taken something like that off the menu before."

*Id.* ¶¶ 77–79.

On August 14, 2015, El Pollo Loco's stock declined from its closing price of $18.36 per share on August 13, 2015 to $14.56 per share. *Id.* ¶¶ 12, 81.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                      Date: March 20, 2017

Page 9

### E.  Procedural History

On January 29, 2016, Plaintiffs filed a Consolidated Class Action Complaint ("CAC") (Dkt. 47) alleging violations of: (1) Section 10(b) of the Exchange Act and Rule 10b-5 against El Pollo Loco and the Individual Defendants; (2) Section 20(a) of the Exchange Act against the Individual Defendants and the Controlling Shareholder Defendants; and (3) Section 20A of the Exchange Act against CEO Sather, CMO Valle, and the Controlling Shareholder Defendants. CAC ¶¶ 75–92.

On July 25, 2016, the Court granted Defendants' Motion to Dismiss ("July 25, 2016 Order") (Dkt. 58), dismissing Plaintiffs' CAC in its entirety. Plaintiffs were permitted to file an amended complaint, and they filed the operative complaint— CSAC—on August 22, 2016 (Dkt. 59). The CASC alleges the same claims as the CAC. *See generally* CSAC.

Defendants filed the instant Motion on October 21, 2016. Plaintiffs filed their Opposition on December 20, 2016 (Dkt. 65); Defendants filed their Reply on January 9, 2016 (Dkt. 68).

### II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

An allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The "circumstances" required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                         Date: March 20, 2017

Page 10

details of the alleged fraudulent activity."). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (quoting *In re Glenfed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). This heightened pleading standard ensures "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Under the heightened pleading standards of the Private Securities Litigation Reform Act ("PLSRA"), a securities fraud complaint must identify each alleged misrepresentation, specify the reasons it is misleading, and state with particularity facts giving rise to a strong inference that the defendant who made the misrepresentation acted with fraudulent intent. *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 321 (2007).

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the incorporation by reference doctrine, a court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir. 2002). A court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Dismissal with leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Dismissal without leave to amend is appropriate only when a court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

## III.   Discussion

Defendants move to dismiss Plaintiffs' entire CSAC on the grounds that Plaintiffs fail to state a claim under § 10(b), 20(a), or 20A and, in general, the CSAC "does nothing

to overcome the Court's concerns and conclusions" regarding Plaintiff's dismissed CAC. *See generally* Mot.

## A. Section 10(b) and Rule 10b-5 Claims

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege facts showing (1) a material misrepresentation (or omission), (2) scienter, (3) a connection with the purchase or sale of security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Ins. v. Broudo*, 544 U.S. 336, 341 (2005). The Court previously dismissed Plaintiff's § 10(b) and Rule 10b-5 claims because it was "not convinced Defendants omitted any information or warnings to investors that would be misleading." July 25, 2016 Order at 16. The Court found that "Plaintiffs have failed to show Defendants' failure to mention the $5 combo meal was at odds with the state of affairs Defendants presented to investors." *Id.* at 15.

As in Defendants' first Motion to Dismiss, the instant Motion only contests falsity and scienter. *See generally* Mot.; Motion to Dismiss, March 28, 2016 (Dkt. 50).

### 1. Scienter and Reliance on Confidential Witnesses

Because Plaintiffs' CSAC relies in part on the declarations of three confidential witnesses, the Court finds it prudent to first address whether the witnesses satisfy PLSRA pleading requirements.

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). First, if the statements are introduced to establish scienter—as with the witnesses here—the witnesses must be "described with sufficient particularity to establish their reliability and personal knowledge." *Id.* (citing *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015–16 (9th Cir. 2005)). Second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (citing *Daou*, 411 F.3d at 1022).

The first prong of this test "analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Id.* The witness' statements may only be relied upon if the witnesses are "described 'with sufficient particularity to support the probability that a person in the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

position occupied by the source would possess the information alleged.'" *Id.* (quoting *Daou*, 411 F.3d at 1015).

As to the second prong, under the PLSRA, the confidential witness' statement must be indicative of at least deliberate recklessness. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (holding plaintiffs must plead the defendants engaged in "knowing" or "intentional" misconduct, and "reckless" conduct may satisfy the scienter requirement when it is "deliberate" and facts describing the recklessness are set forth in great detail); *see also In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999) (holding the recklessness must reflect "some degree of intentional or conscious misconduct" in order to satisfy the scienter requirement), *abrogated on other grounds by* 542 F.3d 776, 784 (9th Cir. 2008).

Defendants argue that the CSAC fails to satisfy either prong as to any of the three confidential witnesses. Mot. at 19–23. The Court disagrees and finds that the CSAC describes the witnesses' job titles and employment information with enough detail to meet *Daou*'s requirement that a complaint make apparent a confidential witnesses' position within the defendant corporation. *See Zucco Partners*, 552 F.3d at 996. However, for reasons explained below, the Court finds each confidential witness to be deficient.

### a. Former Employee 1 ("FE1")

FE1 was an Assistant Manager of a Los Angeles El Pollo Loco. CSAC ¶ 32. FE1 reports that a "Company Area Leader" would regularly visit FE1's store and would "constantly monitor[] the store's operations, including sales and labor costs." *Id.* FE1 states that due the Company Area Leader's ability to monitor this information, he or she would order employees to be sent home from FE1's store whenever there was "unexpected low customer traffic." *Id.* FE1 also reports that customers at FE1's store were "upset about the removal of the $5 combo menu items, and expressed those concerns" through a 1-800 phone number and "an online system for complaints and comments." *Id.* ¶ 33. Finally, Plaintiffs allege that FE1 "confirmed" that "customer complaints and comments" can be "directly viewed and listened to through . . . Operation Dashboard." *Id.*

The Court finds that the CSAC has alleged sufficient facts to support its assumptions that FE1 was in a position to be personally knowledgeable of the facts FE1 reports regarding the actions of the Company Area Leader during store visits. *See* CSAC

¶ 32. As an assistant manager, FE1 would have been able to observe the visits of the Company Area Leader.

However, the Court finds that the CSAC does not allege sufficient facts to support the assumption that FE1 had personal knowledge of the contents or capabilities of Operation Dashboard, or what information within Operation Dashboard the Company Area Leader—much less Defendants—had access to. FE1 does not report that he or she used Operation Dashboard or had access to its data. FE1 also does not report that he or she knew what information the Company Area Leader had access to, other than the vague description of "enough information to know if the store was busy." *Id.* Apparently, "restaurant-level operators" did have access to Operation Dashboard. Declaration of Jonathan Horne ("Horne Decl.") (Dkt. 53) Ex. 2 at 5 (noting the dashboard provides "restaurant-level operators[] with insight into how we are performing"). But Plaintiffs do not claim that FE1 was such an operator, and that term is not defined. FE1 does not appear to have personal knowledge of the contents of Operation Dashboard or the data that higher-ups were able to access through Operation Dashboard. As a result, the Court finds that FE1's statements about the contents and capabilities of Operation Dashboard do not satisfy the first prong of the *Daou* standard.

Although the Court need not address *Daou*'s second prong if the first prong is not satisfied, the Court notes that none of the facts alleged by FE1 indicate that Defendants knew specific information that made their May 14 statements false, or that Defendants were in reckless disregard of such information. In fact, FE1 does not actually allege that customer complaints were entered into Operation Dashboard—just that they could be. CSAC ¶ 33. Even if FE1 did so allege, the fact that FE1's El Pollo Loco location received a "noticeable" number of customer complaints regarding the $5 combo meal is insufficient to show that in May 2015, Defendants knew or were in reckless disregard of specific information within Operation Dashboard that made their May 14 statements false.

### b. Former Employee 2 ("FE2")

FE2 was Team Leader at a Los Angeles El Pollo Loco store. *Id.* at 34. FE2 reports that the removal of the $5 combo meal "caused an immediate fall in store sales." *Id.* FE2 states that customers directly complained to FE2 about the removal. *Id.* FE2 was responsible for entering store inventory information into Operation Dashboard every day. *Id.* Plaintiffs alleged that FE2 "confirmed" that Operation Dashboard included, *inter alia*, "inventory and sales information and customer feedback." *Id.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                    Date: March 20, 2017

The Court finds that the CSAC has alleged sufficient facts to support the assumption that FE2 was in a position to be personally knowledgeable of the information FE2 reports was maintained in Operation Dashboard. *See id.* ¶ 34 (FE2 entered data into Operation Dashboard every other day). FE2 was also in a position to observe that "store managers were often in the store office monitoring the store's data on the computer." CSAC ¶ 34. Thus, the Court finds that FE2's statements satisfy the first prong of the *Daou* test.

However, the Court finds that FE2's statements do not satisfy the second prong of the *Daou* test, because none of the FE2's statements are "themselves indicative of scienter." Plaintiffs argue that FE2's allegations are "offered to show what information was available to Defendants through the Operation Dashboard and the weekly sales meetings." Opp'n at 23. Further, Plaintiffs assert that "the issue is whether FE1 and FE2's reports are sufficient to establish that Defendants had contemporaneous evidence that the removal of the $5 combo menu was having a noticeable impact on El Pollo Loco's Early 2015 Results." *Id.* at 24.

First, FE2's statements do not concern weekly sales meetings. Second, to the extent that FE2's statements do show what information was available to Defendants through Operation Dashboard, FE2's allegations that (a) customers at FE2's store complained to FE2 about the removal of $5 combo meal and (b) Operation Dashboard contains "inventory and sales information and customer feedback," CSAC ¶ 34, are not indicative of scienter. It is not clear that FE2 or anyone else entered the complaints made to FE2 into Operation Dashboard. Even if those complaints were entered, complaints from one El Pollo Loco location are not indicative of the level scienter of scienter required in this case. The facts reported by FE2 do not indicate that Defendants knew or were in reckless disregard of specific information that made their May 14 statements false.

### c.  Former Employee 3 ("FE3")

Finally, FE3 was the Senior Director of Operations at El Pollo Loco from August 2013 to mid-April 2015. *Id.* ¶ 35.  FE3 attended weekly meetings with Defendant Sather, "including weekly executive meetings with [Defendant] Sather, [Defendant] Roberts[,] and other senior executives at the Company." *Id.* FE3 reports that the meetings often included discussions of weekly sales performance, including comparable store sales. Id. In addition, FE3 reports that Defendant Sather was "'glued' to the Operation Dashboard"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

Page 15

and reviewed Operation Dashboard on his iPad. *Id.* FE3 also reports that Defendant Sather created Operation Dashboard. *Id.*

The Court finds that the CSAC has alleged sufficient facts to support its assumptions that FE3 was in a position to be personally knowledgeable of the meetings that FE3 describes in CSAC paragraph 35. FE3 was in a position to observe these meetings because he attended them. *See id.* The fact that these meetings necessarily took place before the class period, *see id.*, is not dispositive as to the first prong. Rather, the timing of the meetings goes to whether FE3's statements are "helpful to Plaintiff's allegations of scienter." *Loritz v. Exide Technologies*, Case No. 2:13-cv-2607-SVW-Ex, 2014 WL 4058752, at *11 (C.D. Cal. Aug. 7, 2014). Accordingly, the Court finds that FE3's allegations satisfy the first prong of the *Daou* test.

As to the second prong, Defendants argue that FE3's allegations are deficient because "FE3 does not allege a single fact about what the Dashboard contained—let alone that the Dashboard contained specific information that informed CEO Sather that the removal of the $5 combo meal was the sole reason for EPL's issues in early 2015." Mot. at 22. Further, Defendants argue that the allegations are deficient because FE3 does not allege that any meetings he or she attended included discussion of the $5 combo meal, "let alone that the removal was the true and sole cause of EPL's issues."[1] *Id.*

Plaintiffs rely on the allegations of FE1 and FE2 to establish the contents of Operation Dashboard.[2] *See* Opp'n at 21. As explained above, the Court finds that FE1 and FE2's statements do not satisfy the PLSRA pleading standard as laid out in *Daou*; consequently, the Court will not rely on those statements.[3]

FE3's statement that Sather was "glued" to Operation Dashboard and that he reviewed the contents of Operation Dashboard during meetings is credible. *See* CSAC ¶ 35. Thus, the Court can infer that Sather was, at least in the period during which FE3 was

---

[1] The Court does not adopt Defendants' characterization of Plaintiffs' claims as alleging that the removal of the $5 combo meal was the "sole cause" of El Pollo Loco's declining performance.

[2] Plaintiff has not provided, and the Court is not aware of, authority showing that the statements of multiple confidential witnesses may be combined to, together, meet the *Daou* test where the statements of one witness would otherwise fail the second prong. Should Plaintiffs amend their complaint and again seek to use confidential witness statements in this fashion, any opposition to a motion to dismiss would need to provide such authority.

[3] Even if it did, FE1 merely asserts that customer complaints could be entered into Operation Dashboard, CSAC ¶ 33, and FE2 asserts only that "store inventory information," "inventory and sales information and customer feedback" was included in Operation Dashboard, *id.* ¶ 34. This is not sufficient for the Court to infer that Operation Dashboard contained information showing that *the removal of the $5 combo meal* was a material reason for El Pollo Loco's poor performance.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                        Date: March 20, 2017

employed—and presumably as a habit and practice—aware of the data in Operation
Dashboard. What FE3's statements do not indicate is that the information contained in
Operation Dashboard revealed that the removal of the $5 combo meal was a significant
enough factor in El Pollo Loco's poor performance that Defendants' failure to
acknowledge that fact during the May 14 call was at least deliberately reckless. In other
words, FE3's statements do not indicate scienter. Accordingly, they do not satisfy the
second prong of the *Daou* test.

For the reasons explained above, the Court will not rely on the confidential
witness statements of FE1, FE2, or FE3.

## 2.  Failure to Allege a Material False or Misleading Statement

Defendants argue that Plaintiffs once again fail to allege a material false or
misleading statement because the May 14, 2015 and June 10, 2015 statements are not
actionable. *See* Mot. at 10–25.

"To be actionable under the securities laws, an omission must be misleading; in
other words it must affirmatively create an impression of a state of affairs that differs in a
material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280
F.3d 997, 1006 (9th Cir. 2002) (citation omitted). This is because "[n]o matter how
detailed and accurate disclosure statements are, there are likely to be additional details
that could have been disclosed but were not." *Id.*

For the Company's statements to be misleading, Defendants must have "actually
known specific information" showing that the removal of the $5 combo meal had a
material impact on the Company's poor performance. *See In re Netflix, Inc. Securities
Litigation*, 923 F. Supp. 2d 1214, 1223 (N.D. Cal. 2013). In its July 25, 2016 Order, the
Court found that "Plaintiffs fail[ed] to allege facts showing how each Individual
Defendant knew any statistical data was specifically linked to the removal of the $5
combo meal . . . ." July 25, 2016 Order at 16 (citing *Police Ret. Sys. of St. Louis v.
Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) ("The complaint lacks
allegations of specific admissions by the individual defendants regarding their
involvement with [the company's] operations or with the software-generated reports.");
*Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) ("The complaint does not plead
facts that show that company insiders knew what the complaint says 'would' occur in
what was then the future."); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, Case No. C 99-
109-SBA, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000) ("Absent specific

allegations of the *source* of this information or some contemporaneous statement by defendants reflecting familiarity with this information, plaintiffs have failed to meet the falsity pleading burden." (emphasis in original))). As a result, the Court was "not convinced Defendants omitted any information or warnings to investors that would be misleading." *Id.*

Plaintiffs attempt to remedy this deficiency in two ways. *See* Opp'n at 13. First, Plaintiffs allege that "Defendants closely monitored information showing the impact different operating initiatives had on sales." *Id.* (citing CSAC ¶¶ 32–35, 55–59). Second, Plaintiffs allege that the impact of the removal of the $5 combo meals was "immediate." *Id.* at 14 (citing CSAC ¶ 34). Disregarding the statements of FE1 and FE2, the Court finds that Plaintiffs have not remedied this deficiency, because they do not adequately plead the existence of information in existence at the time of the May 14 call showing that the removal of the $5 combo meal was a material cause on El Pollo Loco's poor performance. Thus, the issues cited in the Court's July 25, 2016 Order remain.

In its July 25, 2016 Order, the Court also pointed out that the Company disclosed its lower-than-expected growth during the May 14, 2015 call and "made it clear it was evaluating the impact of its higher priced menu items, and it expected its comparable restaurant sales growth to drop." July 25, 2016 Order at 16. Plaintiffs argue that their CSAC addresses this in several ways. First, Plaintiffs argue that the CSAC pleads specific facts showing "Defendants knew a material cause of the poor Early 2015 Results was the removal of the $5 combo menu." Opp'n at 16. The CSAC does make Plaintiffs' allegations about Operation Dashboard clearer. *See* CSAC ¶¶ 55–59. However, Plaintiffs also rely heavily upon the confidential witness statements discussed above. *See* Opp'n at 17 (citing CSAC ¶¶ 32–35). Thus, the Court cannot find that Plaintiffs now "adequately support[] their theory that Defendants misled investors about the causes of poor [performance]," thereby "address[ing] the Court's finding that Defendants disclosed the fact of 1Q 2015 performance." *Id.*

Second, Plaintiffs argue that the CSAC clarifies that their legal theory is that "it was not the inclusion of higher-priced items and resulting confusion that was the issue, but the removal of lower-priced items, coupled with the fact that customers came to El Pollo Loco for its inexpensive offerings." *Id.* at 18 (citing CSAC ¶¶ 1–8, 11, 45–59, 68, 74, 77–80). However, this clarification does not allow the Court to find that Defendants "actually kn[ew] specific information" about the impact on the removal of the $5 combo meal from El Pollo Loco's menu.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                          Date: March 20, 2017

Page 18

The Court finds that the CSAC fails to adequately plead that Defendants knew specific information regarding the impact of the $5 combo meal on El Pollo Loco's performance, such that Defendants' statements on May 14, 2015 or June 10, 2015 were materially false or misleading. Accordingly, the Court GRANTS Defendants' Motion and DISMISSES Plaintiffs' § 10(b) and Rule 10b-5 claims.

### 3.   Whether the CSAC Adequately Pleads Scienter

In its July 25, 2016 Order, the Court found that Plaintiffs "failed to plead sufficient facts giving rise to a strong inference of scienter." July 25, 2016 Order at 18.

The PSLRA requires that the complaint "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This scienter requirement means plaintiffs must plead the defendants engaged in "knowing" or "intentional" misconduct. *South Ferry*, 542 F.3d at 782. Under Ninth Circuit precedent, "reckless" conduct may satisfy the scienter requirement when it is "deliberate" and the facts describing the recklessness are set forth in great detail. *Id.*; *see also In re Silicon Graphics*, 183 F.3d at 977 (holding the recklessness must reflect "some degree of intentional or conscious misconduct" in order to satisfy the scienter requirement), *abrogated on other grounds by* 542 F.3d 776, 784 (9th Cir. 2008).

In determining whether there is a "strong inference" of scienter, the court must weigh competing inferences. *Tellabs*, 551 U.S. at 323–24 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."). The inference of scienter must be more than "merely reasonable . . . it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "Omissions and ambiguities count against inferring scienter," but the court must "not scrutinize each allegation in isolation." *Id.* at 326. Instead, the court must view the complaint "holistically." *Id.*; *see also South Ferry*, 542 F.3d at 784 ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter."). Thus, a complaint for securities fraud survives a motion to dismiss when, after considering the totality of the circumstances, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *South Ferry*, 542 F.3d at 784.

Above, the Court finds it cannot rely on the statements of FE1, FE2, and FE3 to establish scienter. Accordingly, the Court will examine Plaintiffs' other evidence and arguments to determine if Plaintiffs have pled facts giving rise to a strong inference of scienter.

### a.  Temporal Proximity of Statements

Plaintiffs argue that the "temporal proximity of the misleading statements and the revelation of truth" supports an inference of scienter. Opp'n at 25. Plaintiffs allege that the "truth" about the impact of the removal of the $5 combo meal was revealed in Defendants' August 13, 2015 earnings conference call, about two months after Plaintiffs' June 10 statements in which they echoed the alleged misrepresentations made in the May 14 call. CSAC ¶ 50; *see* Opp'n at 25–26. Plaintiffs' argument is based on their allegations that the Defendants had access to "aggregated restaurant-level information on a real-time basis," such that information on "actual sales transactions . . . was immediately available to Defendants." CSAC ¶ 56. As discussed above, the Court finds that the statements of Plaintiffs' confidential witnesses fall short of the PLSRA pleading standards and cannot be relied upon to establish scienter. Plaintiffs have offered the Company's 2014 Form 10-K, in which Operation Dashboard is described as including "sales performance, speed-of-service metrics, and food and labor cost controls." Horne Decl. Ex. 2 at 5. However, merely referring to general categories of data available in Operation Dashboard is not sufficient. *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (finding new allegations failed where they contained no "hard numbers or other specifics," and prior allegations "refer[ring] to the existence of sales and shipment data" and making "a general assertion about what the data showed" were dismissed). Without adequate pleading of the existence of specific information regarding the $5 combo meal, Plaintiffs' temporal proximity argument fails.

The Court finds that "the temporal proximity of the August disclosure to the June and [May] statements, without more, is insufficient to satisfy Rule 9(b)." *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999).

### b.  Analyst Surprise

Plaintiffs also argue that Defendants' May 14 and June 10 statements "misled analysts that it was something other than the removal of the $5 combos or failure to remain in the QSR+ position that caused the declining comparable store sales growth." Opp'n at 11; *see* CSAC ¶ 80. Analysts' surprise, Plaintiffs contend, "will support an inference of materially false statements." Opp'n at 11 (citing *In re Facebook, Inc. IPO*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                              Date: March 20, 2017

Page 20

*Securities and Derivatives Litigation*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. Dec. 12, 2013)). This argument is not significantly different from Plaintiffs' prior allegations of analyst surprise. *See* CAC ¶ 64. Analysts may have been surprised—although the selected quotations provided by Plaintiffs do leave some doubt. Nevertheless, the Court finds that the statements offered in this case, although they could be circumstantial evidence of scienter, are not enough to create an inference of scienter. This is especially true in light of the Court's holding above that Plaintiffs have failed to plead the existence of a materially false or misleading statement.

### c. Insider Trading

To plead scienter, a plaintiff is required to allege "'unusual' or 'suspicious' stock sales. '[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information.*'" *Ronconi*, 253 F.3d at 435 (emphasis in original) (quoting *In re Silicon Graphics*, 183 F.3d at 986 (abrogated on other grounds by *South Ferry LP*, 542 F.3d at 784)). The Ninth Circuit has identified three factors relevant to a determination of suspiciousness: "'(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *Id.* at 435 (quoting *In re Silicon Graphics*, 183 F.3d at 986). "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco Partners*, 552 F.3d at 1005 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1095–96 (9th Cir. 2002)).

In its July 25, 2016 Order, the Court found that Plaintiffs failed to allege facts regarding the sales as a percentage of each individual's total holdings, the context of the sales, why CFO Roberts did not sell any shares, or whether there were any restrictions on the insiders' ability to trade. July 25, 2016 Order at 18. Plaintiffs argue that the CSAC provides "detailed allegations of Defendants' and other corporate insiders' unusual trading or trading at suspicious times or in suspicious amounts, which reinforce strong inference of scienter." Opp'n at 26 (internal citation and quotation omitted).

As an initial matter, the CSAC does not at all address why CFO Roberts did not sell any shares or whether there were any restrictions on the insider's ability to trade. In their Opposition, Plaintiffs argue that the former omission is because CFO Roberts' lack of sales is irrelevant. *See* Opp'n 34–35. As to the insiders' trading restrictions, Plaintiffs argue that any such restrictions were illusory. *See* Opp'n 31–33. Because the latter argument is not present in the CSAC, it cannot serve to address the Court's reasons for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

Page 21

dismissing the CAC. As to the former argument, while CFO Robert's lack of sales on May 19, 2015 is not irrelevant, the Court will not accept Defendants' invitation to dismiss the CSAC with prejudice on this basis. *See* Mot. at 26.

The CSAC does attempt to address the Court's other enumerated concerns. First, Plaintiffs allege that Defendant Trimaran Pollo sold 24% of its shares and exercisable options, Defendant Sather sold 25%, and Defendant Valle sold 46%. CSAC ¶ 69. Plaintiffs argue that "the amount and percentage of holdings sold by Defendants during the Class Period provide strong support for the inference that Defendants knew that the Company's restaurants were facing substantial traffic declines as a result of the loss of the $5 value menu." Opp'n at 26.[4]

Second, Plaintiffs argue that the context of Defendants' sales makes them suspicious. Opp'n at 29. All of the sales at issue took place on May 19, 2015, CSAC ¶¶ 9, 69, "shortly before announcing relatively poor earnings," Opp'n at 34. Plaintiffs argue that Defendants were "motivated to misattribute the causes of poor 1Q and 2Q 2015 results . . . so that they could get out of their position before the market realized El Pollo Loco's dire predicament." *Id.*

In addition, Plaintiffs argue that the Defendants previous trading history is indicative of scienter. Opp'n at 29–33. Specifically, the Individual Defendants' May 19, 2015 sales were larger than their sales in the only previous instance of trading (November 2014). CSAC ¶¶ 69, 71. However, as Defendants note, Individual Defendants Sather and Valle *retained* more shares than they sold on May 19, 2015. Mot. at 27–28. Thus, the mere fact that more shares were sold by each Individual Defendant on May 19, 2015 than in November 2014 does not weigh towards scienter. In addition, more total shares were collectively sold by Defendants in November 2014 than were collectively sold by Defendants on May 19, 2015. *See* Mot. 28–29. While this is not dispositive, it weighs against a finding that the May 19, 2015 sales were "dramatically out of line with prior trading practices." *Ronconi v. Larkin*, 253 F.3d at 435.

As a final matter, the Court previously found that Plaintiffs' allegations regarding, *inter alia*, internal reports was not enough to show that "Defendants omitted any information or warning to investors" in such a way that would have been "misleading."

---

[4] The parties have cited numerous cases, including out-of-circuit cases, to show that a certain dollar amount of sales is or is not suspicious, or that the sale of a certain percentage of total stock owned is or is not suspicious. *See, e.g.*, Mot. at 27–28; Opp'n at 27. However, because the Court's analysis is so fact- and context-specific, these cases are persuasive only as to their reasoning. The specific dollar amounts in the cited cases are not highly probative.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                        Date: March 20, 2017

Page 22

July 25, 2015 Order at 16. The Court finds above that Plaintiffs have not sufficiently pled that Defendants "actually kn[ew] specific information" about the impact on the removal of the $5 combo meal from its menu. *See In re Netflix*, 923 F. Supp. 2d at 1223. Plaintiffs' allegations that Operation Dashboard contained "sales performance, speed-of-service metrics, and food and labor cost controls" are not sufficient to support a strong inference of scienter. Opp'n at 13 (quoting Horne Decl. Ex. 2 at 5). When the confidential witness statements are disregarded, Plaintiffs' new allegations fail to include any data or significant detail, and thus fail for the same reason as the prior allegations. *See Wozniak*, 850 F. Supp. 2d at 1042 (finding new allegations failed where they contained no "hard numbers or other specifics," and prior allegations "refer[ring] to the existence of sales and shipment data" and making "a general assertion about what the data showed" were dismissed).

The Court finds that Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter. Accordingly, the Court GRANTS Defendants' Motion and DISMISSES Plaintiffs' § 10(b) and Rule 10b-5 claims for this reason, as well.

### B. Section 20(a) and Section 20A Claims

Plaintiffs allege a Section 20(a) claim against the Individual Defendants and Controlling Shareholder Defendants, and a Section 20A claim against CEO Sather, CMO Valle, and the Controlling Shareholder Defendants.

"[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n. 15 (9th Cir. 2002); *see also Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b).").

Because Plaintiffs fail to sufficiently allege a violation of § 10(b) and Rule 10b-5, the Court GRANTS Defendants' Motion and DISMISSES Plaintiffs' claims for alleged violations of § 20(a) and 20A.

### IV.   Disposition

For the reasons explained above, the Court GRANTS Defendants' Motion to Dismiss.

Plaintiff may file an amended complaint, if desired, **on or before April 17, 2017**.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 15-1343-DOC (KESx)                                    Date: March 20, 2017

                                                                                                  Page 23

      The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                          Initials of Deputy Clerk: djg
CIVIL-GEN