ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS (225196)
LAURIE L. LARGENT (153493)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
llargent@rgrdlaw.com

THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN (219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA  90071
Telephone:  213/785-2610
213/226-4684 (fax)
lrosen@rosenlegal.com

Co-Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DANIEL TUROCY, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>EL POLLO LOCO HOLDINGS, INC., et al.,<br><br>Defendants. | Case No. 8:15-cv-01343-DOC-KES (**Consolidated**)<br><br>CLASS ACTION<br><br>CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

1253552_1

1  Lead Plaintiffs Robert W. Kegley, Sr., Peter Kim, Dr. Richard J. Levy, Sammy

2  Tanner and Ron Huston (collectively "Plaintiffs"), individually and on behalf of all

3  others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint

4  against defendants, allege the following based upon personal knowledge as to those

5  allegations concerning Plaintiffs and, as to all other matters, upon investigation of

6  counsel, which included, without limitation: (1) review and analysis of El Pollo Loco

7  Holdings, Inc.'s ("El Pollo Loco" or the "Company") Securities and Exchange

8  Commission ("SEC") filings; (2) review and analysis of news releases and other

9  publications disseminated by defendants; (3) review of news articles, analyst reports

10  and conference call transcripts; (4) review of a May 12, 2015 El Pollo Loco

11  management presentation to the Board of Directors; (5) review and analysis of other

12  publicly available information concerning defendants and El Pollo Loco; and (6)

13  discussions with former employees of El Pollo Loco and El Pollo Loco franchises.

14  The investigation of the facts pertaining to this case is continuing.  Plaintiffs believe

15  that additional evidentiary support will exist for the allegations set forth herein after a

16  reasonable opportunity for discovery.

17  **NATURE OF THE ACTION**

18  1.  This is a securities class action on behalf of all purchasers of El Pollo

19  Loco securities between May 15, 2015 and August 13, 2015, inclusive (the "Class

20  Period"), seeking remedies pursuant to §§10(b), 20(a) and 20A of the Securities

21  Exchange Act of 1934 (the "Exchange Act") against defendants El Pollo Loco,

22  Stephen J. Sather ("Sather") the Company's Chief Executive Officer ("CEO"),

23  Laurance Roberts ("Roberts") the Company's Chief Financial Officer ("CFO"),

24  Edward J. Valle ("Valle") the Company's Chief Marketing Officer ("CMO"), and the

25  Company's controlling shareholders, as described below (collectively, "Defendants").

26  2.  El Pollo Loco, a fast food chain primarily based in California with a

27  focus on Los Angeles, faces a serious challenge: California and Los Angeles's quickly

28  rising minimum wages pose a threat to its profitability.  Indeed, before the Class

- 1 -

1  Period, market analysts expressed concern about El Pollo Loco's ability to raise its

2  prices to meet rising labor costs while maintaining its successful market position as a

3  quick service restaurant plus ("QSR+"), a position Defendants acknowledged was

4  responsible for El Pollo Loco's tremendous historic sales growth.

5         3.     In February 2015, just before the start of the Class Period, El Pollo Loco

6  began experimenting with solutions to its minimum wage problems by substantially

7  raising its menu prices.  Specifically, El Pollo Loco significantly altered its QSR+

8  strategy by removing its highly popular $5 combo meal menu, causing menu prices to

9  significantly shift higher.  The change materially reduced the Company's value score.[1]

10  This move was unprecedented as El Pollo Loco always had inexpensive meals on its

11  menu.

12         4.     Unbeknownst to investors, the result was a disaster.  El Pollo Loco's

13  customer traffic immediately fell as a result, as did its same store sales growth – one

14  of the indicators the Company touts to investors as a key measure of its performance.[2]

15  The failed experiment showed that El Pollo Loco would not be able to raise its prices

16  without driving away customers.

17         5.     On May 12, 2015, two days before Defendants made the initial false and

18  misleading statements, El Pollo Loco's management made a presentation to the board

19  revealing the alarming downward trend in customer traffic and same store sales.

20  Valle, who made the presentation concerning marketing results, explicitly concluded

21  that increased menu prices and diminished value, as measured by value scores, had

22

---

23  [1]  "Value scores" are determined through surveys asking customers whether El Pollo
    Loco provides good value for money.  They are closely followed by El Pollo Loco and
24  analysts, and El Pollo Loco's presentations to investors repeatedly stress these value
    scores.

25  [2]  The financial metric "same store sales" measures sales from stores that have been
26  open for a given length of time, usually a year.  It is closely watched by investors and
    analysts because it provides an apples-to-apples comparison of a company's
27  performance.  It is also useful for determining which portion of growth results from
    growth in existing stores versus growth through simply opening new stores.  It is
28  alternatively referred to as "comparable store sales," or simply "comps."

1  caused the decline in customer traffic and same store sales.  Valle presented the
2  marketing portion of the presentation, which included a business overview.  Valle's
3  presentation to the board included a number of slides that illustrated the Company's
4  reduced value score and the effect higher menu prices were having on sales.

5      6.    Management's May 12, 2015 presentation clearly informed the board of
6  the following trends:

7      •    menu prices increased significantly;

8      •    the increased prices caused a reduction in transaction growth and lower
9           total sales;

10     •    the Company was no longer in the QSR+ position as its customers' value
11          score had fallen by 17 percentage points to well below QSR level;

12     •    2Q 2015 same store sales growth was now forecasted to be 2.5%; and

13     •    menu prices needed to decrease in order to increase transactions and
14          sales growth.

15 None of this information was revealed to the public.

16     7.    On May 14, 2015, El Pollo Loco reported its 1Q 2015 financial results.[3]
17 El Pollo Loco reported lower than expected same store sales growth.  On the
18 conference call El Pollo Loco held to discuss the results, analysts repeatedly asked
19 Defendants the cause of the poor same store sales growth.  Despite knowing that price
20 increases were negatively affecting customer traffic and sales, Defendants falsely
21 assured analysts that superficial factors, namely the timing of New Year's Eve –
22 purely a calendar issue – and an unrelated menu change caused the decreased
23 customer traffic and lower than expected same store sales growth.

24     8.    Given investors' concern about El Pollo Loco's ability to raise prices in
25 the face of looming labor cost increases, had Defendants disclosed that El Pollo

26 _____

27 [3]  For financial reporting, El Polo Loco uses a 52- or 53-week fiscal year ending on
   the last Wednesday of each calendar year.  For fiscal 2015, the first quarter ended
28 April 1, 2015 and the second quarter ended July 1, 2015.

- 3 -

1253552_1

1  Loco's attempt to raise prices drove away its customers, analysts would have
2  accurately determined that its financial outlook was dire.

3        9.     During the May 14, 2015 conference call, concerned about the
4  disappointing 1Q same store sales trends, analysts specifically asked Defendants about
5  the current 2Q 2015 trend – the second quarter which was half-way over at the time.
6  Because the Company's prices remained high and its value score was still low, poor
7  performance had persisted into 2Q 2015.  Defendants, however, concealed this truth
8  and misleadingly blamed only an easily-addressable issue – confusion in El Pollo
9  Loco's marketing efforts – for soft customer traffic in early 2Q.  Despite informing
10  the board on May 12, 2015 that higher prices were one of the principal causes of
11  lower store traffic and sales, on May 14, 2015, Valle specifically denied to an analyst
12  that higher prices had any impact on 1Q or 2Q results to date.

13        10.    Defendants' same store sales guidance provided further support to their
14  misleading claim that superficial, easily addressed factors had caused poor early 2015
15  results.  On May 14, 2015, Defendants claimed that same store sales would still grow
16  by at least 3% in 2Q 2015.  Based on Defendants' misleading statements, market
17  analysts estimated 2Q 2015 same store sales in the 3% to 3.3% range.  But internally,
18  at the May 12, 2015 board meeting, Valle specifically disclosed that El Pollo Loco in
19  fact projected that 2Q 2015 same store sales growth would be 2.5%.

20        11.    A mere five days after their false statements, and while knowing that
21  higher menu prices continued to cause a substantial decline in customer traffic that
22  would persist through 2Q 2015, Defendants and Company insiders sold over $130
23  million of their personally-held stock in a coordinated frenzy.

| Defendant | Date Sold | Shares Sold | Proceeds |
|---|---|---|---|
| Controlling Shareholder Defendants | 05/19/15 | 5,402,500 | $118,044,625 |
| Sather | 05/19/15 | 360,000 | $7,866,000 |
| Valle | 05/19/15 | 175,000 | $3,823,750 |

- 4 -

| Defendant | Date Sold | Shares Sold | Proceeds |
|---|---|---|---|
| Additional Insiders[4] | 05/19/15 – 06/02/15 | 124,916 | $2,689,666 |
| TOTALS | | 6,062,416 | $132,424,041 |

12.   No Defendant has sold stock subsequent to May 19, 2015.

13.   The truth behind the Company's disappointing customer traffic and same store sales was revealed three months later on August 13, 2015, when the Company announced 2Q 2015 results.  At 1.5%, same store sales growth was only half of the 3% guidance the Company had provided on the May 14, 2015 conference call, and at that time they already had results for half of the 2Q.  Indeed, traffic in Company-operated stores had fallen by almost 4%.  On the August 13, 2015 conference call with investors held to discuss the 2Q 2015 results, Defendants admitted what the board learned at the May 12, 2015, board meeting: that higher prices and a lower value score caused poor customer traffic and same store sales growth in the first half of 2015.  While denying it throughout the Class Period, Defendants finally admitted that its higher prices, lower value score and change of course away from its QSR+ strategy is what caused El Pollo Loco's lackluster results.

14.   An August 13, 2015, William Blair analyst report captured investors' frustration: "Having missed its forecast that was issued in mid-May, El Pollo Loco is clearly in the penalty box with investors . . . ."

15.   In reaction to Defendants' announcement, the price of El Pollo Loco stock plummeted 20%, from a closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015, the lowest closing price since the Company's initial public offering ("IPO") on July 14, 2014.

---

[4]   As more fully described in ¶93, the following Company insiders also dumped El Pollo Loco stock during the Class Period: Kay Bogeajis ("Bogeajis"), Chief Operating Officer ("COO"), Douglas Ammerman, director, and Samuel Borgese, director.

**JURISDICTION AND VENUE**

16.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act, as El Pollo Loco's principle executive offices are located at 3535 Harbor Boulevard, Suite 100, Costa Mesa, California 92626, and a substantial portion of the acts and transactions giving rise to the violations of law complained of occurred in this District.

**THE PARTIES**

**Plaintiffs**

18.     Lead Plaintiff Robert W. Kegley, Sr. purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

19.     Lead Plaintiff Peter Kim purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

20.     Lead Plaintiff Dr. Richard J. Levy purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

21.     Lead Plaintiff Sammy Tanner purchased El Pollo Loco common stock at artificially inflated prices during the Class Period as described in the previously filed Certification incorporated herein by reference (Dkt. No. 22-2) and suffered damages as a result of Defendants' alleged misconduct.

22.     Lead Plaintiff Ron Huston purchased El Pollo Loco securities at artificially inflated prices during the Class Period as described in the previously filed

1253552_1

1  Certification incorporated herein by reference (Dkt. No. 18-2) and suffered damages
2  as a result of Defendants' alleged misconduct.

3  **Company and Individual Defendants**

4      23.     Defendant El Pollo Loco develops, franchises, licenses and operates
5  quick-service restaurants under the El Pollo Loco name in the United States.

6      24.     Defendant Sather is, and was at all relevant times, El Pollo Loco's
7  President and CEO, and a member of its Board of Directors.  Prior to becoming CEO
8  in 2010, Sather served as the Company's Senior Vice President of Operations from
9  2006 to 2010.  While working in El Pollo Loco's operations department, Sather
10 created the Company's Operation Dashboard.  The Operation Dashboard was used by
11 Company executives and management to closely track and monitor the Company's
12 sales metrics, including same store sales, on a real-time basis.  Through his tenure
13 with the Company, and prior experience, Sather has extensive knowledge of the
14 restaurant industry, including the casual dining and quick-service sectors.  As
15 President and CEO, Sather spoke on El Pollo Loco's behalf in news releases,
16 conference calls and SEC filings and signed El Pollo Loco's filings with the SEC
17 before and during the Class Period.  Sather also attended the May 12, 2015 board
18 meeting where the change in prices and value score and resulting lower customer
19 traffic and sales downturns were discussed.  During the Class Period, Sather sold
20 360,000 shares of El Pollo Loco common stock at $21.85 per share, reaping proceeds
21 of over $7.8 million.

22     25.     Defendant Roberts is, and was at all relevant times, El Pollo Loco's CFO.
23 Roberts has extensive experience in the restaurant industry and as an executive of a
24 publicly held company, including serving as General Manager and CFO of KFC
25 Restaurant Operating Company prior to his employment at El Pollo Loco.  As CFO,
26 Roberts spoke on El Pollo Loco's behalf during conference calls with investors and
27 signed El Pollo Loco's SEC filings before and during the Class Period.  During the
28 Class Period, Roberts owned the least amount of El Pollo Loco stock amongst the

1  Defendants.  He owned merely 88,296 fully vested stock options, and owned no El
2  Pollo Loco shares outright.

3       26.     Defendant Valle is, and was at all relevant times, El Pollo Loco's CMO.
4  As CMO, Valle spoke on El Pollo Loco's behalf during conference calls.  During the
5  Class Period, Valle sold 175,000 shares of El Pollo Loco common stock at $21.85 per
6  share, reaping proceeds of over $3.8 million.  Valle presented a marketing agenda,
7  including a business overview, to the board at the May 12, 2015 board meeting.

8       27.     Defendants Sather, Roberts and Valle are sometimes referred to herein as
9  the "Individual Defendants."

10      28.     During the Class Period, the Individual Defendants operated El Pollo
11 Loco as "hands-on" managers, overseeing El Pollo Loco's operations and finances
12 and making the material false and misleading statements described herein.

13      29.     The Individual Defendants were intimately knowledgeable about all
14 aspects of El Pollo Loco's financial and business operations, as they received daily
15 reports, attended weekly executive meetings and had access to computerized
16 information, including electronic information through the Company's Operation
17 Dashboard, that included real-time information regarding sales, same store sales,
18 customer traffic, costs and expenses, product demand, inventory management and
19 customer incentives.

20      30.     As confirmed by the Company's SEC filings, the Operation Dashboard
21 was a well-developed operations infrastructure that allowed for real-time control over
22 the Company's operations and sales.  The Operation Dashboard allowed Defendants
23 to measure the Company's performance by utilizing a state-of-the-art technology that
24 aggregated real-time restaurant-level information for nearly every aspect of El Pollo
25 Loco's business.  Through the Operation Dashboard, before and during the Class
26 Period, Defendants constantly monitored and measured current performance against
27 benchmarks derived from a broad selection of fast casual and QSR brands, including

28

1253552_1

1   key operational data regarding sales performance, speed-of-service metrics and food
2   and labor cost controls.

3   **Controlling Shareholder Defendants**

4       31.    Defendant Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo") was
5   incorporated in 2005 and is based in Irvine, California.  Defendant Trimaran Pollo is
6   owned by defendant Trimaran Capital Partners ("Trimaran Capital"), a private asset
7   management firm headquartered in New York, New York, and defendant Freeman
8   Spogli & Co. ("Freeman Spogli"), a private equity firm based in Los Angeles,
9   California.  Trimaran Pollo, Trimaran Capital and Freeman Spogli are collectively
10  referred to herein as the "Controlling Shareholder Defendants."

11      32.    The Controlling Shareholder Defendants began ownership of El Pollo
12  Loco in 2005.  In July 2014, the Controlling Shareholder Defendants took the
13  Company public in an underwritten IPO, selling approximately 8.2 million shares of
14  El Pollo Loco common stock at $15 per share, raising more than $123 million in gross
15  proceeds.

16      33.    Following the IPO, "Trimaran and Freeman Spogli indirectly beneficially
17  own[ed] shares sufficient for majority votes over all matters requiring stockholder
18  votes, including: . . . decisions affecting [its] capital structure," and "Trimaran and
19  Freeman Spogli [could] seek to cause [the Company] to take courses of action that . . .
20  might involve risks to [its] other stockholders or adversely affect us or [its] other
21  stockholders . . . ."

22      34.    Pursuant to a stockholders' agreement between El Pollo Loco and the
23  Controlling Shareholder Defendants, following its IPO, El Pollo Loco remained a
24  subsidiary of Trimaran Pollo.  The Controlling Shareholder Defendants collectively
25  owned more than 70% of El Pollo Loco's equity, maintaining the power to select El
26  Pollo Loco's board members.  The Chairman of El Pollo Loco's Board of Directors,
27  Michael G. Maselli, is a managing director of Trimaran Fund Management, L.L.C.
28  Another El Pollo Loco board member, Dean C. Kehler, co-founded Trimaran Capital,

1   and remains one of its managing partners.  A third El Pollo Loco board member,

2   Wesley W. Barton, is a Vice President of Trimaran Capital.  One of Freeman Spogli's

3   General Partners, John M. Roth, is also an El Pollo Loco board member.  Thus,

4   Freeman Spogli and Trimaran Capital representatives account for four of El Pollo

5   Loco's seven directors.

6          35.    Pursuant to the stockholders' agreement between El Pollo Loco and the

7   Controlling Defendant Shareholders, in November 2014, the Company commenced a

8   secondary offering through which the Controlling Shareholder Defendants sold 5.6

9   million shares of their El Pollo Loco common stock.  Following the November 2014

10  secondary offering and until May 19, 2015, the Controlling Shareholder Defendants

11  still, collectively, owned 60% of the Company's shares, sufficient for majority votes

12  over all matters requiring stockholder votes, including election of directors.

13         36.    Thus, when the Controlling Shareholder Defendants unloaded over $118

14  million in El Pollo Loco stock on May 19, 2015, they were well aware of the material

15  negative information provided in the May 12, 2015 board presentation, which was not

16  disclosed to the public.  Indeed, in the week prior to their large stock sales, El Pollo

17  Loco's board – of which the Controlling Shareholder Defendants had four members –

18  was informed that the Company was no longer in its coveted QSR+ value position and

19  the menu changes were causing a decrease in customer traffic, resulting in lower than

20  expected same store sales growth.  Knowing this information, the Company falsely

21  told the pubic its value position was still a great attribute and the higher menu prices

22  were not affecting traffic or sales.  While investors were being misled and El Pollo

23  Loco's stock was artificially inflated, the Controlling Shareholder Defendants sold

24  over five million shares to investors who assumed the Company's statements were

25  truthful.

26         37.    By reason of their controlling ownership in El Pollo Loco before and

27  during the Class Period as describe above, the Controlling Shareholder Defendants

28  were "control persons" of El Pollo Loco within the meaning of §20(a) of the

1253552_1

1   Exchange Act, 15 U.S.C. §78t(a), and had the power and influence to control El Pollo

2   Loco and exercised that control to cause the Company to engage in the violations and

3   improper practices complained of herein.

4                              **STATEMENT OF THE CASE**

5   **Former Employee Sources**

6          38.    In addition to information available from public sources and El Pollo

7   Loco board materials, the allegations pleaded herein are supported by the first-hand

8   accounts of former employees of El Pollo Loco and El Pollo Loco franchises ("FE").

9          39.    FE 1 was an Assistant Manager, at a Los Angeles-area El Pollo Loco

10  store from May 2014 to July 2015, and reported directly to the store's General

11  Manager.  According to FE 1, a Company Area Leader would regularly visit the store

12  where FE 1 worked.  According to FE 1, the Area Leader constantly monitored the

13  store's operations, including sales and labor costs.  FE 1 observed the Area Leader

14  monitoring this information on her mobile phone.  According to FE 1, the Area Leader

15  had enough information to know if the store was busy without even being at the store.

16  For example, according to FE 1, if the store experienced unexpected low customer

17  traffic, within hours, the corporate Area Leader would call and tell the store

18  employees to send employees home to save on labor costs.  FE 1 stated that the Area

19  Leader was always aware of and concerned about labor costs and was monitoring the

20  metric constantly throughout the day.

21         40.    According to FE 1, customers were upset about removal of $5 combo

22  menu items and expressed those concerns through the Company's customer feedback

23  system, which included a 1-800 number and an online system for complaints and

24  comments.  FE 1 confirmed that customer complaints and comments could be directly

25  viewed and listened to through El Pollo Loco's Operation Dashboard.  FE 1 also

26  stated that foot traffic noticeably declined when the popular menu items were

27  removed.

28

1253552_1

41.     FE 2 was a Team Leader at a Los Angeles-area El Pollo Loco from July 2013 to July 2015, and reported directly to the store's General Manager. According to FE 2, the removal of the $5 combo menu in February 2015 caused an immediate fall in store sales. Customers told FE 2 they were upset that the $5 combo menu had been removed.  FE 2 reported the $5 combo meal "was people's favorite – that's why people come back."  As part of FE 2's employment, FE 2 was responsible for entering all store inventory information into the Operation Dashboard and did so every other day.  FE 2 confirmed that the Operation Dashboard also included, among other things, inventory and sales information and customer feedback.  According to FE 2, the store managers were often in the store office monitoring the store's data on the computer and checking El Pollo Loco emails.

42.     FE 3 was the Senior Director of Operations at El Pollo Loco from August 2013 through mid-April 2015.  FE 3 worked at El Pollo Loco's headquarters and reported directly to El Pollo Loco's COO, Bogeajis.  During FE 3's employment at El Pollo Loco, FE 3 attended meetings with Sather, including weekly executive meetings with Sather, Roberts and other senior executives at the Company.  The weekly meetings took place on Monday mornings and usually lasted two hours. The meetings frequently included discussions of the Company's weekly sales performance, including same store sales. According to FE 3, Sather was "glued" to the Operation Dashboard and FE 3 observed Sather reviewing the Operation Dashboard on his iPad when FE 3 went to Sather's office for meetings.  According to FE 3, Sather created the Operation Dashboard.

**Company Background**

43.     El Pollo Loco opened its first location on Alvarado Street in Los Angeles, California, in 1980, and the Company has since grown its restaurant system to 415 restaurants, comprising 172 company-operated and 243 franchised restaurants as of December 31, 2014.  Its restaurants are located in California, Arizona, Nevada, Texas and Utah, with the typical restaurant being a free-standing building with drive-thru

- 12 -

service.  During the Class Period over 80% of El Pollo Loco's restaurants were located in California.

44.    The restaurant industry is divided into two segments; full service and limited service.  El Pollo Loco operates in the limited service restaurant segment, which is comprised of the "quick-service restaurant" ("QSR") and "fast casual" sub-segments.  The restaurant industry defines QSRs as traditional "fast food" restaurants and "fast casual" as a limited or self-service format with higher prices that offer food prepared to order in a more upscale environment.

**The Company's Sales Growth Success Was Attributable to Its Positioning as a "QSR+"**

45.    Before and during the Class Period, El Pollo Loco differentiated itself from its QSR and fast casual competitors by branding itself as a "quick service restaurant *plus*," which allowed it to capture sales from both QSRs and fast casual restaurants.  As a QSR+ chain, El Pollo Loco offered its customers the lower prices and convenience of fast food restaurants, such as Kentucky Fried Chicken or Taco Bell, while also offering fresher, higher quality food and service comparable to more expensive fast casual dining chains, such as Chipotle or Rubios.  As Sather explained in a pre-Class Period January 12, 2015 conference call with investors:

> Now let's talk for a second about our positioning.  We call it QSR+.  And I really call this the best of both worlds.  We capture the high-quality food of the players you see here on the right: the Chipotle, the Zoes, Rubios.  Very high quality of the fast casual.  Yet we do that at the speed, convenience and value of the players you see here on the left: McDonalds, Chick-fil-A or Taco Bell.  And we want to be right in that positioning because we think that's the perfect sweet spot.

46.    Just before the start of the Class Period, in the Company's March 12, 2015 news release for 4Q 2014 and FY 2014, Sather attributed the Company's repeated sales growth success to El Pollo Loco's "'QSR-plus' positioning'" and the

"compelling value proposition" the Company offered its customers, *e.g.*, fresh, high quality food at lower prices.  Later on the same day, during a conference call with investors, Sather again credited the Company's impressive history of consecutive-quarter same store sales growth to the compelling value menu that El Pollo Loco offered through its QSR+ positioning, explaining:

> We believe we are uniquely positioned in the restaurant industry in what we refer to as QSR-plus.  We define QSR-plus as offering the high-quality food and dining experience you would expect at a fast casual restaurant, combined with the speed, convenience and value you'd find at a traditional quick service restaurant, essentially getting the best of both worlds.
>
> ***Our comp[arable store sales a/k/a same store sales] growth is evidence that our compelling value proposition*** alongside our fresh handcrafted Mexican-inspired cuisine continues to appeal to our guests.

47.    In its SEC Form 10-K filing for FY 2014, El Pollo Loco also reported that its unique QSR+ positioning was an integral part of the foundation for the Company's continued sales growth, including growth in customer traffic.  In the FY 2014 Form 10-K, filed March 17, 2015, the Company stated:

> Based on an external research report and a customer satisfaction survey, we believe that our positioning appeals to a broad customer base . . . giving consumers the best of both fast casual and QSR segments.  Our differentiated QSR+ positioning sources traffic from both dining segments ***and as a result continues to fuel our organic transaction growth***.

48.    Not surprisingly, both analysts and investors praised El Pollo Loco's QSR+ positioning and touted the Company's sales growth record.  As a result, the Company enjoyed a meteoric rise in its share price from its IPO offering price of $15 per share in July 2014 to over $29 per share just before the start of the Class Period.

1253552_1

**Value Pricing Was an Important
Component of the QSR+ Strategy**

49.     Given its niche as a QSR+ chain, menu pricing was a crucial component of El Pollo Loco's QSR+ positioning.  As Sather explained in a January 12, 2015 conference call with investors, "we've got a per-person spend of about $5.83.  That's just slightly above what you'd pay in QSR and well below what you see in most fast casuals.  *So we feel that pricing is very important in QSR positioning*."

50.     During the same call, Valle also emphasized pricing as a key component of the QSR+ strategy, stating:

So we position EPL as real food at reasonable prices.  And reasonable prices mean 15% to 18% off the Chipotle, Paneras, the fast casual guys of the world.  And about 8%-8% to 10% above QSR.  That's what we call QSR+.  That allows us to source volume from QSR because we have better food, and it allows us to source volume from fast casual because we have everyday, price-accessible price points.  Right?  So it works ou[t] wonderfully for us.

51.     During a June 23, 2015 conference call with investors, Sather reiterated that El Pollo Loco's menu pricing was an important component of its QSR+ strategy, which was what allowed the Company to successfully grow its same store sales quarter after quarter:

Let's talk about – I mentioned positioning, let's talk about that.  And we call it QSR+, it is really the best of both worlds.  It takes – if you look on the fast casual side, high-quality food, the dining experience, the atmosphere – we have that with our product and yet we bring that to you at the speed, convenience and value that you see of the players here on the left, Chick-fil-A, McDonalds or Taco Bell.

So it is very unique positioning.  *And then with our pricing, puts us right in the middle.  We think that is important*.

1253552_1

**In 1Q 2015 Defendants Abandoned the**
**Company's QSR+ Value Pricing Strategy**

52.    Because of its positioning as a QSR+ chain, before and during the Class Period, El Pollo Loco was under pressure to maintain the lower pricing of a QSR chain with a menu that appealed to the more refined tastes of fast casual diners. Indeed, given this pressure to maintain lower pricing, and thus its QSR+ positioning, before the Class Period, market analysts and investors questioned the Company's ability to increase prices in order to offset future cost pressures, including looming minimum wage increases the Company was facing in California and Los Angeles, where 80% of the Company's restaurants were concentrated.

53.    By the beginning of the Class Period, El Pollo Loco was heavily exposed to rising labor costs, the Company's second largest cost following only food costs. In California alone, the Company was dealing with a 25% increase in minimum wage over a short 1.5 year period. Specifically, on July 1, 2014, the State of California raised its minimum wage 12.5%, from $8 to $9 per hour. Additionally, by the start of the Class Period, California was set to again increase its minimum wage an additional 11.1% to $10 per hour, effective January 1, 2016. Not only did these increases affect El Pollo Loco's minimum wage workers, they also impacted the Company's above-minimum wage workers as the Company paid supervisors a certain "spread" over minimum wage. To make matters worse, in Los Angeles, where El Pollo Loco's restaurants generated approximately 80% of its revenues in fiscal years 2013 and 2014, minimum wage was set to increase to $15 by 2020.

54.    El Pollo Loco was acutely conscious of labor costs. El Pollo Loco used the Operation Dashboard's real-time information to make individual staffing decisions. FE 1 reported that if stores experienced unexpected low traffic, within hours, a Company Area Leader would call and tell the store employees to send employees home to save on labor costs. According to FE 1, Company Area Leaders constantly monitored store operations, including labor costs.

- 16 -

55.     In an attempt to mitigate the effects of the rising labor costs, in 1Q 2015 Defendants decided to eliminate El Pollo Loco's value-priced menu, which was a core component of its QSR+ positioning strategy and one of the key drivers of customer traffic to El Pollo Loco restaurants.   Specifically, in February 2015 the Company removed its highly popular $5 combo meal menu from the Company's menu boards because of increased pricing, and also increased prices on other value-priced menu items.

56.     As Defendants ultimately admitted, these price increases drove away value-conscious customers, which severely impacted customer traffic and, in turn, made it impossible for the Company to meet its same store sales growth guidance for 2Q 2015.

57.     For example, during an August 13, 2015 conference call, Defendants admitted they lost the value focus of their QSR positioning in 1Q and 2Q 2015 due to their decision to remove the Company's $5 combo meal menu, causing El Pollo Loco's same store sales growth to fall to 1.5%, or about 50% below target.   Because of the disastrous consequences of eliminating the value-priced menu, including the $5 combo meal menu, El Pollo Loco re-launched the $5 menu in 3Q 2015, and when it did, it saw an immediate increase in customer traffic, though not back to its original levels.   After the Class Period, Sather admitted that the Company had abandoned its QSR+ strategy in 1Q 2015, telling investors that re-launching the $5 combo meal menu allowed the Company to "return to [its] winning QSR+ strategy."

**Defendants Were Aware that the New Menu**
**Was Effecting Customer Traffic and Sales**

58.     According to FE 1 and FE 2, El Pollo Loco customers were upset about removal of the $5 combo menu and removal of the menu caused an immediate fall in sales.   FE 2 stated that customers immediately expressed their concerns and complaints about removal of the $5 value menu through the Company's customer feedback system that included a 1-800 number and an online system for complaints

- 17 -

and feedback. Both FE 1 and FE 2 confirm that information posted by customers on the feedback system could be immediately and directly accessed through the Operation Dashboard.

59. Defendants later admitted that they knew by Spring 2015 that removing the $5 combo menu was causing an alarming decrease in same store sales growth. During a November 12, 2015 conference call with investors wherein Defendants reported 3Q 2015 earnings, analysts continued to question Defendants about the 50% miss on 2Q 2015 same store sales growth. During the call, Sather admitted that Defendants knew in early 2015 that the abandonment of the Company's QSR+ strategy and price changes to its menu in 1Q 2015 drove away the Company's price-conscious customers and negatively impacted customer traffic. Sather stated: "Our research **confirmed what we thought in the spring, that consumers still love our food, but we can improve on . . . our value**, which [we] are now taking actioned steps to address those issues."

60. In addition to the elimination of El Pollo Loco's value-priced menu, by the beginning of the Class Period the Company was also changing its menu to offer higher priced non-chicken menu items, such as shrimp and beef entrees. During the May 14, 2015 conference call, Defendants told investors that these items were "proven winners with our customers" and were performing "very well." At the same time, Defendants concealed that elimination of the Company's value-priced menu was causing a decline in customer traffic at El Pollo Loco restaurants. The value-priced menu was the driving force behind the QSR+ strategy and responsible for the Company's previous success in same store sales growth. By May 12, 2015, management and the board were aware that the Company offered much less value for money than QSR restaurants, causing significant decrease in customer traffic and same store sales growth.

1253552_1

**Before and During the Class Period Defendants
Tracked and Monitored Same Store Sales**

61.    As evidenced by (i) their public statements, (ii) the business and marketing decisions the Company made before and during the Class Period, and (iii) the May 12, 2015 board presentation, Defendants, as the Company's top executives, were carefully tracking, monitoring and reviewing sales metrics for El Pollo Loco restaurants on a daily basis.  As the Company admitted in its SEC filings, El Pollo Loco's same store sales metric was a key performance indicator for the Company and closely monitored by top management, including Defendants.

62.    Before and during the Class Period, Defendants tracked and monitored El Pollo Loco same store sales through the Company's Operation Dashboard, which aggregated restaurant-level information on a real-time basis, providing immediate feedback to Defendants on nearly every aspect of the Company's business.  As a real-time system, the Operation Dashboard processed information from all of El Pollo Loco's restaurants within milliseconds of the actual sales transactions so that information was immediately available to Defendants.  The Operation Dashboard was constantly monitored by Defendants and available to them through their desktop computers and tablet devices.

63.    According to FE 3, Sather created the Company's Operation Dashboard.  When FE 3 went to Sather's office for meetings, Sather was "glued" to the Operation Dashboard.  FE 3 observed Sather reviewing the Operation Dashboard on Sather's iPad.

64.    Using the Operation Dashboard before and during the Class Period, Defendants closely tracked, monitored and measured the Company's sales performance for both Company-operated and franchise restaurants, including current performance against forecasts, same store sales, customer traffic and average check size and current performance against its competitors.

1253552_1

65.     Based on the information Defendants obtained from the Operation Dashboard, they knew the deleterious impact their decision to eliminate El Pollo Loco's value-priced menu was having on the Company's same store sales growth, but concealed that information from investors during the Class Period.   Instead, Defendants issued a series of materially false and misleading statements concerning the Company's 2Q 2015 sales and customer traffic, as detailed herein.  As a result, El Pollo Loco securities traded at artificially inflated prices during the Class Period.  The Controlling Shareholder Defendants, the CEO, the CMO, and others took advantage and sold more than one hundred thirty million dollars of their personally held El Pollo Loco shares at fraud-inflated prices.

**The May 12, 2015 Board Presentation Provided Insiders with Material Information Concerning Store Traffic,  Value Positioning and Same Store Sales**

66.     The May 12, 2015 board presentation confirmed the information the former employee witnesses have provided, which is that management knew that removal of the $5 combo menu, and the resulting increase in prices and loss of value, was having a material effect on customer traffic and sales.  Two slides that Valle showed the board illustrate that menu prices "[s]hifted [u]p [s]ignificantly" and "[t]ransactions [g]rowth ha[d] [s]lowed."  In fact, 1Q 2015 menu prices were at their highest in two years and transaction growth was at its lowest in almost four years.

1253552_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# But Menu Prices Have Shifted Up Significantly

-- 0.5% of menu pricing in M6 2014, 1.5% in M9 2014, 1.0% in M2 2015



### Check Growth From Pricing (by Quarter)
Company Restaurants

28

- 21 -

**Our Transactions Growth Has Slowed**

-- Q1 Transactions Plan was 0.0%

67.     Valle also informed the board that there was a correlation between the pricing and lower total sales:

1253552_1



68.     The slide clearly showed that in the period between January 29, 2015 and March 6, 2015, El Pollo Loco had experienced "lower total sales from pricing."[5]

69.     Management and the board knew exactly how the Company was performing at the time of the May 12, 2015 presentation.  Another set of slides that Valle presented showed that sales for the first half of 2Q 2015 were well below El Pollo Loco's 2015 plan targets and were now forecasted to stay below the plan targets for the rest of 2Q 2015.

---

[5]   El Pollo Loco divides the year into 10 modules.  The first module of 2015, or M1, began on December 27, 2014, and ended on February 18.  The second module, M2, ran from January 29 to March 6; the third, M3, from March 7 through April 15.





1253552_1

The latter slide suggests that it would be easier to meet the plan in the back half of the year, but the plan was for much lower sales in the back half of the year.

70.     In fact, the Company already forecasted 2Q 2015 same store sales growth to only be 2.5%, which was only a little over half of the 4.7% that was in the plan target:

## However, We Are Trending Below Plan for Q2
-- Transactions forecast at (1.0%)

### 2015 Company SSS% Summary

| Company SSS% | Q1 | P4 | P5 | P6 | Q2 |
|---|---|---|---|---|---|
| Actual/Forecast | 3.5% | 2.2% | 1.8% | 3.4% | 2.5% |
| Plan | 4.3% | 5.4% | 4.8% | 4.2% | 4.7% |
| B/(W) | -0.8% | -3.2% | -3.0% | -0.8% | -2.2% |
| | | | | | |
| Trans % | 0.1% | -1.6% | -2.7% | 0.9% | -1.0% |
| Check % | 3.4% | 3.9% | 4.5% | 2.6% | 3.6% |
| Company AUV | Q1 | P4 | P5 | P6 | Q2 |
| Actual/Forecast | $37,749 | $37,979 | $38,453 | $39,516 | $38,716 |
| Plan | $38,025 | $39,174 | $39,583 | $39,819 | $39,548 |
| B/(W) | -$276 | -$1,195 | -$1,129 | -$303 | -$832 |

71.     The Company's value menu was important to its success and its QSR+ positioning was what Defendants told the public set it apart from other restaurants. As such, Valle also discussed the Company's 2015 value position, presenting to the board a slide that showed a 17 percentage point decrease in the Company's value score. As a result of this drop, El Pollo Loco's value score fell a full 12 percentage points below QSR.

1253552_1



72.     Indeed, the negative impact of increased menu prices on sales was so significant that El Pollo Loco had to reengineer its product line to provide "Value and Price Relief" to customers by changing the Module 7 promotional item from Enchiladas to $5 Pollo Bowls.[6]  At the May 12, 2015 board meeting, El Pollo Loco management presented that information to the board in the slide below:

---

[6]     Module 7 refers to the time frame of August 13, 2015-September 11, 2015.

---

# $5 Pollo Bowls Bring in
# Value and Price Relief

- Module 7, starting in August, changed from Enchiladas to $5 Pollo Bowls
  - Shrimp & Pollo Bowl
  - Caesar Pollo Bowl
  - Black Bean Pollo Bowl
  - Create Your Own Pollo Bowl
- Four week module with media supporting transaction-driving program

73.   This was information that insiders were aware of and hid from investors when they decided to sell over $132 million of El Pollo Loco stock.

## MATERIALLY FALSE AND MISLEADING
## CLASS PERIOD STATEMENTS

**May 2015 False and Misleading Statements and Omissions**

74.   On May 14, 2015, following the close of trading, El Pollo Loco announced its 1Q 2015 financial results for the three-month period ended April 1, 2015.

75.   The Company reported that its total 1Q 2015 revenue had increased 11.1% to $90.4 million, emphasizing that the revenue increase was driven by "[s]ystem-wide comparable restaurant sales [having grown] 5.1%, including a 3.5% increase for company-operated restaurants, and a 6.2% increase for franchised restaurants." The release quoted Sather as stating in pertinent part that the Company's "first quarter results . . . once again demonstrate[d] strong operating momentum

- 27 -

through solid sales and earnings growth." According to Sather, El Pollo Loco's "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to resonate with guests, as evidenced by [its] system-wide comparable restaurant sales growth of 5.1%." Sather also emphasized that the sales growth "extended [the Company's] track record to 15 consecutive quarters of positive comparable restaurant sales growth." The release stated in pertinent part that El Pollo Loco was still on track to report "[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%" for fiscal year 2015.

76.    During the conference call that followed the release later in the afternoon on May 14, 2015, Defendants made further positive statements about the Company's purportedly strong ongoing same store sales trends and ability to meet its 2015 guidance, while concealing that customer traffic was severely declining and that the 2Q 2015 guidance for same store sales growth was unachievable. Sather stated in his opening remarks in pertinent part:

> For the first quarter, we saw a 5.1% increase in system-wide comparable sales growth that consisted of a 3.5% increase for Company-operated restaurants and a 6.2% increase for franchise restaurants. The increase in comparable sales growth marked our 15th consecutive quarter of positive same-store sales and came on top of a 7.2% growth last year, for a strong two-year growth rate of 12.3%. . . .
>
> We believe our comp growth is continued evidence of the appeal of our brand, driven by our fresh, hand-crafted Mexican-inspired cuisine, ***compelling value proposition***, and fast service. Our menu allows us the flexibility to create new and unique menu items to complement our signature fire-grilled chicken and provide our customers with even more choices at a great value.

77.    In fact, El Pollo Loco's 1Q 2015 same store sales growth fell slightly below analyst expectations. El Pollo Loco experienced this relatively poor growth

1   because of the impact of Defendants' decision to remove the $5 combo menu and

2   increase menu prices, undertaken in February 2015.

3        78.    In an attempt to quell analyst concerns, Defendants blamed two one-time

4   events for the lighter than expected same store sales growth.  During the call Roberts

5   stated:

6        The comparable restaurant sales growth [for Company-owned

7        restaurants] was comprised of a 3.4% increase in average check and a

8        0.1% increase in traffic.

9           Note that the comparable restaurant sales growth was negatively

10       impacted by the timing of the New Year's holiday, which reduced same-

11       store transaction and sales by approximately 60 basis points for the

12       quarter.  Franchise revenue increased 9.2% year-over-year, to $5.7

13       million, largely due to an increase in franchise comparable restaurant

14       sales growth of 6.2%.

15       79.    During the conference call, Defendants were asked by an analyst to again

16  explain the slightly lighter increase in same store sales growth during 1Q 2015.  To

17  avoid causing concern, in response, Valle again maintained that it was due largely to

18  the timing of the New Year's holiday, adding that it was also partially caused by a

19  decreased emphasis on the Company's "under 500 calorie" menu offerings, something

20  he said the Company was reinvigorating and that he claimed would return same store

21  sales growth to the Company's lofty 2014 levels, stating in pertinent part as follows:

22       [Analyst:] Hello. Good afternoon. My question is on the comp

23       [*i.e.*, same/comparable store sales] trend that you saw in Q1 and that

24       you're pointing to in Q2.  And while I realize it's still within the

25       boundaries of your plan for the year, it is slower than what we've been

26       used to seeing from you, and was just wondering if you could comment

27       on why you think the trend line slowed versus what you saw in the prior

28       quarters into Q1 and now in Q2?

1        [Valle:] [A]s Larry had mentioned, *[because of] the New Year's*

2      *Eve timing* . . . the gain fell into the prior year and the pain fell into this

3      year.  He mentioned, there was a 60 basis point hit on comps for that.

4            *But also kind of the Under 500 line*, we focused on our shrimp

5      and moved away a little bit from the Under 500 line and that was a little

6      bit of a drag, as well.  We happen to be restaging that line in June, and

7      we believe we'll get back up to the strength that it had in the quarter of

8      last year.

9            Remember, again, how successful that line was in 1Q of 2014.

10     80.    Valle did not provide any other causes for poor 1Q 2015 results in

11 response to the analyst's question.

12     81.    Also, during the May 14, 2015 conference call an analyst asked whether

13 customer traffic was being affected by price resistance to the higher priced alternative

14 proteins (shrimp and carne asada) the Company had added to the menu.  Valle denied

15 that lower same store sales were due to lack of customer interest in higher priced

16 offerings and continued to conceal the cause of the dramatic declines in customer

17 traffic Defendants were seeing at the time, stating in pertinent part:

18        [Analyst:]  Could I follow up on that and understand, *is there a*

19      *dynamic you're seeing that there's some price resistance in the higher*

20      *price points*?  Remind us where the price points of the shrimp and the

21      carne are versus the core chicken products.  And is that the issue, or is it

22      more that people were just confused about the messages you were

23      getting, a couple of different LTOs at once, and maybe that wasn't

24      generating as much incrementally?

25        [Valle:] *It's more of the second one, John*.  We would normally,

26      as we would phase these in, we would sequence them over time.  We

27      would seed the shrimp.  We would grow the shrimp.  And then either 9

28      months to 12 months later, we would then bring the steak in after that.

So I think it was a little bit more of they both kind of converged together.  As a result, the visibility of value on our menu is not as strong as it used to be, at least for that five-week period of time.  ***Our value scores, though, are still high***.

\*        \*        \*

***It's really like the marketing communication thing***.  There's success with the steak.  There's success with the shrimp.  And how are we going to express that and balance that within our menu, as we move into the back end of this year and into 2016.

[Sather] Value scores remain still one of our best attributes.

82.     In fact, the Company's value score decreased 17 percentage points in the course of 1Q 2015.  Notably, none of the slides Valle presented at the May 12, 2015 board meeting suggested anything like the marketing confusion theory he peddled to investors.

83.     Illustrating the importance of the matter, as analysts returned again and again to Defendants' explanation for poor 1Q 2015 and first half 2Q 2015 results, Defendants continued to mislead the public and claim that marketing confusion, and not price increases, were to blame for poor results:

[Analyst:] Okay.  Trying to think through that, because this is kind of a first in 15 years of following restaurants hearing about two proteins together impacting sales.  And I mean, I don't want to beat a dead horse, but the presentation, I mean, is there – if you move forward and you're moving to a multi-protein platform permanently over time, is there some way to present this to emphasize the value without kind of alarming the customer base?

[Valle:] Yes, I definitely think there is.  Again, a lot of this is, when we put it out there, we see acceptance via mix.  ***This is going to be***

- 31 -

1253552_1

1    ***a marketing communication story, not a product story***.  And it's going

2    to be a sequencing story.

3    84.    An analyst asked Defendants why they thought El Pollo Loco's same

4    store sales would increase in the remainder of 2015.  Valle did not mention the most

5    prominent reason he himself had provided to the board at the May 12, 2015 meeting –

6    that El Pollo Loco would reintroduce $5 Pollo Bowl to bring price and value relief to

7    customers:

8        [Analyst:] And then just thinking about the back half, comps were

9        very strong in the back half.  When you talked about high volumes this

10       quarter and last quarter, you're going to face even tougher year-over-

11       year challenges.  Are you changing the way you're thinking about how

12       you're going to promote products to deal with those tougher laps, or do

13       you think this kind of resolves itself when you stop having multiple

14       messages?

15       [Valle:] I think we move to more focused messages as we come

16       out of this, the middle of this second quarter, as we get more focused.

17       The reason why I'm excited about the back end is our hand carved

18       salads, which will come out in another week, as Steve said.  Our

19       signature salads, if you remember, did extremely well last year.  These

20       are actually better salads in and around the neighborhood of the same

21       price points.  The hand carved salad, we carve off the bone and we slice

22       it, we put it on the salad.

23       This is a whole new platform for us.  So we're going to watch how

24       that works.  And you know how we test live, right, John?  We test live.

25       We understand how it performs in a five-week window.  And then we

26       bring it back in and we understand its role, either in the back half of this

27       calendar or into the 2016 calendar.  But the way that we do this chicken,

28

1    this is a whole new platform for us and could literally extend to a bunch

2    of different spots on the menu, like bowls, for example.

3         85.    Defendants repeated their false and misleading statements concerning the

4    Company's value menu in the 1Q 2015 Form 10-Q signed by Sather and Roberts on

5    May 15, 2015. The 1Q 2015 10-Q states:

6         We believe that we offer the quality of food and dining experience

7         typical of fast casual restaurants while providing the speed, convenience,

8         and value typical of traditional quick service restaurants ("QSRs"), a

9         combination that we call "QSR+" and that provides a value-oriented fast

10        casual dining experience.

11        86.    Defendants knew their statements concerning the causes of poor 1Q 2015

12   and beginning of 2Q 2015 results were misleading. In truth, El Pollo Loco's poor 1Q

13   2015 and beginning of 2Q 2015 results were caused by the fact that higher menu

14   prices and lower menu value had driven away its customers, as further set out at ¶¶66-

15   72 above and ¶¶105-108 below. Despite falsely blaming the New Year's holiday and

16   marketing confusion for declining traffic and sales, Sather and Valle both knew that it

17   was really higher menu prices that were significantly impacting traffic and same store

18   sales growth. In fact, pricing and value were causing declining traffic and sales, and

19   were specifically discussed at the May 12, 2015 board presentation. The presentation

20   shows prices were increasing and traffic and sales were decreasing. ¶¶66-68. One of

21   the slides even states that the new Module 2 pricing items "[h]as led to lower total

22   sales from pricing." ¶67. Nonetheless, when an analyst specifically asked if there

23   was resistance due to the higher price points or if the reason was because of marketing

24   confusion, Valle misleadingly blamed marketing confusion, omitting the effects of

25   pricing and lower value. ¶81.

26        87.    Because the Company has credited its success to value pricing and what

27   it calls QSR+ positioning, Valle and Sather made sure to misleadingly state that the

28   Company's value score was one of its best attributes and remained high. ¶81. The

- 33 -

same misleading representation is made in the 1Q 2015 10-Q signed by Sather and Roberts on May 15, 2015.  But the internal documents that Valle presented to the board just two days prior tell a different story.  Those documents specify that "[v]alue [s]cores [h]ave [d]ropped" – by 17 percentage points.  ¶71.  In fact, the documents show that the value score dropped lower than it had been since 2011 and well below the QSR level.  *Id.*

88.    During the same conference call, Roberts informed investors that the Company expected 2Q 2015 same store sales growth to be on the low end of the 3% to 5% range:

> [W]e continue to expect full-year system-wide comparable restaurant sales growth of 3% to 5%.  That said, we do not expect our comparable restaurant sales increases to be evenly split among the remaining three quarters of 2015.  During the second quarter, we will be lapping a record high average unit volume quarter as a result of two of our most successful promotions, while simultaneously conducting extended tests of alternative proteins.  As a result, ***we will expect our second quarter comparable sales to be closer to the low end of the range***.

89.    On May 14, 2015, Roberts predicted at least 3% 2Q 2015 same store sales growth despite knowing that as recent as May 12, 2015, the internal plan was to merely hit 2.5%.  ¶70.  In fact, management presented a document to the board informing them that the Company was "[t]rending [b]elow [p]lan for Q2."  *Id.*  The document indicates that the new adjusted plan of 2.5% was even an ambitious prediction.  At the time, 2Q 2015 was already half completed, and the internal documents indicate that the first two periods of the quarter showed same store sales growth of a mere 2.0%, or about 3.1% below the original plan.  *Id.*

90.    Despite the second quarter trending at 3.1% below plan, management's public prediction of 2.5% assumed the third period of the second quarter would only

1   be 0.8% below plan or 3.4%. *Id.* Indeed, Roberts knew that 2Q 2015 same store sales

2   growth would not come close to reaching the 3% he publicly predicted.

3       91.    On May 19, 2015, just five days after misleadingly informing investors

4   that the New Year's holiday and a marketing mix-up – both one-time events – caused

5   lower than expected same store sales growth, Sather and Valle, the Controlling

6   Shareholder Defendants and other El Pollo Loco top executives and directors

7   suspiciously sold their personally held El Pollo Loco common stock for gross

8   proceeds of over $ 132.4 million.  The insiders made their Class Period transactions

9   only a week after management informed them at the May 12, 2015 board meeting that

10  increased prices and a lower QSR+ position was causing a decrease in traffic and

11  same store sales growth.  When they made their trades, the insiders knew or had

12  access to the following information that other investors did not have:

13      •    menu prices had shifted up significantly;

14      •    the increased menu prices caused transactions growth to slow to levels
15           lower than the Company had seen in four years;

16      •    the Company was no longer in high QSR+ position because its value
17           score dropped to a level lower than it had been in at least four years, and
18           well below QSR;

19      •    increased prices, and not marketing confusion, was causing lower total
20           sales;

21      •    sales were forecasted to be well below the 2Q 2015 plan; and

22      •    the internal plan for 2Q 2015 same store sales growth was an ambitious
23           2.5%, not the 3% – at a minimum – that investors were told.

24      92.    These insider sales were suspicious in amount and timing in light of the

25  fact that none of them had sold any shares since November 2014 and the sales were

26  not made pursuant to any 10(b)-5 trading plan.  The following chart describes the

27  insider sales:

28

- 35 -

| Seller | Shares Sold | Price | Remaining shares and immediately exercisable options | Percentage of shares and immediately exercisable options sold | Proceeds |
|---|---|---|---|---|---|
| Deft. Trimaran Pollo | 5,402,500 | $21.85 | 16,746,544 | 24% | $118,044,625 |
| Deft. Sather | 360,000 | $21.85 | 1,085,499 | 25% | $7,866,000 |
| Deft. Valle | 175,000 | $21.85 | 207,159 | 46% | $3,823,750 |
| Kay Bogeajis, Chief Operating Officer | 25,000 | $21.85 | 36,930 | 40% | $546,250 |
| Douglas Ammerman, Director | 45,822 | $21.80 | 8,272 | 85% | $998,920 |
| Samuel Borgese, Director | 11,645<br>17,200<br>25,249<br>54,094 | $21.85<br>$20.92<br>$21.00 | 34,547 | 61% | $254,443<br>$359,824<br>$530,229<br>$1,144,496 |
| TOTALS | 6,062,416 | | | | $132,424,041 |

93.     The entirety of Sather's and Valle's sales on May 19, 2015 were the result of exercising options.  Because of these options, Sather and Valle obtained this stock at prices ranging from $2.62 to $5.84 per share, a fraction of what other shareholders paid.

94.     Defendants' and other El Pollo Loco directors' stock sales were unusual in timing. Defendants had not sold any stock since certain El Pollo Loco insiders elected to participate in an underwritten offering taking place in November 2014 – their first and only stock sales.  At that time, Sather sold 17% of his shares (against 25% during the Class Period), Ammerman sold 18% of his shares (against 85% during the Class Period), Borgese sold 21% of his shares (against 61% during the Class Period), and Bogeajis sold 40% of her shares, the same as during the Class Period.

1   Valle had not sold any shares prior to the Class Period, yet sold 46% of his shares
2   after learning about El Pollo Loco's poor financial results.

3        95.    Defendants have not sold any shares since their Class Period stock sales.

4   **June 10 False and Misleading Statements and Omissions**

5        96.    On June 10, 2015, El Pollo Loco presented at William Blair's Annual
6   Growth Stock Conference.  During the conference Sather reiterated the Company's
7   QSR+ strategy, but concealed the severe decline in customer traffic the Company
8   restaurants were experiencing in 2Q 2015 due to the abandonment of the QSR+
9   pricing strategy.  During the conference Sather stated:

10          Now we not only provide great service and great atmosphere, but
11          we do it at a very compelling value.  The majority of our items are priced
12          between $5.00 and $7.00.  Our average per person spend is $6.04 as you
13          can see by the graph here.  ***That's just a little bit above the QSRs that***
14          ***you see to the left there, but well below the fast casual such as a***
15          ***Panera or a Chipotle or a Zoes***.

16          So we want to always maintain that value.  We don't want to get
17          up too high pricing towards the fast casual, and we always want to
18          maintain that speed with the convenience of the drive-through, etc.  ***So I***
19          ***think this is very important***.

20          If you look at our system-wide comps, we talked about the last 15
21          quarters of being positive same-store sales.  Very strong.  I think you can
22          see that what we've been doing over the last years is clearly resonating
23          with the consumer.

24        97.    Despite knowing that pricing and lower menu value was causing reduced
25   customer traffic and a negative impact on same store sales growth, and diminishing
26   the Company's ability to meet its 2Q 2015 same store sales growth guidance,
27   Defendants still concealed the truth from investors during the June 10, 2015 William
28   Blair conference.  Sather knew that 2Q 2015 same store sales growth would be below

1  the forecast given to investors.  ¶70.  He also knew that the Company was below the
2  QSR+ position he said was very important.  ¶71.

3  **THE TRUTH IS REVEALED**

4  98.    After the close of trading on August 13, 2015, the Company issued a
5  press release announcing its 2Q 2015 results for the three-month period ended July 1,
6  2015.  El Pollo Loco disclosed that contrary to Defendants' prior claims of being on
7  track to achieve 3%-5% same store sales growth on May 14, 2015, ***halfway through***
8  ***the quarter***, in reality, 2Q 2015 "[s]ystem-wide comparable restaurant sales [had only
9  grown] *1.3%, including a 0.5% decrease for company-operated restaurants*, and a
10  2.6% increase for franchised restaurants."  Also on August 13, 2015, the Company cut
11  its FY 2015 guidance for same store sales from 3%-5% to just 3% because of the
12  Company's significant miss on 2Q 2015 same store sales growth and the severe
13  decline in customer traffic that began in 1Q 2015 due to the loss of the Company's
14  price-conscious customers and abandonment of its QSR+ pricing strategy.

15  99.    In his opening remarks during the conference call held with investors that
16  afternoon, Sather confirmed that El Pollo Loco had only achieved "a 1.3% increase in
17  system-wide comparable restaurant sales growth that consisted of a 50 basis-point
18  decrease for Company-operated restaurants and a 2.6% increase for franchised
19  restaurants," conceding that "second-quarter results were impacted by the combination
20  of higher-priced offerings and a reduction of [the] value portion of [its] menu."  Sather
21  went on to elaborate, stating in pertinent part, as follows:

22  Specifically we ran sequential promotions featuring premium entrées
23  with shrimp and carne asada at the same time we were eliminating our
24  $5 Combo menu panel.  We believe this confluence of actions drove
25  reduced visits from some of our more value-oriented customers. . . .

26  In the third quarter, we re-launched the $5 Combo menu which
27  will remain in our restaurants full time to reinforce our value offering.
28  ***This allows us to return to our winning QSR+ strategy of introducing***

- 38 -

1    *exciting, new, premium Mexican entrees . . . to a base of underlying*
2    *value frequency drivers like our $5 combos*.

3    100.   During his opening remarks, Roberts further disclosed that the
4    "comparable restaurant sales decline of 0.5% . . . was comprised of a 3.9% decrease in
5    traffic partially offset by an increase in average check size of 3.4%."

6    101.   During the Q&A session, Sather and Roberts engaged in the following
7    discussion with a research analyst, conceding that the decrease in same store sales was
8    a trend being experienced throughout 2Q 2015 – which was halfway over by May 14,
9    2015 – and that it was driven in large part by Defendants' decision to eliminate the
10   Company's value-priced menu, including its highly popular $5 combo menu, from the
11   Company's menu boards in February 2015:

12          [Analyst:]  First question is about the comp trends that you saw in
13          Q2, and perhaps if there is a comment on what you're seeing in Q3.
14          Steve, could you elaborate on the factors you think are weighing on the
15          trend line?  And then, I know you mentioned removing the $5 panel, and
16          now bringing it back.  Is that one of the factors that's giving you
17          confidence that you could see better trends going forward? . . .

18          [Sather:]  Sure . . . .  Let me give you an overview, and then I'll
19          have Ed talk specifically on some of the things we've done in Q3.  First
20          of all, I think – kind of referred to it.  We lost the value focus on the first
21          half of 2015.  As you know, we employ a balance of a high/low pricing
22          strategy, and what I think happened is we temporarily overweighed this
23          to the higher-priced items.  To be more specific, we increased the price
24          on our $5 Combo meal.  We actually removed that panel from the . . .
25          menu board, and because that was in February – because of the higher
26          pricing.

27          Also, we increased the prices on our value menu, and specifically,
28          on another entrée line, which was important, the 5 under 500.  We

- 39 -

1    believe that really impacted our value customer.  When you then take on

2    top of that that we layered in the premium proteins, we first did shrimp

3    and then carne asada.  While we were happy with their performance, we

4    think that they really further drove that perception of higher prices with

5    the non-focus of value.  And, I'll [let Ed] comment on what we've done

6    in the start of third quarter to really counter that. . . .

7          [Valle:]  I think that's exactly right.  We launched the $5 combos,

8    David, or re-launched them.  To make – first of all, to put that panel back

9    up on the menu board and make it more prominent, and we're seeing

10   strong results from that.  That $5 combo panel will remain for the

11   balance of 2015.  We also re-launched the under 500 line, which we

12   spoke about briefly in the last call, that we are giving customers more

13   value in terms of not just variety, but also in terms of price range as well.

14   It's not back to its original level, but it's showing very solid growth as

15   we're looking at it.  So we feel pretty good about moving to trying to

16   stabilize the business and reengage our value customer.

17                              *       *       *

18         [Sather:]  David, you had another question?

19         [Analyst:]  Yes, the follow-up to that was – it sounds like you

20   alluded to it.  But, you're starting to see the business respond to the

21   changes you're making, and in your history, have you dealt with this

22   issue before in terms of losing that value customer and then winning

23   them back?  Some historical context there would be helpful.

24         [Sather:]  Yes, this is Steve.

25         I think in period seven, first period of Q3, we actually have the $5

26   pollo bowls to launch there, and then the next period the $5 combos and

27   the chicken and shrimp, **_and we saw the stabilization certainly of_**

28

1253552_1

1   *bringing that a very popular $5 pollo bowl item and now the $5 combos*

2   *on that.  So, we're seeing that stabilization*.

3         *Quite frankly, we had never taken something like that off the*

4   *menu board before*.  They've been on – we've had a very – there has

5   always been a value portion.  Either in $5 loco menu or a number of

6   what we call our snack items, and we've taken some price on those.

7       102.   Analysts were surprised by El Pollo Loco's revelations:

8         (a)   In an August 13, 2015 report, a William Blair analyst stated that

9   "[h]aving missed its forecast that was issued in mid-May, El Pollo Loco is clearly in

10   the penalty box with investors . . . .  [I]t will likely take a few quarters for investors'

11   trust to be regained . . . .  [W]e recognize that the company may remain in a 'show-

12   me' state pending the achievement of sustainably improved comp trends."

13         (b)   In an August 13, 2015 report, a Jefferies analyst stated that

14   "[a]lthough we thought [same store sales] would improve as 2Q went on, the focus on

15   premium items did not resonate with consumers to the extent to offset what appears to

16   be a drop-off in value-oriented traffic. . . .  We have been looking for a return to 4%

17   [same store sales growth] in the 2H at company-owned units, but it does not appear as

18   if the company will get there . . . ."

19         (c)   In an August 13, 2015 report, a Morgan Stanley analyst stated that

20   the "severe dropoff in traffic due to higher price points in 2Q calls into question [El

21   Pollo Loco's] ability to take pricing to offset future cost pressures, including looming

22   minimum wage hikes in CA and LA in '16 and beyond, as well as raise the average

23   check."

24       103.   In response to the above revelations, El Pollo Loco's stock price declined

25   by 20%, from its closing price of $18.36 per share on August 13, 2015 to $14.56 per

26   share on August 14, 2015, 33% below the price at which Defendants had just sold

27   $132 million of their own El Pollo Loco shares and 42% below El Pollo Loco's Class

28

- 41 -

1   Period high of $25.37 per share on May 15, 2015, erasing more than $410 million in

2   market capitalization.

3                          **POST CLASS PERIOD EVENTS**

4   104.   On September 23, 2016, a Verified Stockholder Derivative Complaint

5   was filed against El Pollo Loco, Sather, Roberts, Valle, Trimaran Pollo Partners, and

6   others in the Delaware Court of Chancery.  On March 17, 2017, Vice Chancellor J.

7   Travis Laster heard oral argument on the derivative defendants' motion to stay and

8   motion to dismiss.  The May 12, 2015 board presentation was introduced as an exhibit

9   and discussed extensively during the motion to dismiss hearing.  Many of the slides

10  from that presentation that are used herein to support an inference of scienter were

11  relied on by Vice Chancellor Laster to rule that the derivative complaint "specifically

12  highlights what is in the board book and why it supports an inference that the

13  statements made at the conference call were incorrect and that the defendants had

14  material information to the contrary."

15  105.   Vice Chancellor Laster noted that management understood there were at

16  least four problems in 1Q 2015, and menu pricing, including its effect on value, was

17  one of the problems.  Nonetheless, the Company only emphasized the other problems

18  when explaining the 1Q 2015 results and 2Q 2015 outlook.  As Vice Chancellor

19  Laster explained, "[s]o pricing and value is a key one here, even though it was de-

20  emphasized by management to the point of trying to almost explain it away."

21  106.   Vice Chancellor Laster pointed to specific documents from the May 12,

22  2015 board presentation that showed the Company intentionally de-emphasized

23  pricing and value despite knowing they were materially problems.  Vice Chancellor

24  Laster found that the slides set out at ¶¶66, 71, above, showed that there was a

25  significant drop in transaction growth that was tracked to the Company's value score.

26  107.   Vice Chancellor Laster also found that the slide set out at ¶67 "comes

27  right to the point.  'We've Seen a Decrease in M2 Pricing Items Sold – Has led to

28  lower total sales' – why? one might ask – 'from pricing,' [the slide] says."

108.    In denying the derivative defendants' motion to dismiss, Vice Chancellor Laster described the case against the defendants as follows:

> What this was was a serious problem.  It was a serious risk.  And so if you were going to take profits or hedge by taking substantial profits, now was a good time to do it, because there was significant and enhanced uncertainty and risk to the downside going forward that the market did not know about and which the senior executives de-emphasized during the call.  That still, to me, is a reasonably conceivable *Brophy* claim because you are using inside information, confidential information of the company to benefit yourself.

109.    And interpreting Defendants' argument that they could not sell shares before announcing 1Q 2015 results, Vice Chancellor Laster found:

> The fact that they had been locked up for a while and that this was the first time they could sell, assuming that's the case, as the defendants argue, to me, heightens the likelihood that there was an incentive to keep this information quiet until people could at least unload something.  I don't know if that will be proven or not.  But at the pleading stage, it's logical to me that if I hadn't been able to sell yet and I was coming up on my first chance to sell and there was bad stuff, I might want not to let the bad stuff get out to the market before I could at least sell some of my position.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

110.    At all relevant times, the market for El Pollo Loco securities was an efficient market for the following reasons, among others:

    (a)    El Pollo Loco's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- 43 -

1253552_1

(b)     The Company had more than 38 million shares outstanding as of August 6, 2015.  During the Class Period, on average, more than 960,000 shares of El Pollo Loco stock were traded on a daily basis, demonstrating a very active and broad market for El Pollo Loco stock and permitting a very strong presumption of an efficient market;

(c)     As a regulated issuer, El Pollo Loco filed periodic public reports with the SEC;

(d)     El Pollo Loco regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     El Pollo Loco was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period, and each of these reports was publicly available and entered the public marketplace;

(f)     There were several active market-makers in El Pollo Loco stock at all times during the Class Period; and

(g)     Unexpected material news about El Pollo Loco was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

111.   As a result of the foregoing, the market for El Pollo Loco securities promptly digested current information regarding El Pollo Loco from publicly available sources and reflected such information in El Pollo Loco's share prices. Under these circumstances, all purchasers of El Pollo Loco securities during the Class Period suffered similar injury through their purchase of El Pollo Loco securities at artificially inflated prices, and a presumption of reliance applies.

1253552_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE

112.   Plaintiffs are also entitled to the presumption of reliance under *Affiliated Ute Citizens v. U.S*., 406 U.S. 128 (1972), because Defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of material facts concerning the deterioration of customer traffic to El Pollo Loco restaurants that severely diminished the Company's ability to meet it same store sales growth guidance for 2Q 2015, which information Plaintiffs and the members of the Class would have wanted to have known and which would have caused investors to not have purchased shares of El Pollo Loco at the prices they traded at during the Class Period.

## LOSS CAUSATION

113.   During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted material information concerning El Pollo Loco's business fundamentals and engaged in a scheme to deceive the market.  Defendants knowingly misstated then-present sales trends in order to improve the market's perception of El Pollo Loco's worth, allowing Defendants to sell stock at fraud inflated prices.

114.   By artificially inflating and manipulating El Pollo Loco's share prices, Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, El Pollo Loco's share prices fell precipitously as the prior artificial inflation came out of the price.  As a result of their purchases of El Pollo Loco securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e*., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

115.   This is a class action on behalf of all purchasers of El Pollo Loco securities during the Class Period, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and

- 45 -

the families of the Defendants.  Class members are so numerous that joinder of them is impracticable.

116.   Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the prices of El Pollo Loco securities; and (e) the extent of and appropriate measure of damages.

117.   Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against El Pollo Loco
and the Individual Defendants**

118.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

119.   Throughout the Class Period, El Pollo Loco and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market prices of El Pollo Loco securities, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

120.   During the Class Period, El Pollo Loco and the Individual Defendants carried out a plan, scheme and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period, did: (a) artificially inflate and maintain the market prices of El Pollo Loco securities; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to

1    purchase El Pollo Loco securities at inflated prices; and (d) cause them losses when

2    the truth was revealed.  In furtherance of this unlawful scheme, plan and course of

3    conduct, El Pollo Loco and the Individual Defendants took the actions set forth herein,

4    in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All

5    Defendants are sued either as primary participants in the wrongful and illegal conduct

6    charged herein or as controlling persons as alleged below.

7        121.   In addition to the duties of full disclosure imposed on El Pollo Loco and

8    the Individual Defendants as a result of their affirmative false and misleading

9    statements to the investing public, El Pollo Loco and the Individual Defendants had a

10   duty to promptly disseminate truthful information with respect to El Pollo Loco's

11   operations and performance that would be material to investors in compliance with the

12   integrated disclosure provisions of the SEC, including with respect to the Company's

13   revenue and earnings trends, so that the market price of the Company's securities

14   would be based on truthful, complete and accurate information.  SEC Regulations S-X

15   (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

16       122.   El Pollo Loco and the Individual Defendants had actual knowledge of the

17   misrepresentations and omissions of material facts set forth herein or acted with

18   reckless disregard for the truth in that they failed to ascertain and disclose such facts,

19   even though such facts were either known or readily available to them.

20       123.   As a result of the dissemination of the materially false and misleading

21   information and failure to disclose material facts as set forth above, the market prices

22   of El Pollo Loco securities were artificially inflated during the Class Period.  In

23   ignorance of the fact that the market prices of El Pollo Loco securities were artificially

24   inflated, and relying directly or indirectly on the false and misleading statements made

25   knowingly or with deliberate recklessness by El Pollo Loco and the Individual

26   Defendants, or upon the integrity of the market in which the shares traded, Plaintiffs

27   and other members of the Class purchased El Pollo Loco securities during the Class

28

- 47 -

1   Period at artificially high prices and, when the truth was revealed, were damaged

2   thereby.

3       124.   Had Plaintiffs and the other members of the Class and the marketplace

4   known of the true facts, which were knowingly or recklessly concealed by El Pollo

5   Loco and the Individual Defendants, Plaintiffs and the other members of the Class

6   would not have purchased or otherwise acquired their El Pollo Loco shares during the

7   Class Period, or if they had acquired such shares during the Class Period, they would

8   not have done so at the artificially inflated prices they paid.

9       125.   By virtue of the foregoing, El Pollo Loco and the Individual Defendants

10  have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

11  **COUNT II**

12  **For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants and the**
13  **Controlling Shareholder Defendants**

14      126.   Plaintiffs repeat and reallege above paragraphs as though fully set forth

15  herein.

16      127.   The Individual Defendants and Controlling Shareholder Defendants acted

17  as controlling persons of El Pollo Loco within the meaning of §20(a) of the Exchange

18  Act as alleged herein.  By virtue of their controlling shareholder status (as detailed

19  herein at ¶¶23-30), executive positions, board membership status, stock ownership

20  and/or contractual relationships with El Pollo Loco as alleged above, the Individual

21  Defendants and Controlling Shareholder Defendants had the power to influence and

22  control and did, directly or indirectly, influence and control the decision making of the

23  Company, including the content and dissemination of the various statements which

24  Plaintiffs contend were false and misleading.  The Individual Defendants and

25  Controlling Shareholder Defendants were provided with or had access to the

26  Company's internal reports, press releases, public filings and other statements alleged

27  by Plaintiffs to be misleading prior to or shortly after these statements were issued,

28

- 48 -

1253552_1

1  and had the ability to prevent the issuance of the statements or cause them to be
2  corrected.

3      128.   In particular, the Individual Defendants and Controlling Shareholder
4  Defendants had direct involvement in and responsibility over the operations of the
5  Company and, therefore, are presumed to have had the power to control or influence
6  the particular transactions giving rise to the securities violations as alleged herein.

7      129.   By reason of such wrongful conduct, the Individual Defendants and
8  Controlling Shareholder Defendants are liable pursuant to §20(a) of the Exchange Act.
9  As a direct and proximate result of the Individual Defendants' and Controlling
10  Shareholder Defendants' wrongful conduct, Plaintiffs and the other members of the
11  Class suffered damages in connection with their purchases of the Company's
12  securities during the Class Period.

13  **COUNT III**

14  **For Violation of §20A of the Exchange Act**
**Against Defendants Sather and Valle and the**
15  **Controlling Shareholder Defendants**

16      130.   Plaintiffs repeat and reallege each and every allegation contained above
17  as if fully set forth herein.  Count III is brought pursuant to §20A of the Exchange Act
18  against Sather, Valle and the Controlling Shareholder Defendants, on behalf of
19  Plaintiffs who were damaged by Sather, Valle and the Controlling Shareholder
20  Defendants' insider trading.

21      131.   As detailed herein, Sather, Valle and the Controlling Shareholder
22  Defendants were in possession of material, non-public information concerning El
23  Pollo Loco.  Sather, Valle and the Controlling Shareholder Defendants took advantage
24  of their possession of material, non-public information regarding El Pollo Loco to
25  obtain millions of dollars in insider trading profits during the Class Period.

26      132.   Defendants Sather, Valle and the Controlling Shareholder Defendants'
27  sales of El Pollo Loco common stock were made contemporaneously with Plaintiffs'
28  purchases of El Pollo Loco common stock during the Class Period.

- 49 -

133.   For example, on May 19, 2015, Sather, Valle and the Controlling Shareholder Defendants sold the following shares of El Pollo Loco common stock for total proceeds of excess of $129 million:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Trimaran Pollo | 5/19/2015 | 5,402,500 | $21.85 |
| Sather | 5/19/2015 | 360,000 | $21.85 |
| Valle | 5/19/2015 | 175,000 | $21.85 |

134.   During the period from May 19, 2015 through June 2, 2015, the following Plaintiffs purchased the following shares of El Pollo Loco common stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Peter Kim | 5/19/2015 | 1,000 | $22.90 |
| Ron Huston | 5/19/2015 | 2,000 | $23.21 |
| Ron Huston | 5/29/2015 | 3,000 | $20.88 |
| Robert W. Kegley, Sr. | 6/02/2015 | 20,000 | $21.99 |

135.   Plaintiffs who purchased shares of El Pollo Loco common stock contemporaneously with sales by Sather, Valle and the Controlling Shareholder Defendants' suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of the Class, pray for judgment as follows:

A.   Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained

1    as a result of Defendants' wrongdoing, in an amount to be proven at trial, including

2    interest thereon;

3          C.      Awarding Plaintiffs and the Class their reasonable costs and expenses

4    incurred in this action, including counsel fees and expert fees; and

5          D.      Awarding such other and further relief as the Court may deem just and

6    proper.

7                                    **JURY DEMAND**

8          Plaintiffs demand a trial by jury.

9    DATED:  April 17, 2017               ROBBINS GELLER RUDMAN
                                            & DOWD LLP
10                                         RYAN A. LLORENS
                                           LAURIE L. LARGENT
11

12                                                s/ RYAN A. LLORENS
13                                              RYAN A. LLORENS

14                                         655 West Broadway, Suite 1900
15                                         San Diego, CA  92101
                                           Telephone:  619/231-1058
16                                         619/231-7423 (fax)

17                                         THE ROSEN LAW FIRM, P.A.
18                                         LAURENCE M. ROSEN
                                           355 South Grand Avenue, Suite 2450
19                                         Los Angeles, CA  90071
20                                         Telephone:  213/785-2610
                                           213/226-4684 (fax)
21

22                                         THE ROSEN LAW FIRM, P.A.
                                           PHILIP KIM
23                                         275 Madison Avenue, 34th Floor
24                                         New York, NY  10016
                                           Telephone:  212/686-1060
25                                         212/202-3827 (fax)

26                                         Co-Lead Counsel for Plaintiffs

27

28
                                            - 51 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

GOLDBERG LAW PC
MICHAEL GOLDBERG
13650 Marina Pointe Dr., Suite 1404
Marina Del Rey, CA  90292
Telephone:  800/977-7401
800/536-0065 (fax)

Attorneys for Plaintiffs

- 52 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 17, 2017.

s/ RYAN A. LLORENS
RYAN A. LLORENS

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  RyanL@rgrdlaw.com

1253552_1

## Mailing Information for a Case 8:15-cv-01343-DOC-KES Daniel Turocy v. El Pollo Loco Holdings, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Seth A Aronson**
  saronson@omm.com,LitigationCalendar@omm.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Amber L Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Zachary Marc Faigen**
  zack.faigen@skadden.com,Zack.Faigen@probonolaw.com

- **Winston Ping Hsiao**
  winston.hsiao@skadden.com

- **Alec Johnson**
  aljohnson@omm.com,skemp@omm.com

- **Jay B Kasner**
  jay.kasner@skadden.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Ryan A Llorens**
  ryanl@rgrdlaw.com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Jason D Russell**
  jason.russell@skadden.com,nandi.berglund@skadden.com,DLMLCLAC@skadden.com,Jessica.barcus@skadden.com,hillary.hamilton@skadden.com

- **Evan Jason Smith**
  esmith@brodsky-smith.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)