## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                    Date:  August 4, 2017

Title: DANIEL TUROCY, ET AL. V. EL POLLO LOCO HOLDINGS, INC., ET AL.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

Dwayne Roberts                              Not Present
Courtroom Clerk                             Court Reporter

ATTORNEYS PRESENT FOR              ATTORNEYS PRESENT FOR
PLAINTIFF:                                    DEFENDANT:
None Present                                  None Present

**PROCEEDINGS (IN CHAMBERS):   ORDER DENYING MOTION TO
DISMISS [83]**

Before the Court is Defendants El Pollo Loco Holdings, Inc.; Trimaran Capital
Partners; Trimaran Pollo Partners, LLC; Freeman Spogli & Co.; Stephen J. Sather;
Laurence Roberts; and Edward J. Valle's (collectively, "Defendants") Motion to Dismiss
the Consolidated Third Amended Class Action Complaint ("Motion") (Dkt. 83). The
Court finds this matter suitable for resolution without oral argument. Fed. R. Civ. P. 78;
L.R. 7-15. Having reviewed the papers and considered the parties' arguments, the Court
DENIES Defendants' Motion.

## I.    Background

In light of the procedural posture of this case, the Court takes as true the facts as
laid out in Plaintiff's Consolidated Third Amended Complaint ("CTAC") (Dkt. 74).

This is a putative securities fraud class action brought by Plaintiffs Robert W.
Kegley, Peter Kim, Dr. Richard J. Levy, Sammy Tanner, and Ron Huston (collectively
"Plaintiffs") under Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934
(the "Exchange Act"). CTAC ¶ 1.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                  Date: August 4, 2017

Page 2

The putative class consists of purchasers of the securities of El Pollo Loco
Holdings, Inc. ("El Pollo Loco" or the "Company") between May 15, 2015 and August
13, 2015 ("Class Period"). *Id.* Defendants are El Pollo Loco, certain of its directors and
officers, and the Company's controlling shareholders. *Id.* Generally, Plaintiffs allege
Defendants failed to disclose material facts and made materially false or misleading
statements as part of a scheme which caused the market prices of El Pollo Loco securities
to be artificially inflated during the Class Period. *Id.* ¶ 65.

**A. Facts**

**1.   El Pollo Loco's Menu Changes**

El Pollo Loco is a "quick service restaurant plus" ("QSR+" or "QSR Plus")
restaurant chain—a term adopted by El Pollo Loco to suggest that its restaurants have
both "quick service" and "fast casual" elements. *Id.* ¶¶ 2, 44. In other words, El Pollo
Loco offers "its customers the lower prices and convenience of fast food restaurants, such
as Kentucky Fried Chicken or Taco Bell, while also offering fresher, higher quality food
and service comparable to more expensive fast casual dining chains, such as Chipotle and
Rubios." *Id.* ¶ 45. As of December 31, 2014, the Company's restaurant system had 415
restaurants, over eighty percent of which were located in California. *Id.* ¶ 43. Given the
Company's self-appointed niche as a QSR+ chain, Plaintiffs allege that "menu pricing
was a crucial component of El Pollo Loco's QSR Plus positioning." *Id.* ¶ 49.

At the beginning of the Class Period, El Pollo Loco was "heavily exposed to rising
labor costs." *Id.* ¶ 53. The Company was dealing with a 25% increase in California's
minimum wage over a one-and-a-half year period. *Id.* To offset future labor costs, in
February, 2015, El Pollo Loco decided to remove the $5 combo meal from the
Company's menu boards, even though the combo meal was "a core component of its
QSR Plus positioning strategy and one of the key drivers of customer traffic to El Pollo
Loco restaurants." *Id.* ¶ 55. The Company also increased prices on other "value-priced"
menu items and changed its menu to offer higher priced non-chicken items, such as
shrimp and beef entrees. *Id.* ¶¶ 55, 60.

According to Plaintiffs, the Company's decision to eliminate the $5 combo meal
was "disastrous." *Id.* ¶ 57. Customer traffic to El Pollo Loco restaurants drastically
dropped, which negatively impacted the Company's same store sales growth. *Id.* ¶¶ 56–
57. However, rather than reveal to investors the truth about the Company's waning
customer traffic, Plaintiffs allege Defendants "issued a series of materially false and
misleading statements and omissions concerning the Company's 2Q 2015 sales and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                          Date: August 4, 2017

Page 3

customer traffic." *Id.* ¶ 65. Plaintiffs contend that these statements and omissions caused El Pollo Loco securities to be traded at artificially inflated prices, allowing Defendants to sell "more than one hundred and thirty million dollars of their personally held El Pollo Loco shares at fraud-inflated prices." *Id.*

### 2. Defendants' Roles

Defendants Stephen J. Sather ("Sather"), Laurence Roberts ("Roberts"), and Edward J. Valle ("Valle") (collectively, the "Individual Defendants") "ran El Pollo Loco as 'hands-on' managers, overseeing El Pollo Loco's operations and finances." *Id.* ¶ 28.

Defendants Trimaran Pollo Partners, L.L.C. ("Trimaran Pollo"), Trimaran Capital Partners ("Trimaran Capital"), and Freeman Spogli & Co. ("Freeman Spogli") (collectively the "Controlling Shareholder Defendants") have a "controlling ownership" of El Pollo Loco with "the power and influence to control El Pollo Loco" and "to cause the Company to engage in . . . violations and improper practices." *Id.* ¶ 37.

### a. Individual Defendants

Defendant Sather is the President and Chief Executive Officer ("CEO") of El Pollo Loco, and a member of its Board of Directors. *Id.* ¶ 24. He has extensive experience in the restaurant industry, including the casual dining and quick-service sectors. *Id.* While working at El Pollo Loco, CEO Sather created the Operation Dashboard, a real-time system which allows executives and management to track and monitor sales metrics, including comparable store sales. *Id.* Before and during the Class Period, CEO Sather spoke on El Pollo Loco's behalf in releases, conference calls, and signed SEC filings. *Id.*

Defendant Roberts is the Chief Financial Officer ("CFO") of El Pollo Loco. *Id.* ¶ 25. He has extensive experience in the restaurant industry and as an executive of a publicly held company. *Id.* Before and during the Class Period, CFO Roberts spoke on El Pollo Loco's behalf during conference calls with investors and signed SEC filings. *Id.*

Defendant Valle is the Chief Marketing Officer ("CMO") of El Pollo Loco. *Id.* ¶ 26. During the relevant time period, CMO Valle spoke on El Pollo Loco's behalf during conference calls. *Id.* He also presented a marketing agenda, including a "business overview," during the May 12, 2015 El Pollo Loco board meeting. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                              Date: August 4, 2017

Page 4

### b. Controlling Shareholder Defendants

Defendant Trimaran Pollo is owned by Trimaran Capital, a private asset management firm. *Id.* ¶ 31. Defendant Freeman Spogli is a private equity firm. *Id.* Following El Pollo Loco's July 2014 initial public stock offering ("IPO"), Trimaran Pollo and Freeman Spogli continued to collectively own more than seventy percent of El Pollo Loco's equity, and Trimaran Capital maintained the power to select El Pollo Loco's board members. *Id.* ¶ 32–34. Freeman Spogli and Trimaran Capital representatives account for four of El Pollo Loco's seven directors. *Id.* ¶ 34.

In November 2014, the Company commenced a second offering during which the Controlling Shareholder Defendants sold 5.6 million shares of their El Pollo Loco common stock. *Id.* ¶ 35. Following the secondary offering and until May 19, 2015, the Controlling Shareholder Defendants "maintained 60% of the Company's shares, sufficient for majority votes over all matters requiring stockholders votes, including election of directors." *Id.*

### 3. False and Misleading Statements

On May 12, 2015, CMO Valle gave a presentation to the Company's board that Plaintiffs allege revealed that the removal of the $5 combo meals, and the resulting increase in prices and loss of value, was having a negative, material effect on customer traffic and sales. *Id.* ¶¶ 66–73; *see* Board Presentation (Dkt. 84-2).

In addition, before and during the Class Period, Defendants "tracked and monitored El Pollo Loco same store sales through the Company's Operation Dashboard, which . . . provid[ed] immediate feedback to Defendants on nearly every aspect of the Company's business." CTAC ¶ 62.

On May 14, 2015, the day before the start of the Class Period, the Company reported a 5.1% increase in comparable store sales, including a 3.5% increase for company-operated restaurants, and a 6.2% increase for franchised restaurants, for the first quarter of fiscal year 2015 ("1Q 2015"). *Id.* ¶ 75.

The following statements, among others, were made in the Company's May 14, 2015 press release:

- CEO Sather stated: "first quarter results . . . once again demonstrate[d] strong operating momentum through solid sales and earnings growth."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                         Date: August 4, 2017

Page 5

- CEO Sather stated: "Crazy You Can Taste authentic Mexican inspired cuisine continue[d] to resonate with guests, as evidenced by [its] system-wide comparable restaurant sales growth of 5.1%."

- The press release also stated that El Pollo Loco was on track to report "[s]ystem-wide comparable restaurant sales growth of approximately 3.0% to 5.0%" for fiscal year 2015.

*Id.*

Following the May 14, 2015 press release, CEO Sather, CFO Roberts, and CMO Valle held a conference call with analysts. *Id.* ¶¶ 76, 78, 79. Plaintiffs allege that during this call Defendants concealed that customer traffic at the restaurants was decreasing as a result of the higher menu prices that resulted, in part, from the removal of the $5 combo meal. Instead, Defendants blamed the "lighter than expected sales growth" on the New Year's holiday and other unrelated menu changes, such as the removal of the under 500 calorie menu (also referred to as the Under 500 line). *Id.* ¶ 78–79. For example, Defendants made the following statements during this call:

- CFO Roberts stated: "Note that the comparable restaurant sales growth was negatively impacted by the timing of the New Year's holiday, which reduced same-store transaction and sales by approximately 60 basis points for the quarter."

- CMO Valle stated: "[A]s Larry had mentioned, [because of] the New Year's timing . . . the gain fell into the prior year and the pain fell into this year.  He mentioned, there was a 60 basis point hit on comps for that. But also kind of the Under 500 line, we focused on our shrimp and moved away a little bit from the Under 500 line and that was a little bit of a drag, as well. We happen to be restaging that line in June, and we believe we'll get back up to the strength that it had in the quarter of last year."

- CMO Valle also stated: "We would normally, as we would phase these in, we would sequence them over time. We would seed the shrimp. We would grow the shrimp. And then either 9 months to 12 months later, we would then bring the steak in after that. So I think it was a little bit more of they both kind of converged together. As a result, the visibility of value on our menu is not as strong as it used to be, at least for that five-week period of

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                      Date: August 4, 2017

Page 6

> time. Our value scores, are still high. . . . It's really like the marketing
> communication thing. There's success with the steak. There's success with
> the shrimp. And how are we going to express that and balance that within
> our menu, as we move into the back end of the year and into 2016."

*Id.* ¶¶ 78, 79, 81.

From information contained in the Board Presentation and the data contained in
Operation Dashboard, by May 14, 2015 Defendants allegedly knew that customer traffic
and same store sales growth was severely declining at El Pollo Loco restaurants due to
the elimination of the value-priced menu. However, Defendants concealed this
information from investors. *Id.* ¶¶ 65, 73. Thus, Plaintiffs allege that Defendants' May 14
statements about the Company's "strong ongoing same store sales trends and ability to
meet its 2015 guidance" were false and misleading because Defendants knew such results
were "unachievable." *Id.* ¶ 76.

Less than one month later, on June 10, 2015, CFO Sather presented on behalf of El
Pollo Loco at William Blair's Annual Growth Stock Conference. *Id.* ¶ 96. During the
conference, CEO Sather stated:

> Now we not only provide great service and great atmosphere, but we
> do it at a very compelling value. The majority of our items are priced
> between $5.00 and $7.00. Our average per person spend is $6.04 as
> you can see by the graph here. That's just a little bit above the QSRs
> that you see to the left there, but well below the fast casual such as a
> Panera or a Chipotle or a Zoes.

> So we want to always maintain that value. We don't want to get up
> too high pricing towards the fast casual, and we always want to
> maintain that speed with the convenience of the drive-through, etc.
> So I think this is very important.

> If you look at our system-wide comps, we talked about the last 15
> quarters of being positive same-store sales. Very strong. I think you
> can see that what we've been doing over the last years is clearly
> resonating with the consumer.

*Id.* (emphasis removed).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                    Date: August 4, 2017

Plaintiffs allege that when he made the above statement, "Sather knew that 2Q 2015 same store sales growth would be below the forecaset given to investors. He also knew that the Company was below the QSR+ position he said was very important." *Id.* ¶ 97.

### 4.   Alleged Insider Trading

On May 19, 2015—seven days after the Board Presentation and five days after the May 14 call—CEO Sather, CMO Valle, and the Controlling Shareholder Defendants (as well as other El Pollo Loco top executives and directors) sold their personally held El Pollo Loco common stock, receiving gross proceeds of over $132.4 million. *Id.* ¶ 91.

Trimaran Pollo sold 5,402,500 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $118 million. *Id.* ¶ 92. CMO Valle sold 175,000 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $3.8 million. *Id.* ¶¶ 92. CEO Sather sold 360,000 shares of El Pollo Loco common stock at $21.85 per share, receiving proceeds of over $7.8 million. *Id.* Other non-defendant top executives and directors sold 124,916 shares at prices ranging from $20.92 to $21.95 per share, receiving proceeds of over $2.6 million. *Id.* Plaintiffs do not allege sales by CFO Roberts.

Plaintiffs allege these sales were suspicious in timing and amount because "none of [the sellers had] sold any shares since November 2014 and the sales were not made pursuant to any 10(b)-5 trading plan." *Id.*

### 5.   The "Truth" Revealed in August 13, 2015 Statements

On August 13, 2015, the last day of the Class Period, the Company reported "[s]ystem-wide comparable restaurant sales [had only grown] 1.3%, including a 0.5% decrease for company-operated restaurants, and a 2.6% increase for franchised restaurants" for the second quarter of fiscal year 2015 ("2Q 2015"). *Id.* ¶ 98. The Company did not meet its 1Q 2015 system-wide comparable restaurant sales growth projection of approximately 3%–5%. *Id.* The Company therefore cut "guidance for same store sales" for the remainder of the 2015 fiscal year downward from 3%–5% to just 3%. *Id.*

That same day, CEO Sather, CFO Roberts, and CMO Valle held a conference call with analysts which, according to Plaintiffs, revealed the truth about the Company's false and misleading statements and omissions. For example

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                                          Date: August 4, 2017

Page 8

- CEO Sather stated, "second-quarter results were impacted by the combination of higher-priced offerings and a reduction of [the] value portion of [its] menu."

- CEO Sather stated, "In the third quarter, we re-launched the $5 Combo menu which will remain in our restaurants full time to reinforce our value offering. This allows us to return to our winning QSR+ strategy of introducing exciting, new, premium Mexican entrees . . . to a base of underlying value frequency drivers like our $5 combos."

- CFO Roberts stated, ". . . comparable restaurants sales decline of 0.5% . . . was comprised of a 3.9% decrease in traffic partially offset by an increase in average check size of 3.4%."

- CEO Sather stated, "Also, we increased the prices on our value menu, and specifically, on another entrée line, which was important, the 5 under 500. We believe that really impacted our value customer. When you then take on top of that that we layered in the premium proteins, we first did shrimp and then carne asada. While we were happy with their performance, we think that they really further drove that perception of higher prices with the non-focus of value."

- CMO Valle stated, "We launched the $5 combos, David, or re-launched them. To make—first of all, to put that panel back up on the menu board and make it more prominent, and we're seeing strong results from that. That $5 combo panel will remain for the balance of 2015. We also re-launched the 500 line, which we spoke about briefly in the last call, that we are giving customers more value in terms of not just variety, but also in terms of price range as well."

- CEO Sather stated, "I think in period seven, first period of Q3, we actually have the $5 pollo bowls to launch there, and then the next period the $5 combos and the chicken and shrimp, and we saw the stabilization certainly of bringing that a very popular $5 pollo bowl item and now the $5 combos on that. So, we're seeing that stabilization. Quite frankly, we had never taken something like that off the menu before."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                    Date: August 4, 2017

Page 9

*Id.* ¶¶ 99–101.

On August 14, 2015, El Pollo Loco's stock declined from its August 13, 2015 closing price of $18.36 per share to $14.56 per share. *Id.* ¶¶ 15, 103.

### B.  Procedural History

On January 29, 2016, Plaintiffs filed a Consolidated Class Action Complaint ("CAC") (Dkt. 47) alleging violations of: (1) Section 10(b) of the Exchange Act and Rule 10b-5 against El Pollo Loco and the Individual Defendants; (2) Section 20(a) of the Exchange Act against the Individual Defendants and the Controlling Shareholder Defendants; and (3) Section 20A of the Exchange Act against CEO Sather, CMO Valle, and the Controlling Shareholder Defendants. CAC ¶¶ 75–92.

On July 25, 2016, the Court granted Defendants' Motion to Dismiss ("July 25, 2016 Order") (Dkt. 58), dismissing Plaintiffs' CAC in its entirety. Plaintiffs were permitted to file an amended complaint, which they did on August 22, 2016. Consolidated Second Amended Complaint ("CSAC") (Dkt. 59). The CSAC alleged the same claims as the CAC. *See* CSAC.

On March 30, 2017, the Court granted Defendants' Motion to Dismiss the CSAC ("March 30, 2017 Order") (Dkt. 70), dismissing the CSAC in its entirety. Plaintiffs were again permitted to file an amended complaint, and they filed the operative complaint—the CTAC—on April 17, 2017. The CTAC alleges the same claims as the CAC and CSAC. *See* CTAC.

Defendants filed the instant Motion on May 17, 2017. Plaintiffs filed their Opposition on June 16, 2017 (Dkt. 89); Defendants filed their Reply on July 3, 2017 (Dkt. 90).

### II.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                    Date: August 4, 2017

Page 10

at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

An allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The "circumstances" required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other details of the alleged fraudulent activity."). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (quoting *In re Glenfed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). This heightened pleading standard ensures "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Under the heightened pleading standards of the Private Securities Litigation Reform Act ("PLSRA"), a securities fraud complaint must identify each alleged misrepresentation, specify the reasons it is misleading, and state with particularity facts giving rise to a strong inference that the defendant who made the misrepresentation acted with fraudulent intent. *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 321 (2007).

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the incorporation by reference doctrine, a court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir. 2002). A court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                    Date: August 4, 2017

Dismissal with leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Dismissal without leave to amend is appropriate only when a court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

## III. Discussion

Defendants move to dismiss Plaintiffs' entire CTAC with prejudice on the grounds that Plaintiffs fail to state a claim under § 10(b), 20(a), or 20A and that, in general, the CTAC does nothing to remedy the Court's concerns and conclusions regarding Plaintiff's dismissed CSAC. *See generally* Mot.

### A. Section 10(b) and Rule 10b-5 Claims

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege facts showing (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Ins. v. Broudo*, 544 U.S. 336, 341 (2005).

The Court previously dismissed Plaintiffs' § 10(b) and Rule 10b-5 claims because it was "not convinced Defendants omitted any information or warnings to investors that would be misleading." July 25, 2016 Order at 16. Specifically, the Court found that Plaintiffs failed to show that "Defendants' failure to mention the $5 combo meal" was misleading. *Id.* at 15. On March 20, 2017, the Court again dismissed Plaintiffs' § 10(b) and Rule 10b-5 claims, finding that "the CSAC fail[ed] to adequately plead that Defendants knew specific information regarding the impact of the $5 combo meal on El Pollo Loco's performance, such that Defendants' statements on May 14, 2015 or June 10, 2015 were materially false or misleading." March 20, 2017 Order ("March Order") at 18.

As in Defendants' previous two motions to dismiss, in the instant Motion Defendants focus on falsity and scienter.[1]

---

[1] Defendants also make a brief argument regarding causation, which the Court addresses in Section III(A)(1)(b)(ii) below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                        Date: August 4, 2017

Page 12

### 1.  Whether the CTAC Adequately Pleads Falsity

"To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). This is because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* As for allegedly false statements, "[w]hile a statement need not be literally false to be actionable under the securities laws, it must at least be reasonably susceptible to an interpretation that is contrary to the true state of affairs." *In re Foxhollow Techs., Inc. Sec. Litig.*, 359 F. App'x 802, 805 (9th Cir. 2009) (citing *Brody*, 280 F.3d at 1006).

In its March Order, the Court found that "the CSAC fail[ed] to adequately plead that Defendants knew specific information regarding the impact of the $5 combo meal on El Pollo Loco's performance, such that Defendants' statements on May 14, 2015 or June 10, 2015 were materially false or misleading." March Order at 18. Specifically, the Court found that the CSAC failed to "plead the existence of information in existence at the time of the May 14 call showing that the removal of the $5 combo meal was a material cause of El Pollo Loco's poor performance." *Id.* at 17.

In an effort to address this concern, Plaintiffs point to the May 12 Board Presentation, which contains slides describing the Company's sales growth, transaction rate, and other markers for 1Q 2015 and early 2Q 2015. *See* CTAC ¶¶ 66–73. Notably, May 12 was near the middle of 2Q 2015. *Id.* ¶ 101.

For the Company's statements to be misleading, Defendants must have "actually known specific information" that was "at odds with the state of affairs they presented to investors, such that restatement or additional disclosure was required." *In re Netflix, Inc. Securities Litigation*, 923 F. Supp. 2d 1214, 1223 (N.D. Cal. 2013). Plaintiffs allege that Defendants knew the following facts that investors did not have (and were not given):

- menu prices had shifted up significantly;

- the increased menu prices caused transactions growth to slow to level lower than the Company had seen in four years;

- the Company was no longer in high QSR+ position because its value score dropped to a level lower than it had been in at least four years, and well below QSR;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                          Date: August 4, 2017

Page 13

- increased prices, and not marketing confusion, was causing lower total sales;

- sales were forecasted to be well below the 2Q 2015 plan; and

- the internal plan for 2Q 2015 same store sales growth was an ambitious 2.5%, not the 3%—at a minimum—that investors were told.

CTAC ¶ 91.

The CTAC alleges three categories of false and/or misleading statements and omissions: "(1) statements about the causes of the slowdown in sales growth and customer traffic in 1Q 2015 and 2Q 2015; (2) statements about the Company's value scores and its QSR+ positioning; and (3) statements about the 2Q 2015 same store sales growth." Opp'n at 13. The Court will address each type of statement in turn.

### a. Statements About the Causes of the Slowdown in Sales Growth and Customer Traffic in 1Q 2015 and 2Q 2015

Plaintiffs argue that Defendants Roberts and Valle's statements during the May 14 conference call were misleading. Specifically, Plaintiffs contend that Roberts and Valle "misleadingly blamed 1Q 2015's lighter than expected sales growth (3.5%) and customer traffic (0.1%) at Company-owned stores on the timing of New Year's Eve and decreased emphasis [on the] Under 500 menu and nothing else." Opp'n at 13.

Plaintiffs argue that the May 12 Board Presentation gave Defendants information specifically linking the Company's poor performance to the price increases and the removal of the $5 combo menu. Opp'n at 15. Valle gave the Board Presentation to the Company's board, including Sather and representatives of the Controlling Shareholder Defendants, on May 12, 2015. *Id.* at 5; CTAC ¶ 66. The Board Presentation showed that menu prices had shifted up significantly and transaction growth was very low. CTAC ¶ 66. One slide showed that between January 29, 2015 and March 6, 2015, the Company experienced "lower total sales *from pricing*." *Id.* ¶¶ 67, 68 (emphasis added). Plaintiffs allege that "the negative impact of increased menu prices on sales was so significant that [the Company] had to reengineer its product line" by making the $5 Pollo Bowl the August 13, 2015 to September 11, 2015 promotional item. *Id.* ¶ 72. The Board Presentation also declared that sales during the beginning of 2Q 2015 were significantly lower than planned, and were projected to remain lower than planned. *Id.* ¶ 69. One slide, entitled "However, We Are Trending Below Plan for Q2," shows that same store sales

growth was forecast at 2.5% despite the Company's internal plan that it be at 4.7%. *Id.* ¶ 70.

Two days after the Board Presentation, while on the May 14 conference call with analysts, Valle answered an analyst's question about possible negative customer reaction to higher prices by blaming "the marketing communication thing." *Id.* ¶ 81. None of the slides in the Board Presentation suggested that there was marketing confusion, or that such confusion was a cause of the customer traffic decline. Valle also stated that the solution to the sales impact problem was "going to be a marketing communication story, not a product story." *Id.* ¶ 83. During the call, an analyst specifically asked whether the "price points of the shrimp and carne [asada] . . . versus the core chicken products" were the problem, or whether the problem was "that more people were just confused about the messages [they] were getting." Q1 El Pollo Loco Holdings Inc Earnings Call ("May Call") (Dkt. 51-2 at 9) at 16. Although he acknowledged that "the visibility of value on our menu is not as strong as it used to be," Valle answered that "[i]t's more of the second one." *Id.* He then repeated "It's really like the marketing communication thing." *Id.* Later, when asked whether there was a way to emphasize value on the menu without alarming the customer base, Valle again repeated "[t]his is going to be a marketing story." *Id.* at 19. However, the solutions Valle presented to the Company's board two days earlier included "unbundling" combos to "show lower prices" and, critically, bringing back $5 Pollo Bowls to "bring in value and price relief." Board Presentation at 47, 48.

Also on the May 14 call, an analyst asked why Defendants thought the Company's same store sales would increase in the remainder of 2015 (*i.e.* the remainder of 2Q, and 3Q and 4Q). Valle responded at length, but did not mention his plan—as stated in the Board Presentation—to reintroduce the $5 Pollo Bowls. CTAC ¶ 84.

Plaintiffs point out that the shrimp and carne asada were promoted at the beginning of 2Q, meaning that concurrent promotion of those proteins could not have caused the poor 1Q 2015 performance. Opp'n at 16. Defendants do not appear to contest this assertion. To the extent this is true, Defendants' statements attributing poor 1Q 2015 performance to marketing confusion surrounding the promotion of the new proteins were misleading. In addition, the Board Presentation makes no mention of marketing confusion as a cause of the poor 1Q 2015 performance, or as a cause of the lowered forecasts for 2Q 2015.

Also during the call, an analyst specifically asked about the trends in 1Q 2015 and the early part of 2Q 2015. May Call at 14. Valle listed the "New Year's Eve timing" and "mov[ing] away from the Under 500 line" as the two things that "weighed down on the

first quarter." *Id.* He did not mention the removal of the $5 combo meals, or the fact that he was aware that the higher menu prices were the cause of the downward trend in sales and transactions.

In its July 25, 2016 Order, the Court pointed out that the Company disclosed its lower-than-expected growth during the May 14 call and "made it clear it was evaluating the impact of its higher priced menu items, and it expected its comparable restaurant sales growth to drop." July 25, 2016 Order at 16. In its March Order, the Court found that Plaintiffs failed to plead "specific facts showing 'Defendants knew a material cause of the poor Early 2015 Results was the removal of the $5 combo menu.'" March Order at 17.

Now, the allegations support the contention that the Board Presentation linked the menu price increase with the slowed transaction growth and with the lower total sales. CTAC ¶¶ 66, 67. Although the Board Presentation was optimistic about the Company's ability to meet planned targets in 3Q and 4Q 2015, it explicitly stated that the Company was "trending below plan" for 2Q 2015. *Id.* ¶¶ 69, 70. Indeed, charts within the Board Presentation informed the board that sales were slowing and that there were "lower total sales from pricing." Board Presentation at 30, 34.

When the Company's May 14 statements are viewed in light of the May 12 Board Presentation, it becomes apparent that known causes of the 1Q and 2Q 2015 poor performance—*i.e.* the higher menu prices resulting from the removal of cheaper items and addition of pricier items—were being explained away or minimized. The fact that menu pricing was *mentioned* during the May 14 call is not dispositive, *see* Reply 7–8; rather, the Court must determine if there were omissions or misleading statements that "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. A statement is material for purposes of securities law if there is a "substantial likelihood that, under all the circumstances, [it] would have assumed actual significance in the deliberations of the reasonable shareholder." *In re Foxhollow*, 359 F. App'x at 805 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The Court finds that the statements made during the May 14 call affirmatively created the impression that consumer confusion—and to a lesser extent the New Year's Eve holiday and the changes to the Under 500 line—were the causes of the decline in customer traffic and sales. In fact, Valle knew that the pricing was a direct cause, including the removal of the value-priced menu. Further, the statements were material because a reasonable shareholder would consider the causes of the Company's dropping

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                     Date: August 4, 2017

Page 16

indicators, and the proposed solutions, when making investment decisions. Here, the known causes of the declines were brushed off, minimized, or omitted altogether.

Therefore, the Court finds that Plaintiffs have sufficiently alleged that the May 14 earning call statements affirmatively created an impression of a state of affairs that differs in a material way from the one that actually existed at the time of the call. *Id.*

**b. Statements About the Company's Value Scores and its QSR+ Positioning**

Plaintiffs also allege that during the Class Period, Defendants made statements that misled investors about the value in the Company's menu and its "value scores"—a measurement used by the Company to track its QSR+ positioning. Opp'n at 17.

Specifically, Plaintiffs argue that the following statements were misleading:

- **May 14 Statement Made By Sather** – "We believe our comp growth is continued evidence of the appeal of our brand, . . . driven by *our compelling value proposition* . . .[;]

- **May 14 Statements Made by Sather and Valle in Response to Analyst Questions** – In assuring investors that customers were not negatively reacting to higher prices, Valle and Sather, respectively responded: "[o]ur value scores, though, are still high," and "[v]alue scores remain still one of our best attributes[;]"

- **El Pollo Loco's 1Q 2015 SEC Form 10-Q Filed May 15, 2015** – Signed by Sather and Roberts, the Company continued to identify itself as a QSR+, without disclosing that its value scores were plummeting at the time, putting its QSR+ position in jeopardy[; and]

- **June 10, 2015 Statement Made By Sather** – During an investor conference call, Sather confirmed El Pollo Loco's QSR+ positioning and emphasized its importance to the Company.

Opp'n at 17 (emphases in original). Plaintiffs argue that the above statements were false and misleading when made, because "Defendants know from the Board Presentation that El Pollo Loco's value score had decreased a stunning 17 percentage points in 2015, and was continuing to decline." *Id.* at 18. Indeed, one slide in the Board Presentation shows

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                    Date: August 4, 2017

Page 17

that the Company's value score was twelve points lower than the QSR position by May 2015. CTAC ¶ 71. Part of the Company's solution, as presented by Valle, was to add $5 Pollo Bowls to the menu in August and September 2015 to "bring in value and price relief." *Id.* ¶ 72.

Plaintiffs specifically focus on the fact that Defendants did not disclose that the Company's value score dropped seventeen points and that the Company was no longer in the QSR+ position.

First, Defendants argue that although they did not disclose "a number," they did disclose "that customer perception of value had taken a hit" when Valle stated that "visibility of value on our menu is not as strong as it used to be." Reply at 12 (quoting May Call at 16). Defendants also suggest that there is no evidence that Valle was referring to the "NPD" tracking study cited in the Board Presentation when he stated that "value scores, though, are still high." *Id.* (citing May Call at 16); *see* Board Presentation at 31. Instead, Defendants suggest that he was referring to "a value score not mentioned in the Board Presentation," or perhaps "a study done by [the Company's] primary marketing vendor, MarketForce." Reply at 12.

Drawing reasonable inferences in favor of Plaintiffs, as required at the motion to dismiss stage, the Court infers that during the May 14 call Valle was referring to the value scores presented to the board in the slide he created entitled, "Value Scores Have Dropped." *See* Board Presentation at 31. To the extent that Valle was referring to the scores analyzed by Marketforce, the Court's analysis is not affected. *See id.* at 32 (slide entitled "MarketForce Value Scores Confirm Trend," confirming the trend of dropping value scores).

In light of the Board Presentation, Valle and Sather's May 14 statements are misleading because the value scores were in fact not high. Rather, they had dropped below the QSR level, and were the lowest they had been five years. Board Presentation at 31. This trend was "confirm[ed]" by the Company's "primary marketing vendor." *Id.* at 32. In addition, the number of items sold had dropped significantly, *id.* at 34, and transaction growth had "slowed" dramatically, *id.* at 30. Thus, when during the May 14 call Sather referred to the Company as having "a compelling value proposition" and Valle said that "visibility of value on our menu is not as strong as it used to be," they were significantly understating the serious decline in the Company's value scores. The Court finds that these statements affirmatively created an impression that the Company's value scores were strong, or at least remained in the Company's target QSR+ range, when

this was not so. Thus, while these statements may not have been literally false, the Court finds that they are actionable at this stage.

Moreover, the Court finds the statements material. Again, a statement is material for purposes of securities law if there is a "substantial likelihood that . . . [it] would have assumed actual significance in the deliberations of the reasonable shareholder." *In re Foxhollow*, 359 F. App'x at 805 (quoting *TSC Indus., Inc.*, 426 U.S. at 449). The Court finds that whether or not the Company maintained its self-appointed QSR+ status is material. The Company clearly believed that the QSR+ label was central to its identity, and promoted itself as a QSR+ brand at every available opportunity. *See* El Pollo Loco Holdings, Inc. Announces Second Quarter 2015 Financial Results (Dkt. 51-2 at 21–27); LOCO - Q2 2015 El Pollo Loco Holdings Inc Earnings Call ("August Call") (Dkt. 51-2 at 29–39) at 31; Board Presentation at 31; El Pollo Loco 1Q 2015 SEC Form 10-Q, filed May 15, 2015 (Dkt. 93-1) at 18; LOCO - El Pollo Loco Holdings Inc. at William Blair Annual Growth Stock Conference (Dkt. 51-2 at 41–9) at 43, 44; El Pollo Loco Holdings, Inc. Announces Second Quarter 2015 Financial Results (Dkt. 51-2 at 22). A reasonable shareholder would find it significant that the Company's value scores had fallen not only below its own self-imposed QSR+ goals, but also below the lower QSR level.

Second, the Court does not find that the Form 10-Q statement is misleading. In context, the 10-Q appears to be describing the Company's self-identification as a QSR+, and not affirmatively suggesting that the Company, at that moment in time, had value scores at the QSR+ level. Thus, the Court does not find this statement "create[ed] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

Third, Defendants argue that Sather's statements at William Blair's June 10, 2015 Annual Growth Stock Conference are not actionable. Mot. at 22–24. Plaintiffs allege that Sather made the following statements, which "concealed the severe decline in customer traffic the Company restaurants were experiencing in 2Q 2015 due to the abandonment of the QSR+ pricing strategy[:]"

> Now we not only provide great service and great atmosphere, but we do it at a very compelling value. The majority of our items are priced between $5.00 and $7.00. Our average per person spend is $6.04 as you can see by the graph here. ***That's just a little bit above the QSRs that you see to the left there, but well below the fast casual such as a Panera or a Chipotle or a Zoes***.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                        Date: August 4, 2017

Page 19

> So we want to always maintain that value. We don't want to get up too high pricing towards the fast casual, and we always want to maintain that speed with the convenience of the drive-through, etc. ***So I think this is very important***.
>
> If you look at our system-wide comps, we talked about the last 15 quarters of being positive same-store sales. Very strong. I think you can see that what we've been doing over the last years is clearly resonating with the consumer.

CTAC ¶ 96 (emphasis in original).

"While a statement need not be literally false to be actionable under the securities laws, it must at least be reasonably susceptible to an interpretation that is contrary to the true state of affairs." *In re Foxhollow*, 359 F. App'x at 805 (citing *Brody*, 280 F.3d at 1006). Here, Sather's statements are reasonably susceptible to the interpretation that the Company remained in its QSR+ status. He points to the average check per person as "a little bit above the QSRs," and states that the Company "wants to maintain that value." These statements suggest that the Company was, at that time, in the QSR+ position. The Board Presentation makes it clear that that was not the case less than a month before these statements were made, and Defendants have provided no evidence the Company's value score had changed. *See* Board Presentation at 31. Thus, at the motion to dismiss stage, the Court draws an inference in favor of Plaintiffs. Further, Sather's statement that "what we've been doing over the last years is clearly resonating with the consumer" is arguably false as to 1Q 2015 and early 2Q 2015, when sales growth, transactions, and value scores were low and/or dropping. Finally, for the same reasons explained in this section above, the Court finds the June 10 statements regarding the QSR+ positioning to be material.

To the extent Plaintiffs allege that information was omitted from the above statement, the issue is whether the omission created an impression of a state of affairs that differs in a material way from the one that actually existed. The Court finds that Sather's failure to specifically mention the removal of the $5 combo meal neither misleading nor material in the context of the June 10 statement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                          Date: August 4, 2017

Page 20

### i.    Whether June 10 Statement May Support a Claim Against Defendants Roberts or Valle

Defendants suggest that because the June 10 statement is not attributable to Roberts or Valle, it cannot support a claim against those defendants. Reply at 16 n.4.

"The Ninth Circuit has not definitively addressed, and has left open, 'whether, in some circumstances, it might be possible to plead scienter under a collective theory.'" *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1354 (C.D. Cal. 2014) (quoting *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 744–45 (9th Cir. 2008)). Nevertheless, "[c]ourts within the Ninth Circuit have . . . largely concluded that group pleading is not compatible with the PSLRA's requirements." *In re American Apparel, Inc. Shareholder Litigation*, No. CV 10–6352 MMM (JCGx), 2013 WL 174119, *25 (C.D. Cal. Jan. 16, 2013) (collecting cases). Indeed, this Court has found that

> Although the Ninth Circuit has yet to squarely address the issue, the majority of district courts within the Circuit to confront the group pleading doctrine post-*Tellabs* have decided that the doctrine did not survive. . . . The Central District of California, in particular, appears to be unanimous in this conclusion. . . . This Court hereby joins the chorus of voices rejecting the continued viability of the group pleading doctrine.

*Petrie v. Electronic Game Card, Inc.*, Case No. 10-0252-DOC-RNBx, 2011 WL 165402, at *3 (C.D. Cal. Jan. 12, 2011) (referencing *Tellabs Inc.*, 551 U.S. at 321).

Plaintiffs are not clear about whether they rely on a collective theory of scienter as to the June 10 statement or any other statements. Nevertheless, the Court remains convinced that such a theory is no longer viable in the PLSRA context, and holds that the June 10 statement—made verbally by Sather—cannot support a claim against either Roberts or Valle.

### ii.    Whether Plaintiffs Have Adequately Alleged Causation as to Statements Regarding Value Scores

Defendants argue that the allegedly misleading statements about the Company's value scores, discussed above, are irrelevant to Plaintiff's claims because "there is no allegation that those facts were later revealed during the event that allegedly caused

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                                    Date: August 4, 2017

Page 21

Plaintiff's loss." Mot. at 22. Specifically, Defendants argue that Plaintiffs cannot allege the statements discussed above caused the August 13 stock drop, because "the value scores were not disclosed or discussed in any way on August 13." Reply at 12–13.

A securities fraud plaintiff "shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). The plaintiff must "allege[] that a material misrepresentation or omission kept the share price artificially inflated and that as a result of a corrective disclosure, the share price fell." *Greenberg v. Cooper Companies, Inc.*, No. 11-cv-05697 YGR, 2013 WL 2403648, at *14 (N.D. Cal. May 31, 2013). *See also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 344 (2005) (noting with approval the "judicial consensus" that a securities fraud defendant "becomes liable to a relying purchaser for the loss the purchaser sustains when the facts become generally known and as a result share value depreciates" (internal quotations omitted)); *Bielousov v. GOPRO, Inc.*, No. 16-cv-6654-CW, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017) (quoting *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014)).

In the CTAC, Plaintiffs allege that during the August 13 call, Sather and Roberts "conced[ed] that the decrease in same store sales was a trend being experienced throughout 2Q 2015—which was halfway over by May 14, 2015." CTAC ¶ 101. Plaintiffs further allege that Sather and Roberts conceded that the trend was "driven in large part by Defendants' decision to eliminate the Company's value-priced menu." *Id.* In addition, Sather allegedly conceded that "second-quarter results were impacted by the combination of higher-priced offerings and a reduction of [the] value portion of the menu." *Id.* ¶ 99; *see* August Call at 3. Plaintiffs also allege that Sather acknowledged that the Company had slipped from its self-appointed QSR+ status and abandoned the QSR+ pricing strategy. CTAC ¶ 98–99; *see* August Call at 3.

Finally, Plaintiffs allege that "[i]n response to the above revelations, El Pollo Loco's stock price declined. . . ." CTAC ¶ 103. That is, "[w]hen Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, El Pollo Loco's share prices fell precipitously as the prior artificial inflation came out of the price." *Id.* ¶ 113. Plaintiffs allege that analysts observed that after the August 13 call "it will take a few quarters for investors' trust to be regained" and "El Pollo Loco is clearly in the penalty box with investors." *Id.* ¶ 102. In addition, an analyst reported that the "severe dropoff in traffic due to higher price points in 2Q calls into question [El Pollo Loco's] ability to take pricing to offset future cost pressures. . . ." *Id.* (insertion in original).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                          Date: August 4, 2017

Page 22

Accordingly, Plaintiffs have "alleged that a material misrepresentation or omission kept the share price artificially inflated and that as a result of a corrective disclosure, the share price fell." *Greenberg*, 2013 WL 2403648, at *14. Thus, Plaintiffs have sufficiently alleged that the market learned of and reacted to the corrective disclosure, as opposed to "merely reacting to reports of the defendant's poor financial health generally." *Bielousov*, 2017 WL 3168522, at *7 (finding causation sufficiently alleged where plaintiff alleged stock dropped in response to revelation of previously-concealed insufficient supply of products and a product recall, and analysts identified the corrective disclosure as "another ding on management's credibility" in light of previous inaccurate statements).

### c. Statements About the 2Q 2015 Same Store Sales Growth

Plaintiffs also argue that two days after the Board Presentation, while on the May 14 conference call with analysts, Defendant Roberts made misleading statements about the Company's 2Q 2015 same store sales growth. Reply at 21. Roberts stated that

> we continue to expect full-year system-wide comparable restaurant sales growth of 3% to 5%. That said, we do not expect our comparable restaurant sales increases to be evenly split among the remaining three quarters of 2015. During the second quarter, we will be lapping a record high average unit volume quarter as a result of two of our most successful promotions, while simultaneously conducting extended tests of alternative proteins. As a result, ***we will expect our second quarter comparable sales to be closer to the low end of the range***.

CTAC ¶ 88 (emphasis in original).

During the May 14 call, Roberts affirmatively misstated the Company's forecast for the rest of 2Q 2015. Roberts predicted at least 3% same store sales growth, despite the fact that just two days before he—and the rest of the board—received the Company's internal forecast predicting only 2.5% growth. May Call

Case No. SACV 15-1343-DOC (KESx)                                    Date: August 4, 2017

at 13; *id.* ¶¶ 70, 89.[2,3] Plaintiffs allege that Roberts knew, at least in large part due to the Board Presentation, that the 2Q 2015 same store sales growth "would not come close to reaching the 3% he publically predicted." *Id.* ¶ 90. The Court finds this statement was misleading.

Roberts's statement was additionally misleading because it appears that Defendants did not have plans to adjust menu prices until the 3Q 2015 re-addition of the $5 Pollo Bowl. *See* Opp'n at 22. This, combined with the fact that Roberts knew that the Company was not on track to meet the 3% goal (much less exceed 3%, which is a possibility suggested by his statement), makes this statement misleading.

The Court also finds this statement material. As evidenced by the repeated questions posed by analysts during the May 14 call, the Company's growth rate was a key factor used to determine the health of the Company. A reasonable shareholder would certainly consider the Company's failure to meet projected growth goals when making deliberations.

For the reasons explained above, the Court finds that Plaintiffs have adequately pled the existence of misleading statements and omissions.

## 2. Whether the CTAC Adequately Pleads Scienter

The PSLRA requires that Plaintiffs' complaint "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This scienter requirement means plaintiffs must plead the defendants engaged in "knowing" or "intentional" misconduct. *South Ferry*, 542 F.3d at 782. Under Ninth Circuit precedent, "reckless" conduct may satisfy the scienter requirement when it is "deliberate" and the facts describing the recklessness are set forth in great detail. *Id. See also In re Silicon Graphics*, 183 F.3d at 977 (holding the recklessness must reflect "some degree of intentional or conscious misconduct" in

---

[2] The parties dispute the correct interpretation of the statistics in Slide 44 of the Board Presentation. *See* Opp'n at 22 n.8, Reply at 15. Given the limited context available to the Court, and the prevalence of insider terminology throughout the Board Presentation, the Court is unable to determine which interpretation is most accurate. However, because the Court finds Plaintiff's reading of the statistics to be plausible, at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation of Slide 44 is correct.

[3] Defendants argue that they disclosed that the estimate for company-owned comparable store sales growth would be "below" 3%. Mot. at 21. The transcript of the May 14 call does not reflect such a disclosure.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                    Date: August 4, 2017

Page 24

order to satisfy the scienter requirement), *abrogated on other grounds by* 542 F.3d 776, 784 (9th Cir. 2008).

      In determining whether there is a "strong inference" of scienter, the court must weigh competing inferences. *Tellabs*, 551 U.S. at 323–24 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."). The inference of scienter must be more than "merely reasonable . . . it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "Omissions and ambiguities count against inferring scienter," but the court must "not scrutinize each allegation in isolation." *Id.* at 326. Instead, the court must view the complaint "holistically." *Id.*; *see also South Ferry*, 542 F.3d at 784 ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter."). Thus, a complaint for securities fraud survives a motion to dismiss when, after considering the totality of the circumstances, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *South Ferry*, 542 F.3d at 784.

      **a.  Whether the Confidential Witness Statements Weigh Toward an Inference of Scienter**

      "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). First, if the statements are introduced to establish scienter—as with the witnesses here—the witnesses must be "described with sufficient particularity to establish their reliability and personal knowledge." *Id.* (citing *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015–16 (9th Cir. 2005)). Second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (citing *Daou*, 411 F.3d at 1022).

      The first prong of this test "analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Id.* The witness' statements may only be relied upon if the witnesses are "described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* (quoting *Daou*, 411 F.3d at 1015).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                                        Date: August 4, 2017

Page 25

As to the second prong, under the PLSRA, the confidential witness' statement must be indicative of at least deliberate recklessness. *See South Ferry*, 542 F.3d at 782 (holding plaintiffs must plead the defendants engaged in "knowing" or "intentional" misconduct, and "reckless" conduct may satisfy the scienter requirement when it is "deliberate" and facts describing the recklessness are set forth in great detail); *see also In re Silicon Graphics*, 183 F.3d at 977 (holding the recklessness must reflect "some degree of intentional or conscious misconduct" in order to satisfy the scienter requirement), *abrogated on other grounds by* 542 F.3d 776, 784 (9th Cir. 2008).

In its March Order, the Court found that, analyzed individually, the three confidential witness statements offered by Plaintiffs did not satisfy the Ninth Circuit's *Daou* test. March Order at 11–16. Specifically, the Court found that Former Employee 1's ("FE1") statements failed *Daou*'s first prong with respect to Operation Dashboard, because the CSAC did not "allege sufficient facts to support the assumption that FE1 had personal knowledge of the contents or capabilities of Operation Dashboard, or what information within Operation Dashboard . . . Defendants . . . had access to." *Id.* at 13. Further, the Court found that "none of the facts alleged by FE1 indicate that Defendants knew specific information that made their May 14 statements false, or that Defendants were in reckless disregard of such information." *Id.* As to Former Employee 2 ("FE2"), the Court found that FE2 satisfied the first prong of the *Daou* test, but failed the second because none of FE2's statements are "themselves indicative of scienter." *Id.* at 14. Finally, as to Former Employee 3 ("FE3"), the Court found that FE3's statements satisfied *Daou*'s first prong, but failed to satisfy the second prong because the "statements [did] not indicate . . . that the information contained in Operation Dashboard revealed that the removal of the $5 combo meal was a significant enough factor in El Pollo Loco's poor performance that Defendants' failure to acknowledge that fact during the May 14 call was at least deliberately reckless." *Id.* at 16.

The Court noted that it was not aware of authority showing that the statements of multiple confidential witnesses may be combined to, together, meet the *Daou* test where the statements of an individual witness would otherwise fail the test. *Id.* at 15 n.2.

Recently, in *In re Quality Systems, Inc. Sec. Litig.*, No. 15-55173, slip op. (Dkt. 42) (9th Cir. July 28, 2017), the Ninth Circuit analyzed a complaint relying, in part, on confidential witnesses. The Circuit found that "'taken collectively,' statements by confidential witnesses establish that members of executive-level management, including individual defendants, has access to and used reports documenting in real time the decline in sales during the Class Period.'" *Id.* at 27. In particular, the Circuit drew together the testimony of four confidential witnesses and found that together, their "'particularized

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                                Date: August 4, 2017

Page 26

allegations that defendants had "actual access to the disputed information," . . . raise a strong inference of scienter.'" *Id.* (quoting *City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (quoting *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014))). Accordingly, the Court will assess whether, together, the confidential informants' statements raise a strong inference of scienter.

In this case, FE1 "confirmed that customer complaints and comments could be directly viewed and listened to through El Pollo Loco's Operation Dashboard." CTAC ¶ 40. FE1 also observed an "Area Leader"—apparently a middle management position in charge of a number of stores—monitoring sales and labor cost information on her mobile phone. *Id.* ¶ 39. FE2's statements confirm that Operation Dashboard also contained "inventory and sales information and customer feedback," which FE2 had personal knowledge of because FE2 entered that information into Operation Dashboard every other day. *Id.* ¶ 41. Finally, FE3 had personal knowledge of the fact that Sather, Roberts, and other senior Company executives participated in weekly meetings that "frequently included discussions of the Company's weekly sales performance, including same store sales." *Id.* ¶ 42. At the same time, FE3 had personal knowledge that Sather was "glued" to Operation Dashboard and reviewed it on his iPad during meetings. *Id.*

Taken collectively, *see Quality Systems*, No. 15-55173, slip op. at 27, statements by these confidential witnesses establish that members of executive-level management—including the individual defendants—had access to and, at least in the case of Sather, used data tracking in real time the decline of sales and transactions. Indeed, the Company itself advertised Operation Dashboard as providing information on "sales performance, speed-of-service metrics, and food and labor cost controls." Jonathan Horne ("Horne Decl.") (Dkt. 53) Ex. 2 at 5 (noting the dashboard provides "restaurant-level operators[] with insight into how we are performing").Thus, the Court finds that the former employees' "particularized allegations that defendants had actual access to the disputed information, . . . raise a strong inference of scienter." *Quality Systems*, No. 15-55173, slip op. at 26 (internal quotation and citation omitted).

### b.  Other Factors Weighing Toward Scienter

Plaintiffs argue that the Individual Defendant's positions within the Company can support inference of scienter. Opp'n at 25. Indeed, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                          Date: August 4, 2017

Page 27

allegations about management's exposure to factual information within the company."
*South Ferry*, 542 F.3d at 785. Here, Plaintiffs have alleged that the Individual Defendants
were "'hands-on' managers," who "overs[aw] El Pollo Loco's operations and finances."
CTAC ¶ 28. The Individual Defendants allegedly were "intimately knowledgeable about
all aspects of El Pollo Loco's financial and business operations, . . received daily reports,
attended weekly executive meetings and had access to computerized information,
including through . . . Operation Dashboard." *Id.* ¶ 29. As described above, the
confidential witness statements establish that members of executive-level management
had access to real-time reports of sales and transactions. The Company itself advertised
Operation Dashboard as providing information on "sales performance" and more. Horne
Decl. Ex. 2 at 5. In addition, Plaintiffs allege the existence of the Board Presentation,
which was presented to the Company's board on May 12.

There are three ways in which "allegations regarding management's role in a
company" can help satisfy the PSLRA's scienter requirement. *South Ferry*, 542 F.3d at
785. Most relevant here, they may read together with other allegations to raise a strong
inference of scienter. *Id.* In addition, they may sometimes independently satisfy the
PSLRA "where they are particular and suggest that defendants had actual access to the
disputed information." *Id.* at 786. The Court finds that the allegations described above,
taken together, go "beyond a mere inference of management knowledge of all core
operations, and [are] sufficient under the PLSRA because they include[] details about the
defendants' access to information within the company." *Id.* at 785.

Plaintiffs further argue that the timing of the Defendants' May 19 stock sales
supports Plaintiffs' allegations of scienter. Opp'n at 25; *see* CTAC ¶¶ 11,12, 24, 26, 36,
91–95.

For allegations of stock sales to serve as a basis for scienter, a plaintiff is required
to allege "'unusual' or 'suspicious' stock sales. The Ninth Circuit has identified three
factors relevant to a determination of suspiciousness: "'(1) the amount and percentage of
shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were
consistent with the insider's prior trading history.'" *Id.* at 435 (quoting *In re Silicon
Graphics*, 183 F.3d at 986).

In its March Order, the Court made the following findings:

> . . . . Individual Defendants Sather and Valle *retained* more shares
> than they sold on May 19, 2015. . . . Thus, the mere fact that more
> shares were sold by each Individual Defendant on May 19, 2015

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 15-1343-DOC (KESx)                                      Date: August 4, 2017

Page 28

> than in November 2014 does not weigh towards scienter. In addition,
> more total shares were collectively sold by Defendants in November
> 2014 than were collectively sold by Defendants on May 19, 2015. . .
> . While this is not dispositive, it weighs against a finding that the
> May 19, 2015 sales were "dramatically out of line with prior trading
> practices." *Ronconi v. Larkin*, 253 F.3d at 435.

March Order at 15 (emphasis in original).

The Court has now found that Plaintiffs have sufficiently pled that Defendants
"actually kn[ew] specific information" that was "at odds with the state of affairs they
presented." *In re Netflix*, 923 F. Supp. 2d at 1223. Without displacing the findings in its
March Order, after a holistic analysis of Plaintiffs' newest allegations, *see Tellabs*, 551
U.S. at 323–24, the Court finds that Plaintiffs have sufficiently alleged facts giving rise to
a strong inference of scienter.

Plaintiffs and Defendants point out that Defendants traded on the first possible day
they could following the alleged false and misleading statements. Opp'n at 26; Mot. at 26
(". . . . the EPL insiders were subject to lock-up agreements and pre-public disclosure
blackout periods prohibiting them from selling their shares from November 19, 2014
through February 17, 2015, and then until May 19[, 2015]."). If there were indeed lock-
up agreements in place, as Defendants insist, the fact that Defendants did not sell stock
between November 2014 and May 19, 2014 cannot weigh toward scienter. However, the
fact that Defendants sold large amount of stock at the first available opportunity after
learning the disputed information through the Board Presentation and, presumably,
through Operation Dashboard, is notable. The alleged lock-up agreements also explain
why Defendants sold "at a time that did not maximize their potential return" but rather
sold after "the tempered projections in the May 14 earnings release and investor call
caused the stock to drop." Mot. at 26–27.

Defendants also argue that the "lapse in time" between the May 19 sales and the
August 13 "corrective disclosure" further negates the inference of scienter. Mot. at 27. It
appears that the August 13 call was a regularly-scheduled quarterly investor call focused,
in this instance, on the Company's 2Q 2015 earnings. *See* August Call. In light of the end
of the alleged lock-up period, and the fact that August 13 was a natural date for any
disclosures related to 2Q 2015's poor performance, the Court finds that the "lapse in
time" does not at all weigh against an inference of scienter.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                   Date: August 4, 2017

Page 29

Defendants sold at the earliest possible moment, while aware of negative information kept from investors, and before the quarterly call during which 2Q 2015's poor performance would have to be revealed and explained. Further, as Plaintiffs point out, Defendants were incentivized to play down and/or conceal negative information on May 14, in light of the fact that they were barred from selling stock until May 19. *See* Opp'n at 27. After considering the totality of the circumstances, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. *See also South Ferry*, 542 F.3d at 784. The Court thus finds that Plaintiffs have met their burden to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

As explained above, the Court finds that Plaintiffs have sufficiently plead facts demonstrating the existence of false and misleading statements, and giving rise to a strong inference of scienter.[4] Accordingly, the Court DENIES Defendants' Motion as to Plaintiffs' § 10(b) and Rule 10b-5 claims.

### B. Section 20(a) and Section 20A Claims

Plaintiffs allege a Section 20(a) claim against the Individual Defendants and Controlling Shareholder Defendants, and a Section 20A claim against CEO Sather, CMO Valle, and the Controlling Shareholder Defendants.

"[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002); *see also Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b).").

Because the Court finds that Plaintiffs have sufficiently alleged a violation of § 10(b) and Rule 10b-5, and Defendants make no other arguments for dismissal of these claims, the Court DENIES Defendants' Motion as to Plaintiffs' § 20(a) and § 20A claims.

### IV.   Disposition

For the reasons explained above, the Court DENIES Defendants' Motion to Dismiss with Prejudice the Consolidated Third Amended Complaint.

---

[4] The Court reiterates that the June 10 statements made by Sather at the William Blair conference cannot support a claim against either Roberts or Valle.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 15-1343-DOC (KESx)                                    Date: August 4, 2017

                                                                        Page 30


        The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                          Initials of Deputy Clerk
CIVIL-GEN